# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| O.A., K.S., A.V., G.Z., D.S., C.A., | Civil Action No. 1:18-cv-02718-RDM |
| *Plaintiffs*, | |
| v. | |
| DONALD J. TRUMP, et al., | |
| *Defendants*. | |

## MOTION FOR TEMPORARY RESTRAINING ORDER
## AND PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65 and Civil Local Rule 65.1, Plaintiffs hereby move the Court to issue a temporary restraining order, to be followed by a preliminary injunction, enjoining implementation or enforcement of the Rule announced in the Federal Register entitled "Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations," 83 Fed. Reg. 55,934 (Nov. 9, 2018), which was issued in connection with President Donald J. Trump's Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States, 83 Fed. Reg. 57,661 (Nov. 9, 2018).

In support of this motion, Plaintiffs rely upon the attached memorandum of points and authorities and accompanying declarations.  A proposed order is attached.  Oral argument is requested.

The Certification of Counsel Pursuant to LCvR 56.1(a) that immediately follows contains a notification regarding the parties' meeting-and-conferring on a proposed briefing schedule for

the motion for a Temporary Restraining Order, with proposals to be submitted to the Court no later

than Friday, November 23.

Dated:  November 21, 2018                    Respectfully submitted,

                                             /s/Thomas G. Hentoff
                                             Thomas G. Hentoff (D.C. Bar No. 438394)
                                             Ana C. Reyes (D.C. Bar No. 477354)
                                             Ellen E. Oberwetter (D.C. Bar No. 480431)
                                             Charles L. McCloud[*]
                                             Matthew D. Heins[*]
                                             WILLIAMS & CONNOLLY LLP
                                             725 Twelfth Street, N.W.
                                             Washington, D.C. 20005
                                             Tel: (202) 434-5000
                                             Fax: (202) 434-5029

                                             Hardy Vieux (D.C. Bar No. 474762)
                                             HUMAN RIGHTS FIRST
                                             805 15th Street, N.W., Suite 900
                                             Washington, D.C. 20005
                                             Tel: (202) 547-5692
                                             Fax: (202) 553-5999

                                             Eleni Rebecca Bakst[*]
                                             Anwen Hughes[*]
                                             HUMAN RIGHTS FIRST
                                             75 Broad Street, 31st Floor
                                             New York, New York 10004
                                             Tel: (212) 845-5200
                                             Fax: (212) 845-5299

                                             Charles George Roth[*]
                                             Keren Hart Zwick[*]
                                             Gianna Borroto[*]
                                             Ruben Loyo[*]
                                             NATIONAL IMMIGRANT JUSTICE CENTER
                                             208 S. LaSalle Street, Suite 1300
                                             Chicago, Illinois 60604

---

[*] Certification to practice pursuant to LCvR 83.2(g) to be submitted.

Tel: (312) 660-1370
Fax: (312) 660-1505

*Attorneys for Plaintiffs*

## CERTIFICATION OF COUNSEL PURSUANT TO LCvR 65.1(a)

Pursuant to LCvR 65.1(a), I hereby certify that on November 21, 2018, in addition to filing

via ECF, I caused true and correct copies of the Plaintiffs' Complaint, Civil Cover Sheet, Motion

for Temporary Restraining Order and Preliminary Injunction, Memorandum of Points and

Authorities in Support of Motion for Temporary Restraining Order and Preliminary Injunction,

and all supporting papers to be (1) delivered by hand, (2) delivered by overnight delivery, and

(3) delivered by registered mail to the Defendants in the above-captioned action, and to the United

States Attorney for the District of Columbia, at the following addresses:

DONALD J. TRUMP
President of the United States
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20500

MATTHEW G. WHITAKER
Acting Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

KIRSTJEN M. NIELSEN
Secretary of the Department of Homeland Security
U.S. Department of Homeland Security
245 Murray Lane, S.W.
Washington, D.C. 20528

LEE FRANCIS CISSNA
Director of United States Citizenship and Immigration Services
U.S. Citizenship and Immigration Services
20 Massachusetts Avenue, N.W.
Washington, D.C. 20529

JOHN LAFFERTY
Asylum Division Chief
U.S. Citizenship and Immigration Services
20 Massachusetts Avenue, N.W.
Washington, D.C. 20529

JESSIE K. LIU
United States Attorney for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530

In addition, I also provided notice to Defendants of the time of the making of Plaintiffs'

TRO and preliminary injunction motion on November 21, 2018 at 12:40 p.m. by leaving a

voicemail message with Erez Reuveni, Assistant Director, U.S. Department of Justice, Civil

Division, Office of Immigration Litigation and by following up with an email to Mr. Reuveni

sent at 1:03 p.m.  At approximately 2:20 p.m. Mr. Reuveni and I spoke and he confirmed receipt

of actual notice that Plaintiffs will be filing today a motion for a Temporary Restraining Order.

I will also send a copy of all these filings to Mr. Reuveni by email today before 4 p.m. and will

also cause copies to be sent to him by hand delivery.

The parties intend to meet and confer on a proposed briefing schedule for the motion for

a Temporary Restraining Order, with proposals to be submitted to the Court no later than Friday,

November 23.

Dated:  November 21, 2018                    Respectfully submitted,


                                             /s/Thomas G. Hentoff
                                             Thomas G. Hentoff (D.C. Bar No. 438394)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| O.A., K.S., A.V., G.Z., D.S., C.A., | Civil Action No. 1:18-cv-02718-RDM |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, et al., | |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

   A.   Proceedings in the Northern District of California ............................................. 2

   B.   Plaintiffs ............................................................................................................ 3

   C.   The November 9, 2018, Proclamation and Interim Final Rule ........................... 6

   D.   The Trump Administration's Previous Efforts to Foreclose Asylum Claims at the Southern Border. ............................................................................................................ 9

   E.   Asylum Trends and Administration Position .................................................... 14

   F.   The New Policies' Effects on Plaintiffs ........................................................... 18

ARGUMENT .................................................................................................................... 18

I.   Plaintiffs Are Likely to Succeed on the Merits ...................................................... 19

   A.   The Rule Violates the Asylum and Expedited Removal Statutes. ..................... 20

      1.   The Rule is inconsistent with the plain text of the INA. ............................... 20

      2.   Canons of statutory construction further support Plaintiffs' interpretation of the INA ............................................................................................................ 25

   B.   The New Regulations Are Not in Accordance with Law Because They Dispense with Required Agency Rulemaking. ............................................................................ 29

   C.   The New DOJ Regulations Are Void Because They Were Issued by an Acting Attorney General Whose Appointment Violates the Attorney General Succession Act and the Appointments Clause of the Constitution. ................................................................. 32

      1.   AAG Whitaker's appointment violates the Attorney General Succession Act. .......... 33

      2.   AAG Whitaker's appointment violates the Appointments Clause of the Constitution. .................................................................................................... 35

   D.   The New Rule Is Contrary to Law Because It Violates the Public Comment Provisions of 5 U.S.C. § 553. ....................................................................................................... 37

      1.   The Rule Does Not Satisfy the "Good Cause" Standard. ............................... 37

      2.   The Good Cause Standard Applies to the Rule. ........................................... 38

II.   Plaintiffs Will Suffer Irreparable Harm Without Relief ......................................... 40

III.   A Temporary Restraining Order Will Not Substantially Harm the Government and Instead Serves the Public Interest. ............................................................................................ 43

CONCLUSION ................................................................................................................. 45

## TABLE OF AUTHORITIES

### CASES

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166 (D.C. Cir. 2003)............................19

*Al Otro Lado v. Kelly*, No. 17-cv-5111 (C.D. Cal).............................................................................42

*Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053 (9th Cir. 2014).....................................43

*Bartolome v. Sessions*, 904 F.3d 803 (9th Cir. 2018) ...............................................................7, 8

*Batterton v. Marshall*, 648 F.2d 694 (D.C. Cir. 1980) ...................................................................37

*Bowsher v. Synar*, 478 U.S. 714 (1986)...........................................................................................36

*Buckley v. Valeo*, 424 U.S. 1 (1976) ...............................................................................................35

*Caldera v. J.S. Alberici Constr. Co.*, 153 F.3d 1381 (Fed. Cir. 1998) ..........................................28

*Cazun v. Att'y Gen.,* 856 F.3d 249 (3d Cir. 2017) ..........................................................................27

*Devitri v. Cronen,* 289 F. Supp. 3d 287 (D. Mass. 2018).............................................................40

*Doe v. Mattis*, 889 F.3d 745 (D.C. Cir. 2018) ................................................................................19

*East Bay Sanctuary Covenant v. Trump*, No. 3:18-cv-6810 (Nov. 15, 2018) ...................... passim

*Garcia v. Sessions*, 856 F.3d 27 (1st Cir. 2017) ............................................................................27

*Hou Ching Chow v. Att'y Gen.*, 362 F. Supp. 1288 (D.D.C. 1973)................................................39

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ..............................................................................26

*Int'l B'hd of Teamsters v. Pena*, 17 F.3d 1478 (D.C. Cir. 1994).....................................................39

*Jean v. Nelson*, 711 F.2d 1455 (11th Cir. 1983) .............................................................................39

*Jones v. United States*, 526 U.S. 227 (1999) ................................................................................34

*Khan v. Holder*, 584 F.3d 773 (9th Cir. 2009)................................................................................27

*Kofa v. INS*, 60 F.3d 1084 (4th Cir. 1995)......................................................................................27

*Marmolejo-Campos v. Holder*, 558 F.3d 903 (9th Cir. 2009) .......................................................28

*Matter of Pula*, 19 I. & N. Dec. 467 (B.I.A. 1987).........................................................................20

*Morgan Stanley DW Inc. v. Rothe,* 150 F. Supp. 2d 67 (D.D.C. 2001).........................................18

*Morrison v. Olson*, 487 U.S. 654 (1988) ...................................................................35

*Morton v. Mancari*, 417 U.S. 535 (1974) ............................................................28, 29

*Mova Pharm Corp. v. Shalala*, 140 F.3d 1060 (D.C. Cir. 1998)..................................19

*Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804)......................25, 26

*Narenji v. Civiletti*, 481 F. Supp. 1132 (D.D.C.), *rev'd on other grounds*, 617 F.2d
    745 (D.C. Cir. 1979) ...........................................................................................39

*Negusie v. Holder*, 555 U.S. 511 (2009)....................................................................26

*NLRB v. SW Gen. Inc.*, 137 S. Ct. 929 (2017) .......................................................35, 36

*Nunez v. Boldin*, 537 F. Supp. 578 (S.D. Tex. 1982).................................................40

*Orantes-Hernandez v. Meese*, 685 F. Supp. 1488 (C.D. Cal. 1988)...........................40

*Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199 (2015).............................................29

*R–S–C v. Sessions*, 869 F.3d 1176 (10th Cir. 2017)...................................................41

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012)................34

*Ramadan v. Chase Manhattan Corp.*, 229 F.3d 194 (3d Cir. 2000)...........................28

*Ramirez-Mejia v. Lynch,* 813 F.3d 240 (5th Cir. 2016)...............................................27

*Robbins v. Bentsen,* 41 F.3d 1195 (7th Cir. 1994)......................................................28

*Tamang v. Holder*, 598 F.3d 1083 (9th Cir. 2010) ...............................................40, 41

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018)..................................................................30

*United States v. Eaton*, 169 U.S. 331 (1898)..............................................................36

*United States v. Germaine*, 99 U.S. 508 (1878).........................................................35

*Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013) ......................................43

*Wanjiru v. Holder*, 705 F.3d 258 (7th Cir. 2013) ......................................................27

*Weiss v. United States*, 510 U.S. 163 (1994) ..............................................................36

*Zhang v. Slattery*, 55 F.3d 732 (2d Cir. 1995), *superseded by statute on other
    grounds by statute, see City of New York v. Permanent Mission of India To
    United Nations*, 618 F.3d 172 (2d Cir. 2010) .......................................................38

iii

## CONSTITUTIONAL PROVISIONS, STATUTES, LEGISLATIVE MATERIALS, AND REGULATIONS

U.S. Const. Article II, § 2, cl. 2 .................................................................................................35

5 U.S.C. § 553.......................................................................................................19, 29, 37, 38

5 U.S.C. § 702...................................................................................................................29

5 U.S.C. § 706 .............................................................................................................. passim

5 U.S.C. § 3345...................................................................................................................34

5 U.S.C. § 3347...................................................................................................................34

8 U.S.C. § 1158 ............................................................................................................ passim

8 U.S.C. § 1182(f)...............................................................................................................30

8 U.S.C. § 1225(b) ...............................................................................................20, 21, 22, 31

8 U.S.C. § 1231.............................................................................................................27, 40

8 U.S.C. § 1232...................................................................................................................23

