# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| O.A., et al.,<br><br>                    *Plaintiffs*,<br>     v.<br><br>DONALD J. TRUMP, et al.,<br><br>                    *Defendants*. | Civil Action No. 1:18-CV-02718-RDM<br><br>**The Honorable Randolph D. Moss** |

## BRIEF OF THE OFFICE OF THE UNITED NATIONS HIGH COMMISSIONER FOR REFUGEES AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS

Patrick W. Pearsall
D.C. Bar No. 975801
     *Counsel of Record*
Karthik P. Reddy
D.C. Bar No. 1048848
1099 New York Ave., N.W.
Washington, D.C. 20001
(202) 639-6000

Vaishalee V. Yeldandi
Ill. Bar No. 6327807
Pro Hac Vice Application Pending
353 N. Clark St.
Chicago, Ill. 60654
(312) 840-7378

JENNER & BLOCK LLP

Counsel for Office of the United Nations
High Commissioner for Refugees

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................ i

TABLE OF AUTHORITIES ......................................................................................................... ii

INTEREST OF AMICUS CURIAE ............................................................................................... 1

SUMMARY OF ARGUMENT ...................................................................................................... 3

ARGUMENT .................................................................................................................................. 7

I.     The United States Is Bound by the 1951 Convention and the 1967 Protocol .................... 7

II.    UNHCR Provides Authoritative Guidance in Interpreting the 1951
       Convention and the 1967 Protocol ..................................................................................... 8

III.   The Revised Policy Is at Variance with the United States' Obligations
       Under the 1951 Convention and the 1967 Protocol. .......................................................... 9

       A.    *The Revised Policy Restricts the Right to Seek Asylum in
              Violation of the 1951 Convention and the 1967 Protocol.* ........................................ 10

       B.    *The Revised Policy Creates a Penalty on Irregular Entry That
              Is Prohibited by Article 31(1) of the 1951 Convention.* ............................................ 13

       C.    *The Revised Policy Risks* Refoulement *of Refugees in Violation of
              Article 33(1) of the 1951 Protocol.* ............................................................................. 15

       D.    *Neither Withholding of Removal Under the INA Nor Protection
              Under the Convention Against Torture Is an Adequate Substitute
              for the Asylum Process.* .............................................................................................. 17

CONCLUSION ............................................................................................................................. 20

# TABLE OF AUTHORITIES

**Cases**

*Ali v. Lynch*, 814 F.3d 306 (5th Cir. 2016) ......................................................................9

*B010 v. Canada*, [2015] 3 S.C.R. 704 (Can.) ........................................................14, 15

BVerfG, 2 BvR 450/11, Dec. 8, 2014 (Ger.) ..........................................................15

*Fei Mei Cheng v. Attorney General*, 623 F.3d 175 (3d Cir. 2010)................................9

*Gjerazi v. Gonzales*, 435 F.3d 800 (7th Cir. 2006)................................................19

*Gutierrez-Rogue v. INS*, 954 F.2d 769 (D.C. Cir. 1992) ........................................18

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ...........................................2, 6–8, 18

*INS v. Stevic*, 467 U.S. 407 (1984) ......................................................................18

*Ling Huang v. Holder*, 744 F.3d 1149 (9th Cir. 2014) ........................................17

*M.A. v. INS*, 899 F.2d 304 (4th Cir. 1990)............................................................8

*Mekhoukh v. Ashcroft*, 358 F.3d 118 (1st Cir. 2004)..........................................9

*Mohammed v. Gonzales*, 400 F.3d 785 (9th Cir. 2005)........................................9

*Poradisova v. Gonzales*, 420 F.3d 70 (2d Cir. 2005) ........................................2

*R v. Asfaw* [2008] UKHL 31 ..............................................................................15

*Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155 (1993) ..........................................7, 16

*Yusupov v. Attorney General*, 518 F.3d 185 (3d Cir. 2008) ..........................................8

**Statutes**

8 U.S.C. § 1158..................................................................................................12

8 U.S.C. § 1231..................................................................................................17

Immigration and Nationality Act, 8 U.S.C. § 1101 et seq...........................8, 12, 17, 18

Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102....................................2, 3, 6, 8

**Legislative Materials**

S. Rep. No. 96-590 (1980).....................................................................................8

## Other Authorities

8 C.F.R. § 208.16 ................................................................................................17, 18

8 C.F.R. § 208.31 ....................................................................................................19

Ad Hoc Comm. on Statelessness, Status of Refugees & Stateless Persons, U.N.
   Doc. E/AC.32/2 (1950) ...............................................................................9, 11, 13

Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations, 83
   Fed. Reg. 55,934 (Nov. 9, 2018).......................................................2–4, 14, 17, 20

Brief of the UNHCR as Amicus Curiae, *INS v. Stevic*, 467 U.S. 407 (1984) (No.
   82-973)...............................................................................................................18

Convention on the Privileges & Immunities of the United Nations, Feb. 13, 1946,
   1 U.N.T.S. 15 .........................................................................................................1

Convention Relating to the Status of Refugees, July 28, 1951,
   189 U.N.T.S. 150 ..................................................................................1–15, 17–19

Cathryn Costello et al., Article 31 of the 1951 Convention Relating to the Status
   of Refugees (2017).................................................................................................15

Exec. Comm. of the High Commissioner's Programme, Note on International
   Protection, U.N. Doc. A/AC.96/815 (1993) ...............................................11, 15, 16

Final Act of the United Nations Conference of Plenipotentiaries on the Status of
   Refugees and Stateless Persons, July 25, 1951, 189 U.N.T.S. 138 ........................19

G.A. Res. 49/169 (Dec. 23, 1994)..............................................................................7

G.A. Res. 48/116 (Dec. 20, 1993)..............................................................................1

