**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

O.A., K.S., A.V., G.Z., D.S., C.A.,

                    *Plaintiffs*,

           v.                                                        Civil Action No. 1:18-cv-02718-RDM

DONALD J. TRUMP, et al.,

                    *Defendants*.

**REPLY IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING
ORDER AND PRELIMINARY INJUNCTION**

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................1

I.    Plaintiffs' Claims Are Justiciable. ....................................................................................1

    A.    This Court Has Jurisdiction to Hear Plaintiffs' Claims Under Either 28 U.S.C. § 1331 or 8 U.S.C. § 1252(e)(3).........................................................1

        1.    The Court Has Jurisdiction Under 28 U.S.C. § 1331.................................2

        2.    The Court Has Jurisdiction Under § 1252(e)(3). ......................................3

    B.    The *East Bay* Injunction Does Not Deprive Plaintiffs of Standing. ......................4

II.    Plaintiffs Are Likely To Succeed on the Merits. ...............................................................6

    A.    The Rule Violates 8 U.S.C. § 1158(a)(1)................................................................6

        1.    The Rule Effectively Denies the Right to Seek Asylum.............................7

        2.    None of the Cases on Discretionary Denials of Asylum Support the Government's Position................................................................................7

        3.    The Rule Denies Asylum Based on Manner of Entry................................9

    B.    The Rule Violates the Expedited Removal Statute, 8 U.S.C. § 1225(b). ...............9

    C.    The Rule Violates the TVPRA. .............................................................................10

    D.    The Statutes Should Be Construed To Avoid Placing the United States in Violation of Its International Obligations. .............................................................11

    E.    Final "Agency Action" Has Occurred. ..................................................................14

    F.    The New DOJ Regulations Are Void Because They Were Issued by an Acting Attorney General Whose Appointment Violates the Law. ........................14

    G.    The Rule Violates the Statutory Requirement that Conditions on Asylum Be Established By Regulation. .............................................................................17

    H.    The Rule Was Improperly Issued Without Notice and Time for Comment.........18

        1.    The Good Cause Exception Does Not Apply. .........................................19

        2.    The Foreign Affairs Exception Does Not Apply. ....................................21

III.    The Remaining TRO Factors Support the Issuance of a TRO, and the Court May Grant Nationwide Equitable Relief....................................................................................23

CONCLUSION............................................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Aguilar v. ICE*, 510 F.3d 1 (1st Cir. 2007) .................................................................2, 3

*Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013)...........................................................6

*American Immigration Lawyers Association v. Reno*, 199 F.3d 1352 (D.C. Cir. 2000) ...............................................................................................................4, 25

*Aziz v. Trump*, 2017 WL 580855 (E.D. Va. Feb. 13, 2017) .......................................5

*Barrick Goldstrike Mines Inc. v. Browner,* 215 F.3d 45 (D.C. Cir. 2000) ..................14

*Bennett v. Spear*, 520 U.S. 154 (1997) .......................................................................2

*Cazun v. Att'y Gen.*, 856 F.3d 249 (3d Cir. 2017) ......................................................13

*City of Waukesha v. EPA*, 320 F.3d 228 (D.C. Cir. 2003)...........................................17

*Comm. on Judiciary of U.S. House of Representatives v. Miers*, 542 F.3d 909 (D.C. Cir. 2008) ...................................................................................................5

*Delgado v. Quarantillo*, 643 F.3d 52 (2d Cir. 2011) (per curium) ..............................3

E. Bay Sanctuary Covenant v. Trump, 2018 WL 6053140 (N.D. Cal. Nov. 19, 2018) ................................................................................................... passim

*E. Bay Sanctuary Covenant v. Trump*, 2018 WL 6428204 (9th Cir. Dec. 7, 2018) .............. passim

*Farquharson v. U.S. Att'y Gen.*, 246 F.3d 1317 (11th Cir. 2001) ...............................18

*Florida ex rel. Bondi v. U.S. Dep't of Health & Human Servs.*, 780 F. Supp. 2d 1256 (N.D. Fla. 2011) ........................................................................................5

*Goudy-Bachman v. U.S. Dep't of Health & Human Servs.*, 811 F. Supp. 2d 1086 (M.D. Pa. 2011) .....................................................................................5

*Harmon v. Thornburgh*, 878 F.2d 484 (D.C. Cir. 1989) ............................................25

*Haw. Helicopter Operators Ass'n v. FAA*, 51 F.3d 212 (9th Cir. 1995) .....................20

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ..........................................23

*Horsehead Res. Dev. Co. v. EPA*, 130 F.3d 1090 (D.C. Cir. 1997) ............................15

*Int'l B'hd of Teamsters v. Peña*, 17 F.3d 1478 (D.C. Cir. 1994)................................21, 22

*Int'l Refugee Assistance Project v. Trump*, 2017 WL 1018235 (D. Md. Mar. 16, 2017) ............................................................................................................................5

*J.E.F.M. v. Lynch*, 837 F.3d 1026 (9th Cir. 2016) ...........................................................2

*Jarkesy v. SEC,* 803 F.3d 9 (D.C. Cir. 2015) ...................................................................3

*Jennings v. Rodriguez*, 138 S. Ct. 830 (2018) ................................................................2

*Jifry v. FAA*, 370 F.3d 1174 (D.C. Cir. 2004) .........................................................19, 20

*Kennecott Utah Copper Corp. v. DOI*, 88 F.3d 1191 (D.C. Cir. 1996) ....................15, 16

*Kirwa v. Dep't of Def.*, 285 F. Supp. 3d 21 (D.D.C. 2017) ...........................................23

*Komarenko v. INS*, 35 F.3d 432 (9th Cir. 1994) ..............................................................8

*Mack Trucks, Inc. v. EPA*, 682 F.3d 87 (D.C. Cir. 2012) .............................................20

*Matter of G-*, 20 I. & N. Dec. 764 (BIA 1993) ..............................................................18

*Matter of Pula*, 19 I. & N. Dec. 467 (BIA 1987) ..........................................7, 8, 12, 13

*Matter of Salim*, 18 I. & N. Dec. 311 (BIA 1982) ...........................................................8

*Mejia v. Sessions*, 866 F.3d 573 (4th Cir. 2017) ...........................................................13

*Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804) .............................11

*Narenji v. Civiletti*, 481 F. Supp. 1132 (D.D.C.), *rev'd on other grounds*, 617 F.2d 745 (D.C. Cir. 1979) ....................................................................................................21

*Nat'l Grain & Feed Ass'n v. OSHA*, 845 F.2d 345 (D.C. Cir. 1988) (per curium) ......15

*Nat'l Mining Ass'n v. U.S. Army Corps. of Eng'rs*, 145 F.3d 1399 (D.C. Cir. 1998) .............................................................................................................................25

*Pars Equality Center v. Trump*, No. 1:17-cv-00255, ECF 84 (D.D.C. May 11, 2017) ............................................................................................................................24

*Pereira v. Sessions*, 138 S. Ct. 2105 (2018) ...................................................................3

*Raoof v. Sullivan*, 315 F. Supp. 3d 34 (D.D.C. 2018) ..................................................21

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476 (9th Cir. 2018) .....................................................................................................................2, 3

*Si v. Slattery*, 864 F. Supp. 397 (S.D.N.Y. 1994) .........................................................15

*Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15 (D.D.C. 2017).......................................17

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807 (2016) ..........................................2, 14

*United States v. Borden Co.*, 347 U.S. 514 (1954) ......................................................................5, 6

*United States v. Malenge*, 472 F. Supp. 2d 269 (N.D.N.Y. 2007)...............................................12

*United States v. Valverde*, 628 F.3d 1159 (9th Cir. 2010)............................................................19

*Vetcher v. Sessions*, 316 F. Supp. 3d 70 (D.D.C. 2018) ................................................................3