8 U.S.C. § 1252(a)(2)(A) .........................................................................................................7

8 U.S.C. § 1521...................................................................................................................1

28 U.S.C. § 505...................................................................................................................34

28 U.S.C. § 506...................................................................................................................34

28 U.S.C. § 508.............................................................................................................32, 33, 34, 36

19 U.S.T. 6223...................................................................................................................26

Act to Establish the Dep't of Justice, ch. 150, 16 Stat. 162 (June 22, 1870)................................33

142 Cong. Rec. S11,491 (Sept. 27, 1996).....................................................................................28

H.R. Rep. No. 96-781 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 160.................................21, 22

H.R. Rep. No. 110-941 ...........................................................................................................23

142 Cong. Rec. H11054...........................................................................................................22

S. Exec. Doc. No. 14, 90th Cong., 2d Sess. 4 (1968) ...................................................................22

iv

8 C.F.R. § 208 ....................................................................................................... passim

8 C.F.R. § 274a.12 .........................................................................................................41

8 C.F.R. § 1003.42 ...........................................................................................................8

8 C.F.R. § 1208 .......................................................................................................7, 8, 41

Aliens Subject to a Bar on Entry Under Certain Presidential Proclimations, 83
    Fed. Reg. 55,934 (Nov. 9, 2018) ...................................................................... passim

Convention Relating to the Status of Refugees, 189 U.N.T.S. 137 (July 28, 1951) .......... 21, 23, 26

62 Fed. Reg. 10312 (Mar. 6, 1997) ................................................................................21

83 Fed. Reg. 57,661 (Nov. 9, 2018) .................................................................... passim

Protocol Relating to the Status of Refugees, 606 U.N.T.S. 267 (Jan. 31, 1967) ................ 21, 26

Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 ..................................................26

## OTHER AUTHORITIES

Amnesty International, *USA: 'You Don't Have Any Rights Here': Illegal
    Pushbacks, Arbitrary Detention & Ill-Treatment of Asylum-Seekers in the
    United States* (2018) ...................................................................................... 10, 11

Convention and Protocol Relating to the Status of Refugees, United Nations High
    Commissioner for Refugees (UNHCR) ...................................................................21

Dara Lind, *Exclusive: Trump administration plan would bar people who enter
    illegally from getting asylum*, VOX (June 29, 2018) ...............................................38

Dep't of Homeland Security Office of Inspector General, *Special Review - Initial
    Observations Regarding Family Separation Issues Under the Zero Tolerance
    Policy* (Sept. 27, 2018) .............................................................................. 10, 13

Douglas Massey, *Today's US–Mexico 'Border Crisis' in 6 Charts,* THE
    CONVERSATION (June 27, 2018) ...................................................................14

Emily Green, *"The Truth, It's Even Worse In Honduras." Migrant Caravan
    Faces Misery At Mexican Border*, VICE NEWS (Oct. 21, 2018) ..............................11

Fox News, *Secretary Nielsen Talks Immigration, Relationship with Trump* 03:20
    (May 15, 2018) ....................................................................................................10

Guy S. Goodwin-Gill, *Article 31 of the 1951 Convention Relating to the Status of Refugees: non-penalization, detention, and protection, in* Refugee Protection in International Law 185, (Erika Feller, et al. eds. 2003) .................................................26, 27

Human Rights First, *Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seekers* (May 2017)......................................................................................10, 12, 13

Human Rights First, *Mexico: Still Not Safe for Refugees and Migrants* (Mar. 2018) .......................................................................................................................11

Human Rights First, *Zero-Tolerance Criminal Prosecutions: Punishing Asylum Seekers and Separating Families* (2018) ..............................................................12

The Immigration and Naturalization Service, Guidelines for Children's Asylum Claims (Dec. 10, 1998) ..............................................................................................24

John Wagner, *Trump Says He 'Wouldn't Be Surprised' If Unfounded Conspiracy About George Soros Funding Caravan Is True*, WASH. POST, Nov. 1, 2018 ........................17

Josiah Heyman & Jeremy Slack, *Blockading Asylum Seekers at Ports of Entry at the US–Mexico Border Puts Them at Increased Risk of Exploitation, Violence, and Death*, Ctr. For Migration Studies (June 25, 2018) ...........................................12

Larisa Epatko & Joshua Barajas, *What We Know About the Latest Migrant Caravan Traveling Through Mexico*, PBS NEWS HOUR (Oct. 22, 2018) ...............................16

Lauren Dezenski, *Sessions: Many Unaccompanied Minors Are 'Wolves in Sheep's Clothing'*, POLITICO (Sept. 21, 2017) .........................................................17

Linda Qiu, *Fact Check of the Day: Border Crossings Have Been Declining for Years, Despite Claims of a 'Crisis of Illegal Immigration'*, N.Y. TIMES, June 20, 2018.................................................................................................................16

Maegan Vazquez, *Trump Admits 'There's No Proof' Of His Unknown Middle Easterners Caravan Claim*, CNN (Oct. 23, 2018) .................................................17

Max Bearak, *Even Before Trump, More Mexicans Were Leaving the U.S. Than Arriving*, WASH. POST, Jan. 27, 2017......................................................................14

Maya Averbuch, *Caravan Migrants Leave Mexico City To Press North Toward Tijuana*, WASH. POST, Nov. 10, 2018 ...................................................................16

Nadwa Mossad & Ryan Baugh, *Refugees and Asylees: 2016*, Office of Immigration Statistics, U.S. Dep't of Homeland Security (2016)..........................16

Neal K. Katyal & George T. Conway III, *Trump's Appointment of the Acting Attorney General Is Unconstitutional*, N.Y. TIMES, Nov. 8, 2018 .........................36

Rebecca Hersher, *3 Charts That Show What's Actually Happening Along The Southern Border*, NPR (June 22, 2018) ...................................................................15

*Remarks by President Trump on the Illegal Immigration Crisis and Border Security*, The White House (Nov. 1, 2018) ........................................................17, 18

U.S. Border Patrol, U.S. Customs & Border Protection, *Southwest Border Sectors: Total Illegal Alien Apprehensions By Fiscal Year (Oct. 1st through Sept. 30th)* (Dec. 2017) ........................................................................................15

U.S. Dep't of State, *Mexico Travel Advisory* (Aug. 22, 2018) .......................................11

UNHCR, *Advisory Opinion on the Extraterritorial Application of* Non-Refoulement *Obligations Under the 1951 Convention Relating to the Status of Refugees and Its 1967 Protocol* (Jan. 26, 2007) .......................................................22

UNHCR, *Note on International Protection*, U.N. Doc. A/AC.96/815 (Aug. 31, 1993) ......................................................................................................................22

USCIS Adjudicator's Field Manual, App. 15-2 Non-Adversarial Interview Techniques .............................................................................................................24

USCIS, Procedural Guidance, PM-602-0166 (Nov. 9, 2018) ........................................32

U.S. Citizenship and Immigration Services, *Credible Fear Workload Report Summary* (Apr. 25, 2018) ......................................................................................43

U.S. Customs & Border Protection, *SW Border Migration FY 2018* (2018) ................16

*Video: President Trump Rally In Macon Georgia*, C-SPAN, at 22:32 (Nov. 4, 2018) ...................................................................................................................17

Washington Organization on Latin America, Latin American Working Group Education Fund & Kino Border Initiative, *Situation of Impunity and Violence in Mexico's Northern Border Region* (2017) .................................................12, 13

William A. Kandel, U.S. Congressional Research Service, *Unaccompanied Children:  An Overview* (R43599; Jan. 18, 2017) ................................................24

## INTRODUCTION

For decades, the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1158, has protected the right of individuals fleeing persecution in their home countries to seek asylum in the United States.  As Congress has highlighted, "[I]t is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands, including . . . admission to this country of refugees of special humanitarian concern to the United States, and transitional assistance to refugees in the United States."  Refugee Act of 1980, 94 Stat. 102, 8 U.S.C. § 1521 note (2012).  Plaintiffs have traveled thousands of miles under extreme hardship in search of protection under this longstanding statutory framework.  Their journey is motivated by a simple, foundational idea:  that here, in the United States, they and their families may seek refuge, and that the American legal system guarantees them a forum for their claims to be heard.

President Donald J. Trump openly and illegally abrogated this historic policy when, on November 9, 2018, he issued a Presidential Proclamation (the "Proclamation") that deemed individuals who cross the U.S.–Mexico border without inspection at a port of entry categorically ineligible for asylum.[1]  In the Administration's view, those seeking to avail themselves of the asylum system are not vulnerable individuals asking for humanitarian protection, but "invad[ers]" who are "abusing" the United States' immigration system.  Rather than evaluate who has a meritorious claim of asylum, the Administration's "solution" to this concocted problem is to bar a vast swath of asylum seekers from even making their case and simultaneously to heighten the standard for them to seek other forms of relief.

---

[1] President Donald J. Trump, *Addressing Mass Migration Through the Southern Border of the United States*, Proclamation No. 9822, 83 Fed. Reg. 57,661 (Nov. 9, 2018).

The Department of Homeland Security and Department of Justice facilitated the Proclamation by issuing an interim final rule (the "Rule")[2] that violates both the INA and the Administrative Procedure Act in multiple respects. Together, the Proclamation and Rule constitute an attempt by the President unilaterally to subvert a statutory scheme that Congress established to effectuate the United States' international treaty obligations. As outlined below, Plaintiffs are bona fide asylum seekers who are likely to succeed on the merits of their claims. Any delay in providing Plaintiffs' requested relief would prolong their already harrowing journey and potentially foreclose all access to protection in the United States, thus causing Plaintiffs irreparable harm. Plaintiffs respectfully request that the Court enter a temporary restraining order, to be followed by a preliminary injunction, enjoining the new Rule, implemented following President Trump's Proclamation, from going into effect.

## BACKGROUND

### A.      Proceedings in the Northern District of California

Plaintiffs note at the outset that on the evening of November 19, 2018, a federal district court in the Northern District of California entered a nationwide temporary restraining order to enjoin Defendants from taking any action to implement the Rule. *See* Order, *E. Bay Sanctuary Covenant v. Trump*, No. 3:18-cv-6810, dkt. 43 (Nov. 19, 2018). That court also scheduled a hearing for December 19, 2018, at which time that court will consider whether to issue a preliminary injunction with respect to the Rule. Because the court in *East Bay Sanctuary Covenant* issued a restraining order that temporarily protects Plaintiffs, it may not be necessary for the Court to schedule a hearing with respect to this Motion as quickly as it otherwise would. Plaintiffs

---

[2] Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations, 83 Fed. Reg. 55,934 (Nov. 9, 2018).

anticipate, however, that the Government may seek to appeal or otherwise challenge the order

entered in that case, and that a TRO hearing in this matter thus still should occur expeditiously.

### B.    Plaintiffs

Plaintiffs are men, women, and minors fleeing persecution abroad.

#### 1.    Plaintiff O.A.

Plaintiff O.A. is a 23-year-old man from Honduras, Ex. A (O.A. Decl.), ¶ 1, who the

government contends is subject to the Proclamation.  O.A. fled Honduras with his 4-year-old

daughter because a gang called Mara-18 (M-18) threatened to kill him and his family.  They did

so because M-18 had killed O.A.'s brother, and they then targeted O.A. and his family when O.A.

cooperated with the police to help them investigate his brother's death.  *Id.* ¶ 14.  Those threats

began with menacing phone calls, *id.* ¶¶ 11–14, but culminated with M-18 burning down his house,

and O.A. and his family barely escaped with their lives, *id.* ¶ 15.  O.A. attempted to elude M-18

for a time, but they were able to track him down and threatened to kill him, his daughter, and his

parents.  *Id.* ¶ 18.  O.A. knew that the police in Honduras would not be willing or able to help him,

*id.*, and he decided to flee Honduras with his daughter.  *Id.* ¶ 19.

O.A. entered the United States other than at a port of entry, and subsequently identified

himself, along with his daughter, K.S., to an immigration officer when the officer approached him.

At that point O.A. and his daughter, K.S., were apprehended.  *Id.* ¶¶ 22–23.  O.A. did not know

the rules relating to ports of entry, and he and his daughter are currently detained.  *Id.* ¶¶ 22, 24.

#### 2.    Plaintiff K.S.

Plaintiff K.S. is a 4-year-old girl from Honduras.  *Id.* ¶ 2.  O.A. is her father, and she entered

the United States with him when he entered the United States after fleeing Honduras.  K.S.'s life

was at risk in Honduras because her father cooperated with police to investigate the death of his

brother, and she accompanied him when he fled persecution in Honduras to seek asylum in the United States. *Id.* ¶¶ 12–13, 17, 19, 22.