G.A. Res. 428(V) annex, Statute of the Office of the UNHCR (Dec. 14, 1950).......1, 3

G.A. Res. 217 A(III), Universal Declaration of Human Rights (Dec. 10, 1948) ........4, 9, 16

Guy S. Goodwin-Gill, *Article 31 of the 1951 Convention Relating to the Status of
   Refugees*, in Refugee Protection in International Law 185 (Volker Türk et al.
   eds., 2003).............................................................................................................13

Handbook on Procedures & Criteria for Determining Refugee Status, U.N. Doc.
   HCR/1P/4/ENG/REV.3 (3d ed. 2011) ...............................1, 5, 7–11, 13, 16, 18, 19

Elihu Lauterpacht & Daniel Bethlehem, *The Scope & Content of the Principle of
   Non-Refoulement*, in Refugee Protection in International Law 87 (Erika Feller
   et al. eds., 2003) ..............................................................................................16, 17

Presidential Proclamation Addressing Mass Migration Through the Southern
Border of the United States, 83 Fed. Reg. 57,661 (Nov. 9, 2018)............................3–5, 14, 20

Protocol Relating to the Status of Refugees, Jan. 31, 1967, 606 U.N.T.S. 267.......1–11, 14, 17–19

Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478 (Feb.
19, 1999) ..........................................................................................................................17

UNHCR, A Guide to International Refugee Protection and Building State Asylum
Systems (2017).................................................................................................................5, 10

UNHCR, Declaration of State Parties to the 1951 Convention and Its 1967
Protocol Relating to the Status of Refugees (2002)........................................................12, 18

UNHCR Exec. Comm., Conclusion No. 6 (XXVIII) (1977)............................................11, 16, 17

UNHCR Exec. Comm., Conclusion No. 8 (XXVIII) (1977)............................................11

UNHCR Exec. Comm., Conclusion No. 15 (XXX) (1979)...............................................15

UNHCR Exec. Comm., Conclusion No. 22 (XXXII) (1981).............................................17

UNHCR Exec. Comm., Conclusion No. 24 (XXXII) (1981).............................................19

UNHCR Exec. Comm., Conclusion No. 30 (XXXIV) (1983) ..................................11, 12, 17, 19

UNHCR Exec. Comm., Conclusion No. 58 (XL) (1989)..................................................14

UNHCR Exec. Comm., Conclusion No. 79 (XLII) (1996) ...............................................11

UNHCR, Follow-Up on Earlier Conclusions of the Sub-Committee on the
Determination of Refugee Status, U.N. Doc. EC/SCP/29 (1983) ...................................12

UNHCR, Guidelines on Applicable Criteria & Standards Relating to the
Detention of Asylum-Seekers and Alternatives to Detention (2012)................................9, 14

UNHCR, Note on Non-*Refoulement* (Submitted by the High Commissioner),
U.N. Doc. EC/SCP/2 (1977)............................................................................................15

U.S. Dep't of Justice, Exec. Office for Immigration Review, Fact Sheet: Asylum
& Withholding of Removal Relief & Convention Against Torture Protections
(Jan. 15, 2009)..................................................................................................................19

## INTEREST OF AMICUS CURIAE[1]

The Office of the United Nations High Commissioner for Refugees ("UNHCR") has a direct interest in this matter as the organization entrusted by the United Nations General Assembly with responsibility for providing international protection to refugees and other persons under its mandate.  *See* G.A. Res. 428(V), annex, Statute of the Office of the UNHCR (Dec. 14, 1950) ("UNHCR Statute"); G.A. Res. 48/116 (Dec. 20, 1993).  UNHCR fulfills its mandate by "[p]romoting the conclusion and ratification of international conventions for the protection of refugees" and by "supervising their application and proposing amendments thereto."  UNHCR Statute ¶ 8(a).

UNHCR's supervisory responsibility is also expressly provided for in the Preamble and Article 35 of the Convention Relating to the Status of Refugees ("1951 Convention"), July 28, 1951, 189 U.N.T.S. 150, and Article II of the Protocol Relating to the Status of Refugees ("1967 Protocol"), Jan. 31, 1967, 606 U.N.T.S. 267.  Both treaties obligate State parties to cooperate with UNHCR in the exercise of its mandate and to facilitate its supervisory role.

UNHCR exercises its mandate by issuing interpretations of the meaning of the 1951 Convention, the 1967 Protocol, and other international refugee instruments.  It issues these interpretations principally through its *Handbook on Procedures & Criteria for Determining Refugee Status* ("*Handbook*"), U.N. Doc. HCR/1P/4/ENG/REV.3 (3d ed. 2011).  UNHCR's *Guidelines on International Protection* and other UNHCR guidance documents supplement the *Handbook* and provide comprehensive direction to States on their obligations to ensure the

---

[1] No person other than UNHCR and its outside counsel authored this brief or provided funding related to it. This brief does not constitute a waiver, express or implied, of any privilege or immunity that UNHCR and its staff enjoy under applicable international legal instruments and recognized principles of international law.  *See* Convention on the Privileges & Immunities of the United Nations, Feb. 13, 1946, 1 U.N.T.S. 15.

protection of refugees.   UNHCR also provides specific guidance to States in the form of submissions to executive, legislative, and judicial branches of government.