*Virginia ex rel. Cuccinelli v. Sebelius*, 728 F. Supp. 2d 768 (E.D. Va. 2010)................................5

*Yassini v. Crosland*, 618 F.2d 1356 (9th Cir. 1980) ....................................................................22

## CONSTITUTIONAL PROVISIONS, STATUTES
## LEGISLATIVE MATERIALS, AND REGULATIONS

5 U.S.C. § 553(a)(1)............................................................................................... 21, 22, 23

5 U.S.C. § 704........................................................................................................................14

5 U.S.C. § 706(2)...................................................................................................................25

8 U.S.C. § 1158................................................................................................................7, 8, 9

8 U.S.C. § 1158(a) .................................................................................................................9

8 U.S.C. § 1158(a)(1)....................................................................................................6, 7, 8, 9

8 U.S.C. § 1158(b) ...............................................................................................................18

8 U.S.C. § 1158(b)(2)(A)(vi) ................................................................................................12

8 U.S.C. § 1158(b)(2)(C)...............................................................................................8, 9, 16

8 U.S.C. § 1182(f)................................................................................................................18

8 U.S.C. § 1225(b) ...........................................................................................................9, 25

8 U.S.C. § 1225(b)(1)(B)(i) ..................................................................................................10

8 U.S.C. § 1225(b)(1)(B)(v) ..................................................................................................9

8 U.S.C. § 1229(a) ................................................................................................................3

8 U.S.C. § 1231(a)(5)............................................................................................................8

8 U.S.C. § 1232 .................................................................................................10

8 U.S.C. § 1252(a)(2)(A) ...................................................................................10

8 U.S.C. 1252(a) ..................................................................................................2

8 U.S.C. 1252(b) ..................................................................................................2

8 U.S.C. § 1252(e)(3) ................................................................................... passim

8 U.S.C. § 1252(f)(1) .........................................................................................24

28 U.S.C. § 1331 ..............................................................................................1, 2

44 U.S.C. § 1503 ...............................................................................................15

1 C.F.R. § 18.13(a) ............................................................................................16

8 C.F.R. § 208.16(a) ..........................................................................................10

8 C.F.R. § 208.30(e)(4) ......................................................................................10

8 C.F.R. § 208.30(e)(5) ...................................................................................9, 10

8 C.F.R. § 239.2 ...................................................................................................3

83 Fed. Reg. 55,934 ...........................................................................9, 10, 15, 17, 19

83 Fed. Reg. 55,948 .............................................................................................9

83 Fed. Reg. 55,949 ...........................................................................................20

83 Fed. Reg. 55,952 ...........................................................................................17

83 Fed. Reg. 55,953 ...........................................................................................15

83 Fed. Reg. 55,963 .............................................................................................9

83 Fed. Reg. 57,663 ...........................................................................................16

Convention Relating to the Status of Refugees, 189 U.N.T.S. 137 (July 28,1951),
    Art. 31(1) .........................................................................................11, 12, 13

Protocol Relating to the Status of Refugees, 606 U.N.T.S. 267 (Jan. 31, 1967) ...................11, 12

## OTHER AUTHORITIES

Amy Guthrie, *Incoming Mexico gov't: No deal to host US asylum-seekers*, S.F.
    Chron., Nov. 25, 2018 ..........................................................................................22

Dep't of Homeland Security Office Inspector General, *Special Review - Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy* (Sept. 27, 2018)...................................................................................................20

Ted Hesson & Andrew Restuccia, *Trump to make asylum changes as soon as Friday*, Politico (Nov. 7, 2018).......................................................................................... 16

USCIS, Procedural Guidance, PM-602-0166 (Nov. 9, 2018).......................................................11

## INTRODUCTION

The Plaintiffs in this case have traveled thousands of miles under extreme hardship to reach the United States with the hope of seeking asylum.  Meanwhile, the United States Government, through a policy of "metering" at the border and now through the Rule, quite obviously seeks to eliminate access to asylum at the southern border altogether.  The Government does not—and cannot—deny this, but instead maintains that an "urgent situation" at the border requires such efforts.  Opp. 1.  But the evidence cited by the Government does not support this claim, and the Government's arguments, including that the asylum statute does not mean what it plainly says, do not suffice to demonstrate the legality of the Rule.

Since Plaintiffs filed their Motion for Temporary Restraining Order, the Ninth Circuit has joined the District Court for the Northern District of California in concluding that the plaintiffs in that case have a likelihood of showing that the Rule is unlawful.  *See E. Bay Sanctuary Covenant v. Trump*, 2018 WL 6428204, at *2 (9th Cir. Dec. 7, 2018); *E. Bay Sanctuary Covenant v. Trump*, 2018 WL 6053140, at *1 (N.D. Cal. Nov. 19, 2018).  These courts offered thorough reasoning, and Plaintiffs request that this Court likewise find that Plaintiffs have a likelihood of prevailing on the merits of their claims, and that they are entitled to a TRO that enjoins the Rule.

## I.      Plaintiffs' Claims Are Justiciable.

### A.      This Court Has Jurisdiction to Hear Plaintiffs' Claims Under Either 28 U.S.C. § 1331 or 8 U.S.C. § 1252(e)(3).

The Rule renders Plaintiffs categorically ineligible for asylum and they face the prospect of removal without the possibility of obtaining asylum and the benefits such status carries.  Nevertheless, the Government contends that this Court lacks jurisdiction because Plaintiffs' administrative-law challenges must be adjudicated by an immigration judge and because they have not received expedited removal orders.  The Government is wrong in both respects.

1

### 1.    The Court Has Jurisdiction Under 28 U.S.C. § 1331.

As an initial matter, Plaintiffs have presented federal questions that may rightly be adjudicated in a federal district court under 28 U.S.C. § 1331.  An agency rule implementing new regulations constitutes final agency action that can be reviewed under the APA, *see Bennett v. Spear*, 520 U.S. 154, 178 (1997), and no specific agency application of a regulation to the plaintiff is required.  *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016).

The Government nevertheless contends that this Court lacks jurisdiction because the INA requires Plaintiffs to challenge the Rule in a removal proceeding.  This argument stems from a misconception of the jurisdictional channeling provisions of 8 U.S.C. § 1252(a) and (b).  The Government posits that these provisions require that "all issues arising from removal proceedings *or that can be raised in those proceedings*" may be litigated in federal court only through a petition for review before a circuit court of appeals.  Opp. 13 (emphasis added).  That is not the test.  The question is not whether an issue conceivably is related to or might be considered in removal proceedings but, rather, whether it "arise[s] from" them.  *See Jennings v. Rodriguez*, 138 S. Ct. 830, 841 & n.3 (2018) (plurality opinion) (operative test is whether the "legal questions in this case arise from" a removal action); *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 504 n.19 (9th Cir. 2018) (channeling "applies only to those claims seeking judicial review of orders of removal" (citation omitted)).