### 3.  Plaintiff A.V.

Plaintiff A.V. is a 27-year-old woman from Honduras who crossed the border from Mexico into the United States other than at a port of entry on November 11, 2018, Ex. B (A.V. Decl.), ¶ 18, and so is subject to the Proclamation.  She fled Honduras because for the past eight years she has been the subject of severe physical assaults by her partner, who is the father of her two children. *Id.* ¶¶ 2–3.  On certain occasions, her partner has thrown her to the ground and beaten her with a machete.  *Id.* ¶ 3.  A.V. believes that her partner is a gang member, *id.* ¶ 10, and that he is responsible for murdering her father after her father tried to protect her, *id.* ¶ 5.  Given the power of gangs in Honduras and the lack of government interest in protecting victims of domestic violence, A.V. has nowhere to turn in Honduras.  *Id.* ¶¶ 14, 19–20.  She believes that her husband expects her to find work in the United States and to begin sending money to him for the children's care, and she fears that if she does not, he will kill her or harm her children, who A.V. has left in the care of her mother.  *Id.* ¶¶ 7, 9, 13.  To come to the United States, A.V. exhausted her life's savings, totaling $82, and made the dangerous and difficult journey across Mexico over the past six weeks.  *Id.* ¶¶ 16–17.  She traveled by foot and train and sometimes went days without food. *Id.* ¶ 17.  A.V. did not understand the significance of crossing at a port of entry and did not know that doing so was a possibility.  *Id.* ¶ 18.

### 4.  Plaintiff G.Z.

Plaintiff G.Z. is a 17-year-old unaccompanied minor from Honduras who crossed the border from Mexico into the United States other than at a port of entry. Ex. C (G.Z. Decl.), ¶ 17. The Government has charged him with crossing the border in contravention of the Proclamation

on November 10, 2018.  G.Z. subsequently turned himself in to border control authorities on the United States side of the border.  *Id.* ¶ 17.  G.Z. left Honduras and made the dangerous journey across Mexico to reach the United States to escape the threats of violence he faced in Honduras. In particular, G.Z. was the victim of recurring violence at the hands of his father, who is a police officer.  *Id.* ¶¶ 1–4.  G.Z.'s father has beaten him since he was a small child, sometimes multiple times a week.  *Id.*  G.Z. has no ability to seek protection from the police, because his father is one of them.  In the weeks preceding his departure from Honduras, MS 13 gang members also began efforts to recruit G.Z.  *Id.* ¶¶ 5–6.  G.Z. believes gang participation is morally wrong and declined to join MS 13 as they increased their threats against him.  These threats included the threat of death; they pointed guns at him and one of them hit him in the chest with the butt of a gun.  *Id.* ¶¶ 8–9.  G.Z. knew that he had to leave Honduras, or he would be killed.  *Id.* ¶¶ 11–12.  G.Z. is presently being detained in a shelter for unaccompanied minors who are awaiting asylum and removal proceedings.  *Id.* ¶ 17.

### 5.  Plaintiff D.S.

Plaintiff D.S. is an asylum seeker from Honduras, and her minor son, C.A., is also a Plaintiff.  D.S. fled Honduras because of severe domestic abuse by her partner, who is a security guard.  Ex. D (Decl. of D.S.), ¶¶ 2–4.  She tried to report the violence, which at points required hospitalization, but the government did nothing in response to her complaint and did not pursue her partner when he failed to appear in judicial proceedings.  *Id.* at ¶¶ 4–5.  D.S. also tried to relocate internally within Honduras but her partner tracked her down and threatened to kill her. *Id.* ¶¶ 5, 7.  D.S. made the difficult journey across Mexico with her son, C.A., over the course of two weeks, during which time she exhausted all of her financial resources.  *Id.* ¶ 10.  D.S., with

her son, C.A., entered the United States other than at a port of entry on November 13, 2018, and they were apprehended by immigration officials on the U.S. side of the border.  *Id.* ¶ 13.

### 4.  Plaintiff C.A.

Plaintiff C.A. is a 16-year-old asylum seeker from Honduras, whose mother is Plaintiff D.S.  *Id.* ¶ 1.  Plaintiff C.A. was regularly beaten by his father in Honduras before he accompanied his mother, D.S., on her journey to the United States.  He entered the United States with her other than at a port of entry on November 13, 2018, and they were apprehended by immigration officials on the U.S. side of the border.  *Id.* ¶ 13.

\*       \*       \*       \*       \*

As set forth below, through the Proclamation entered on November 9, 2018, and the Rule published on that same date, Defendants have sought to foreclose each of these Plaintiffs from exercising the right to seek asylum provided by 8 U.S.C. § 1158(a)(1).

### C.      The November 9, 2018, Proclamation and Interim Final Rule

The Proclamation and related Rule reflect a continuing policy by the Administration of thwarting access to U.S. asylum laws, without regard for whether affected individuals are the very noncitizens that Congress designed those laws to protect.  The Proclamation provides that entry of "any alien" into the United States across the international boundary between the United States and Mexico is "suspended and limited" for a period of 90 days, Proclamation, 83 Fed. Reg. at 57,663 § 1, at which point the President will decide whether to extend the suspension period.  *Id.* § 2(d). The suspension applies to all noncitizens who enter the United States after the date of the Proclamation unless they enter at "a port of entry."  *Id.* §§ 2(a), (b).

In advance of the Proclamation's issuance, the Department of Justice and Department of Homeland Security released on November 8, 2018, a proposed interim final rule which then was

published in the Federal Register on November 9, 2018. *See* Rule, 83 Fed. Reg. 55,934. The Rule

makes four changes. First, it provides that noncitizens who apply for asylum after November 9,

2018 will be ineligible for asylum if they are "subject to a presidential proclamation or other

presidential order suspending or limiting the entry of noncitizens along the southern border with

Mexico that is issued pursuant to subsection 212(f) or 215(a)(1) of the Act on or after November 9,

2018," and have entered the United States contrary to the terms of that proclamation or order. *Id.*

at 55,952 (to be codified at 8 C.F.R. §§ 208.13(c)(3), 1208.13(c)(3)).

Second, the Rule changes the way asylum interacts with the expedited removal process,

providing that noncitizens who are ineligible for asylum pursuant to the Rule will not be permitted

to make a showing of "credible fear" of persecution, as noncitizens seeking asylum were permitted

to do before November 9. *See id.* (to be codified at 8 C.F.R. § 208.30). This negative credible-

fear finding is not subject to judicial review. *See* 8 U.S.C. § 1252(a)(2)(A). Instead, the

individual's asylum application is, from a merits standpoint, summarily denied, because the

asylum officer is directed to "enter a negative credible fear determination with respect to the alien's

application for asylum." Rule, 83 Fed. Reg. at 55,952 (to be codified at 8 C.F.R. § 208.30(e)(5)).

Third, the Rule narrows available immigration remedies and increases the burden of proof

for those seeking relief from expedited removal. As to protection-based remedies, asylum is off

the table, but withholding of removal and protection under the Convention Against Torture

("CAT")—which are harder to prove, come with fewer benefits, and do not allow for family

reunification—remain. Under the Rule, after a noncitizen's credible fear interview results in a

summary denial, the noncitizen's claim for withholding of removal or deferral of removal under

the Convention Against Torture will be considered, "if the alien establishes *a reasonable fear* of

persecution or torture." *Id.* (emphasis added). The reasonable fear standard is a higher standard

than the credible fear standard provided for by the INA.  *Compare Bartolome v. Sessions*, 904 F.3d 803, 808–09 & n.4 (9th Cir. 2018) (reasonable fear standard), *with* 8 C.F.R. § 208.30(e)(2) (credible fear standard).  Thus, an individual who would have been permitted to develop her claim fully under the credible fear standard, would be prevented from obtaining any relief if she did not meet the higher reasonable fear standard.

Fourth, the Rule instructs an immigration judge as to the review of expedited removal orders following a negative credible or reasonable fear assessment.  It provides that an immigration judge is to review de novo the determination that the applicant falls within the scope of a Presidential proclamation. Rule, 83 Fed. Reg. at 55,952 (to be codified at 8 C.F.R. § 1003.42).  If the judge determines that the noncitizen is not subject to a proclamation, then the asylum officer's finding will be vacated and DHS may commence traditional removal proceedings under section 240 of the INA, in which asylum would be available.  If the judge agrees that the noncitizen is subject to a proclamation, the judge will then review the asylum officer's determination that the noncitizen lacks a reasonable fear of persecution pursuant to the procedures set forth in 8 C.F.R. § 1208.30(g)(2).[3]  In short, the new Rule, deferring to the content of unspecified Presidential proclamations, purports to bar asylum for a person who enters the United States along the southern border other than at a port of entry, regardless of the merits of such a claim.

---

[3] On the subject of immigration judge review, the new DHS amended regulations in 8 C.F.R. § 208.30(e)(5) cross-reference the Department of Justice procedures in 8 C.F.R. § 1208(g).  *See* Rule, 83 Fed. Reg. at 55,952 (to be codified at 8 C.F.R. § 208.30).

**D.** **The Trump Administration's Previous Efforts to Foreclose Asylum Claims at the Southern Border.**

The present Rule and Proclamation mark a continuation of the Administration's efforts to close the southern border to asylum seekers. The President has made no secret of his disdain for the Nation's duly-enacted immigration laws, and its asylum laws in particular:

- On June 21, 2018, the President tweeted, "We shouldn't be hiring judges by the thousands, as our ridiculous immigration laws demand, we should be changing our laws, building the Wall, hire Border Agents and Ice and not let people come into our country based on the legal phrase they are told to say as their password."

- On June 24, 2018, President Trump tweeted, "[When somebody comes in, we must immediately, with no Judges or Court Cases, bring them back from where they came. Our system is a mockery to good immigration policy and Law and Order."

- On June 30, 2018, President Trump tweeted, "When people come into our Country illegally, we must IMMEDIATELY escort them back out without going through years of legal maneuvering."

- On July 5, 2018, President Trump tweeted, "When people, with or without children, enter our Country, they must be told to leave without our Country being forced to endure a long and costly trial. Tell the people, 'OUT,' and they must leave, just as they would if they were standing in your front lawn."

- On October 29, 2018, the President tweeted, "Many Gang Members and some very bad people are mixed into the Caravan heading to our Southern Border. Please go back, you will not be admitted into the United States unless you go through the legal process. This is an invasion of our Country and our Military is waiting for you!"

- Former Attorney General Jefferson B. Sessions III, whose name appears at the bottom of the new regulations, espoused the theory that asylum claims are the product of "dirty immigration lawyers" who encourage migrants to make false claims.

- On November 1, 2018, in remarks that were part of the lead-up to the Proclamation, President Trump again referred to migrants from Central America as "an 'invasion,'" and accused those individuals of using "fraudulent or meritless asylum claims to gain entry into our great country."

- President Trump attacked the content of the asylum laws passed by Congress: "Think of it. Somebody walks into our country, reads a statement given by a lawyer, and we have a three-and-a-half-year court case for one person." The President called the laws that Congress has passed "incompetent, very, very stupid laws," and said that the immigration laws are "not archaic; they're incompetent. It's not that they're old; they're just bad."

The Administration has implemented these views in part by slowing to a crawl the pace of inspection for asylum seekers who present themselves at authorized ports of entry. Using a policy of "metering" asylum claims, U.S. Customs & Border Protection ("CBP") bars and delays asylum seekers' entry, without referring them for the statutorily required protection screening or immigration court proceedings.[4]

The existence of the "metering" policy was confirmed by Department of Homeland Security Secretary Kirstjen Nielsen, who stated in a May 2018 interview, "We are 'metering,' which means that if we don't have the resources to let them in on a particular day, they are going to have to come back."[5] As most recently implemented, the "metering" process involves CBP officers standing at the international border in the middle of the bridges to the ports of entry. When an asylum seeker approaches the line, officers tell such individuals that they may be permitted "to enter once there is sufficient space and resources to process them."[6] During this wait time, asylum

---

[4] *See generally* Human Rights First, *Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seekers* (May 2017) [hereinafter *Crossing the Line*] <https://tinyurl.com/y8rxsfmn>.

[5] Fox News, *Secretary Nielsen Talks Immigration, Relationship with Trump* 03:20 (May 15, 2018) <https://tinyurl.com/y8buwakc>.