UNHCR regularly presents its opinions to national courts, including to the federal courts of the United States.  Consistent with UNHCR's role and experience, the Supreme Court and lower federal courts have turned to UNHCR for "significant guidance" in interpreting international refugee instruments.  *E.g.*, *INS v. Cardoza-Fonseca*, 480 U.S. 421, 439 n.22 (1987); *Poradisova v. Gonzales*, 420 F.3d 70, 80 n.5 (2d Cir. 2005).  As the United States is a party to the 1967 Protocol, and has thereby also "agreed to comply with the substantive provisions of" the 1951 Convention, *Cardoza-Fonseca*, 480 U.S. at 429, UNHCR's guidance is particularly relevant to this Court's interpretation of the United States' treaty obligations and their implementation through domestic statutory law by the Refugee Act of 1980 ("Refugee Act"), Pub. L. No. 96-212, 94 Stat. 102.

The views of UNHCR are informed by more than six decades of experience supervising the treaty-based system of refugee protection created by United Nations Member States.  UNHCR has won two Nobel Peace Prizes for its work, and operates in some 130 countries in support of the nearly 68.5 million people who remain forcibly displaced from their homes.

UNHCR submits this brief out of concern that the United States' recent rule entitled Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations ("Interim Asylum Rule"), 83 Fed. Reg. 55,934 (Nov. 9, 2018), constitutes a substantial change in the United States' asylum policy that, if implemented, would be at variance with the United States' obligations under international law.  UNHCR has a strong interest in ensuring that the United States' asylum policy remains consistent with the obligations that the United States undertook when becoming party to the 1967 Protocol, and submits this brief to offer guidance to the Court on those obligations.

Consistent with its approach in other cases, UNHCR takes no position directly on the merits of Plaintiffs' asylum claims through this brief.

## SUMMARY OF ARGUMENT

The United States is bound to certain international treaty obligations as they relate to refugees, in particular those enshrined in the 1967 Protocol, to which the United States is formally a party, and the 1951 Convention, which is incorporated by reference in the 1967 Protocol. Essential to this body of international refugee law are core procedural and substantive individual rights that States must uphold, and which Congress incorporated into federal statutory law by enacting the Refugee Act. By virtue of its authority and mandate under the UNHCR Statute, the 1951 Convention, and the 1967 Protocol, UNHCR provides authoritative guidance to States, including the United States, on how to ensure compliance with their obligations under international refugee law.

UNHCR is concerned that the Interim Asylum Rule, when considered alongside the November 9, 2018, Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States ("Proclamation"), 83 Fed. Reg. 57,661 (Nov. 9, 2018), creates a national refugee policy (the "Revised Policy") that is at odds with the United States' obligations under international law. In particular, the Revised Policy effectively denies the right to seek asylum to any refugee who crosses into the United States from Mexico outside of a designated port of entry. The Proclamation suspends the right of entry to "any alien into the United States across the international boundary between the United States and Mexico" and exempts only "alien[s] who enter[] the United States at a port of entry and properly present[] for inspection." *Id.* at 57,663. The Interim Asylum Rule makes individuals ineligible for asylum if "the alien is subject

to a presidential proclamation" that "suspend[s] or limit[s] the entry of aliens along the southern border with Mexico."  Interim Asylum Rule, 83 Fed. Reg. at 55,952.

This blanket denial of asylum without due process for refugees who cross the United States' southern border irregularly is at variance with three well-established fundamental principles of international law, namely, the right to seek asylum, the prohibition against penalties for irregular entry, and the principle of non-*refoulement*.

First, UNHCR is concerned that the Revised Policy unduly restricts access to asylum. International law establishes the right of every individual "to seek . . . in other countries asylum from persecution."  G.A. Res. 217 A(III) art. 14(1), Universal Declaration of Human Rights (Dec. 10, 1948).  The 1951 Convention and 1967 Protocol effectuate the right to seek asylum and implicitly require a process whereby an asylum-seeker's status can be determined.

The 1951 Convention and 1967 Protocol define who is a refugee, as well as who is not entitled to refugee protection by virtue of specific and limited exclusion clauses.  They also establish a prohibition on returning refugees, whether directly or indirectly, to "the frontiers of territories where [their] life or freedom would be threatened on account of [their] race, religion, nationality, membership of a particular social group or political opinion"—known as the principle of non-*refoulement*—which has also been recognized as a norm of customary international law. 1951 Convention art. 33(1).

A person is a refugee within the meaning of the 1951 Convention and 1967 Protocol as soon as he or she fulfills the criteria in the definition of a refugee, which necessarily occurs prior to the time at which his or her refugee status is formally determined.  Recognition of refugee status therefore does not make an individual a refugee, but instead formally declares the person to be one.  Consequently, the 1951 Convention and 1967 Protocol implicitly require States to implement

a fair and efficient process for determining refugee status for asylum-seekers or to resort to group-based protection mechanisms in the event of a large-scale influx. Handbook ¶¶ 28–29; UNHCR, A Guide to International Refugee Protection and Building State Asylum Systems 30 (2017).

The Revised Policy effectively nullifies the right to seek asylum for all of those affected because it denies access to asylum without an individualized or group-based protection process to persons who cross the southern border irregularly. Such a sweeping policy goes well beyond the specific and limited exclusions on entitlements to refugee protection included in the 1951 Convention.

The exception included in the Proclamation, which allows asylum-seekers who enter the United States through official ports of entry to apply for asylum, does not render the Revised Policy consistent with international law. The 1951 Convention and 1967 Protocol do not foresee any restrictions on the rights of individuals seeking asylum based on the manner of their entry. UNHCR is concerned that the well-documented realities surrounding refugee flight, and the sometimes lengthy wait times at border checkpoints and associated dangers, will compel some refugees to cross into the United States irregularly. Were these refugees to enter the United States irregularly, the Revised Policy would render them categorically ineligible to seek asylum, a result international law does not permit.