The issues presented in this case do not "arise from" removal proceedings.  Rather, the challenged Rule bars affected individuals from obtaining asylum in *any* posture—not just in removal proceedings—based on conduct (crossing the border) that does not arise in removal proceedings.  This case is thus unlike the cases that Defendants cite, where plaintiffs sought to challenge aspects of the fairness of their removal proceedings.  *See J.E.F.M. v. Lynch*, 837 F.3d 1026, 1029 (9th Cir. 2016) (asserting a right to counsel in removal proceedings); *Aguilar v. ICE*,

510 F.3d 1, 14 (1st Cir. 2007) (same); *Vetcher v. Sessions*, 316 F. Supp. 3d 70, 75 (D.D.C. 2018) (*pro se* litigant sought an adequate law library to defend against removal).[1]  Nor do Plaintiffs here challenge a removal order or a subsequent application for admission.  *See Delgado v. Quarantillo*, 643 F.3d 52, 54 (2d Cir. 2011) (per curiam).  Plaintiffs instead seek to challenge a change to U.S. asylum law, which does not arise from removal proceedings.  Indeed, as to at least five of the six Plaintiffs, the Government has not even properly initiated such proceedings.[2]

### 2.    The Court Has Jurisdiction Under § 1252(e)(3).

The Court also has jurisdiction to hear Plaintiffs' challenge to the Rule's lawfulness under 8 U.S.C. § 1252(e)(3).  That section provides for judicial review in this Court of "determinations under [the expedited removal statute] and its implementation," where the plaintiff challenges "(i) whether such section, or any regulation issued to implement such section, is constitutional," or "(ii) whether such a regulation . . . is not consistent with applicable provisions of this subchapter or is otherwise in violation of law."  8 U.S.C. § 1252(e)(3).  That is precisely one of the questions Plaintiffs have asked this Court to resolve.

As to Plaintiff A.V., whom the Government itself asserts "is in expedited removal

---

[1] The Government heavily relies on *Vetcher's* application of the "wholly collateral" test from *Jarkesy v. SEC,* 803 F.3d 9, 17 (D.C. Cir. 2015).  But this test is inconsistent with the plurality in *Jennings* and the test advanced in more recent case law, such as *Regents*.  While this "wholly collateral" test has been applied to plaintiffs seeking to enjoin ongoing SEC enforcement actions, *see* Opp. 14 n.2 (collecting cases), those holdings have no applicability here.

[2] Although the Government asserts Plaintiffs O.A., K.S., G.Z., D.S., and C.A. were issued notices to appear, Opp. 12, as far as counsel is aware, no such notices have been filed with any immigration court, and may therefore be cancelled at DHS's discretion.  *See* 8 C.F.R. § 239.2.  The Government did not put the purported notices into the record, and they are unlikely to satisfy the requirements of 8 U.S.C. § 1229(a).  A notice that fails to list the "specific time or place" of the removal proceedings is insufficient to initiate such proceedings and is "not a notice" as defined by statute. *Pereira v. Sessions*, 138 S. Ct. 2105, 2113-14 (2018).

proceedings," Opp. 15,[3] it is difficult to imagine a statutory scheme that more clearly vests jurisdiction in this Court to adjudicate the claims at bar.  The Government contends that *American Immigration Lawyers Association v. Reno* (*AILA*), 199 F.3d 1352 (D.C. Cir. 2000), bars A.V. from challenging the regulation until her expedited removal proceeding is sufficiently advanced that the Rule is actually applied to her.  Opp. 12.  Setting aside that the 60-day deadline to bring a § 1252(e)(3) challenge means A.V. cannot wait, *AILA* does not so hold.  *AILA* has nothing to do with how far along in an expedited removal proceeding a person must be to invoke § 1252(e)(3).  *AILA*, 199 F.3d at 1363-64.  Rather, *AILA* relates to whether claims under § 1252(e)(3) may be brought by *third parties* on behalf of persons who are subject to expedited removal.  *Id.*  And while Plaintiffs O.A., K.S., D.S., and C.A. are not currently in expedited removal proceedings, they are potentially subject to such proceedings as a result of the Rule.[4]  People like Plaintiffs—persons against whom expedited removal procedures are being, or imminently may be, applied—are exactly the people *AILA* permits to raise challenges under § 1252(e)(3).  *See id.*

### B.     The *East Bay* Injunction Does Not Deprive Plaintiffs of Standing.

The Government also contends that Plaintiffs have not suffered a cognizable injury because another district court has granted a nationwide temporary restraining order until December 19.  *See* Opp. 9, 15.  It is ironic that the Government would make this argument while simultaneously

---

[3] The Government has not been consistent on this point, and also asserts that A.V. is *not* currently in expedited removal proceedings when it benefits their argument.  *See* Opp. 12.  But in any event, if she is not now in expedited removal, she will be in short order.

[4] As explained above, *see supra* at 3 & n.2, the Government's efforts to initiate non-expedited removal proceedings against them are defective, and there is no barrier to pursuing expedited removal proceedings.  Given the time limitation in § 1252(e)(3)(B), these Plaintiffs cannot simply wait and see whether the Government initiates expedited removal proceedings.  As to G.Z., the TVPRA should foreclose later seeking expedited removal, but as discussed *infra* at 23, he is about to turn 18, and it is not clear how his case will proceed at that point.

arguing in California that the presence of *this* case shows that the organizational plaintiffs who obtained that injunction had no standing to do so.  *See* Gov't Reply Br., *E. Bay Sanctuary Covenant v. Trump*, No. 18-17274 (9th Cir. Dec. 4, 2018), dkt. 9, at 5.  Irony aside, the Government cites no authority for the proposition that the existence of one injunction means this case cannot proceed.

To the contrary, district courts routinely grant overlapping equitable relief against government defendants.  For example, multiple district courts entered overlapping declaratory judgments holding unlawful the Affordable Care Act's individual mandate.  *See, e.g.*, *Florida ex rel. Bondi v. U.S. Dep't of Health & Human Servs.*, 780 F. Supp. 2d 1256 (N.D. Fla. 2011); *Goudy-Bachman v. U.S. Dep't of Health & Human Servs.*, 811 F. Supp. 2d 1086 (M.D. Pa. 2011); *Virginia ex rel. Cuccinelli v. Sebelius*, 728 F. Supp. 2d 768 (E.D. Va. 2010); *see also Comm. on Judiciary of U.S. House of Representatives v. Miers*, 542 F.3d 909 (D.C. Cir. 2008) (in litigation against the U.S. Government, a "declaratory judgment is the functional equivalent of an injunction").  The same was true in connection with the multiple challenges to the "travel ban."  *See, e.g.*, *Int'l Refugee Assistance Project v. Trump*, 2017 WL 1018235 (D. Md. Mar. 16, 2017) (granting nationwide injunctive relief ten days after similar relief was granted in D. Haw.); *Aziz v. Trump*, 2017 WL 580855 (E.D. Va. Feb. 13, 2017) (granting nationwide injunctive relief ten days after similar relief was granted in W.D. Wash.).  None of these courts concluded that another court's decision to grant equitable relief somehow deprived it of jurisdiction to do the same.

This makes sense given the Supreme Court's longstanding view that an injunction forbidding a defendant from engaging in unlawful conduct does not negate another litigant's right to seek similar injunctive relief.  *See United States v. Borden Co.*, 347 U.S. 514, 518 (1954) (district court's dismissal of Clayton Act enforcement action was an abuse of discretion because it was solely based on the fact that the injunctive relief the Government sought had already been granted

5

to a private litigant).  This rule stems from the basic fact that when a defendant acts unlawfully, one person who is harmed might have different interests than another.  *Id.* at 519 (observing that a victorious plaintiff sometimes "might find it to his advantage to refrain from seeking enforcement of a violated decree," when "looking to his own interest").  And a non-party may, for example, suffer serious harm if the parties in another case fail to enforce an existing injunction.  Thus, a justiciable case or controversy persists even after another court has issued injunctive relief that mirrors what the plaintiffs seek.

Further, the timing of the proceedings in the Northern District of California and the Government's evident intention to resume implementation of the Rule absent court-ordered cessation likewise makes clear that Plaintiffs in this case have standing.  The Northern District of California entered a TRO enjoining implementation of the Rule on November 19, 2018, for thirty days only.  It will expire two days after this Court's December 17 hearing on Plaintiffs' Motion for TRO, whereupon the Government surely will resume enforcing the Rule should plaintiffs in *East Bay* fail to obtain further injunctive relief.  Indeed, the Government has already asked the Northern District of California, the Ninth Circuit Court of Appeals, and now the Supreme Court to allow it to carry on implementing its illegal rule while the case is litigated.  Thus, there can be no doubt that Plaintiffs have a justiciable case or controversy that is worthy of judicial redress.  *Cf. Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (voluntary cessation does not moot a claim unless the defendant meets "the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur" (citation omitted)).