[6] Dep't of Homeland Security Office of Inspector General, *Special Review - Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy* [hereinafter OIG Report], at 6 (Sept. 27, 2018) <https://tinyurl.com/y9rkz2ye>. The government's claims regarding its limited capacity to process asylum applications are similarly unfounded. Senior CBP and Immigration and Customs Enforcement (ICE) officials at the San Ysidro port of entry stated in interviews "that CBP has only actually reached its detention capacity a couple of times per year and during 'a very short period' in 2017." Amnesty International, *USA: 'You Don't Have Any*

seekers wait as long as six weeks in upwards of 100-degree weather, sitting on cement walkways on bridges without steady access to restrooms, food, or water.[7]  Ex. E (Expert Decl.), ¶ 8.  As a consequence, migrants who arrive at ports of entry on the southern border and seek to enter with claims of asylum are rebuffed and left in limbo on the dangerous Mexican side of the border.

Staying in Mexico is hardly a viable alternative.  On several occasions asylum seekers have been informed by border patrol that they must wait on the Mexican side of the border, only to find that their lives are just as imperiled there as they were at home.  *Id.* ¶¶ 10–14.  The year 2017 was listed as "the deadliest year in Mexico," with 29,168 homicide victims, a 27-percent increase from 2016.[8]  In January 2018, the U.S. State Department issued a Level Four, "Do not travel" warning— the highest-level travel warning—for the state of Tamaulipas, which incorporates Reynosa, Matamoros, and Nuevo Laredo, three major port of entry sites.[9]  Many of the other border states, such as Chihuahua, Coahuila, Nuevo León, and Sonora, are listed at Level Three, "Reconsider travel," due to high levels of "[v]iolent crime and gang activity."[10]

---

*Rights Here':  Illegal Pushbacks, Arbitrary Detention & Ill-Treatment of Asylum-Seekers in the United States*, at 15 (2018) <https://tinyurl.com/y8k4q54o>.  The September 2018 DHS OIG Report similarly stated that "the OIG team did not observe severe overcrowding at the ports of entry it visited."

[7] *See* Emily Green, *"The Truth, It's Even Worse In Honduras."  Migrant Caravan Faces Misery At Mexican Border*, VICE NEWS (Oct. 21, 2018) < https://tinyurl.com/yc7n6xqh>.

[8] Human Rights First, *Mexico: Still Not Safe for Refugees and Migrants* [hereinafter *Still Not Safe*], at 1 (Mar. 2018) <https://tinyurl.com/y8b6flak>.

[9] *See* U.S. Dep't of State, *Mexico Travel Advisory* (Aug. 22, 2018) <https://tinyurl.com/ycpn4cxr> ("Violent crime, such as murder, armed robbery, carjacking, kidnapping, extortion, and sexual assault, is common. Gang activity, including gun battles, is widespread. . . .  Local law enforcement has limited capability to respond to violence in many parts of the state.").

[10] *Id.*

Migrants and refugees like Plaintiffs are particularly likely to be victims of violence at the border, including kidnapping, disappearances, sexual assault, trafficking, and other harms in Mexico's northern border region.  Ex. E ¶¶ 10, 12–13.  They are targeted not only due to their inherent vulnerabilities as refugees and migrants, but also due to their nationality, race, gender, sexual orientation, and gender identity.  Further, "evidence of mass graves and disappearances in Mexico suggest disproportionate killing of non-Mexican migrants."[11]  Migrants also are frequent targets of the Mexican cartels, which prey on migrants directly outside some ports of entry.[12] Attorneys and employees of migrant shelters in Reynosa, Mexico, report that "most—if not all— migrants they encounter who had been turned away from the port of entry have been kidnapped and held for ransom."[13]

Examples of the violence facing migrants while they wait for refugee-protection screening abound:

- In May 2018, shortly after a "caravan" arrived at the U.S.–Mexico border, the Caritas shelter in Tijuana, Mexico, was broken into and set on fire, likely for housing a group of transgender women asylum seekers who had previously been turned away several times by CBP.[14]

- In December 2016, Celinda Aracely Rodriguez, a badly injured Guatemalan asylum seeker, was turned away by CBP from accessing asylum at the port of

---

[11] Josiah Heyman & Jeremy Slack, *Blockading Asylum Seekers at Ports of Entry at the US–Mexico Border Puts Them at Increased Risk of Exploitation, Violence, and Death*, Ctr. for Migration Studies (June 25, 2018) <https://tinyurl.com/yc5tgec3>.

[12] *Crossing the Line*, *supra* note 4, at 16.

[13] *Id.*; *see also* Washington Organization on Latin America, Latin American Working Group Education Fund & Kino Border Initiative, *Situation of Impunity and Violence in Mexico's Northern Border Region* [hereinafter *Situation of Impunity*] (2017) <https://tinyurl.com/y947f7vz>; *Still Not Safe*, *supra* note 8.

[14] Human Rights First, *Zero-Tolerance Criminal Prosecutions: Punishing Asylum Seekers and Separating Families*, at 9 (2018) <https://tinyurl.com/y989lxvd>.

entry.  She was subsequently kidnapped by smugglers in Reynosa, Mexico, only steps from the international bridge.[15]

- In January 2017, a Honduran family of asylum seekers was kidnapped by smugglers and forced to pay a ransom in exchange for their release. They were previously turned away by CBP at the Hidalgo port of entry twice.[16]

- In December 2016, an asylum-seeking woman and her young child were turned away by CBP agents three times.  After the third turnback, she was raped in front of her child.  She eventually managed to cross into the United States and the two were detained at one of the family detention centers.[17]

As a result of these dangers and the finite resources of most asylum seekers, the Administration's policy of "metering" has created strong incentives for legitimate asylum seekers to cross the border other than at authorized ports of entry.  The Department of Homeland Security's Office of Inspector General ("OIG") discussed this reality in its September 27, 2018, Special Review of the Administration's "zero-tolerance" and family separation policies.[18]  In that report, the OIG "saw evidence that limiting the volume of asylum seekers entering at ports of entry leads some aliens who would otherwise seek legal entry into the United States to cross the border illegally.  According to one Border Patrol supervisor, the Border Patrol sees an increase in illegal entries when aliens are metered at ports of entry."[19]  The OIG Report further observed that "[t]he fact that both aliens and the Border Patrol reported that metering leads to increased illegal border crossings strongly suggests a relationship between the two."[20]

---

[15] *Situation of Impunity*, *supra* note 13, at 5.

[16] *Crossing the Line*, *supra* note 4, at 15.

[17] *Id.* at 18.

[18] OIG Report, *supra* note 6.

[19] *Id.* at 7.

[20] *Id.* at n.15.

The Rule and Proclamation are—explicitly and by design—efforts to foreclose the option of asylum to those whose desperate and often dangerous circumstances at the border lead them to cross illegally.  And while President Trump said in the written statement preceding the text of the Proclamation that he is "directing the Secretary of Homeland Security to commit additional resources to support our ports of entry at the southern border to assist in processing those aliens . . . as efficiently as possible," Proclamation, 83 Fed. Reg. at 57,663, he has offered no explanation about those purported resources, nor has he ordered DHS to reverse its "metering" policy.

### E.     Asylum Trends and Administration Position

Contrary to the impression the Rule seeks to create, the available data show that migration across the U.S.–Mexico border has remained significantly lower in recent years than it was during the first decade of this century.[21]

---

[21] Douglas Massey, *Today's US–Mexico 'Border Crisis' in 6 Charts*, THE CONVERSATION (June 27, 2018) <https://tinyurl.com/ycn4czpl>; *see also* Max Bearak, *Even Before Trump, More Mexicans Were Leaving the U.S. Than Arriving*, WASH. POST, Jan. 27, 2017 <https://tinyurl.com/ybbrr348>.

In 2017, the number of people apprehended by border officials after crossing irregularly was the lowest it has been in 46 years.[22]  The chart below demonstrates how border apprehensions have declined precipitously since 2000, based on data from CBP.[23]



According to CBP, in fiscal year 2017, there were 60,000 fewer apprehensions of undocumented noncitizens from Mexico and more than 40,000 fewer apprehensions of undocumented noncitizens from outside of Mexico than in fiscal year 2016.[24]  In 2018, the number of people without legal

---

[22] U.S. Border Patrol, U.S. Customs & Border Protection, *Southwest Border Sectors:  Total Illegal Alien Apprehensions By Fiscal Year (Oct. 1st through Sept. 30th)* [hereinafter *Total Apprehensions*] (Dec. 2017) <https://tinyurl.com/ybg3vkld>.

[23] Rebecca Hersher, *3 Charts That Show What's Actually Happening Along The Southern Border*, NPR (June 22, 2018) <https://tinyurl.com/y8o7m7d2>.

[24] *Total Apprehensions*, *supra* note 22.

status who have been apprehended attempting to enter the United States from Mexico has been roughly the same as it was for the last five years.[25]

And the "caravan" that was the obsession of some news outlets and President Trump in the lead-up to the midterm elections also has diminished.  Recent reports put it at approximately one-third of the 14,000 that was breathlessly reported over the past month.[26]  Migrants fleeing Central America have traveled in large numbers often referred to as caravans for years.  Historically, "caravans" tend to dissipate to a small fraction of their starting size by the time they reach the U.S. border, and reports indicate the same is happening to this one.[27]

While the President has taken the position that only a "fraction" of asylum applicants who crossed the U.S. border have valid claims for asylum,[28] many asylum seekers are indisputably found to have valid claims for asylum.  For example, in fiscal year 2016, 2,157 people from El Salvador, 1,505 from Honduras, and 1,949 from Guatemala were found by U.S. asylum officers and immigration judges to be eligible for asylum.[29]

---

[25] *See* Linda Qiu, *Fact Check of the Day:  Border Crossings Have Been Declining for Years, Despite Claims of a 'Crisis of Illegal Immigration'*, N.Y. TIMES, June 20, 2018 <https://tinyurl.com/y7dhmlt6>; U.S. Customs & Border Protection, *SW Border Migration FY 2018* (2018) <https://tinyurl.com/ycorhe4p>.

[26] Maya Averbuch, *Caravan Migrants Leave Mexico City To Press North Toward Tijuana,* WASH. POST, Nov. 10, 2018 <https://tinyurl.com/y9bmuwkv>.

[27] *See, e.g.*, Larisa Epatko & Joshua Barajas, *What We Know About the Latest Migrant Caravan Traveling Through Mexico*, PBS NEWS HOUR (Oct. 22, 2018) <https://tinyurl.com/y92thaox> (reporting that the April 2018 caravan shrank from more than 1,000 to less than 200).

[28] *See* Proclamation, 83 Fed. Reg. at 57,661.

[29] *See* Nadwa Mossad & Ryan Baugh, *Refugees and Asylees:  2016*, at 8, Office of Immigration Statistics, U.S. Dep't of Homeland Security (2016) <https://tinyurl.com/ybkvggdg> (Table 6).

Given the absence of dramatic precipitating events at the border, the President's proffered justifications for the Proclamation and Rule are instead consistent with an established pattern of making policy and statements based on conspiracy theories and unsubstantiated threats, which lurk beneath the surface of articulated cherry-picked facts.  For example:

- President Trump has effectively conceded that he has no evidence that people from the Middle East are "mixed in" with the migrants currently traveling to Tijuana, as he initially asserted, stating, when questioned about it on October 23, 2018, that "there's *no proof of anything*,"[30] with respect to the composition of the group.

- President Trump has entertained as recently as October 31, 2018, the suggestion that the caravan of Northern Triangle migrants may have been sponsored by George Soros.[31]  ("I don't know who [is funding the caravan], but I wouldn't be surprised.  A lot of people say yes."); *see also* Nov. 1, 2018, Press Conference ("There's a lot of professionalism taking place, and there seems to be a lot of money passing.  And then, all of a sudden, out of the blue, these big caravans are formed and they start marching up.");[32] Nov. 4, 2018, Georgia Campaign Rally Remarks ("Ask yourself, how do you think that [the caravan] formed?").[33]

- In September 2017, former Attorney General Sessions asserted that many unaccompanied minors seeking to enter the United States across the southern border are "gang members who come to this country as 'wolves in sheep's clothing.'"[34]

---

[30] Maegan Vazquez, *Trump Admits 'There's No Proof' Of His Unknown Middle Easterners Caravan Claim*, CNN (Oct. 23, 2018) <https://tinyurl.com/yc3hkqdw> (emphasis added).

[31] John Wagner, *Trump Says He 'Wouldn't Be Surprised' If Unfounded Conspiracy About George Soros Funding Caravan Is True*, WASH. POST, Nov. 1, 2018 <https://tinyurl.com/yauu4yoo>.

[32] *Remarks by President Trump on the Illegal Immigration Crisis and Border Security* [hereinafter "Nov. 1 Remarks"], The White House (Nov. 1, 2018) <https://tinyurl.com/y9x88wfj>.

[33] *Video:  President Trump Rally In Macon Georgia*, C-SPAN, at 22:32 (Nov. 4, 2018) <https://tinyurl.com/y8tf576l>.