Second, the Revised Policy fails to take into account Article 31(1) of the 1951 Convention, which prohibits States from penalizing refugees for unlawful entry. Parties bound by Article 31(1) generally commit to refrain from enforcing "penalties . . . on refugees" "on account of their illegal entry or presence" in the relevant State's territory. 1951 Convention art. 31(1). As Article 31(1)'s drafting history shows, the provision was informed by experience with the realities of refugee movements before, during, and after World War II, realities that make irregular entry in many

instances a precarious necessity.  Consistent with the protective purpose of the 1951 Convention, the word "penalties" in Article 31(1) has an inclusive meaning and in principle encompasses any kind of civil, criminal, or procedural disadvantage—including the restriction of asylum itself.  The Revised Policy is at odds with Article 31(1)'s prohibition as it penalizes refugees who irregularly enter the United States at its southern border by categorically denying them the right to seek asylum in the United States, and putting them at risk of being returned to persecution solely because of their manner of entry.

Third, the Revised Policy is at odds with the principle of non-*refoulement*—a core principle of international refugee law.  The 1951 Convention and the 1967 Protocol prohibit States from "expel[ling] or return[ing] ('*refouler*') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."  1951 Convention art. 33(1).  The Revised Policy's categorical prohibition on asylum for anyone who enters the country irregularly at the southern border could result in the removal of refugees to countries where they face the aforementioned risks, a result that is inconsistent with international law.

In light of these three deficiencies, UNHCR is concerned that the Revised Policy is at variance with the United States' obligations under international law, specifically the 1951 Convention and the 1967 Protocol.  Given its mandated responsibility to supervise the implementation of both treaties and to advise States of their duties under international refugee law, and mindful of Congress's avowed intention through the Refugee Act to "bring United States refugee law into conformance with" its international obligations, *Cardoza-Fonseca*, 480 U.S. at 436, UNHCR respectfully encourages the Court to consider the United States' international law obligations when evaluating Plaintiffs' challenge to the Revised Policy.

## ARGUMENT

**I.       The United States Is Bound by the 1951 Convention and the 1967 Protocol.**

The 1951 Convention was drafted with the intent of providing those fleeing persecution with "the widest possible exercise of . . . fundamental rights and freedoms." 1951 Convention preamble.  The treaty, which for more than six decades has served as the "cornerstone of the international system for the protection of refugees," clarifies the obligations of States to refugees, as well as to persons seeking international protection whose refugee status has not yet been formally determined.  G.A. Res. 49/169 (Dec. 23, 1994).  The 1951 Convention specifically prohibits States from expelling refugees, penalizing them for unlawful entry, or returning them to territory where their lives or freedom would be threatened on account of "race, religion, nationality, membership of a particular social group or political opinion," unless they fall within its specific and limited exclusion clauses.  1951 Convention art. 31–33.

Though the United States is not formally a party to the 1951 Convention, it has ratified the Convention's 1967 Protocol.  *Cardoza-Fonseca*, 480 U.S. at 436–37.  Because the 1967 Protocol explicitly incorporates "Articles 2 through 34 of the [1951] Convention," by ratifying the 1967 Protocol, the United States agreed to comply with all of these "substantive provisions" of the 1951 Convention.  *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 169 n.19 (1993); *Cardoza-Fonseca*, 480 U.S. at 429.

The 1967 Protocol augments the 1951 Convention and expands the definition of "refugee" by removing the geographic and temporal limitations that existed in the 1951 Convention.  1967 Protocol art. I(2)–(3).  As a result of the 1967 Protocol, the status of "refugee," along with the rights that accompany that status, apply to any individual who meets the broader definition.  1951 Convention art. 1(A); 1967 Protocol art. I(2)–(3); Handbook ¶ 28.

In 1980, in order to implement by statute the United States' commitments under the 1951 Convention and the 1967 Protocol and bring "United States refugee law into conformance" with international law, Congress amended the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 et seq., by enacting the Refugee Act. *Cardoza-Fonseca*, 480 U.S. at 436. Congress's intent in passing the Refugee Act was clear: The INA's asylum provisions must "be construed consistent with the Protocol." S. Rep. No. 96-590 at 20, 96th Cong., 2d Sess. (1980). Congress thus gave unambiguous guidance to the federal courts that the INA "protect[s] refugees to the fullest extent of [the United States'] international obligations." *Yusupov v. Attorney General*, 518 F.3d 185, 203 (3d Cir. 2008).

## II.    UNHCR Provides Authoritative Guidance in Interpreting the 1951 Convention and the 1967 Protocol.

UNHCR exercises its supervisory responsibility by issuing interpretive guidance on the meaning of provisions contained in the 1951 Convention and its 1967 Protocol. The *Handbook*, which was prepared in 1979 at the request of Member States, including the United States, sets forth authoritative guidance. Although the *Handbook* is not legally binding upon United States officials, "Congress was aware of the criteria articulated in the *Handbook* when it passed the [Refugee] Act in 1980, and . . . it is appropriate to consider the guidelines in the *Handbook* as an aid to construction of the Act." *M.A. v. INS*, 899 F.2d 304, 321 n.6 (4th Cir. 1990) (quoting Memorandum from Theodore B. Olson, Assistant Attorney Gen., OLC, to David Crossland, Gen. Counsel, INS (Aug. 24, 1981)). As the Supreme Court has recognized, the *Handbook* thus provides "significant guidance" in construing the 1967 Protocol and the Refugee Act that implemented it into domestic law. *Cardoza-Fonseca*, 480 U.S. at 439 n.22.

In addition to the Supreme Court's recognition of UNHCR's unique role, lower federal courts also recognize that UNHCR's "analysis provides significant guidance for issues of refugee

8

law," *Mohammed v. Gonzales*, 400 F.3d 785, 798 (9th Cir. 2005), and regularly rely upon UNHCR's legal interpretations and policy statements in assessing refugee claims and policies. *See, e.g.*, *Ali v. Lynch*, 814 F.3d 306, 314 n.7 (5th Cir. 2016); *Fei Mei Cheng v. Attorney General*, 623 F.3d 175, 193 & n.13 (3d Cir. 2010); *Mekhoukh v. Ashcroft*, 358 F.3d 118, 126 & n.6 (1st Cir. 2004).