## II.      Plaintiffs Are Likely To Succeed on the Merits.

### A.      The Rule Violates 8 U.S.C. § 1158(a)(1).

The central proposition in this case is straightforward:  the Rule is contrary to statute because § 1158(a)(1) provides that "[a]ny alien" who is present in the United States or who arrives

in the United States "whether or not at a designated port of arrival" may seek asylum.  The Rule directly violates this statutory mandate by providing that if someone has entered the United States other than at a port of entry, that person becomes automatically ineligible for asylum.

### 1.      The Rule Effectively Denies the Right to Seek Asylum.

The Government's primary response is to draw a distinction between seeking asylum and being granted asylum.  Opp. 18 ("Section 1158 imposes no express constraints on the Executive's discretion to deny asylum to an applicant, and thus the asylum bar imposed by the rule here is not inconsistent with § 1158.").  But two courts have now forcefully rejected this formalistic distinction, which would render the language of § 1158(a)(1) a nullity.  As the Ninth Circuit wrote in *East Bay*, "[i]t is the hollowest of rights that an alien must be allowed to apply for asylum regardless of whether she arrived through a port of entry if another rule makes her categorically ineligible for asylum based on precisely that fact."  2018 WL 6428204 at *15.  And, as the Ninth Circuit further explained, "[a]lthough the Rule technically applies to the decision of whether or not to *grant* asylum, it is the equivalent of a bar to *applying* for asylum in contravention of a statute that forbids the Attorney General from laying such a bar on these grounds."  *Id.*  There is no way around this fact, and the Rule is contrary to law as a result.

### 2.      None of the Cases on Discretionary Denials of Asylum Support the Government's Position.

The Government cites agency precedent that allows the Government to consider fraudulent entry as a negative discretionary factor in asylum cases.  *See Matter of Pula*, 19 I. & N. Dec. 467 (BIA 1987).  On this basis, the Government argues that it may categorically deny entry to anyone who enters without inspection.  But it does not follow that if fraudulent entry may be considered as a negative *factor*, the Government may adopt a blanket rule barring asylum based on entry without inspection.  Indeed, as *Matter of Pula* itself makes clear:  "circumvention of orderly

refugee procedures . . . should not be considered in such a way that the practical effect is to deny relief in virtually all cases." *Id.* at 473. The cases cited by the Ninth Circuit in *East Bay* further support this distinction. 2018 WL 6428204 at *16-17 (collecting cases).

Moreover, it is not apparent that entry without inspection, standing alone, is appropriately considered even as an adverse discretionary factor. In *Matter of Pula*, for example, the negative asylum factor was document fraud, and not merely entry without inspection. *See Matter of Pula*, 19 I. & N. Dec. at 472 (despite overruling the IJ's decision, observing that "fraudulent avoidance" of refugee procedures, such as false documents, may be an adverse factor against asylum). And while the Government cites *Matter of Salim*, 18 I. & N. Dec. 311, 315-16 (BIA 1982), the BIA *withdrew* that decision in *Matter of Pula* "insofar as it suggests that the circumvention of orderly refugee procedures alone is sufficient to require the most unusual showing of countervailing equities." *Matter of Pula*, 19 I. & N. Dec. at 473.

The Government also argues that the existence of other categorical bars to asylum proves that there is a distinction between seeking asylum and being granted asylum. Opp. 18. This argument, however, misses the point: in § 1158(a)(1), Congress singled out an immigrant's manner of arrival in the United States—whether at a port of entry or not—as a fact that *does not affect* the immigrant's right to seek asylum. It did not do so with respect to other mandatory asylum bars. *See, e.g.*, *Komarenko v. INS*, 35 F.3d 432, 436 (9th Cir. 1994) (commission of a particularly serious crime may be a bar to asylum), cited at Opp. 18.[5] And even if the Government may normally make rules that give "fixed weight to a particular factor," Opp. 21, that principle would not permit the creation of a blanket rule that conflicts with the language of § 1158(a)(1). *See* 8 U.S.C.

---

[5] Beyond that, other bars to asylum are provided by statute, either within the text of § 1158 or, in one instance, within 8 U.S.C. § 1231(a)(5), which bars all relief to those subject to reinstatement of a prior removal order.

§ 1158(b)(2)(C) ("additional limitations and conditions" on asylum are to be "consistent with this section").

### 3. The Rule Denies Asylum Based on Manner of Entry.

Confronted with the logic that the Rule would render § 1158(a)(1) entirely hollow, the Government claims that the Rule is not based on the immigrant's manner of arrival into the United States, but instead on whether "an alien has contravened a Presidential proclamation concerning the southern border." Opp. 22. This statement is sophistry. The Government has said expressly that only if noncitizens "decide[] to arrive at ports of entry" will they "remain eligible for asylum and . . . proceed through the existing credible-fear screening process." 83 Fed. Reg. 55,948. Likewise, in announcing the Proclamation, the President added: "[A]liens *who enter the United States unlawfully through the southern border* in contravention of this proclamation *will be ineligible to be granted asylum* under the regulation promulgated by the Attorney General and the Secretary of Homeland Security that became effective earlier today." *Id.* at 57,663 (emphasis added). The purpose of the Rule is to bar asylum based on an immigrant's manner of entry; it is remarkable that the Government would attempt to suggest otherwise.

### B. The Rule Violates the Expedited Removal Statute, 8 U.S.C. § 1225(b).

If the Court concludes the Rule violates § 1158(a), it necessarily also violates § 1225(b), which incorporates by reference the asylum eligibility criteria under § 1158. *See* 8 U.S.C. § 1225(b)(1)(B)(v). But separate and apart from the § 1158(a) issue, the Government admits that the Rule also eliminates key procedural protections afforded in expedited removal proceedings, Opp. 25-26, which violates both existing regulations and the expedited removal statute.

The Government concedes that prior to the Rule, if a person in expedited removal proceedings could otherwise establish "credible fear" but was subject to a "mandatory bar" to asylum, applicable regulations nonetheless required "full consideration of the alien's claim" via

regular, non-expedited removal proceedings.  Opp. 25 (citing 8 C.F.R. § 208.30(e)(5)); *see also* TRO Br. 21-22.  Moreover, the preexisting regulations in place before the Rule also require that all "novel or unique" issues be transferred to an immigration judge.  8 C.F.R. § 208.30(e)(4). These safeguards—a meaningful interview with an Asylum Officer, the opportunity to be diverted to regular removal proceedings, and the resulting opportunity to seek judicial review of negative determinations—reduce the risk of refugees being summarily returned to a country where they would be persecuted.  TRO Br. 21-22.

Such safeguards were recognized by Congress as necessary to comply with the United States' *non-refoulement* obligations under international law.  *See id.*  But as the Government admits, the Rule eliminates these safeguards and purports to treat manner of entry as a *per se* bar early in the process, Opp. 25-26, by instructing Asylum Officers to automatically enter a negative credible fear determination.  Contrary to the Government's assertion, an improperly promulgated regulation such as the Rule cannot override pre-existing, properly promulgated regulations such as 8 C.F.R. § 208.30(e)(5).[6]  And an automatic negative credible fear determination by the Asylum Officer is not the statutorily required "interview" at all, *see* 8 U.S.C. § 1225(b)(1)(B)(i)—it is just a formalistic rubber-stamp, which is not subject to judicial review, *see* 8 U.S.C. § 1252(a)(2)(A).[7]

### C.    The Rule Violates the TVPRA.

The Government also claims that the Rule is consistent with the TVPRA because it "has no impact on the statutory procedural protections afforded to unaccompanied minors under the TVPRA, 8 U.S.C. § 1232."  Opp. 27.  It maintains that children like G.Z. will receive "the initial

---

[6] Although the Government contends the Rule overrides 8 C.F.R. § 208.30(e)(5), it does not address the interplay between the Rule and 8 C.F.R. § 208.30(e)(4), which the Rule does not purport to revise.  The Government does not address this tension in its brief.