[34] Lauren Dezenski, *Sessions:  Many Unaccompanied Minors Are 'Wolves in Sheep's Clothing'*, POLITICO (Sept. 21, 2017) <https://tinyurl.com/y7x3lk44>.

The President and his Administration have a history of making unsubstantiated assertions about migrants at the southern border while expressing overt hostility toward Latinos and immigrants from Central America specifically.   President Trump has described immigrants arriving at the southern border as part of an "invasion" that desperately needs to be stopped.[35]

### F.    The New Policies' Effects on Plaintiffs

The Plaintiffs in this case are not invaders.  They are asylum seekers who are asking for the protection of the United States.  The November 9 Proclamation and new Rule strip them of the ability to make their cases and seek asylum in the United States, and subject them to an imminent threat of summary removal to their home countries.  Even if they ultimately prevail in receiving withholding of removal—the lesser protection that remains available—the Rule's damage will be done.  Plaintiffs will not be permitted to work lawfully in the United States while their applications are pending, they will not be able to reunite with their children, and they will not have a path to citizenship.

## ARGUMENT

The Court should issue a temporary restraining order enjoining implementation of the Rule. The issuance of a temporary restraining order, like the issuance of a preliminary injunction, depends on the consideration of four factors taken together:  whether "(1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will not substantially injure the other party; and (4) the public interest will be furthered by an injunction."  *Morgan Stanley DW Inc. v. Rothe,* 150 F. Supp.

---

[35] Nov. 1 Remarks, *supra* n.32.

2d 67, 72 (D.D.C. 2001) (quoting *Mova Pharm Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998)); *see also Doe v. Mattis*, 889 F.3d 745, 751 (D.C. Cir. 2018).

## I.      Plaintiffs Are Likely to Succeed on the Merits

Plaintiffs are likely to succeed on the merits of each of their claims in the Complaint and, indeed, the district court in *East Bay Sanctuary Covenant v. Trump* already has concluded that the plaintiffs there are likely to prevail on the merits of their claims that the Rule is contrary to law. *See* Order, *E. Bay Sanctuary Covenant v. Trump*, No. 3:18-cv-6810, dkt. 43 (Nov. 19, 2018), at 23, 29.  As set forth below, the new Rule violates the Administrative Procedure Act ("APA") in multiple ways.  The APA sets forth strict requirements that agencies must meet before they may implement new rules, 5 U.S.C. § 553(b), and forbids agencies from implementing rules that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A).  Defendants fail these tests.  The new Rule is not in accordance with the language of the statute that it purports to implement; it is not validly promulgated due to the absence of a properly appointed Attorney General; and there is no "good cause" for its having been issued without ordinary notice-and-comment rulemaking.

The Rule is also *ultra vires* for the same reasons set forth in subsections (A), (B), and (C), below, because the Rule has been promulgated outside of the authority delegated to the Departments of Justice and Homeland Security by statute.  *See, e.g.*, *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1172, 1175 (D.C. Cir. 2003) (postal service regulations found *ultra vires* where they were inconsistent with and "pervert[ed] the meaning of the statute").

19

## A.      The Rule Violates the Asylum and Expedited Removal Statutes.

### 1.      The Rule is inconsistent with the plain text of the INA.

The Administration's Rule preventing individuals who enter the United States without inspection from seeking asylum is directly at odds with the plain language of the INA.

***8 U.S.C. § 1158(a)(1).*** Section 1158(a)(1) is unambiguous: "Any alien who is physically present in the United States or who arrives in the United States (*whether or not at a designated port of arrival . . .* ), *irrespective of such alien's status*, may apply for asylum in accordance with this section or, where applicable, [8 U.S.C. § 1225(b)]." 8 U.S.C. § 1158(a)(1) (emphasis added). In light of this unmistakable language, the Board of Immigration Appeals has held that although "an alien's manner of entry or attempted entry" may indicate "circumvention of orderly refugee procedures," such circumvention "should not be considered in such a way that the practical effect is to deny [asylum] relief in virtually all cases." *Matter of Pula*, 19 I. & N. Dec. 467, 473 (B.I.A. 1987). The Rule and Proclamation, taken together, unambiguously violate the statutory mandate and relevant precedent by barring refugees from obtaining asylum if they enter the United States along the southern border without first being inspected at a designated port of arrival. *See* Order, *E. Bay Sanctuary Covenant v. Trump*, No. 3:18-cv-6810, dkt. 43 (Nov. 19, 2018), at 21–22 (finding that the Rule "flout[s] the explicit language of the statute").

Plaintiffs fall clearly within the confines of this statutory provision. They are physically present in the United States and wish to apply for asylum, yet the Rule and Proclamation will deny them any opportunity to obtain asylum for the very reasons the statute deems they should not be denied asylum:  the place and manner of their entry and their status. As the district court explained in *See East Bay Sanctuary Covenant*, "[t]o say that one may apply for something that one has no

right to receive is to render the right to apply a dead letter.  There simply is no reasonable way to harmonize the two."  *Id.* at 21.

*8 U.S.C. § 1225(b)(1)(B)(ii).*  Second, and relatedly, the Rule deprives Plaintiffs of the ability to avail themselves of a credible fear interview under 8 U.S.C. § 1225(b)(1)(B)(ii).  Under that provision, Plaintiffs are permitted to present their claims for asylum at a credible fear interview, during which they would need to show a "significant possibility" that they could establish their eligibility for asylum.  8 U.S.C. § 1225(b)(1)(B)(ii).  If an asylum seeker demonstrates credible fear during his or her interview, he or she enters the regular removal process, whereby he or she will ultimately appear before an immigration judge to present a claim for relief and any corroborating evidence.  *See also Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures*, 62 Fed. Reg. 10312, 10320 (Mar. 6, 1997) ("The credible fear standard sets a low threshold of proof of potential entitlement to asylum . . . .").

The right to seek asylum while present in the United States and the statutory scheme providing for a "credible fear" interview did not emerge by happenstance.  Congress established the credible fear process to comport with *non-refoulement*, an international legal principle that obliges States not to return a refugee to any country where he or she would face persecution or a real risk of serious harm.  *Non-refoulement* undergirds the core of both the Convention Relating to the Status of Refugees ("1951 Convention"), July 28, 1951, 189 U.N.T.S. 137,[36] and the Protocol Relating to the Status of Refugees ("1967 Protocol"), Jan. 31, 1967, 606 U.N.T.S. 267;

---

[36] *See* Convention and Protocol Relating to the Status of Refugees, United Nations High Commissioner for Refugees (UNHCR), http://www.unhcr.org/3b66c2aa10.html.

the United States expressly acceded to the latter in 1968.  H.R. Rep. No. 96-781, at 19 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 160, 160; S. Exec. Doc. No. 14, 90th Cong., 2d Sess. 4 (1968).[37]

Indeed, in enacting the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), representatives from both parties emphasized that expedited removal would be accompanied by "major safeguards"—most notably the credible fear process—that would safeguard *non-refoulement* and protect "against returning persons who meet the refugee definition to conditions of persecution."   142 Cong. Rec. H11071, H11081; 142 Cong. Rec. H11054, H11066–67 ("It is . . . important . . . that the process be fair and particularly that it not result in sending genuine refugees back to persecution.").  The plain text of the statute requires the U.S. government to act on positive credible fear determinations by referring the noncitizen to an asylum officer for an interview.  8 U.S.C. § 1225(b)(1)(B)(ii) (upon finding of credible fear, noncitizens "shall be detained for further consideration of the application for asylum").  By directing asylum officers to "enter a negative credible fear determination," Defendants violate this clear statutory scheme.  Indeed, the system would be entirely unavailable to those who do not enter at a port of entry.  Nothing in the statute can be read to permit this wholesale subversion of the credible fear process.

*8 U.S.C. § 1158(b)(2)(C).*   The Proclamation and Rule improperly invoke 8 U.S.C. § 1158(b)(2)(C) as the source of Defendants' authority for the actions they have taken.  That provision provides:  "The Attorney General may by regulation establish additional limitations and

---

[37] The prohibition of *refoulement* applies to all refugees, including those who have not formally been recognized as such, and to asylum seekers whose status has not yet been determined. UNHCR, *Note on International Protection* ¶ 11, U.N. Doc. A/AC.96/815 (Aug. 31, 1993), http://www.unhcr.org/refworld/docid/3ae68d5d10.html; UNHCR, *Advisory Opinion on the Extraterritorial Application of* Non-Refoulement *Obligations Under the 1951 Convention Relating to the Status of Refugees and Its 1967 Protocol* ¶¶ 26–31 (Jan. 26, 2007), http://www.unhcr.org/refworld/docid/45f17a1a4.html.

conditions, *consistent with this section*, under which an alien shall be ineligible for asylum . . . ." 8 U.S.C. § 1158(b)(2)(C) (emphasis added).  But, none of the other "limitations and conditions" on asylum in Section 1158 bar asylum based on manner of entry because doing so would be contrary to the plain language of Section 1158(a)(1), and Section 1158 on the whole repeatedly mandates that any limits on the right to seek asylum must be consistent with its text.

Moreover, the location of the language that Defendants invoke undermines their reliance on it. The other bars to asylum within § 1158(b)(2)(A) are rooted in the Refugee Convention. Subsections 1158(b)(2)(A)(ii), (iv), and (v) respectively instruct that asylum cannot be granted to individuals convicted of particularly serious crimes, who are a danger to the United States, or who have ties to terrorism.  These provisions are supported by the Refugee Convention.  *See* 1951 Convention art. 33(2).  The same is true for the other bars, like the persecutor bar and the bar for those who committed serious nonpolitical crimes outside of the United States.  *Compare* 8 U.S.C. § 1158(b)(2)(A)(i), (iii) *with* 1951 Convention art. 1(F)(a)–(c).

*8 U.S.C. § 1232(d)(7)(B).*  Next, the Rule is contrary to the statutory provisions applicable to unaccompanied minors like Plaintiff G.Z.  Congress enacted the William Wilberforce Trafficking Victims Protection Reauthorization Act (TVPRA) in 2008 to provide additional protections to unaccompanied immigrant children, given their unique vulnerabilities.  *See* TVPRA, Pub. L. 110-457 (codified at 8 U.S.C. § 1232); *see also* H.R. Rep. 110-941 at 215–16 (summarizing Section 235 of the TVPRA).

The TVPRA provides that unaccompanied children are generally not subject to expedited removal.  *See* 8 U.S.C. § 1232(a)(5)(D)(i).  They are instead placed into regular removal proceedings before an immigration judge without having to pass a credible fear interview.  *See*

*id.*[38]   The statute further provides that before the unaccompanied child appears before the immigration judge, any asylum proceedings for that unaccompanied child are to occur in the first instance in a non-adversarial interview before the Asylum Office.   *See* 8 U.S.C. § 1158(b)(3)(C) ("An asylum officer . . . shall have initial jurisdiction over any asylum application filed by an unaccompanied alien child.").   The agency's understanding of the non-adversarial nature of the interview process[39] is as follows:

> A non-adversarial proceeding is one in which the parties are not in opposition to each other.  This is in contrast to adversarial proceedings, such as civil and criminal court proceedings, where two sides oppose each other by advocating their mutually exclusive positions before a neutral arbiter until one side prevails and the other side loses.  A removal proceeding before an immigration judge is an example of an adversarial proceeding, where the Service trial attorney is seeking to remove a person from the United States, while the alien is seeking to remain.

> The interview is part of a non-adversarial proceeding.  The principal intent of the Service is not to oppose the interviewee's goal of obtaining a benefit, but to determine whether he or she qualifies for such benefit.  If the interviewee qualifies for the benefit, it is in the Service's interest to accommodate that goal.  On the other hand, if he or she does not qualify for the benefit, it is in the Service's interest to deny the application or petition.  Therefore, unlike an adversarial proceeding, the interests of the Service and the applicants are not mutually exclusive.  In this determination, the officer is a neutral decision-maker, not an advocate for either side.[40]

---

[38]  Congress was apparently concerned that border officers were improperly screening unaccompanied children for asylum and summarily returning children to persecution in their home countries. *See* William A. Kandel, U.S. Congressional Research Service, *Unaccompanied Children: An Overview* (R43599; Jan. 18, 2017) <https://tinyurl.com/haeb3n5>.

[39]  The legacy INS also issued substantive guidelines for adjudicating children's asylum claims. *See* The Immigration and Naturalization Service, Guidelines for Children's Asylum Claims (Dec. 10, 1998).

[40]  USCIS Adjudicator's Field Manual, App. 15-2 Non-Adversarial Interview Techniques <https://tinyurl.com/ybx5kcml>.

The TVPRA thus ensures that when a child recounts for the first time the traumatic and sensitive facts of the persecution underlying a claim for protection, she does so in a non-adversarial setting.