**III.      The Revised Policy Is at Variance with the United States' Obligations Under the 1951 Convention and the 1967 Protocol.**

The right to seek asylum is firmly established in international law.  Article 14(1) of the Universal Declaration of Human Rights, whose adoption by the United Nations General Assembly the United States strongly supported, establishes the right of the individual to "seek and to enjoy in other countries asylum from persecution."  G.A. Res. 217 A(III) art. 14(1) (Dec. 10, 1948) ("UDHR").  The 1951 Convention and 1967 Protocol give meaning to this right by defining refugee to include those who have not been formally recognized as a refugee, and by elaborating on refugees' rights and protections.  *See* 1951 Convention art. 1(A); 1967 Protocol art. I(2)–(3); Handbook ¶ 28.

Among these embedded rights and protections are the right to seek asylum, protection against penalties for illegal entry where the applicable conditions are fulfilled, and the principle of non-*refoulement*, which help to ensure the protection of those fleeing persecution and are essential to the full enjoyment of the other rights guaranteed by the 1951 Convention and 1967 Protocol. These protections are designed to account for the reality that the "position of asylum-seekers may . . . differ fundamentally from that of ordinary migrants."  UNHCR, Guidelines on Applicable Criteria & Standards Relating to the Detention of Asylum-Seekers and Alternatives to Detention 12 (2012) ("Detention Guidelines"); Ad Hoc Comm. on Statelessness, Status of Refugees & Stateless Persons, U.N. Doc. E/AC.32/2, ch. XI, art. 24 cmt. ¶ 2 (1950).  By definition, refugees

are fleeing persecution and do not enjoy the protection of their country of origin and, as a result, are among the most vulnerable of populations in the world.  Handbook ¶ 190.

UNHCR is concerned that the United States' recent refugee policy changes, reflected in the Revised Policy, are at variance with its obligations under the 1951 Convention and 1967 Protocol.  The Revised Policy is inconsistent with three aspects of the United States' international law obligations.  First, the Revised Policy's categorical denial of asylum to a broad class of asylum-seekers is at odds with the United States' obligation to protect the right of access to asylum and to provide a fair and efficient individualized process consistent with the standards set forth in international law.  Second, the Revised Policy's categorical denial of asylum on the basis of irregular entry is inconsistent with the United States' obligation under Article 31(1) of the 1951 Convention not to penalize asylum-seekers.  Finally, the Revised Policy is likely to result in the *refoulement* of refugees who, despite being able to meet the criteria for refugee status, have been categorically prohibited from asylum within the United States.

### A.  The Revised Policy Restricts the Right to Seek Asylum in Violation of the 1951 Convention and the 1967 Protocol.

The 1951 Convention and 1967 Protocol define who is a refugee, and therefore entitled to protection, without reference to official recognition.  In other words, a grant of refugee status, or asylum, does not make a person a refugee; it formally recognizes that the person is a refugee. Handbook ¶ 28; UNHCR, Guide to International Refugee Protection, *supra*, at 30.  In light of this, "[i]t is obvious that, to enable States part[y] to the Convention and to the Protocol to implement their provisions, refugees have to be identified."  Handbook ¶ 189.  This embodies the right to seek asylum, and States must provide all asylum-seekers with a fair and efficient process that allows them to demonstrate their eligibility for refugee status under international law.  *Id.* ¶¶ 189–90;

Exec. Comm. of the High Commissioner's Programme, Note on International Protection ¶ 11, U.N. Doc. A/AC.96/815 (1993) ("Note on International Protection").

That process must meet basic requirements. In particular, it must allow for an individualized examination on whether the asylum-seeker meets the definition of a refugee as established in the 1951 Convention and 1967 Protocol. *See* UNHCR Exec. Comm., Conclusion No. 8 (XXVIII) ¶ (e) (1977); UNHCR Exec. Comm., Conclusion No. 30 (XXXIV) ¶¶ (e), (i) (1983). Moreover, because some refugees have no choice but to enter a safe country irregularly, *see infra* § III(B), States may not condition access to asylum procedures on regular entry. Ad Hoc Comm. on Statelessness, *supra*, ch. XI, art. 24 ¶ 2; UNHCR Exec. Comm., Conclusion No. 6 (XXVIII) ¶ (c) (1977); UNHCR Exec. Comm., Conclusion No. 79 (XLII) ¶ (j) (1996). In other words, a fair asylum process must allow for the possibility that some refugees will need to cross borders irregularly, and a State may not restrict asylum on this ground. Handbook ¶ 189.

The Revised Policy falls short of these requirements. The Revised Policy effectively establishes a bar to access that denies asylum-seekers fair and efficient procedures to determine their refugee claims. Although refugees who enter the United States at a designated port of entry do retain access to asylum, the Revised Policy ignores the realities of refugee flight, which make it impossible for some refugees to present themselves at ordinary ports of entry. Moreover, it may be impossible for some refugees to await the "lengthy delays" for processing at designated ports of entry given the exigencies of their situation, and they may therefore be compelled to cross irregularly. *E. Bay Sanctuary Covenant v. Trump*, ___ F.3d ____, No. 18-CV-06810, 2018 WL 6053140, at *7 (N.D. Cal. Nov. 19, 2018).