[7] A reasonable fear interview is no substitute, because the reasonable fear standard is both higher and substantively different than the credible fear standard. *See* TRO Br. 7-8.

non-adversarial interview, dictated by the TVPRA." *Id.*   But this contention conveniently overlooks the fact that Asylum Officers lack the authority to grant withholding of removal.  *See* 8 C.F.R. § 208.16(a).  Thus, any interview that a child such as G.Z. would receive is meaningless.

The Government also suggests that the Rule actually will not have any consequences for unaccompanied minors because the Proclamation—rather than the Rule—says "[n]othing in this proclamation shall . . . limit the statutory processes afforded to unaccompanied alien children upon entering the United States under section 279 of title 6, United States Code, and [the TVPRA]." Opp. 27 (citing Proclamation § 2(c)).  But the Government does not suggest that unaccompanied children are excluded from the scope of the Proclamation or the Rule.  Indeed, USCIS has taken the position that they are not excluded, noting that while certain protections related to care and custody will remain in place, unaccompanied immigrant children are "barred from asylum eligibility" under the Rule.  *See* USCIS, Procedural Guidance, PM-602-0166 (Nov. 9, 2018).

Providing unaccompanied children with a *pro forma* nonadversarial process, and then requiring them to again present the traumatic details of their asylum claims in an adversarial proceeding in immigration court—with no prospect for asylum if the Rule is permitted to stand— is directly contrary to the protections that the TVPRA provides.

### D.   The Statutes Should Be Construed To Avoid Placing the United States in Violation of Its International Obligations.

In attempting to avoid the obvious conclusion that the Rule is inconsistent with the relevant statutes, the Government attempts to recast the statutes in ways that would violate the United States' international law obligations, particularly its obligations under the 1951 Convention and 1967 Protocol (together, the "Refugee Convention").  Opp. 23.  But the *Charming Betsy* canon requires courts to interpret statutes in a manner consistent with such obligations.  *See Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804) ("[A]n act of Congress ought never

be construed to violate the law of nations if any other possible construction remains."). The Government's arguments are, therefore, unavailing.

To start, Plaintiffs direct the Court to the amicus brief filed by the United Nation High Commissioner for Refugees (UNHCR). UNHCR is "entrusted by the United Nations General Assembly with responsibility for providing international protection to refugees and other persons under its mandate . . . by issuing interpretations of the meaning of the 1951 Convention, the 1967 Protocol, and other international refugee instruments." UNHCR Br. 1. As such, UNHCR is uniquely situated to aid the Court with respect to the interpretation of the Refugee Convention. Here, UNHCR supports Petitioners' contention that the Rule violates the United States' international law obligations.

The Government first contends that Article 31(1)'s use of the word "directly" means that the Article could only apply to Mexican and Canadian nationals. *See* Opp. 23. That is an overly restrictive reading. As UNHCR confirms, Article 31(1) applies to refugees who travel through a third country before reaching the United States. *See* UNHCR Br. 15 & n. 4. In support of its position, the Government cites to *United States v. Malenge*, 472 F. Supp. 2d 269, 273 (N.D.N.Y. 2007). But *Malenge* interpreted the Refugee Convention as Plaintiffs contend it applies, interpreting the word "directly" in Article 31(1) to exclude from protection only those individuals who have "settled" in another country prior to arriving to the United States. *Id.* at 273. It does not exclude from asylum individuals who traversed other countries in coming to the United States.[8]

The Government also contends that Article 31(1) is inapplicable because individuals may be granted withholding of removal or CAT protection even if they are ineligible for asylum. That

---

[8] The INA expressly bars asylum for those individuals who are "firmly resettled" in a third country before arriving in the United States. *See* 8 U.S.C. § 1158(b)(2)(A)(vi).

is no answer because those two forms of relief require a higher evidentiary showing.  *See Pula*, 19 I. & N. Dec. at 474 (noting it would be of "particular concern" to remove someone able to meet the asylum standard but not the withholding standard).  Thus, an individual with a valid asylum claim might not be able to obtain either withholding of removal or CAT protection.  *See* TRO Br. 40-41; UNHCR Br. 17-19.  Moreover, neither withholding of removal nor CAT affords individuals the same protections as asylum.  *See* TRO Br. 40-41; UNHCR Br. 17-19.  While the United States permits asylees the right to reunite with their families and to seek naturalization as is required under the Refugee Convention, UNHCR Br. 19, those who obtain withholding of removal or CAT protection are not afforded these rights, TRO Br. 41.

Finally, the Government contends (ironically, given its criminal prosecution of A.V.) that Article 31(1) does not apply because denying refugees the ability to apply for asylum is not a criminal penalty or fine.  But in doing so the Government reads into the Refugee Convention a word—"criminal"—that it does not contain.  Article 31(1) prohibits States from imposing any "penalties"—not just criminal penalties—for irregular entry.  *See* Refugee Convention, Art. 31(1).  Narrowing the scope of Article 31(1) in the manner that the Government suggests would run contrary to the Article's purpose, which is "to ensure that all refugees can effectively gain access to international protection, and to protect them from the imposition of penalties on account of illegal entry or presence."  UNHCR Br. 14.[9]  Thus, according to UNHCR, "the concept of impermissible 'penalties' in Article 31(1) encompasses civil or administrative penalties as well as criminal ones."  *Id*. at 15.

---

[9] The Government's citation to *Cazun v. Att'y Gen.*, 856 F.3d 249, 257 n.16 (3d Cir. 2017), and *Mejia v. Sessions*, 866 F.3d 573, 588 (4th Cir. 2017), is unavailing.  Neither case addressed whether the term "penalty" in the Refugee Convention applies only to criminal penalties.

E.       **Final "Agency Action" Has Occurred.**

The Government argues that the APA is unavailing here because there has been no "final agency action."  Opp. 16.  This is untrue.  Plaintiffs' challenge hinges not on what happens to them in removal proceedings, but on the fact that the Government has sought to make them categorically ineligible for asylum regardless of when and how they seek it.  The Rule is thus final agency action that forecloses asylum in every possible posture.

The Government also argues that APA review is not available with respect to the President's proclamation.  Opp. 16.  But Plaintiffs are not presently challenging the Proclamation.  Instead, they challenge the Rule, which the Government intends to apply to Plaintiffs and is reviewable under the APA.  5 U.S.C. § 704; *see also Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000) (if an agency will apply its position to plaintiff with resulting "legal consequences," the agency's position constitutes a reviewable "final agency action").  That the Rule has not yet been applied to Plaintiffs in a particular proceeding is no barrier—where, as here, it is clear that the Rule will be applied to the Plaintiffs, there is no requirement to wait until the Government chooses to act.  *See, e.g.*, *Hawkes*, 136 S. Ct. at 1815-16.[10]

F.       **The New DOJ Regulations Are Void Because They Were Issued by an Acting Attorney General Whose Appointment Violates the Law.**

In response to Plaintiffs' argument that the DOJ regulations are void because Acting

---

[10] The Government suggests in passing that Plaintiffs "would have the opportunity to seek . . . relief in their full removal proceedings, or, for A.V., through a § 1252(e)(3) action if and when the rule is in fact applied to her in expedited removal proceedings."  Opp. 16.  But these are not "adequate alternatives to APA review in court."  *Hawkes*, 136 S. Ct. at 1816.  Plaintiffs need not wait in limbo until the Government pursues removal proceedings.  *See id.* (administrative proceedings are "inadequate" where they involve significant risk, delay, or expense).  As to A.V., the Government inconsistently suggests § 1252(e)(3) review is an adequate alternative while simultaneously asserting it is unavailable.  In any event, that § 1252(e)(3) *expressly permits* judicial review cannot strip this Court of its power to act.