The Rule improperly dispenses with the statutory requirements of the TVPRA. Under the Rule, unaccompanied children who enter without inspection are ineligible for asylum and thus will proceed immediately to the adversarial immigration court proceedings, where they will be eligible for withholding of removal but not asylum. In other words, the first time an unaccompanied minor will have an opportunity to present the traumatic and sensitive details of an asylum claim will be in the adversarial posture. The Rule thus upends the specialized procedural protections Congress created in the TVPRA mandating less stressful, non-adversarial hearings for unaccompanied minors, and thereby exposes children like G.Z. to the precise risk of traumatization that Congress, in the TVPRA, intended to minimize.

$$*\qquad*\qquad*\qquad*\qquad*\qquad*$$

Because both the Proclamation and the Rule conflict with the plain and detailed language of both the asylum and expedited removal statutes, this Court should conclude that they are "arbitrary, capricious, or otherwise contrary to law." 5 U.S.C. § 706(2)(A).

**2.      Canons of statutory construction further support Plaintiffs' interpretation of the INA.**

Even if the Court were to conclude that the relevant provisions of the INA are ambiguous, Plaintiffs' interpretation of those provisions would still be compelled by other rules of statutory construction. First among them is the well-established rule that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804). This principle—known as the

*Charming Betsy* canon—requires courts to interpret statutes so as not to conflict with an earlier treaty or other international agreement.

The *Charming Betsy* canon applies with full force in this case. The United States has bound itself to international instruments concerning the ability of refugees to apply for asylum. Accordingly, in deciding the questions presented by this case, this Court must construe the applicable statutes consistently with the United States' international legal obligations to asylum seekers to the fullest extent possible. The 1951 Convention and the 1967 Protocol are the key international instruments that govern the legal obligations of States to protect refugees. The 1967 Protocol binds parties to comply with the substantive provisions of Articles 2 through 34 of the 1951 Convention. 1967 Protocol art. 1, ¶¶ 1–2. The 1967 Protocol universalizes the refugee definition in Article 1 of the 1951 Convention, removing the geographical and temporal limitations. *Id.* ¶¶ 2–3. The United States acceded to the 1967 Protocol in 1968, *see* 19 U.S.T. 6223, thereby binding itself to the international refugee-protection regime contained in the 1951 Convention. Congress amended the INA with the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, expressly to "bring United States refugee law into conformance with the [1967 Protocol]." *INS* v. *Cardoza-Fonseca*, 480 U.S. 421, 436–37 (1987); *see also Negusie* v. *Holder*, 555 U.S. 511, 537 (2009).

As particularly relevant here, Article 31 of the 1951 Convention forbids States from restricting the movement of or imposing penalties on persons seeking asylum. 1951 Convention art. 31. *See* Guy S. Goodwin-Gill, *Article 31 of the 1951 Convention Relating to the Status of Refugees: non-penalization, detention, and protection*, *in* Refugee Protection in International Law 185, 195–96 (Erika Feller, et al. eds. 2003). Article 31(1) provides:

> The Contracting States shall not impose penalties, on account of
> their illegal entry or presence, on refugees who, coming directly

26

> from a territory where their life or freedom was threatened in the
> sense of Article 1, enter or are present in their territory without
> authorization, provided they present themselves without delay
> to the authorities and show good cause for their illegal entry or
> presence.

Denying first-time entrants into the country asylum without any individualized determination of

their refugee status, is plainly a penalty.  And, of course, it is a violation of Article 31(1) to impose

that penalty "on account of their illegal entry."  *See Garcia v. Sessions*, 856 F.3d 27, 57 (1st Cir.

2017) (Stahl, J. dissenting); *see also id.* at 59 (noting that an "administrative roadblock" that

prohibits a noncitizen from seeking asylum would constitute "an impermissible 'penalty' . . . likely

triggering a violation of Article 31").[41]

Numerous courts have considered *Charming Betsy* when interpreting asylum and refugee

law, and this Court should do so here.  *See Wanjiru v. Holder*, 705 F.3d 258, 265 (7th Cir. 2013)

(exercising judicial review over CAT deferral claims and refusing to "lightly presume that

Congress has shut off avenues of judicial review that ensure this country's compliance with its

obligations under an international treaty"); *Khan v. Holder*, 584 F.3d 773, 783 (9th Cir. 2009)

(noting that the INA must be interpreted "to avoid any conflict with the [Refugee] Protocol, if

possible"); *Kofa v. INS*, 60 F.3d 1084, 1090 (4th Cir. 1995) (recognizing that the Court "must

construe the statute consistent with our obligations under international law" but declining to look

to the history behind the 1951 Convention).

---

[41] In the Rule, Defendants cite to two federal court decisions in purported support of their belief
that the new exclusionary bar does not violate U.S. treaty obligations.  *See* Rule, 83 Fed. Reg. at
55,939 (citing *Cazun v. Att'y Gen.,* 856 F.3d 249, 257 & n.16 (3d Cir. 2017); *Ramirez-Mejia v.
Lynch,* 813 F.3d 240, 241 (5th Cir. 2016)).  Those cases are inapposite as they concern a bar to
individuals who have entered the United States following a previous removal order and who were
thus barred from asylum based on another statutory provision, 8 U.S.C. § 1231(a)(5), which
prohibits noncitizens subject to reinstatement of a prior removal order from applying for "any
relief."  There is no such statutory bar for applicants who enter without inspection; indeed, the text
of the asylum statute expressly permits applications for asylum in this context.

The legislative history also weighs in favor of Plaintiffs' interpretation of the statutory text. That history shows that Congress negotiated changes to the asylum statute with great care. Senator Hatch—chair of the committee that produced IIRIRA—stated that the bill "involved a number of compromises on provisions involving the asylum system." 142 Cong. Rec. S11,491 (Sept. 27, 1996). He noted, for instance, the changed-circumstances exception, which "will deal with situations like those in which an alien's home government may have stepped up its persecution of people of the applicant's religious faith or political beliefs." *Id.* By contrast, there was no discussion in the Congressional Record that would support the conclusion that Congress intended to authorize the President and executive branch officials to overturn 8 U.S.C. § 1158(a) and to bar access to asylum to all noncitizens who enter the United States without inspection. To the contrary, the limited legislative history available for IIRIRA shows that, even as Congress focused on imposing greater enforcement measures in the immigration space, it intended to "provide adequate protection to those with legitimate claims of asylum" in acknowledgement of the seriousness of refugee-protection concerns. *Id.* at S11,492.

Finally, it is black letter law that regulations must be consistent with the statutes they implement. When a rule is inconsistent with the statute it purports to implement, the statute controls. *See Marmolejo-Campos v. Holder*, 558 F.3d 903, 919 (9th Cir. 2009) ("[A]gencies are not free, under *Chevro*n, to generate erratic, irreconcilable interpretations of their governing statutes and then seek judicial deference."); *see also Ramadan v. Chase Manhattan Corp.*, 229 F.3d 194, 204 (3d Cir. 2000) ("[R]egulations cannot trump congressional statutes."); *Caldera v. J.S. Alberici Constr. Co.*, 153 F.3d 1381, 1383 n.2 (Fed. Cir. 1998) ("Statutes trump conflicting regulations."); *Robbins v. Bentsen,* 41 F.3d 1195, 1198 (7th Cir. 1994) ("Regulations cannot trump the plain language of statutes."). Given this rule and this Court's obligation to construe a statute

in a way that gives meaning to all the words it contains, *see, e.g.*, *Morton v. Mancari*, 417 U.S.

535, 551 (1974), this Court should construe any ambiguity in this case in Plaintiffs' favor.

> **B.     The New Regulations Are Not in Accordance with Law Because They
> Dispense with Required Agency Rulemaking.**

Plaintiffs are also likely to succeed in this litigation with respect to their challenge to the

Rule under the APA because it is contrary to law—specifically, contrary to 8 U.S.C.

§ 1158(b)(2)(C)'s requirement that "additional limitations and conditions" on eligibility for

asylum be established "by regulation."  Notwithstanding the plain language of this provision, the

Attorney General seeks to abdicate responsibility for establishing additional limitations and

conditions on asylum by giving the President the blank check he so clearly has wanted to

pronounce unilaterally—and without threat of full judicial review or the process of agency

rulemaking—what those additional limitations and conditions should be.

The requirement that implementation of a statute be achieved "by regulation" is not a

meaningless one.  Regulations are subject to judicial review under the APA, with a variety of

statutory bases for courts to find agency action unlawful.  5 U.S.C. §§ 702, 706.  The APA also

imposes a variety of requirements on agencies before they may implement a new rule.  Section 4

of the APA requires an agency engaged in formal rulemaking to give notice of proposed

rulemaking by publication in the Federal Register and "give interested persons an opportunity to

participate in the rule making through submission of written data, views, or arguments."  5 U.S.C.

§ 553(b)–(c).  Agencies are then required to "consider and respond to significant comments

received during the period for public comment."  *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199,

1203 (2015).  With the comments of the community before them, agencies must explain their

justifications for departing from longstanding past practices or declining to accord substantial

weight to countervailing facts raised in public comments, or else face the prospect of courts striking

down their regulations. *See* 5 U.S.C. § 706 (vesting power in the judiciary to set aside agency decisions that are arbitrary, capricious, or otherwise contrary to law).

A unilateral Presidential proclamation under § 1182(f) cannot be deemed the equivalent of a regulation in any meaningful sense. It may be issued with no warning, no period for public comment and, per the Supreme Court's statements in *Trump v. Hawaii*, there is no assurance that "findings" that underlie a Presidential Proclamation will be subject to the same judicial scrutiny that regulatory findings would be. 138 S. Ct. 2392, 2409 (2018) (questioning whether the President's findings under § 1182(f) need be explained in sufficient detail to enable judicial review, and concluding that a "searching inquiry" into the President's justifications under § 1182(f) may not be required).

It is inconsistent with the text of a statute that requires the Attorney General to establish additional conditions and limitations *by regulation* for the Attorney General to abdicate that rulemaking responsibility and instead defer to unspecified Presidential proclamations and orders, sight unseen. If Congress had intended to vest in the President unilateral authority to limit the categories of people eligible for asylum without soliciting input from the public, it surely would have said so. Congress is perfectly capable of saying when the President should have authority— outside of the formal rulemaking process—to proclaim the status of immigrants. For example, Section 1182(f) provides with respect to the entry of immigrants into the country: "Whenever the President finds that the entry of any aliens . . . would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens . . . or impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. § 1182(f). Section 1158(b)(2)(C), by contrast, contains no such language; rather, it

expressly requires formal rulemaking, with its susceptibilities to searching judicial review and applicable procedural requirements.

Even apart from the plain language of § 1158(b)(2)(C), the nuanced approach Congress took to establishing asylum eligibility criteria belies the notion that Congress intended to give the Attorney General authority to abdicate this rulemaking responsibility to unilateral Presidential orders.   Long after § 1182(f) conferred authority to the President to suspend the entry of noncitizens, Congress created a detailed statutory framework in the INA for the handling of asylum claims.   The INA provides specific grounds upon which otherwise eligible refugees would be ineligible for asylum, *see* 8 U.S.C. § 1158(b)(2)(A); it expressly vests in the Attorney General the responsibility to "designate by regulation" offenses that constitute crimes that void a refugee's eligibility, *see id.* § 1158(b)(2)(B)(ii); and carefully crafted statutory provisions sketch the contours of how asylum claims are to be processed, *see id.* § 1225(b)(1)(B).   Those statutes, in turn, are implemented by a detailed set of regulations that guides asylum officer and immigration judge decision-making.   *See* 8 C.F.R. § 208 *et seq.*   This structure is inconsistent with a system in which the President, with whatever notice or lack of notice he chooses to provide, may fill in the blanks of a hollow regulatory shell that the Attorney General would create for the President's future, unilateral use.

There is no question that this is what the new Rule has done.   As DOJ and DHS acknowledged in the Rule, "this rule will result in the application of an additional mandatory bar to asylum, *but the scope of that bar will depend on the substance of relevant triggering proclamations*."   Rule, 83 Fed. Reg. at 55,951 (emphasis added).   And the Department of Homeland Security has directly instructed its employees that they now need to be alert not only to agency rulemaking, but to parsing out whether the President has established, through future

31

proclamations, any changes to the limitations and conditions on asylum.  *See* USCIS, Procedural

Guidance, PM-602-0166 (Nov. 9, 2018).  In that guidance, DHS told its employees:  "Asylum

officers shall carefully read any future presidential proclamation issued under INA § 212(f) or

§ 215(a)(1) to understand its terms, the classes of aliens to which it applies, whether it expressly

provides that it does not affect eligibility for asylum, and whether there are waivers or exceptions

for which an applicant may be eligible."  *Id.* at 3.  The new Rule, thus, expressly contemplates that

there will be "additional limitations and conditions" for asylum eligibility that do not currently

exist, and that the President would establish by unilateral decree, rather than through the regulatory

process as required by the statute.  *See also* Order, *E. Bay Sanctuary Covenant v. Trump*, No. 3:18-

cv-6810, dkt. 43 (Nov. 19, 2018), at 23 (finding "little reason to think Congress intended" for the

Attorney General to defer to unilateral proclamations rather than engage in rulemaking).