UNHCR appreciates that States have operational demands to manage borders efficiently. It further acknowledges that, in the interest of orderly operation of borders, States are within their

rights to manage access to asylum through the imposition of procedural requirements and accelerated procedures. UNHCR, Fair and Efficient Asylum Procedures: A Non-Exhaustive Overview of Applicable International Standards 2–3 (2005). However, UNHCR has serious concerns about the categorical bar to the asylum process envisioned by the Revised Policy. States may not use border management objectives to deny protection to entire categories of persons who may satisfy the refugee definition.[2]

UNHCR also recognizes that screening procedures for the initial determination of refugee status "may usefully include special provision for dealing in an expeditious manner with applications" that are "clearly abusive" or "manifestly unfounded." UNHCR Exec. Comm., Conclusion No. 30, *supra*, ¶ (d). However, any such procedures must, taking into account "the grave consequences of an erroneous decision," be "accompanied by appropriate procedural guarantees," *id.* ¶ (e), and "no application [may] be treated as manifestly unfounded or abusive unless its fraudulent character or its lack of any connection with the relevant criteria is truly free from doubt," UNHCR, Follow-Up on Earlier Conclusions of the Sub-Committee on the Determination of Refugee Status ¶ 19, U.N. Doc. EC/SCP/29 (1983).[3]

Finally, although the 1951 Convention foresees that some individuals may be excluded from refugee protection in exceptional circumstances, the Revised Policy does not conform to the specific and limited restrictions that the 1951 Convention allows. Under the 1951 Convention,

---

[2] Where procedural bars appear in the INA, they are either premised on the notion that international protection will be provided elsewhere or include exceptions for those who satisfy the refugee definition and have good reason for failing to satisfy a State's procedural requirements. *See, e.g.*, 8 U.S.C. § 1158(a)(2)(D) (providing for an exception to asylum application filing deadline).

[3] The underlying purpose behind such procedural provisions is to safeguard non-*refoulement*, a foundational principle of the 1951 Convention. UNHCR, Declaration of State Parties to the 1951 Convention and Its 1967 Protocol Relating to the Status of Refugees ¶ 4 (2002).

States are to deny refugee protection to individuals who have committed heinous acts or serious common crimes—and they may deny protection from *refoulement* to individuals who pose a "danger to the security of the country in which" they are in and to individuals "who, having been convicted by a final judgment of a particularly serious crime, constitute[] a danger to the community of that country."   1951 Convention art. 1(F), 33(2).   These exclusions require individualized assessments and "must be [interpreted] restrictive[ly]."   Handbook ¶149.   The Revised Policy, by establishing a categorical bar to asylum based on irregular entry, is thus outside the careful framework for access to asylum provided for by the Convention.

At its core, the international refugee protection regime requires that an individual be admitted to a procedure that assesses whether he or she meets the international definition of a refugee in a fair and efficient manner, or an application of a group-based recognition mechanism. *See* Handbook ¶ 44 (noting that in a "'group determination' of refugee status, . . . each member of [a] group is regarded *prima facie* . . . as a refugee").   Any such procedural framework must provide safe access to, and process within, "the State where [the asylum-seeker is] seeking admission as [a] refugee[]."   UNHCR, Fair and Efficient Asylum Procedures, *supra*, at 2.

### B.   The Revised Policy Creates a Penalty on Irregular Entry That Is Prohibited by Article 31(1) of the 1951 Convention.

Because of their serious and urgent plight, refugees are "rarely in a position to comply with the requirements for legal entry," and it has long been recognized that refugees may often be forced to "cross[] . . . frontier[s] clandestinely" to evade detection and ensure their safety.   Ad Hoc Comm. on Statelessness, *supra*, art. 24 cmt. ¶ 2.   The framers of the 1951 Convention understood this reality and, at the prompting of a joint proposal co-authored by the United States, incorporated protections against punishment for irregular entry into the treaty.   Guy S. Goodwin-Gill, *Article 31 of the 1951 Convention Relating to the Status of Refugees*, *in* Refugee Protection in International

Law 185, 190 (Volker Türk et al. eds., 2003). The resulting provision, Article 31(1), prohibits States from "impos[ing] penalties, on account of their illegal entry or presence, on refugees who, coming directly from a territory where their life or freedom was threatened . . . enter or are present in their territory without authorization." 1951 Convention art. 31(1).

The importance of Article 31(1)'s protection cannot be overstated, as penalties on irregular entry endanger the fundamental right to asylum itself. As noted, in "exercising the right to seek asylum, asylum-seekers are often forced to arrive at, or enter, a territory without prior authorisation," and if a State could refuse refugees asylum based on unlawful entry, such a refusal would necessarily operate to return refugees to the dangers they fled in the first instance. Detention Guidelines at 12; UNHCR Exec. Comm., Conclusion No. 58 (XL) (1989). Accordingly, and as the Supreme Court of Canada recently explained, "[Article 31(1)'s] prohibition for domestic admissibility provisions is clear. . . . '[A]n individual cannot be denied refugee status—or, most important, the opportunity to make a claim for such status through fair assessment procedures— solely because of the way in which that person sought or secured entry into the country of destination.'" *B010 v. Canada*, [2015] 3 S.C.R. 704, 729 (Can.) (quoting Anne T. Gallagher & Fiona David, The International Law of Migrant Smuggling 165 (2014)). The Revised Policy is inconsistent with this proscription, as it has the effect of categorically denying asylum to anyone who crosses the United States' southern border outside of a designated port of entry. *See* Proclamation, 83 Fed. Reg. at 57,663; Interim Asylum Rule, 83 Fed. Reg. at 55,952.