Attorney General Matthew Whitaker lacked authority to issue them, the Government makes only a single legal argument:  that "the relevant date for discerning the identity of the agency decisionmaker" is "when DOJ—under the authority of then-Attorney General Sessions—delivered the rule into [the] custody" of the Office of the Federal Register ("OFR") on November 6.  Opp. 30 n.8.  But the Government cites no legal authority that the date of physical delivery to the OFR is the relevant date instead of the date the regulations were issued via publication in the Federal Register, which occurred on November 9 "under the authority," *id.*, of AAG Whitaker.

As the Government concedes, "[a] regulation is not final until it has been published in the Federal Register." *Id.* (citing *Kennecott Utah Copper Corp. v. DOI*, 88 F.3d 1191, 1206 (D.C. Cir. 1996)); *see also Nat'l Grain & Feed Ass'n v. OSHA*, 845 F.2d 345, 345-46 (D.C. Cir. 1988) (per curiam); *Horsehead Res. Dev. Co. v. EPA*, 130 F.3d 1090, 1093 (D.C. Cir. 1997); *Si v. Slattery*, 864 F. Supp. 397, 404 (S.D.N.Y. 1994) (Justice Department regulations).  That did not happen here until November 9, when AAG Whitaker had been in office for two days.[11]

 A regulation sent to the OFR has no force or effect until publication and may be withdrawn by the agency at any time before then.  *See Si*, 864 F. Supp. at 404.  And the Government agrees that during his first two days in office AAG Whitaker had the authority to "intervene[] in the rulemaking process after Attorney General Sessions left office and before the rule was published" to prevent publication.  Opp. 30 n.8.  AAG Whitaker did not merely unknowingly allow the regulations to proceed to publication.  The Government instead admits that they were published

---

[11]  In addition, although the Justice Department transmitted the regulations to the OFR on November 6, Opp. 30, that is not the same thing as "filing" with the OFR, which did not occur until November 8 when the OFR made the Rule available for public inspection and AAG Whitaker was already in office.  *See* 83 Fed. Reg. 55,953 (noting that the Rule was "[f]iled 11-8-18; 4:15 pm"); 44 U.S.C. § 1503 ("Upon filing, at least one copy shall be immediately available for public inspection in the Office.").

"on the same day as, and in anticipation of, the proclamation, *in close concert with action by the President*" on November 9. Opp'n to TRO Mot., *S.M.S.R. v. Trump*, No. 18-cv-2838 (D.D.C. Dec. 12, 2018), dkt. 31, at 38; *see also* 83 Fed. Reg. 57,663 (Proclamation referencing "the regulation promulgated by the Attorney General . . . that became effective earlier today").

The Government argues that the Court should instead look to the date when the Department of Justice physically delivered the final regulation to the OFR, November 6. Opp. 30-31. The Government is correct that Plaintiffs believed that the regulations were not sent to the OFR for public inspection until after November 6. *See* TRO Br. 33; *see also* Ted Hesson & Andrew Restuccia, *Trump to make asylum changes as soon as Friday*, Politico (Nov. 7, 2018) ("A working group of administration officials met Wednesday [November 7] to discuss possible moves.") <https://tinyurl.com/y7qcc2ww>. However, the Government is unable to cite to any legal authority that the date of the physical delivery of a regulation to the OFR has any legal significance. During the time the OFR is processing a regulation for publication, it has no authority over the regulation superior to that of the agency, *see Kennecott*, 88 F.3d at 1206, and thus acts merely as a bailee for an agency until publication, *see* 1 C.F.R. § 18.13(a) ("A document that has been filed for public inspection with the Office of the Federal Register but not yet published, may be withdrawn from publication . . . by the submitting agency.").

Because the Justice Department was acting "in close concert," *S.M.S.R.* Opp'n at 38, with the President up until the Proclamation's and Rule's joint November 9 issuance, and could have withdrawn the regulations until then, the only conclusion is that AAG Whitaker issued the regulations. *See Kennecott*, 88 F.3d at 1206 ("[P]ermitting agencies . . . to withdraw regulations until virtually the last minute before public release . . . helps assure that regulations appearing in the Federal Register are as correct as possible in both form and substance."). AAG Whitaker was

Attorney General when the regulations issued on November 9.  He, therefore, issued them.[12]

### G.    The Rule Violates the Statutory Requirement that Conditions on Asylum Be Established By Regulation.

Section 1158(b)(2)(C) provides that "the Attorney General may *by regulation* establish additional limitations and conditions on asylum."  The Rule, on its face, violates this directive because rather than imposing additional conditions or limitations through administrative rulemaking, it leaves that task entirely to the President.  It does this by incorporating by reference *any* presidential order limiting entry along the southern border.  *See* 83 Fed. Reg. 55,952.

The Rule functionally authorizes future "conditions and limitations" that are presently unknown and that will never face regulatory scrutiny.  *E. Bay*, 2018 WL 6053140 at *13-14. Indeed, the Government does not even attempt to address the DHS guidance stating that border officials will need to "carefully read any future presidential proclamation" to understand whether it affects an individual's "eligibility for asylum."  TRO Br. 32.  The Government has built a framework for the imposition of future conditions and limitations that do not presently exist, and that would come into existence outside of the regulatory process that the statute requires.

The legislative imperative that "additional limitations and conditions on asylum" be established "by regulation" is not a hollow one:  by discarding it, the Rule would permit additional limitations and conditions with no further agency review, no good cause determinations, no notice and comment period, and no judicial review of the sort that would typically be available to guard against unlawful regulation.  TRO Br. 31-32.  The Government contends that judicial review of

---

[12] The Government fails to set forth any legal argument defending the lawfulness of the appointment of AAG Whitaker on the merits.  Instead, the Government notes that it has made such arguments elsewhere, listing some places.  Opp. 31.  The Government has thus waived any merits arguments in defense of the appointment since "arguments not developed in briefs are waived." *Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 29-30 (D.D.C. 2017) (Moss, J.) (citing *City of Waukesha v. EPA*, 320 F.3d 228, 250 n.22 (D.C. Cir. 2003)).

the Rule is literally available here, and so there is no harm. Opp. 28. But there cannot be *meaningful* judicial review of a regulation that is an empty shell, the scope of which can be varied by unilateral proclamation in nearly infinite ways and subject to presidential whim—without regard for how circumstances have changed at the border, and without any of the deliberation, substantiation, or public participation that agency rulemaking requires.

The Government contends that the Rule does not unlawfully abdicate rulemaking responsibility because § 1158(b) gives the Attorney General broad discretion, and the President in turn has the authority under § 1182(f) to deny entry to whomever he pleases. But the President's authority under § 1182(f) relates to restricting *entry*, an act that is accomplished as soon as a person crosses the border without being in custody. *Farquharson v. U.S. Att'y Gen.*, 246 F.3d 1317, 1321-22 (11th Cir. 2001) (alien who is present in the United States without inspection and not in custody upon entry has achieved "entry" under the INA); *see Matter of G-*, 20 I. & N. Dec. 764, 769 (BIA 1993) (aliens achieve entry if they arrive in the United States without detection). The President's authority with respect to "entry" does not give him the power to establish unilateral bars to asylum outside of the rulemaking process. *See E. Bay*, 2018 WL 6428204 at *17 (Ninth Circuit holding that the Rule "is not an exercise of the President's authority under § 1182(f) because it does not concern *the suspension* of entry or otherwise 'impose on the entry of aliens . . . restrictions'").