The statute simply does not authorize the Attorney General to write a blank check of this

sort to the President, however convenient the Attorney General finds it to give him one, and

however much the President wants the power to unilaterally dispense with congressionally enacted

laws that he finds "stupid."  *See supra*, at 10.  The statute requires rulemaking, not asylum bans

by executive fiat.

**C.    The New DOJ Regulations Are Void Because They Were Issued by an Acting Attorney General Whose Appointment Violates the Attorney General Succession Act and the Appointments Clause of the Constitution.**

The amendments to DOJ regulations implemented by the Rule are void as contrary to law

pursuant to the APA, 5 U.S.C. § 706(2)(A), because the Rule was issued by an Acting Attorney

General ("AAG"), Matthew G. Whitaker, whose appointment (1) is contrary to the Attorney

General Succession Act, 28 U.S.C. § 508, and (2) violates the Appointments Clause of the U.S.

Constitution.

The Rule bears the name of former Attorney General Jefferson B. Sessions III and is dated November 6, 2018.  But Attorney General Sessions ceased acting as Attorney General by no later than the morning of November 7, 2018.  President Trump appointed AAG Whitaker the same day, and then under the authority of AAG Whitaker, the Department made the decision to transmit the Rule to the Federal Register website for publication on November 8, resulting in publication of the Rule in final form on November 9, with the name of Mr. Sessions still attached.  In the words of the Government:  "On November 9, 2018," the day after AAG Whitaker's appointment, "the Attorney General and Secretary [of Homeland Security] issued a joint interim final rule . . . ." Opp'n to TRO Mot. at 4, *E. Bay Sanctuary Covenant v. Trump*, No. 3:18-cv-6810, dkt. 27 (Nov. 15, 2018).

AAG Whitaker was previously chief of staff to Attorney General Sessions, a position that did not require, and did not receive, Senate confirmation.  He has not subsequently been confirmed by the Senate.  He is therefore unable lawfully to assume the responsibilities of Attorney General.

### 1.    AAG Whitaker's appointment violates the Attorney General Succession Act.

The Department of Justice is so important to the functioning of the federal government that Congress decided—in an unbroken line of statutes dating back to 1870, *see* Act to Establish the Dep't of Justice, ch. 150, 16 Stat. 162, § 2 (June 22, 1870)—that, unlike the case with most departments and agencies, a special succession law would apply when the office of Attorney General becomes vacant.  According to the Attorney General Succession Act, in the case of a vacancy the Deputy Attorney General *automatically* "may exercise all the duties of that office" without any need for Presidential action.  28 U.S.C. § 508(a).  If the Deputy Attorney General is also unavailable, then the duties "shall" be assumed by the Associate Attorney General and the Attorney General may also designate the Solicitor General or the Assistant Attorneys General to

assume the duties.  *Id.* § 508(b).  *All* of these positions require Senate confirmation.  *See id.* § 505 (requiring Senate confirmation for Solicitor General); *id.* § 506 (requiring Senate confirmation for Assistant Attorneys General).  As a mere DOJ staffer, AAG Whitaker is accordingly ineligible to assume the duties of Attorney General.  Moreover, since Deputy Attorney General Rod Jay Rosenstein *is* available, the Act calls for him, not AAG Whitaker, to serve.

Any argument that the President may nevertheless appoint AAG Whitaker under the otherwise generally applicable Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. § 3345 *et seq.*, is unavailing.  Section 3347 of the FVRA provides that the FVRA is the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any office of an Executive agency "unless" a different statute—here the Attorney General Succession Act— designates different procedures.  *Id.* § 3347(a)(1).  The specific statute should take precedence over the general statute in determining who fulfills the responsibility of the vacant Attorney General office.  *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).  This is particularly the case where the Attorney General Succession Act *automatically* sets forth the succession rules and contains mandatory language:  "When . . . neither the Attorney General nor the Deputy Attorney General is available . . . , the Associate Attorney General *shall* act as Attorney General."  28 U.S.C. § 508(b) (emphasis added).

Finally, as discussed in the next section, even if the FVRA rather than the Attorney General Succession Act did apply here, AAG Whitaker's appointment would still be unlawful as violating the Appointments Clause of the Constitution.  Thus, to the extent there is any ambiguity about which statute applies, the canon of "constitutional avoidance" directs that "where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter."  *Jones v.*

*United States*, 526 U.S. 227, 239 (1999).   Under the Attorney General Succession Act, AAG

Whitaker's appointment is unlawful and without force and effect, rendering the Rule invalid.

### 2.   AAG Whitaker's appointment violates the Appointments Clause of the Constitution.

Article II of the Constitution requires that the President obtain "the Advice and Consent of

the Senate" before appointing principal "Officers of the United States."   U.S. Const. art. II, § 2,

cl. 2.   The Appointments Clause is the exclusive process by which the President may appoint

"officers of the United States."   *United States v. Germaine*, 99 U.S. 508, 510 (1878); *Buckley v.*

*Valeo*, 424 U.S. 1, 125–26 (1976).   For the purpose of appointment, the Constitution divides all

parties into two classes—inferior officers and non-inferior officers, known as principal officers.

*Germaine,* 99 U.S. at 509.   "Principal Officers are selected by the President with the advice and

consent of the Senate" while inferior officers may be appointed by the President alone.   *Valeo*, 424

U.S. at 132.   "[A] principal officer is one who has no superior other than the President."   *NLRB v.*

*SW Gen. Inc.*, 137 S. Ct. 929, 947 (2017) (Thomas, J., concurring).

The Attorney General, as the chief law officer of the United States, the head of the U.S.

Department of Justice, and a Cabinet-level official who only reports to the President, satisfies the

definition of a principal officer.   *See Morrison v. Olson*, 487 U.S. 654, 670–77 (1988).   An

Attorney General must thus be appointed by the President and confirmed by the Senate.   President

Trump has not obtained the advice and consent of the Senate before appointing Matthew Whitaker

as the acting Attorney General.   Accordingly, AAG Whitaker's appointment is invalid as

prohibited by the Constitution.

As Justice Thomas stated in his concurring opinion in *NLRB v. SW General*, *Inc.*, this

constitutional requirement applies whether the appointment is permanent or temporary:   The

Framers "empowered the Senate to confirm principal officers on the view that 'the necessity of its

35

co-operation in the business of appointments will be a considerable and salutary restraint upon the conduct of' the President. We cannot cast aside the separation of powers and the Appointments Clause's important check on executive power for the sake of administrative convenience or efficiency." 137 S. Ct. at 948 (Thomas, J., concurring) (internal citations omitted) (citing *Bowsher v. Synar*, 478 U.S. 714, 736 (1986)). "That [the appointee] was appointed 'temporarily' to serve as *acting* general counsel does not change the analysis." *Id.* at 946 n.1 (emphasis in original).

Even if an exigency could permit the temporary service of an acting Attorney General pending Senate confirmation, no such exigency exists here: the President himself chose the timing of Mr. Sessions's departure as Attorney General by demanding his resignation. And, as commentators have noted, Justice Department officials who *have* been confirmed by the Senate in their current positions, such as Deputy Attorney General Rosenstein, were available to fill the position of acting Attorney General—and indeed, were specifically identified by statute as being in the line of succession at the Department of Justice, *see* 28 U.S.C. § 508—but the President chose instead someone who is constitutionally ineligible. *See, e.g.*, Neal K. Katyal & George T. Conway III, *Trump's Appointment of the Acting Attorney General Is Unconstitutional*, N.Y. TIMES, Nov. 8, 2018; *see also Weiss v. United States*, 510 U.S. 163, 174 (1994) (Appointments Clause discussion regarding Senate-confirmed officers assuming principal officers' duties germane to the office to which that had already been confirmed).[42]

For these reasons, the DOJ regulations issued as part of the Rule under the authority of AAG Whitaker are void and without any legal effect.

---

[42] *United States v. Eaton*, 169 U.S. 331 (1898), does not support a different result. There, unlike here, the Supreme Court determined that a true "exigency" existed allowing for an individual to perform the functions of a principal officer—the acting U.S. consul to Siam—for "a limited time and under special and temporary conditions." *Id.* at 343.

**D.    The New Rule Is Contrary to Law Because It Violates the Public Comment Provisions of 5 U.S.C. § 553.**

The Rule violates the APA because Defendants flouted Congress's express instruction that final rules be subject to public scrutiny in all but the most unusual of circumstances.  The APA requires agencies to publish general notice of a proposed rulemaking in the Federal Register and give the public "an opportunity to participate in the rule making through submission of written data, views, or arguments" before a rule is enacted, and agencies may only adopt new rules after "consideration of the relevant matter presented."  5 U.S.C. § 553(b)–(c); *Batterton v. Marshall*, 648 F.2d 694, 703 (D.C. Cir. 1980); *see also* Order, *E. Bay Sanctuary Covenant v. Trump*, No. 3:18-cv-6810, dkt. 43 (Nov. 19, 2018), at 24.  Only where an agency "for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest" may the agency implement a rule without following the steps set forth in the APA.  *Id.* § 553(b)(B). The Rule was issued on November 9, 2018, and made effective the same day.  The Rule was therefore issued without giving the public an opportunity to participate in rulemaking.

### 1.    The Rule Does Not Satisfy the "Good Cause" Standard.

There is no "good cause" for haste here, or for dispensing with the required opportunity for public participation in rulemaking, as demonstrated by Defendants' own contradictory statements relating to this issue.  The government first posits that if the Rule is published, asylum seekers who otherwise would not enter the United States would have a new incentive "to attempt to enter the United States unlawfully before this rule took effect."  Rule, 83 Fed. Reg. at 55,950.  Putting aside the remarkable assertion that refugees in transit are this steeped in the details of the American regulatory system, the Defendants entirely undermine this supposed concern elsewhere in the Rule. In particular, Defendants say that migrants would *not* be dissuaded by the regulations from

crossing illegally, because they "could still obtain statutory withholding of removal or CAT protection if they crossed illegally, which would allow them a safeguard against persecution." *Id.* at 55,949.

The notion that there is any exigency here is also belied by the fact that it has been widely reported that the Administration's Rule has been under development for months.[43]  The long delay in promulgating the Rule likewise supports that there is no need to rush the Rule to completion. *Zhang v. Slattery*, 55 F.3d 732, 745 (2d Cir. 1995) (that the subject of the interim rule had been in the national debate for months before issuance suggested that § 553(a)(1) requirements should not be dispensed with), *superseded by statute on other grounds by statute*, *see City of New York v. Permanent Mission of India To United Nations*, 618 F.3d 172, 201 (2d Cir. 2010).  The Court should find that this is particularly true given that the potential scope of the Rule—which erects an empty shell for further Presidential action—is far more sweeping than any proffered justification for haste.[44]

## 2.     The Good Cause Standard Applies to the Rule.

DHS and DOJ next argue that even if the "good cause" standard for immediate publication of the Rule was not met, that requirement is not applicable here because the rule at issue is one that "involves a foreign affairs function of the United States."  Rule, 83 Fed. Reg. at 55,950 (citing 5 U.S.C. § 553(a)(1)).  The court in *East Bay Sanctuary Covenant* rejected that contention, *see* Order, *E. Bay Sanctuary Covenant v. Trump*, No. 3:18-cv-6810, dkt. 43 (Nov. 19, 2018), at 27–

---

[43] *See* Dara Lind, *Exclusive:  Trump administration plan would bar people who enter illegally from getting asylum*, Vox (June 29, 2018) <https://tinyurl.com/y9lqzhdb>.

[44] The court in *East Bay Sanctuary Covenant* left open pending further development of the record whether the defendants in that case have met the "high bar" required to show good cause.  Order, *E. Bay Sanctuary Covenant v. Trump*, No. 3:18-cv-6810, dkt. 43 (Nov. 19, 2018), at 29.

28, and this Court should, too.   The foreign affairs function exception should be construed narrowly, *Jean v. Nelson*, 711 F.2d 1455, 1477 (11th Cir. 1983), and it is not applicable here.   The Rule concerns who is eligible to seek asylum in the United States, which is the type of alteration to the eligibility of immigrants to remain in the United States that a court in this district held does not fall within the "foreign affairs function" exception.   *See Hou Ching Chow v. Att'y Gen.*, 362 F. Supp. 1288–90 (D.D.C. 1973); *see also Narenji v. Civiletti*, 481 F. Supp. 1132, 1137 (D.D.C.) (regulation on aliens did not involve a "foreign affairs function" even where a foreign event may have "provoked the promulgation"), *rev'd on other grounds*, 617 F.2d 745 (D.C. Cir. 1979).