The purpose of the 1951 Convention and 1967 Protocol is to ensure that all refugees can effectively gain access to international protection, and to protect them from the imposition of penalties on account of illegal entry or presence. Accordingly, the term "penalties" in Article 31(1) should be interpreted in a manner that protects, rather than prevents, refugees' access to

14

asylum.   UNHCR, Summary Conclusions on Non-Penalization for Illegal Entry or Presence 2 (2017); *accord, e.g.*, *B010*, 3 S.C.R. at 729; Cathryn Costello et al., Article 31 of the 1951 Convention Relating to the Status of Refugees 33 (2017).[4]   UNHCR's view is that the concept of impermissible "penalties" in Article 31(1) encompasses civil or administrative penalties as well as criminal ones.   In sum, the refusal to allow a person who has entered a country without authorization to apply for asylum amounts to a penalty at variance with Article 31(1) of the 1951 Convention.

### C.   The Revised Policy Risks **Refoulement** *of Refugees in Violation of Article 33(1) of the 1951 Protocol.*

The principle of non-*refoulement* is established in the 1951 Convention, which in Article 33(1) prohibits States from "expel[ling] or return[ing] ('*refouler*') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." 1951 Convention art. 33(1).   Article 33(1) has a broad reach and its protection against *refoulement* extends to all refugees, including those who have not been formally recognized as such.   Note on International Protection ¶ 11; UNHCR, Note on Non-*Refoulement* (Submitted by the High

---

[4] Article 31(1) should also be interpreted to include those who transit through a third country before seeking asylum. There is no obligation under international law for a person to seek international protection at the first effective country, and "asylum should not be refused solely on the ground that it could be sought from another State."   UNHCR Exec. Comm., Conclusion No. 15 (XXX) (1979).   Consistent with this principle of refugee law, Article 31(1)'s protections are available to refugees who have arrived in a State from their country of origin after transiting through a third State.   *See, e.g.*, *R v. Asfaw* [2008] UKHL 31, [19], [50] (appeal taken from Eng.) ("Article 31(1) was intended to apply, and has been interpreted to apply, to persons who have briefly transited other countries . . . ."); BVerfG, 2 BvR 450/11 ¶ 31, Dec. 8, 2014 (Ger.) ("[A] refugee does not forfeit his protection under Article 31, Paragraph 1, simply because he entered from a third country instead of his country of origin, provided that the third country is used only as a transit country and the stay in the third country is not culpably delayed." (translation of counsel)).

Commissioner) ¶ 19, U.N. Doc. EC/SCP/2 (1977).  As a consequence, Article 33(1) also protects all asylum-seekers whose status has not yet been determined.  Note on International Protection ¶ 11; Elihu Lauterpacht & Daniel Bethlehem, *The Scope & Content of the Principle of Non-Refoulement*, *in* Refugee Protection in International Law 87, 116–18 (Erika Feller et al. eds., 2003).

The principle of non-*refoulement* serves as "the cornerstone of asylum and of international refugee law," UNHCR, Note on the Principle of Non-*Refoulement* (1997), and is one of the "[c]ore principles of the 1951 Convention," Handbook at 1.  The principle follows directly from the international law right to seek and enjoy asylum from persecution.  UNHCR Exec. Comm., Conclusion No. 6, *supra*, ¶ (a); *see* UDHR art. 14.  The proscription against returning vulnerable individuals to a place where they are endangered "reflects the commitment of the international community to ensure to all persons the enjoyment of human rights, including the rights to life, to freedom from torture or cruel, inhuman or degrading treatment or punishment, and to liberty and security of the person."  UNHCR, Note on the Principle of Non-*Refoulement*, *supra*.  It is also recognized as a principle of customary international law.  Lauterpacht & Bethlehem, *supra*, at 149–63.

By categorically denying refugees the right to seek asylum if they have crossed the United States' southern border irregularly, the Revised Policy risks violating Article 33(1).  The Revised Policy's requirements expressly render refugees who are present in the United States or at its border subject to the risk of deportation, directly or indirectly, to the very States they have desperately sought to escape.  As the Supreme Court has made clear, such expulsion is forbidden by Article 33(1).  *See Sale*, 509 U.S. at 180, 182; *see also* Lauterpacht & Bethlehem, *supra*, at

113–14; UNHCR Exec. Comm., Conclusion No. 6, *supra*, § (c); UNHCR Exec. Comm., Conclusion No. 22 (XXXII) § II(A) ¶ 2 (1981).[5]

### D. Neither Withholding of Removal Under the INA Nor Protection Under the Convention Against Torture Is an Adequate Substitute for the Asylum Process.

The Interim Asylum Rule purports to be consistent with the United States' obligations under international refugee law because it does not deny aliens the right to apply for withholding of removal under the INA, *see* 8 U.S.C. § 1231(b)(3)(A), or the protection afforded by the federal regulations that implement the Convention Against Torture ("CAT"), *see* 8 C.F.R. § 208.16(c). Interim Asylum Rule, 83 Fed. Reg. at 55,939.  However, UNHCR is concerned that neither withholding of removal under the INA nor protection under CAT provides an adequate substitute for the asylum procedures qualified by the Interim Asylum Rule.  Nor do they extend refugees all of the rights articulated in the 1951 Convention and 1967 Protocol.