What the Government seeks to achieve here is the creation of unreviewable future bars to asylum eligibility that the President may achieve unilaterally and outside of the rulemaking process. This strategy violates the language of the statute that Congress enacted.

### H.    The Rule Was Improperly Issued Without Notice and Time for Comment.

The Government maintains that the Rule was permissibly issued without providing advance notice and time for comment both because there was "good cause" to do so and because the foreign affairs exception to providing such notice applies here. Both courts in *East Bay*

correctly rejected these arguments, and this Court should do the same. *E. Bay*, 2018 WL 6428204 at *18-21; *E. Bay*, 2018 WL 6053140 at *15-17.

### 1.     The Good Cause Exception Does Not Apply.

As the Ninth Circuit observed in *East Bay*, the good cause exception is "'essentially an emergency procedure'" that is "'narrowly construed and only reluctantly countenanced.'" *E. Bay*, 2018 WL 6428204 at *20 (quoting *United States v. Valverde*, 628 F.3d 1159, 1165 (9th Cir. 2010) and *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004)).  In seeking to satisfy this standard, the Government advances just one argument:  that if it had announced the policy in advance, there would have been a "surge" of immigrants across the border, posing a safety risk.  Opp. 32-34.

This argument is not convincing.  First, it is highly speculative—and the Government identifies no reason to presume—that migrants are so closely monitoring the Federal Register that it is necessary to issue new asylum regulations with no warning.  Both the Ninth Circuit and District Court in *East Bay* were rightfully skeptical of such claims.  *See E. Bay*, 2018 WL 6428204 at *20; *E. Bay*, 2018 WL 6053140 at *17.[13]  Conversely, the Government has not substantiated that there is any immediate deterrent effect to the Rule to support its issuance with no notice, because it concedes in the Rule that more limited forms of relief—such as withholding of removal and under the Convention Against Torture—remain available to people who cross the border other than at ports of entry.  TRO Br. 37-38.  The existence of these other mechanisms—and the fact

---

[13] Tellingly, in the time since the *East Bay* court enjoined the Rule,  there have been no reports that immigrants have been suddenly prompted to travel to the United States to take advantage of the Rule's suspension.   Nor did a "surge" occur this summer following reports that the Administration was considering restrictions on asylum. TRO Br. 37-38.  To the contrary, the President said on Twitter on December 11, 2018 that there is no emergency at the border, and that "Despite the large Caravans that WERE forming and heading to our Country, people have not been able to get through our newly built Walls, makeshift Walls & Fences, or Border Patrol Officers & Military. They are now staying in Mexico or going back to their original countries" and "Our Southern Border is now Secure and will remain that way."

that the Government affirmatively anticipates that migrants will continue to seek them, *see* 83 Fed.

Reg. 55,949—puts the Government at odds with itself on its claims of deterrence.

Second, even if a border surge were a valid concern, the Government proffers no evidence

to support its claim that additional unlawful border crossings increase the risks to border control

agents or migrants.  The claimed correlation is hardly intuitive, as asylum seekers may not be the

population engaged in the most risky border crossings.  The Government's own data tends to

disprove a linear relationship of this sort.  The chart of migrant deaths that the Government cites,

Opp. 33 & n.9, shows a generally consistent level of migrant deaths at the southern border from

1998–2017, even as overall unlawful border crossings at the southern border have *decreased*

*dramatically* over the same time period.  TRO Br. 15.

Finally, the cases that the Government cites to support the availability of the "good cause"

exception here are not persuasive.  The regulations at issue in those cases were more narrowly

targeted in scope to the proffered justifications.  *See Haw. Helicopter Operators Ass'n v. FAA*, 51

F.3d 212, 214 (9th Cir. 1995) (discussing narrowly targeted safety rules about Hawaiian tourist

helicopters in light of recent deaths); *Jifry*, 370 F.3d at 1179 (finding good cause, after 9/11, for a

regulation allowing suspension of airmen certificates for individuals found to be security threats).

Here, the scope of the Rule vastly exceeds any "good cause" that the Government has even

attempted to articulate, in part because it permits the imposition of future, and presently unknown,

conditions on asylum.  Further, while *Mack Trucks, Inc. v. EPA*, 682 F.3d 87 (D.C. Cir. 2012),

contains the language that the Government cites, the Government in this case has not substantiated

the dangers that it says exist.[14]

---

[14] The *Mack Trucks* court also warned that the "good cause" exception cannot rescue a party from
"the folly of its own choices."  *Id.* at 93.  That framing has resonance here, where the Government

## 2.      The Foreign Affairs Exception Does Not Apply.

The Government argues that even if the good cause exception does not apply, the foreign affairs exception of 5 U.S.C. § 553(a)(1) does.  Again, two courts have preliminarily rejected this argument, and rightly so.  *See E. Bay*, 2018 WL 6428204 at *18-20 (Ninth Circuit holding that the Government is "not likely to succeed" on foreign affairs exception based on current record); *E. Bay*, 2018 WL 6053140 at *16 (finding "serious questions" as to this argument's merits).

Fundamentally, the Government offers a series of distorted tests for the foreign affairs exception, which ignore precedent both from within the D.C. Circuit and from the immigration context.  For example, the Government offers a sweeping claim that the exception applies because the admission of immigrants inherently "implicates the foreign policy interests of the United States."  Opp. 35.  In the leading D.C. Circuit case, however, the court found that the exception applied where the regulation would "carry out obligations to a foreign nation."  *Int'l B'hd of Teamsters v. Peña*, 17 F.3d 1478, 1486 (D.C. Cir. 1994).  While the court in *Peña* did not say that this is the *exclusive* test for the exception to apply, district courts in this circuit have generally held that the promulgation of rules affecting the eligibility of aliens to remain in the United States do not automatically constitute a "foreign affairs" function under § 553(a)(1).  *See* TRO Br. 39; *Narenji v. Civiletti*, 481 F. Supp. 1132, 1137 (D.D.C.) (matters involving naturalization and deportation not subject to the foreign affairs exception), *rev'd on other grounds*, 617 F.2d 745 (D.C. Cir. 1979).[15]  The Ninth Circuit's approach in *East Bay* was similarly limiting:  it held that

---

has strategically choked off lawful entry to asylum seekers at ports of entry, leading migrants to attempt entry without inspection out of desperation.  *See* TRO Br. 13; Dep't of Homeland Security Office of Inspector General, *Special Review - Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy*, at 6 (Sept. 27, 2018) <https://tinyurl.com/y9rkz2ye>.

[15] The Government instead cites *Raoof v. Sullivan*, 315 F. Supp. 3d 34, 44 (D.D.C. 2018), which does not discuss this D.C. Circuit case law or other immigration-related § 553(a)(1) cases.

the foreign affairs exception should apply in the immigration context "only when ordinary application of 'the public rulemaking provisions [will] provoke definitely undesirable international consequences.'"  *See E. Bay*, 2018 WL 6428204 at *19 (quoting *Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980)); *see also E. Bay*, 2018 WL 6053140 at *15 ("the foreign affairs exception cannot be given too much breadth in the immigration context").