It is telling that Defendants' explanation of the Rule's connection to foreign affairs relies on a discussion of the content of hypothetical future agreements with Mexico, rather than on the content of the Rule itself.   *See* Rule, 83 Fed. Reg. at 55,950.   Moreover, while Defendants baldly assert that the Rule will be "an integral part of ongoing negotiations with Mexico and Northern Triangle countries over how to address the influx" of migrants, *id.*, the government utterly fails to explain how and why that is the case, and apparently was also unable to do so at the TRO hearing in the *East Bay Sanctuary Covenant* case.   *See* Order, *E. Bay Sanctuary Covenant v. Trump*, No. 3:18-cv-6810, dkt. 43 (Nov. 19, 2018), at 27.   And the Rule does not resemble the sort of regulation that the U.S. Court of Appeals for the D.C. Circuit has previously found qualifies as serving a foreign affairs function, where regulations would "carry out obligations to a foreign nation undertaken for purposes of resolving a problem requiring coordination."   *See Int'l B'hd of Teamsters v. Pena*, 17 F.3d 1478, 1486 (D.C. Cir. 1994).   The Rule is directed to the status of immigrants who have come into the United States and seek to avail themselves of the U.S. immigration system; their status does not involve a "foreign affairs function."

## II.      Plaintiffs Will Suffer Irreparable Harm Without Relief

Plaintiffs seek asylum in the United States because they are fleeing persecution in their home countries on account of protected grounds and their governments are unable or unwilling to protect them.  Their fear is serious, credible, and well-supported.

Depriving Plaintiffs of the opportunity to demonstrate that they are eligible for asylum constitutes an irreparable harm.  That is so because the denial of a valid asylum claim can lead to removal to a country where the applicant's life is in danger.  *See, e.g.*, *Devitri v. Cronen,* 289 F. Supp. 3d 287, 296–97 (D. Mass. 2018) (significant risk of persecution if removed is irreparable harm); *Orantes-Hernandez v. Meese*, 685 F. Supp. 1488, 1504–05 (C.D. Cal. 1988) (plaintiffs would suffer irreparable harm if they were summarily removed without being afforded the opportunity to exercise their right to apply for asylum given that they would be removed to a country overrun with civil war, violence, and government-sanctioned terrorist organizations); *Nunez v. Boldin*, 537 F. Supp. 578, 586–87 (S.D. Tex. 1982) ("Deportation to a country where one's life would be threatened obviously would result in irreparable injury.").

To be sure, the government has left open the possibility that individuals could apply for withholding of removal or relief under CAT.  If granted either form of relief, the applicant would not be removed to his or her country of origin.  Those forms of relief, however, are illusory in this context.  Both withholding of removal and relief under CAT demand a higher level of proof of potential harm than under asylum.  *See* 8 C.F.R. §§ 208.13(b)(1), 208.31(c), 208.16.[45]  Thus, an

---

[45] Withholding of removal requires the petitioner to demonstrate his or her "life or freedom would be threatened in that country because of the petitioner's race, religion, nationality, membership in a particular social group, or political opinion."  *Tamang v. Holder*, 598 F.3d 1083, 1091 (9th Cir. 2010) (alteration omitted) (quoting 8 U.S.C. § 1231(b)(3)).  Similar to asylum, a petitioner may establish eligibility for withholding of removal (A) by establishing a presumption of fear of future persecution based on past persecution, or (B) through an independent showing of clear probability

individual could have a valid asylum claim, but be unable to meet the standard under the other forms of relief and therefore would be removed back to their country of origin, where they would face irreparable harm.

Moreover, as the Rule acknowledges, *see* Rule, 83 Fed. Reg. at 55,939, withholding of removal and CAT protection do not provide noncitizens the same benefits available to those granted asylum.  Withholding of removal and CAT protection do not prohibit the government from removing the noncitizen to a third country; do not create a path to lawful permanent resident status and citizenship; and do not permit a noncitizen's spouse or minor child to obtain lawful immigration status derivatively.  *See R–S–C v. Sessions*, 869 F.3d 1176, 1180 (10th Cir. 2017). As such, even if granted withholding of removal, Plaintiffs A.V. and D.S. will be permanently separated from their minor children because they will be unable to leave the United States to see them and unable to petition for them to join them here.  *See* Ex. B (A.V. Decl.), ¶ 15; Ex. D (D.S. Decl.), ¶ 6.

Indeed as *applicants* for withholding of removal as opposed to asylum, Plaintiffs are prejudiced. Asylum applicants may obtain authorization to work if their application has been pending for more than 180 days, not counting any delays caused by the noncitizen.  See 8 U.S.C. § 1158(d)(2); 8 C.F.R. § 208.7.  Applicants for withholding of removal cannot obtain work authorization, unless and until the application has been finally approved.   8 C.F.R. § 274a.12(a)(10).

---

of future persecution.  Unlike asylum, however, the petitioner must show a "clear probability" of the threat to life or freedom if deported to his or her country of nationality.  The clear probability standard is more stringent than the well-founded fear standard for asylum.  *Id.*  For CAT relief, an applicant must show it is more likely than not that he or she will be tortured or killed if removed to the home country.  8 C.F.R. § 1208.16(c)(2).

It is also no answer for the government to argue that applicants could present themselves at ports of entry.  Plaintiffs are impoverished and vulnerable individuals who, as a practical matter, have one narrow window to escape their circumstances.  The Administration has (likely by design) capitalized on this problem by enacting a number of policies (not presently the subject of this lawsuit, but detailed elsewhere[46]) designed to slow entry into the United States by asylum seekers to a crawl.  Plaintiffs lack the resources to wait indefinitely for an opportunity to seek asylum.  Even apart from the resource demands of waiting, waiting in Mexico is dangerous, particularly along the border.  *See supra*, at 11–13.  Migrants and refugees like Plaintiffs are disproportionally exposed to this violence.  *Id.*  Indeed Plaintiff G.Z. was robbed in Mexico en route to the United States and now fears having to return to that country, Ex. C (G.Z. Decl.), ¶¶ 14–18.  Further, Plaintiffs already experienced trauma before fleeing their home countries, and are thus particularly sensitive to the harm that would be inflicted were they forced to wait in Mexico.

Finally, the injuries suffered by Plaintiffs cannot be alleviated by monetary compensation, nor do Plaintiffs seek such compensation.  Instead, Plaintiffs ask this Court to grant injunctive and declaratory relief invalidating and setting aside the illegal Rule.  Unlike financial injury, the harm from being denied the opportunity to pursue asylum under an unlawful policy cannot be remedied after the fact.

In light of the foregoing, Plaintiffs have demonstrated that they will suffer irreparable harm if a Temporary Restraining Order is not granted.

---

[46] *See, e.g.*, *Al Otro Lado v. Kelly*, No. 17-cv-5111 (C.D. Cal.).

### III.     A Temporary Restraining Order Will Not Substantially Harm the Government and Instead Serves the Public Interest.

There was no need for Defendants to take the announced action.   Despite President Trump's increasingly nationalistic and xenophobic rhetoric, the data shows a decrease in migration at the U.S.–Mexico border over time, as described *supra*, at 14–16, the notion that there are extraordinary events underway at the border is not supported by the evidence.

Moreover, the Government—through CBP, Immigration & Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS)—has established a system (such as it is) for handling asylum claims at the southern border.   This system has proven capable of conducting credible fear interviews in an orderly manner.   Indeed, the number of credible fear interviews has, with some fluctuations in either direction, remained relatively constant over the past two years, as has the percentage of credible fear interviews timely completed.[47]   There is simply no imminent need to shutter access to the asylum system at this time.   The Government would not be harmed by the Court's entering a temporary restraining order.

The public interest, on the other hand, weighs strongly in favor of granting emergency relief.   Put simply, Defendants have no cognizable interest in carrying out a policy that violates federal law.   *Cf. Ariz. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014) ("'[I]t is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available.'" (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013))).   The public interest also would be damaged if the United States abrogated its treaty obligations and worked to undermine the

---

[47] U.S. Citizenship and Immigration Services, *Credible Fear Workload Report Summary* (Apr. 25, 2018) <https://tinyurl.com/y8zfh23s>.

international system of asylum that has served for decades to provide a safety net for the world's most vulnerable people. *See also* Order, *E. Bay Sanctuary Covenant v. Trump*, No. 3:18-cv-6810, dkt. 43 (Nov. 19, 2018), at 32.

The United States asylum system is the product of decades of discussion and negotiation between Congress, the President, the courts, and our international partners. Statutory text, case precedent, and executive history inform and delineate the shape and bounds of that system. The law does not allow Defendants to rewrite that system by executive fiat.

# CONCLUSION

For the foregoing reasons, Plaintiffs urge the Court to enter a temporary restraining order enjoining implementation of the Rule, to be followed by a preliminary injunction.

Dated:  November 21, 2018        Respectfully submitted,

/s/Thomas G. Hentoff
Thomas G. Hentoff (D.C. Bar No. 438394)
Ana C. Reyes (D.C. Bar No. 477354)
Ellen E. Oberwetter (D.C. Bar No. 480431)
Charles L. McCloud[*]
Matthew D. Heins[*]
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel: (202) 434-5000
Fax: (202) 434-5029

Hardy Vieux (D.C. Bar No. 474762)
HUMAN RIGHTS FIRST
805 15th Street, N.W., Suite 900
Washington, D.C. 20005
Tel: (202) 547-5692
Fax: (202) 553-5999

Eleni Rebecca Bakst[*]
Anwen Hughes[*]
HUMAN RIGHTS FIRST
75 Broad Street, 31st Floor
New York, New York 10004
Tel: (212) 845-5200
Fax: (212) 845-5299

Charles George Roth[*]
Keren Hart Zwick[*]
Gianna Borroto[*]

---

[*] Certification to practice pursuant to LCvR 83.2(g) to be submitted.

Ruben Loyo[*]
NATIONAL IMMIGRANT JUSTICE CENTER
208 S. LaSalle Street, Suite 1300
Chicago, Illinois 60604
Tel: (312) 660-1370
Fax: (312) 660-1505

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

Pursuant to LCvR 65.1(a), I hereby certify that on November 21, 2018, in addition to filing via ECF, I caused true and correct copies of the Plaintiffs' Complaint, Civil Cover Sheet, Motion for Temporary Restraining Order and Preliminary Injunction, Memorandum of Points and Authorities in Support of Motion for Temporary Restraining Order and Preliminary Injunction, and all supporting papers to be (1) delivered by hand, (2) delivered by overnight delivery, and (3) delivered by registered mail to the Defendants in the above-captioned action, and to the United States Attorney for the District of Columbia, at the following addresses:

DONALD J. TRUMP
President of the United States
1600 Pennsylvania Avenue, N.W.
Washington, D.C. 20500

MATTHEW G. WHITAKER
Acting Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

KIRSTJEN M. NIELSEN
Secretary of the Department of Homeland Security
U.S. Department of Homeland Security
245 Murray Lane, S.W.
Washington, D.C. 20528

LEE FRANCIS CISSNA
Director of United States Citizenship and Immigration Services
U.S. Citizenship and Immigration Services
20 Massachusetts Avenue, N.W.
Washington, D.C. 20529

JOHN LAFFERTY
Asylum Division Chief
U.S. Citizenship and Immigration Services
20 Massachusetts Avenue, N.W.
Washington, D.C. 20529

JESSIE K. LIU
United States Attorney for the District of Columbia
555 4th Street, N.W.
Washington, D.C. 20530

In addition, I also provided notice to Defendants of the time of the making of Plaintiffs'

TRO and preliminary injunction motion on November 21, 2018 at 12:40 p.m. by leaving a

voicemail message with Erez Reuveni, Assistant Director, U.S. Department of Justice, Civil

Division, Office of Immigration Litigation and by following up with an email to Mr. Reuveni

sent at 1:03 p.m.  At approximately 2:20 p.m. Mr. Reuveni and I spoke and he confirmed receipt

of actual notice that Plaintiffs will be filing today a motion for a Temporary Restraining Order.

I will also send a copy of all these filings to Mr. Reuveni by email today before 4 p.m. and will

also cause copies to be sent to him by hand delivery.

Dated:  November 21, 2018                          Respectfully submitted,


                                                   /s/Thomas G. Hentoff_____
                                                   Thomas G. Hentoff (D.C. Bar No. 438394)