Withholding of removal and protection under CAT are not available to all refugees. UNHCR understands that in order to prove entitlement to withholding of removal under the INA, an applicant "must demonstrate that it is more likely than not that he would be subject to persecution" in his country of origin.  *Ling Huang v. Holder*, 744 F.3d 1149, 1152 (9th Cir. 2014). By contrast, an alien is entitled to asylum if he makes the lesser showing of a well-founded fear of persecution, which requires establishing "to a reasonable degree, that his continued stay in his

---

[5] As noted, Article 33(2) does create narrow exceptions to Article 33(1)'s prohibition against *refoulement*, providing that the "benefit of [Article 33(1)] may not . . . be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of that country."  1951 Convention art. 33(2).  However, the Revised Policy goes beyond the Article 33(2) exceptions by creating a categorical ban on refugees who cross irregularly at the United States' southern border, putting these individuals at grave risk of persecution. *See* UNHCR Exec. Comm., Conclusion No. 30, *supra*, ¶ (e).  A State relying on Article 33(2) must determine on an individual basis whether a refugee falls into one of the Article 33(2) exceptions.  *See* Lauterpacht & Bethlehem, *supra*, at 136–37.

country of origin has become intolerable to him for the reasons stated in the definition [of a refugee] or would for the same reasons be intolerable if he returned there." *Cardoza-Fonseca*, 480 U.S. at 439–40 (quoting Handbook ¶ 42).   Under the Revised Policy, a refugee who can demonstrate a "well-founded fear of persecution" may nonetheless be denied even the most basic rights that come with asylum under the 1951 Convention and 1967 Protocol, including protection from *refoulement*, if she cannot make the "greater showing" that she is entitled to withholding of removal under the INA.  *Gutierrez-Rogue v. INS*, 954 F.2d 769, 772 (D.C. Cir. 1992).[6]

The statutory incorporation of protections provided by CAT are similarly unavailable to all refugees who would otherwise qualify for asylum.  UNHCR understands that under United States law, an alien is entitled to protection under CAT only if he or she proves that "it is more likely than not that he or she would be tortured if removed."  8 C.F.R. § 208.16(c)(2).  Like the standard for withholding of removal, this standard is more difficult to meet than the internationally prescribed standard for asylum: "[T]o show a 'well-founded fear of persecution,' an alien need not prove that it is more likely than not that he or she will be persecuted in his or her home country." *Cardoza-Fonseca*, 480 U.S at 449.  Moreover, because of its singular focus on torture, statutory

---

[6] Although UNHCR recognizes that the Supreme Court's opinion in *INS v. Stevic*, 467 U.S. 407 (1984)—in which the Court held that withholding of removal is available to only those who can prove that it is more likely than not that they will be persecuted on removal, *id.* at 429–30—is binding upon this Court, UNHCR notes that Article 33(1) of the 1951 Convention prohibits the *refoulement* of any individual who can make the lesser showing of a "well-founded fear of persecution."  *See generally* Brief of the UNHCR as Amicus Curiae at 12–29, *Stevic*, 467 U.S. 407 (No. 82-973).  The purpose behind a lower threshold is to safeguard against *refoulement* given the serious danger that *refoulement* poses.   UNHCR, Declaration of State Parties to the 1951 Convention and Its 1967 Protocol Relating to the Status of Refugees, *supra*, ¶ 4.  Moreover, even if Article 33(1) did incorporate the more onerous "more likely than not" standard of proof, it is still an inadequate substitute for asylum, which, as the Supreme Court has recognized, is available to all individuals who can demonstrate a "well-founded fear of persecution."  *Cardoza-Fonseca*, 480 U.S. at 430–32.

protection implementing CAT may be unavailable for refugees facing persecution "for reasons of race, religion, nationality, membership of a particular social group or political opinion," 1951 Convention art. 1(A)(2), even where the persecution entails serious violations of human rights, such as unlawful "detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, [or] surveillance," if the persecution does not qualify as torture under federal law, *Gjerazi v. Gonzales*, 435 F.3d 800, 808 (7th Cir. 2006).[7]

Finally, the 1951 Convention and 1967 Protocol also require States to provide substantive guarantees for refugees that ensure a standard of treatment appropriate to their predicament and a more humane life in the host country. For instance, States should endeavor to unite refugees with their families and provide refugees with the possibility of naturalization. *See* 1951 Convention art. 34; Final Act of the United Nations Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons, July 25, 1951, § IV(B), 189 U.N.T.S. 138; Handbook ¶¶ 181–88; UNHCR Exec. Comm., Conclusion No. 24 (XXXII) (1981). The same treatment is not necessarily available to those who receive withholding of removal or protection under CAT. *See* U.S. Dep't of Justice, Exec. Office for Immigration Review, Fact Sheet: Asylum & Withholding of Removal Relief & Convention Against Torture Protections 1, 6–7 (Jan. 15, 2009).

---

[7] Although the Revised Policy provides individuals access to procedures that screen for potential eligibility for withholding of removal and relief under CAT, those screening procedures require applicants to show a "reasonable fear of persecution or torture," 8 C.F.R. § 208.31(c), which not only amounts to a "higher screening standard" than the "credible fear" standard that entitles an alien to the asylum process, Regulations Concerning the Convention Against Torture, 64 Fed. Reg. 8478, 8485 (Feb. 19, 1999), but also exceeds the permissible bounds of screening under international law. UNHCR Exec. Comm., Conclusion No. 30, *supra*.

## CONCLUSION

UNHCR is concerned that the refugee policy reflected in the Interim Asylum Rule and Proclamation is at variance with the United States' obligations under international law, and requests the Court to consider those obligations when evaluating the merits of Plaintiffs' claims.

Dated:  December 6, 2018                         Respectfully submitted,

                                                /s/ Patrick W. Pearsall

                                                Patrick W. Pearsall
                                                D.C. Bar No. 975801
                                                    *Counsel of Record*
                                                Karthik P. Reddy
                                                D.C. Bar No. 1048848
                                                1099 New York Ave., N.W.
                                                Washington, D.C. 20001
                                                (202) 639-6000

                                                Vaishalee V. Yeldandi
                                                Ill. Bar No. 6327807
                                                Pro Hac Vice Application Pending
                                                353 N. Clark St.
                                                Chicago, Ill. 60654
                                                (312) 840-7378

                                                JENNER & BLOCK LLP

                                                Counsel for Office of the United Nations
                                                High Commissioner for Refugees