The Government next argues that the Rule falls within the foreign affairs exception because it "directly relate[s] to our ongoing negotiations with Mexico over our shared obligations to consider asylum claims."  Opp. 35.  But the Government again ignores *Peña*, 17 F.3d at 1487, and fails to explain why barring asylum based on manner of entry would "carry out obligations to a foreign nation."  To the contrary, the Rule would undermine the United States' international obligations.  TRO Br. 26-27.  And even if the Government were correct that the foreign affairs exception applies to any rule that might have an effect on international relations, the Government still does not cogently explain why the new asylum policy would have that effect.  As the Ninth Circuit put it in *East Bay*, "the connection between negotiations with Mexico and the immediate implementation of the Rule is not apparent on this record."  *See E. Bay*, 2018 WL 6428204 at *19; *see also E. Bay*, 2018 WL 6053140 at *16 ("Defendants do not say . . . and were unable to explain at the hearing, how eliminating notice and comment would assist the United States in its negotiations.").[16]

Finally, the Government argues that no court should consider the breadth of the foreign affairs exception because doing so would involve impermissible "second-guessing" of the

---

[16] The Government also has not substantiated that it is engaged in meaningful negotiations with Mexico on these issues, and the Mexican government recently denied U.S. Government assertions about its position.  *See* Amy Guthrie, *Incoming Mexico gov't:  No deal to host US asylum-seekers*, S.F. CHRON., Nov. 25, 2018 < https://tinyurl.com/y946z8ug>.

Administration's foreign policy.  Opp. 37.  But "concerns of national security and foreign relations do not warrant abdication of the judicial role."  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010).  In any event, neither of the cases the Government cites is on point, Opp. 37, and neither relates to § 553(a)(1), which simply requires the Government to proceed through normal rulemaking unless a rule serves a "foreign affairs function."

### III.    The Remaining TRO Factors Support the Issuance of a TRO, and the Court May Grant Nationwide Equitable Relief.

Finally, the Government insists that the Court cannot temporarily restrain or enjoin the illegal Rule, and that even if it could, such relief would be inappropriate.  Not so.  Plaintiffs stand to suffer significant and irreparable injury by being categorically barred from asylum, and the balance of harms supports entry of a TRO.  Further, neither the INA nor the APA preclude injunctive relief, and precedent dictates that nationwide relief is permissible and sensible here.

*Irreparable Harm.*  If the Government is permitted to resume its illegal activity, Plaintiffs will be irreparably and immediately harmed because they will be deprived of the right to seek asylum.  Moreover, that the asylum bar would be applied to Plaintiffs is hardly hypothetical.  Plaintiff A.V., as the Government concedes, is in expedited removal proceedings, Opp. 15, and at any moment could be deported without the opportunity to demonstrate eligibility for asylum.  Plaintiff G.Z.—a juvenile in government custody—risks losing access to TVPRA protection when he turns 18.  He also faces the possibility of transfer to adult detention in a county jail on his birthday.  Plaintiffs O.A., K.S., D.S., and C.A. have all been issued defective Notices to Appear and are thus subject to expedited removal at the discretion of the government.  *See supra* at 3 & n.2.  The limbo Plaintiffs have been put into and resulting fear of removal constitutes irreparable harm.  *Kirwa v. Dep't of Def.*, 285 F. Supp. 3d 21, 43-44 (D.D.C. 2017) (non-speculative fear of removal qualifies as irreparable harm).  This remains true even given that a nationwide TRO is

currently enjoining the Rule's implementation.[17]

*Balance of Interests.*   The balance of the interests likewise supports the issuance of a TRO. Preserving the status quo that existed for decades before the Rule will impose no substantial burden on the Government, and will protect Plaintiffs (and others like them) from harms that cannot be undone.   These harms include the risk of removal without the ability to pursue asylum.   Even those persons who are granted withholding of removal will be narrowly protected while facing the long-term likelihood of eventual removal and permanent separation from their families.   While the Government maintains that the situation at the border is "significant and urgent," Opp. 40, it has consistently overstated the purported border "crisis" given historical migration trends, TRO Br. 14-18; and the President has also announced on Twitter his views as to the lack of exigency.   *See supra*, at 19 & n.13.   The public interest in depriving individuals of the right to seek asylum is thus diminished.

*Availability of Injunctive Relief.*   The Government is also wrong in contending that any statute or precedent bars a nationwide injunction.   First, in arguing that action under § 1252(e)(3) is premature, the Government simply rehashes its justiciability argument, which relies on a

---

[17] The Government relies on *Pars Equality Center v. Trump*, No. 1:17-cv-00255, ECF 84 (D.D.C. May 11, 2017) as support for the notion that irreparable harm cannot be shown where another court has already enjoined the unlawful activity.   Opp. 38.   The court in *Pars* did not so hold.   *See id.* at 2 (temporarily staying resolution of plaintiffs' claims and stating that because plaintiffs were "likely to succeed on the merits," the court would be "prepared to issue a ruling without delay" if existing injunctions were overturned).   In any event, the Government's argument ignores the fact that the TRO in *East Bay* is set to expire on December 19, when the Northern District of California will hold a hearing to determine whether to issue a preliminary injunction.   Plaintiffs also remain at risk of imminent harm as the Government continues to seek emergency relief from the *East Bay* TRO in the Northern District of California, the Ninth Circuit, and the Supreme Court.

mischaracterization of the D.C. Circuit's decision in *AILA*. *See supra* at 4.[18]  Contrary to the Government's unsupported claim, injunctive relief setting aside the unlawful Rule is simply not equivalent to setting aside an order to exclude an alien under § 1225(b). *See* Opp. 42.  Such relief is not foreclosed by the statute, *AILA*, or any other court decision.

Second, the Government's argument that the INA broadly prohibits injunctive relief fares no better.  It makes no sense that the INA authorizes courts to make a "determination" that a rule is unlawful, but prohibits courts from doing anything about it, Opp. 43, and the Government cites no authority for such a proposition.  The APA, meanwhile, instructs courts to "hold unlawful and set aside" illegal agency rules, *see* 5 U.S.C. § 706(2), and the D.C. Circuit has repeatedly held that the way courts serve that role is by granting nationwide injunctive relief.  *See, e.g.*, *Nat'l Mining Ass'n v. U.S. Army Corps. of Eng'rs*, 145 F.3d 1399, 1408 (D.C. Cir. 1998) ("[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."); *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989).  That is exactly what the Court should do here.

## CONCLUSION

For the foregoing reasons, the Motion should be granted.

Dated:  December 12, 2018                           Respectfully submitted,


                                                    /s/Thomas G. Hentoff
                                                    Thomas G. Hentoff (D.C. Bar No. 438394)
                                                    Ana C. Reyes (D.C. Bar No. 477354)
                                                    Ellen E. Oberwetter (D.C. Bar No. 480431)
                                                    Charles L. McCloud[*]

---

[18] The Government also offers a truncated quotation of § 1252(f)(1) to suggest that only the Supreme Court may enjoin policies relating to removal.  Opp. 43.  But § 1252(f)(1) applies only to "the operation of the provisions of part IV of this subchapter," not to related regulations.

Matthew D. Heins[*]
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel: (202) 434-5000
Fax: (202) 434-5029

Hardy Vieux (D.C. Bar No. 474762)
HUMAN RIGHTS FIRST
805 15th Street, N.W., Suite 900
Washington, D.C. 20005
Tel: (202) 547-5692
Fax: (202) 553-5999

Eleni Rebecca Bakst[*]
Anwen Hughes[*]
HUMAN RIGHTS FIRST
75 Broad Street, 31st Floor
New York, New York 10004
Tel: (212) 845-5200
Fax: (212) 845-5299

Charles George Roth[*]
Keren Hart Zwick (D.D.C. Bar No. IL0055)
Gianna Borroto[*]
Ruben Loyo[*]
NATIONAL IMMIGRANT JUSTICE CENTER
208 S. LaSalle Street, Suite 1300
Chicago, Illinois 60604
Tel: (312) 660-1370
Fax: (312) 660-1505

*Attorneys for Plaintiffs*

---

[*] Certification to practice pursuant to LCvR 83.2(g) to be submitted.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 12, 2018, I caused to be electronically filed the foregoing document with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system.  Counsel in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/Thomas G. Hentoff_____
Thomas G. Hentoff (D.C. Bar No. 438394)