# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| O.A., *et al.*, on behalf of themselves and all others similarly situated, | Civil Action No. 1:18-cv-2718-RDM |
| *Plaintiffs*, | |
| v. | [Consolidated with Civil Action No. 18-cv-2718-RDM] |
| DONALD J. TRUMP, *et al.*, | |
| *Defendants*. | **AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## PRELIMINARY STATEMENT

1.      This case concerns the U.S. government's unlawful attempt to deprive vulnerable individuals of access to the protection that the nation's asylum system affords.

2.      Under U.S. law, noncitizens are entitled to seek asylum irrespective of immigration status and without regard to manner of entry into the United States.  *See* 8 U.S.C. § 1158(a)(1). U.S. law in this regard is consistent with the United States' treaty obligations under the Refugee Act of 1980.  U.S. law also requires certain procedural safeguards during removal proceedings. *See id.* § 1225(b)(1).   These safeguards are critical to ensuring that individuals who face persecution—including rape, kidnapping, torture, and even death—in their home countries are given a fair chance to establish their eligibility for asylum.

3.      On November 9, 2018, the Department of Justice ("DOJ") and the Department of Homeland Security ("DHS") promulgated an interim final rule ("the Rule"), EOIR Docket No. 18–0501; A.G. Order No. 4327–2018, imposing new, significant limitations on who may seek asylum in the United States.  On the same day, President Trump signed a presidential proclamation entitled "Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States" ("the Proclamation") that purports to suspend the entry of individuals who have entered the United States from across the U.S.–Mexico border without receiving inspection at a designated port of entry.  Together, the Rule and the Proclamation render ineligible for asylum any noncitizen who enters the United States without inspection from across the U.S.–Mexico border. This dramatic change to the Nation's asylum laws shutters access to the asylum system for thousands of men, women, and children that the Administration concedes are likely to have meritorious asylum claims.  The Rule is illegal in several respects.

4.      First, the Rule contradicts the requirements of the Immigration and Nationality Act ("INA"), specifically 8 U.S.C. § 1158(a)(1), which gives any noncitizen who is physically present in or who arrives in the United States a statutory right to seek asylum, irrespective of the individual's manner of entry, and requires the government to follow specific processes when an individual expresses a desire to seek asylum or fear of returning to his or her home country.  The Rule is therefore contrary to law under the INA and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA").

5.      Second, the Rule violates 8 U.S.C. § 1225 by mandating a denial of a credible fear determination, even in situations where a noncitizen in expedited removal proceedings shows a significant possibility that she could establish eligibility for asylum.  For this reason, the Rule is again contrary to law under the INA and the APA.

6.      Third, the Rule violates The William Wilberforce Trafficking Victims Protection Act, 8 U.S.C. § 1158 (b)(3)(C), by denying unaccompanied children the opportunity to first present the substance of their claims for asylum in a non-adversarial proceeding before an asylum officer.

7.      Fourth, by adopting, without notice and the opportunity to comment, an interim final rule depriving certain asylum seekers of the statutory protection outlined in the INA simply because they enter the country without inspection, the responsible government officials have acted in excess of their statutorily prescribed authority, contrary to law, and arbitrarily and capriciously, all in violation of the APA.

8.      Fifth, the promulgation of the Rule was invalid because the current Acting Attorney General who putatively authorized promulgation of the Rule is ineligible to serve in that role under 28 U.S.C. § 508 and the Appointments Clause of the United States Constitution, art. II, § 2, cl. 2.

9.      Sixth, even assuming the current Acting Attorney General's appointment was lawful, the Rule violates the requirement under 8 U.S.C. § 1158(b)(2)(C) that any changes to the limitations and conditions imposed on asylum seekers be made by regulation—rather than by presidential decree.  Because the Rule is predicated on an abdication of that responsibility, and simply incorporates by reference the consequence of Presidential proclamations, the Rule is invalid under the APA and is *ultra vires*.

10.     If allowed to stand, the Rule would fundamentally reshape and constrict asylum law, in contravention of U.S. and international law.  This Court's intervention is necessary to put a stop to this Administration's illegal actions and prevent irreparable harm to thousands of asylum seekers who desperately need protection in this country.

11.     Plaintiffs respectfully request a declaration that the Rule violates the APA, and an order enjoining the application of the Rule.

## **PARTIES**

12.     Plaintiffs are noncitizens who are presently in the United States and wish to seek asylum.

13.     Plaintiff O.A. is a 23-year-old man from Honduras who the government contends is subject to the Proclamation.  O.A. fled Honduras with his 4-year-old daughter, K.S., because a gang called Mara-18 (M-18), threatened to kill him and his family.  They did so because M-18 had killed O.A.'s brother, and they then targeted O.A. and his family when O.A. cooperated with the police to help them investigate his brother's death.  O.A. knew that the police in Honduras would not be willing or able to help him, and he decided to flee Honduras with his daughter.

14.     Plaintiff K.S. is a 4-year-old girl from Honduras.  O.A. is her father, and she entered the United States with him when he entered the United States after fleeing Honduras.  K.S.'s life

was at risk in Honduras because her father cooperated with police to investigate the death of his brother, and she accompanied him when he fled Honduras to seek asylum in the United States.

15.     Plaintiff A.V. is a 27-year-old woman from Honduras who crossed the border from Mexico into the United States other than at a port of entry on November 11, 2018.  She has a credible fear of persecution in Honduras because she is a victim of repeated violent assaults by her partner (who is the father of her children), and because her partner is likely a member of gang and has threatened to kill her.  A.V. has nowhere to turn for help in Honduras.

16.     Plaintiff G.Z. is a 16-year-old unaccompanied minor from Honduras who the government alleges crossed the U.S.–Mexico border other than at a port of entry on November 10, 2018.  In Honduras, G.Z. was the victim of recurring violence at the hands of his father, who is a police officer.  G.Z. has no ability to seek protection from the police, because his father is one of them.  In the weeks preceding his departure from Honduras, G.Z. also rebuffed efforts by MS-13 gang members to recruit him because he believes their activities to be morally wrong.  G.Z. feared that if he did not leave Honduras he would be killed.  He has a credible fear of persecution.

17.     Plaintiff D.S. is an asylum seeker from Honduras.  She fled Honduras because of severe domestic abuse by her partner, who is a security guard.  She tried to report the violence, which at points required hospitalization, but the government did nothing in response to her complaint and did not pursue her partner when he failed to appear in judicial proceedings.  D.S. also tried to relocate internally within Honduras but her partner tracked her down and threatened to kill her.  D.S. made the difficult journey across Mexico with her son, C.A., over the course of two weeks, during which time she exhausted all of her financial resources.  D.S., with her son, C.A., entered the United States other than at a port of entry on November 13, 2018, and they were apprehended by immigration officials on the U.S. side of the border.

18.     Plaintiff C.A. is an asylum seeker from Honduras, whose mother is Plaintiff D.S. Plaintiff C.A. was regularly beaten by his father in Honduras and accompanied his mother, D.S., on her journey to the United States.  With D.S., C.A. entered the United States other than at a port of entry on November 13, 2018, and they were apprehended by immigration officials on the U.S. side of the border.

19.     Plaintiff D.R. is an asylum seeker from El Salvador who crossed the southern border other than at a port of entry on or about November 13, 2018.  D.R. was forced to flee El Salvador with her 20-year-old daughter, P.R., after government officials and members of a major political party badly beat them and threatened their lives for opposing the party and refusing to help it violate the law.  She fears she will be persecuted again if forced to return to El Salvador.

20.     Plaintiff P.R. is a 20-year-old asylum seeker from El Salvador, whose mother is Plaintiff D.R.  Like her mother, P.R. was beaten and threatened by police and other government and political-party officials.  This abuse occurred because of her and her mother's political affiliation and refusal to support the party.  Neither she nor her mother could go to the Salvadoran authorities to report and prevent their persecution, because those authorities were precisely the people perpetrating that persecution.  With nowhere to turn for help, she fled the country, crossing the U.S. southern border with her mother on or about November 13, 2018.  She has a credible fear that if returned to her home country, she would be gravely harmed or killed on account of her refusal to support the party and on account of her relationship to her mother.

21.     Plaintiff G.R. is an 18-year-old Nicaraguan national who is seeking asylum in the United States.  After providing medical assistance to protesters participating in peaceful protests against government policies—and after participating in some such protests herself—G.R. received threatening phone calls, whereupon she attempted to relocate to another part of Nicaragua.  Internal

relocation did not work: in response to her continued political activism, police stopped her on the street, called her by her name, and informed her that the next time they saw her they would take her into custody. It became clear to G.R. that the authorities intended to arrest her for her political beliefs, and that she would likely be tortured and raped in prison if she did not flee. Accordingly, G.R. departed Nicaragua seeking refuge from persecution. She was apprehended crossing the southern border into the United States other than at a port of entry on or about November 13, 2018.

22.     Defendant Donald J. Trump is the President of the United States. On November 9, 2018, he issued the Proclamation. He is sued in his official capacity.

23.     Defendant Matthew G. Whitaker was appointed to the position of Acting Attorney General of the United States ("Acting Attorney General") on November 7, 2018. The Attorney General is responsible for administering the INA, oversees the Executive Office for Immigration Review ("EOIR"), and is empowered by statute to grant asylum or any other relief. He is sued in his official capacity.

24.     Defendant Kirstjen M. Nielsen is the Secretary of DHS ("the Secretary"). She directs United States Immigration and Customs Enforcement ("ICE"), United States Citizenship and Immigration Services ("USCIS"), and United States Customs and Border Protection ("CBP"). She is sued in her official capacity.

25.     Defendant Lee Francis Cissna is Director of USCIS, which is the agency that employs the Asylum Officers who conduct credible fear screening interviews to determine whether individuals may apply for asylum before an immigration judge. He is sued in his official capacity.

26.     Defendant John Lafferty, the Asylum Division Chief within USCIS, is responsible for overseeing the credible fear screening process and asylum adjudication within USCIS. He is sued in his official capacity.

## NATURE OF ACTION

27.     This is an action arising under the Immigration and Nationality Act ("INA"), 8

U.S.C. § 1101 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*

28.     Plaintiffs seek a declaratory judgment that the interim final rule entitled "Aliens

Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection

Claims," 83 Fed. Reg. 55,934 (Nov. 9, 2018) is arbitrary, capricious, contrary to law, and beyond

the authority of the Acting Attorney General and the Secretary to promulgate under the APA and

otherwise.  Plaintiffs further seek an injunction prohibiting Defendants from enforcing the Rule

and such additional and other relief as is just and proper.

## JURISDICTION AND VENUE

29.     This Court has jurisdiction under 28 U.S.C. § 1331, as the claims in this case arise

under federal statutes, including the INA, 8 U.S.C. § 1101 *et seq.*, and the APA, 5 U.S.C. § 701 *et*

*seq.*  Specifically, this Court has jurisdiction to review Plaintiffs' claims that the Rule is

inconsistent with the INA and thus *ultra vires* to it.

30.     This Court further has jurisdiction to review this case as a challenge to changes in

the expedited removal process under 8 U.S.C. § 1252(e)(3).  Although courts generally lack

jurisdiction to review challenges to the expedited removal process, judicial review under § 1225(b)

is available to determine if any regulation issued to implement such section is constitutional or

whether such regulation is otherwise in violation of law.  This case falls squarely within this

statutory exception.  Plaintiffs present a challenge to the "validity of the system" for expedited

removal. *See* 8 U.S.C. § 1252(e)(3).  The Rule and Proclamation are each a "written policy

directive, written policy guideline, or written procedure" issued to implement the expedited

removal procedures set forth in 8 U.S.C. § 1225(b).  And Plaintiffs assert that the Rule and

Proclamation impose changes to the expedited removal and credible fear system that are "not

consistent with applicable provisions of [8 U.S.C. § 1158(a)(1)]," and "otherwise in violation of law." *Id.* § 1252(e)(3)(A)(ii).

31.     The declaratory, injunctive, and other relief sought by Plaintiffs are authorized by 28 U.S.C. §§ 2201 and 2202.

32.     Venue in this District is proper pursuant to 5 U.S.C. § 703 and 8 U.S.C. § 1252(e). In addition, venue is proper pursuant to 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to the claim occurred at or in this District.  Defendants are headquartered in Washington, D.C., and upon information and belief, Defendants' decisions regarding changes to the expedited removal and credible fear processes have taken place and are being made in the District of Columbia.

## FACTUAL ALLEGATIONS

### Legal Framework

33.     Congress enacted the Refugee Act of 1980 to "bring United States refugee law into conformance" with international law, as outlined under the United Nations Convention Relating to the Status of Refugees and the 1967 United Nations Protocol Relating to the Status of Refugees. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436–37 (1987).

34.     Among the treaty obligations undertaken by the United States was the promise that the "Contracting States shall apply the provisions of this Convention to refugees without discrimination as to race, religion or country of origin."  Convention Relating to the Status of Refugees art. 3, July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150.[1]  Further, "[c]ontracting States shall not impose penalties, on account of their illegal entry or presence, on refugees who, coming directly from a territory where their life or freedom was threatened in the sense of Article 1, enter

---

[1] The text of the Convention is available online at http://www.unhcr.org/en-us/3b66c2aa10.

or are present in their territory without authorization, provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence." *Id.* at art. 31(1). This prohibition against restricting asylum access based on manner of entry is reiterated in the Introductory Note to the Refugee Convention, which states: "The Convention further stipulates that, subject to specific exceptions, refugees should not be penalized for their illegal entry or stay. This recognizes that the seeking of asylum can require refugees to breach immigration rules." *Id.* at Introductory Note.

35.     The INA is the embodiment of these international law obligations. Its instructions regarding the asylum process are clear: "Any alien who is physically present in the United States or who arrives in the United States (*whether or not at a designated port of arrival* and including an alien who is brought to the United States after having been interdicted in international or United States waters), *irrespective of such alien's status*, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title." 8 U.S.C. § 1158(a)(1) (emphases added).

36.     While asylum is ultimately a discretionary remedy within the parameters set by statute, the duty to allow a noncitizen access to the process for seeking asylum is not discretionary, as the U.S. government has recognized. *See, e.g.*, Federal Defendant's Reply Brief in Support of Motion for Summary Judgment and Dismissal for Lack of Jurisdiction, cited in *Munyua v. United States*, 2005 U.S. Dist. LEXIS 11499, at *16–19 (N.D. Cal. Jan. 10, 2005) ("[D]efendant acknowledges that [the immigration officers] did not have the discretion to ignore a clear expression of fear of return or to coerce an alien into withdrawing an application for admission.").

37.     For a noncitizen to be eligible for asylum, the noncitizen must establish that he or she is a refugee under the INA, defined as follows:

[A]ny person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A); *see id.* § 1158(a)(1).

38.     To demonstrate a well-founded fear of persecution, a noncitizen need not show that harm is certain or even more likely than not; a 1 in 10 chance of persecution is sufficient under U.S. Supreme Court precedent. *See Cardoza-Fonseca*, 480 U.S. at 430.

### Expedited Removal and Credible Fear

39.     In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), which created an expedited removal process for immigration officials to deport certain individuals deemed inadmissible under the INA.

40.     Out of a concern that expedited removal would prevent individuals from seeking and applying for asylum—and thereby abrogate the United States' obligations under domestic and international law—IIRIRA implemented the "credible fear" screening process to ensure that individuals subject to expedited removal proceedings would be given meaningful access to the asylum process.

41.     Under those provisions, if a noncitizen facing expedited removal indicates any fear of returning to his or her home country, an immigration officer must refer the asylum seeker for a "credible fear" interview. *See* 8 U.S.C. § 1225(b)(1)(A)(ii); 8 C.F.R. § 235.3(b)(4). This interview is designed to "elicit all relevant and useful information bearing on whether the applicant has a credible fear of persecution or torture." 8 C.F.R. § 208.30(d).

42.     To satisfy the credible fear standard, an asylum seeker need only show a "significant possibility, taking into account the credibility of the statements made by the noncitizen

and in support of the noncitizen's claim and such other facts as are known to the officer, that the noncitizen could establish eligibility for asylum." 8 U.S.C. § 1225(b)(1)(B)(v). The standard used in this initial screening is intentionally lower than the standard used in the full asylum hearing that the applicant will later undergo if he or she passes the credible fear interview. The intentionally low threshold for demonstrating a credible fear accounts for the reality that credible fear interviews typically take place shortly after asylum seekers have completed their often traumatic journeys to the United States, in border processing centers or detention facilities where asylum seekers typically do not have access to attorneys. The standard also acknowledges that many asylum seekers arrive in the United States without the time, resources, or expertise to develop fully, upon arrival, the evidence necessary to prevail on their ultimate asylum application.

43.    The credible fear process includes another important limitation. Recognizing the abbreviated nature of these interviews, if a person meets the definition of a refugee but may be subject to a bar to asylum, officers are required to flag those potential bars for future adjudication, but to refer the applicant for full removal proceedings. *See* 8 C.F.R. § 208.30(e)(5).

44.    The requirement to refer an asylum seeker subject to expedited removal proceedings to an asylum officer for a credible fear interview is mandatory. *See* 8 U.S.C. § 1225(b)(1)(A)(ii) (immigration officer "*shall* refer the [noncitizen] for an interview by an asylum officer" (emphasis added)); 8 C.F.R. § 235.3(b)(4) ("[T]he inspecting officer *shall not* proceed further with removal of the [noncitizen] until the [noncitizen] has been referred for an interview by an asylum officer." (emphasis added)).

45.    If an applicant is found by an asylum officer to have a credible fear of persecution or torture, the applicant is taken out of the expedited removal process and placed in the regular removal process. The applicant thus obtains the ability to develop a full record in support of his

or her asylum claim; the right to present that claim before an immigration judge at a trial-like hearing; and the ability to appeal an adverse decision to the Board of Immigration Appeals and a federal court of appeals. *See* 8 U.S.C. § 1225(b)(1)(B)(ii).

46.     The newly promulgated Rule and the accompanying Proclamation upend this detailed statutory scheme.  Under the Rule, asylum seekers who enter without inspection from across the U.S.–Mexico border are barred from obtaining asylum and may only apply for withholding of removal or relief under the Convention Against Torture ("CAT").  Obtaining either of these forms of relief requires satisfying a different standard than credible fear interviews, requiring an individual to demonstrate a "reasonable possibility" of persecution "on account of" a protected ground.  This "reasonable fear" standard is significantly higher than the credible fear standard.  That is so because the reasonable fear screening standard is the same standard required to establish a "well-founded fear" of persecution in the asylum context.  The credible fear standard, on the other hand, requires only a showing of a significant possibility that the well-founded fear will be established.

47.     Moreover, unlike asylum, withholding of removal and CAT protection do not prohibit the government from removing the noncitizen to a third country; do not create a path to lawful permanent resident status and citizenship; do not allow the noncitizen to travel freely within the United States or internationally; and do not ensure family unity by permitting a noncitizen's family members to obtain lawful immigration status derivatively.

48.     The Government contends that Plaintiffs are subject to the new Proclamation and Rule; Plaintiffs are suffering irreparable harm as a result.  Plaintiffs suffered persecution that their home country's government was unwilling and unable to stop, and have come to the United States to seek refuge.  The Proclamation and Rule effectively prevent Plaintiffs from applying for asylum

and the benefits that come with it, and place Plaintiffs at high risk of being returned to the country that perpetrated or sanctioned their oppression.

**Implementation of "Zero-Tolerance" Immigration Policy**

49.     In April 2018, the U.S. government began implementing a "zero-tolerance" policy on immigration.  In announcing the policy, then-Attorney General Jefferson B. Sessions III stated without any evidence that "[t]he situation at our Southwest Border is unacceptable," and "necessitate[d] an escalated effort to prosecute those who choose to illegally cross our border."[2] Mr. Sessions continued:   "To those who wish to challenge the Trump Administration's commitment to public safety, national security, and the rule of law, I warn you:  illegally entering this country will not be rewarded, but will instead be met with the full prosecutorial powers of the Department of Justice."

50.     In accordance with this directive, the U.S. government took steps to deter immigration at the southern border, such as referring greater numbers of migrants, including asylum seekers, for criminal prosecution, detaining migrants (including children) in inhospitable conditions, and encouraging adjudication officers to deny asylum claims.

51.     The Administration's "zero-tolerance" policy resulted in the forcible separation of child migrants from their parents, ostensibly so that the government could criminally prosecute the parents for illegal entry or reentry.[3]  Before federal courts enjoined the practice of separating families, the Department of Homeland Security had separated over 2,000 children from their parents.

---

[2] DOJ, *Attorney General Announces Zero-Tolerance Policy for Criminal Illegal Entry* (Apr. 6, 2018) <https://tinyurl.com/y96nsut6>.

[3] *See* Miriam Jordan, *How and Why "Zero-Tolerance" is Splitting Up Families*, N.Y. TIMES, May 12, 2018 <https://tinyurl.com/y73urcyj>.

52.     The Administration's "zero-tolerance" policy applied even to asylum seekers.  In fact, "zero-tolerance" led to a significant increase in criminal prosecutions of individuals seeking such protection, including many parents who entered the United States without inspection because it was their only means of protecting their children from the persecution faced in their home countries.[4]

53.     Nor did the Administration always permit asylum seekers to seek asylum through designated ports of entry; the Administration began to employ a policy of "metering" at the U.S.–Mexico border to keep a caravan of asylum seekers from presenting themselves at the border to seek protection.  The existence of this policy was confirmed by the Secretary, who stated in a May 2018 interview, "We are 'metering,' which means that if we don't have the resources to let them in on a particular day, they are going to have to come back."[5]  A September 27, 2018 Special Review of the Administration's "zero-tolerance" and family separation policies by DHS's Office of Inspector General ("OIG Report") similarly acknowledges that the "metering" process involves CBP officers standing at the international border line in the middle of the bridges to the ports of entry; when an asylum seeker approaches the border line, officers confirm whether space is available and permit them "to enter once there is sufficient space and resources to process them."[6]

---

[4] *See* Russell Berman, *85 Immigrants Sentenced Together Before One Judge*, THE ATLANTIC, June 19, 2018 <https://tinyurl.com/ydh63e8u>.  The need to escape the persecution they face in their home countries is frequently cited by asylum seekers as a primary reason for seeking safe harbor in the United States.  *See generally* University of Washington, *The Cycle of Violence: Migration from the Northern Triangle* (2017) <https://tinyurl.com/yabyz9ax> (reporting that the increase of violence in Guatemala, Honduras, and El Salvador between 2011 and 2016 coincided with a doubling of total respondents listing "fleeing violence" as their main reason for migration).

[5] Fox News, *Secretary Nielsen Talks Immigration, Relationship with Trump* 03:20 (May 15, 2018) <https://tinyurl.com/y8buwakc>.

[6] Dep't of Homeland Security Office of Inspector General, Special Review - Initial Observations Regarding Family Separation Issues Under the Zero Tolerance Policy, at 6 (Sept. 27, 2018)

54.     Although CBP does not maintain a wait list for those who have been turned away due to metering, some asylum seekers have instituted an unofficial waitlist to keep track of those awaiting entry.  CBP will often refer migrants to the unofficial waitlist when metering.  Due to metering, the average wait time for asylum seekers at a port of entry can be up to several weeks.

**Public Statements by Defendants**

55.     Public statements by the senior Executive Branch officials and the President both before and after the implementation of "zero-tolerance" reinforced the basic theme of the Administration's immigration policy:  to deter any and all immigration.

56.     On October 12, 2017, then-Attorney General Sessions, in an address to the Executive Office for Immigration Review, stated, without any evidence:  "We . . . have dirty immigration lawyers who are encouraging their otherwise unlawfully present clients to make false claims of asylum providing them with the magic words needed to trigger the credible fear process."[7]

57.     On January 16, 2018, Secretary Nielsen stated, before the U.S. Senate, that "we must tighten [our] case processing standards, including the 'credible-fear' standard."[8]

---

<https://tinyurl.com/y9rkz2ye>.  The Administration's claims regarding its limited capacity to process asylum applications are similarly unfounded.  Senior CBP and ICE officials at the San Ysidro port of entry stated in interviews "that CBP has only actually reached its detention capacity a couple of times per year and during 'a very short period' in 2017."  Amnesty International, *USA: 'You Don't Have Any Rights Here': Illegal Pushbacks, Arbitrary Detention & Ill-Treatment of Asylum-Seekers in the United States* (2018) <https://tinyurl.com/y8k4q54o>.  The September 2018 OIG report similarly stated that "the OIG team did not observe severe overcrowding at the ports of entry it visited."

[7] DOJ, *Attorney General Sessions Delivers Remarks to the Executive Office of Immigration Review* (Oct. 12, 2017) <https://tinyurl.com/y9n3alru>.

[8] DHS, Written testimony of DHS Secretary Kirstjen Nielsen for a Senate Committee on the Judiciary hearing titled "Oversight of the United States Department of Homeland Security" <https://tinyurl.com/yc57pd6n>.

58.     For his part, President Trump has made no secret of his disdain for the Nation's

duly-enacted immigration laws, including the asylum laws:

    a.  On June 21, 2018, the President tweeted:  "We shouldn't be hiring judges by the thousands, as our ridiculous immigration laws demand, we should be changing our laws, building the Wall, hire Border Agents and Ice and not let people come into our country based on the legal phrase they are told to say as their password."

    b.  On June 24, 2018, the President tweeted:  "We cannot allow all of these people to invade our Country.  When somebody comes in, we must immediately, with no Judges or Court Cases, bring them back from where they came.  Our system is a mockery to good immigration policy and Law and Order.  Most children come without parents . . . ."

    c.  On June 30, 2018, the President tweeted:  "When people come into our Country illegally, we must IMMEDIATELY escort them back out without going through years of legal maneuvering."

    d.  On July 5, 2018, the President tweeted:  "When people, with or without children, enter our Country, they must be told to leave without our Country being forced to endure a long and costly trial. Tell the people, 'OUT,' and they must leave, just as they would if they were standing in your front lawn."

    e.  On October 29, 2018, the President tweeted:  "Many Gang Members and some very bad people are mixed into the Caravan heading to our Southern Border. Please go back, you will not be admitted into the United States unless you go through the legal process. This is an invasion of our Country and our Military is waiting for you!"

    f.  On November 1, 2018, President Trump delivered a speech regarding asylum policy.  In that speech, the President again referred to migrants from Central America as "an 'invasion,'" and accused those individuals of using "fraudulent or meritless asylum claims to gain entry into our great country."[9]

    g.  In the same speech, President Trump attacked the content of the asylum laws passed by Congress:  "Think of it.  Somebody walks into our country, reads a statement given by a lawyer, and we have a three-and-a-half-year court case for one person."   The President called the laws that Congress has passed "incompetent, very, very stupid laws," and said that the immigration laws are "not archaic; they're incompetent.  It's not that they're old; they're just bad."

---

[9] *Remarks by President Trump on the Illegal Immigration Crisis and Border Security*, The White House (Nov. 1, 2018) <https://tinyurl.com/y9x88wfj>.

59.     The foregoing statements reflect a hostility amongst senior members of the Administration to the immigration system and to asylum claims, especially those filed by individuals from Central America.  The statements also demonstrate the Administration's desire to shutter access to asylum by all possible means.

### Effects of the Zero-Tolerance Policy

60.     As a result of the Administration's zero-tolerance policy, many migrants who arrive at ports of entry on the U.S.–Mexico border are rebuffed and left in limbo on the Mexican side of the border.

61.     In recent years, violence in Mexico has increased.  2017 was listed as "the deadliest year in Mexico," with 29,168 homicide victims, a 27 percent increase from 2016.[10]  In January 2018, the U.S. State Department issued a Level Four, "Do not travel" warning—the highest-level travel warning—for the state of Tamaulipas, which incorporates Reynosa, Matamoros, and Nuevo Laredo, three major port of entry sites.[11]  Many of the other border states, such as Chihuahua, Coahuila, Nuevo León, and Sonora, are listed at Level Three, "Reconsider travel," due to high levels of "[v]iolent crime and gang activity."[12]

62.     The violence faced by migrants and refugees like Plaintiffs while in Mexico is disproportionately high and serious.  They face grave risks of kidnapping, disappearances, sexual assault, trafficking, and other harms in Mexico's northern border region.  They are targeted not

---

[10]  Human Rights First, *Mexico:   Still Not Safe for Refugees and Migrants* (Mar. 2018) <https://tinyurl.com/y8b6flak>.

[11]  U.S. Dep't. of State, *Mexico Travel Advisory* <https://tinyurl.com/ycpn4cxr> ("Violent crime, such as murder, armed robbery, carjacking, kidnapping, extortion, and sexual assault, is common. Gang activity, including gun battles, is widespread. . . .   Local law enforcement has limited capability to respond to violence in many parts of the state.").

[12]  *Id.*

only due to their inherent vulnerabilities as refugees and migrants, but also due to their nationality, race, gender, sexual orientation and gender identity.  Additionally, they have limited or no financial resources or contacts in the region.

63.    Long wait times for access to ports of entry—times which will only increase under the Rule—leave asylum-seekers especially vulnerable.  Cartels and other criminal organizations prey on migrants in border towns and near ports of entry, with cartel members often waiting directly outside some ports of entry.[13]  As a result, "evidence of mass graves and disappearances in Mexico suggest disproportionate killing of non-Mexican migrants."[14]  Attorneys and employees of migrant shelters in Reynosa, Mexico, report that "most—if not all—migrants they encounter who had been turned away from the port of entry have been kidnapped and held for ransom."[15]  And with migrant shelters frequently at capacity, many asylum-seekers have no other choice but to sleep on the streets or on the bridge itself while they await access to a port of entry.

64.    The Administration's policy of "metering" has also created strong incentives for legitimate asylum seekers to cross the border other than at authorized ports of entry.  DHS's recent OIG Report confirmed this reality.  The OIG reported "evidence that limiting the volume of asylum-seekers entering at ports of entry leads some aliens who would otherwise seek legal entry into the United States to cross the border illegally.  According to one Border Patrol supervisor, the

---

[13] Human Rights First, *Crossing the Line: U.S. Border Agents Illegally Reject Asylum Seekers*, at 16 (May 2017) [hereinafter *Crossing the Line*] <https://tinyurl.com/y8rxsfmn>.

[14] Josiah Heyman & Jeremy Slack, *Blockading Asylum Seekers at Ports of Entry at the US–Mexico Border Puts Them at Increased Risk of Exploitation, Violence, and Death*, Ctr. for Migration Studies (June 25, 2018) <https://tinyurl.com/yc5tgec3>.

[15] *Crossing the Line*, *supra* n.13, at 16.

Border Patrol sees an increase in illegal entries when aliens are metered at ports of entry."[16]  The OIG Report further observed that "[t]he fact that both aliens and the Border Patrol reported that metering leads to increased illegal border crossings strongly suggests a relationship between the two."[17]

### Issuance of the Rule and Proclamation

65.     On November 9, 2018, Defendants enacted the next phase of their "zero-tolerance" policy aimed at significantly reducing the availability of asylum.

66.     The process began when Acting Attorney General Whitaker and the Secretary promulgated the Rule.  The Rule makes three main changes to asylum law.

a.  First, the Rule provides that noncitizens who apply for asylum after November 9, 2018 will be ineligible for asylum if they are "subject to a presidential proclamation or other presidential order suspending or limiting the entry of aliens along the southern border with Mexico that is issued pursuant to subsection 212(f) of 215(a)(1) of the Act on or after November 9, 2018" and have entered the United States contrary to the terms of the proclamation or order.  *See* Rule, 83 Fed. Reg. at 55,952 (to be codified at 8 C.F.R. §§ 208.13(c)(3), 1208.13(c)(3)).

b.  Second, the Rule provides that noncitizens who are ineligible for asylum pursuant to §§ 2018.13(c)(3) and 1208.13(c)(3) will not be permitted to make a showing of "credible fear" of persecution, as noncitizens seeking asylum presently may do.  Under the Rule, a noncitizen's request for asylum is, from a

---

[16] OIG Report, *supra* note 6, at 7.

[17] *Id.* at n.15.

merits standpoint, summarily denied, because the asylum officer is directed to "enter a negative credible fear determination with respect to the alien's application for asylum."   The noncitizen instead will be placed into "proceedings under section 240 of the Act for full consideration of the alien's claim for withholding of removal under section 241(b)(3) of the Act, or for withholding or deferral of removal under the Convention Against Torture if the alien establishes a reasonable fear of persecution or torture." *Id.* (to be codified at 8 C.F.R. § 208.30).

c.   Third, the Rule provides for what an immigration judge is to do with respect to the review of expedited removal orders following a negative credible or reasonable fear assessment.  The Rule provides that an immigration judge is to review *de novo* the determination that a noncitizen falls within the scope of a Presidential proclamation that is described in 8 C.F.R. § 208.13(c)(3) or § 1208.13(c)(3).  If the immigration judge determines that the noncitizen is not subject to a proclamation, then the asylum officer's finding will be vacated and DHS may commence removal proceedings under Section 240 of the INA.  If the judge agrees that the noncitizen is subject to a proclamation, the judge will then review the asylum officer's determination that the noncitizen lacks a reasonable fear of persecution pursuant to the procedures set forth in 8 C.F.R. § 1208.30(g)(2).

67.   Put more succinctly, together the Rule and Proclamation prohibit anyone from obtaining asylum if they cross outside of a port of entry and make it more difficult for those people

to obtain other forms of relief.  At the same time, as detailed above, the Administration has made

it untenable for many, if not most, noncitizens to apply for asylum at a port of entry.

68.     In support of the Rule, the Acting Attorney General and the Secretary cited 8 U.S.C.

§ 1158(b)(2)(C), which authorizes the Attorney General to "by regulation establish additional

limitations and conditions, consistent with [the remainder of Section 1158], under which an alien

shall be ineligible for asylum."  The Acting Attorney General and the Secretary also relied on 8

U.S.C. § 1158(d)(5)(B), which provides that the Attorney General may "provide by regulation for

any other conditions or limitations on the consideration of an application for asylum not

inconsistent with this chapter."  None of the other "limitations and conditions" on asylum that are

present in Section 1158 relate to manner of entry, and a bar to asylum based on manner of entry is

contrary to the plain language of Section 1158.

69.     The Acting Attorney General and the Secretary acknowledged that in the previous

year 1,889 migrants from the Northern Triangle (*i.e.*, Guatemala, Honduras, and El Salvador),

representing nearly 25% of those whose asylum applications were adjudicated on the merits, had

been ***granted*** asylum.  *See* Rule, 83 Fed. Reg. at 55,946.  They further acknowledged that "[s]ome

of those asylum grants would become denials for aliens who became ineligible for asylum" under

the Rule.  *Id.* at 55,948.

70.     Although the APA requires an agency to allow for a period of public notice and

comment (as well as a 30-day waiting period) before implementing a proposed regulation, *see* 5

U.S.C. §§ 553(b), (c), (d), the Rule became effective upon its publication.  In explaining why they

failed to follow the ordinary rulemaking process, DOJ and DHS claimed that "good cause" existed

to bypass those procedures under 5 U.S.C. § 553(b)(B).  DOJ and DHS also invoked the "foreign

affairs" exception to the notice and comment requirement set forth in 5 U.S.C. § 553(a)(1).

71.     Also on November 9, 2018, President Trump issued the Proclamation pursuant to 8 U.S.C. §§ 1182(f) and 1185(a).  The Proclamation provides that entry of "any alien" into the United States across the international boundary between the United States and Mexico is "suspended and limited" for a period of 90 days, Proclamation § 1, at which point the President will decide whether to extend the suspension period, *id.* § 2(d).  The suspension of entry applies to aliens who enter the United States after the date of the Proclamation, and does not apply to "any alien who enters the United States at a port of entry and properly presents for inspection, or to any lawful permanent resident."  *Id.* §§ 2(a), (b).

72.     In the Proclamation, President Trump openly prejudged asylum claims of intending migrants; he specifically stated that the Proclamation was meant to bar access to asylum for Central Americans, who, according to the President's unsupported say-so, "have no lawful basis for admission into our country."

73.     Taken together, the Rule and Proclamation eliminate asylum for a person who enters the United States along the southern border other than at a port of entry, even if she has a credible fear of persecution if returned to her home country and even if she ultimately crosses other than at a port of entry because "metering" or other delays at a port of entry have exhausted her financial resources or expose her to a continuing threat of crime and violence at the Mexican border.

74.     The Administration purported to justify the Rule and Proclamation by citing "an urgent situation at the southern border."  Rule, 83 Fed. Reg. at 55,944.  Contrary to assertions contained in the Rule, however, the available data show that migration across the U.S.–Mexico

border has, in fact, decreased since 2016.[18]  In 2017, the number of people apprehended by border

officials after crossing irregularly was the lowest it has been in 46 years.[19]



75.     According to CBP, when compared to 2016, there were, at the southern border,

more than 60,000 fewer apprehensions of undocumented aliens from Mexico in 2017, and more

---

[18] Douglas Massey, *Today's US–Mexico 'Border Crisis' in 6 Charts*, THE CONVERSATION (Jun. 27, 2018) <https://tinyurl.com/ycn4czpl>; *see also* Max Bearak, *Even Before Trump, More Mexicans Were Leaving the U.S. Than Arriving*, WASH. POST, Jan. 27, 2017 <https://tinyurl.com/ybbrr348>.

[19] U.S. Border Patrol, U.S. Customs & Border Protection, *Southwest Border Sectors: Total Illegal Alien Apprehensions By Fiscal Year (Oct. 1st through Sept. 30th)* [hereinafter *Total Apprehensions*] (Dec. 2017) <https://tinyurl.com/ybg3vkld>.

[20] Rebecca Hersher, *3 Charts That Show What's Actually Happening Along The Southern Border*, NPR (June 22, 2018) <https://tinyurl.com/y8o7m7d2> (referencing United States Broder Patrol Data).

than 40,000 fewer apprehensions of undocumented aliens from outside Mexico.[21]  In 2018, the number of people without legal status who have been apprehended attempting to enter the United States from Mexico has been roughly the same as it has been for the last five years.[22]

76.     While President Trump in the Proclamation has taken the position that only a "fraction" of asylum applicants who crossed the U.S. border have valid claims for asylum ("fraction" meaning less than 100%), thousands of refugees from Northern Triangle countries were found to have valid claims for asylum in 2016 alone.  In 2016, 2,157 people from El Salvador, 1,505 from Honduras, and 1,949 from Guatemala were found by U.S. asylum officers and immigration judges to be eligible for asylum.[23]  According to DHS's own statistics, El Salvador and Guatemala were two of the three most common countries of nationality of people affirmatively granted asylum in the United States in 2016—the third being China—while El Salvador, Guatemala, and Honduras were three of the four most common countries of nationality of persons granted asylum defensively in immigration court, the fourth, again, being China.[24]

## CLASS ACTION ALLEGATIONS

77.     Plaintiffs O.A., K.S., G.Z., C.A., and D.S. (collectively the "Proposed Class Representatives") bring the below Counts 1 and 4–8 challenging the illegal Rule on their own

---

[21] *Total Apprehensions*, *supra* n.19.

[22]Linda Qiu, *Fact Check of the Day:  Border Crossings Have Been Declining for Years, Despite Claims of a 'Crisis of Illegal Immigration'*, N.Y. TIMES, June 20, 2018 <https://tinyurl.com/y7dhmlt6>; U.S. Customs & Border Protection, SW Border Migration FY 2018 (2018) <https://tinyurl.com/ycorhe4p>.

[23] *See* Nadwa Mossad & Ryan Baugh, *Refugee Asylees:  2016*, Homeland Security:  Office of Immigration Statistics (Jan. 2016) <https://tinyurl.com/y7n4bxqk> (Tables 4 and 5).

[24] *Id.*

behalf and on behalf of a proposed nationwide class under Federal Rule of Civil Procedure 23(b)(2), comprised of all noncitizen asylum-seekers who have or will have entered the United States through the southern border, without inspection, on or after November 10, 2018, excepting those who are barred from seeking asylum due to a reinstatement order entered under 8 U.S.C. § 1231(a)(5).

78.     Plaintiff G.Z. brings the below Count 3 challenging the illegal Rule on his own behalf and on behalf of a subclass comprised of all noncitizen asylum-seekers from a non-contiguous country who are found to be unaccompanied minors by the immigration authorities, who have or will have entered the United States through the southern border, without inspection, on or after November 10, 2018, excepting those who are barred from seeking asylum due to a reinstatement order entered under 8 U.S.C. § 1231(a)(5).

79.     The prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are satisfied. The proposed class and subclass consist of thousands of persons who have crossed the southern border since November 10, 2018, and have either gone into hiding to avoid detection, presented outside a port of entry and been detained, or presented and been released pending further immigration proceedings, rendering joinder of all class members impracticable.  The lawfulness of the Rule presents legal and factual questions that are common to the class and subclass.  The Proposed Class Representatives' claims are typical of the class, given that the Rule implements a categorical bar on asylum eligibility equally applicable to all class and subclass members.  The Proposed Class Representatives will fairly and adequately protect the interests of the proposed class and subclass.  *See* Fed. R. Civ. P. 23(a)(1)–(4).

80.     The Proposed Class Representatives are willing and able to represent the proposed class and have every incentive to pursue this action to a successful conclusion.  The Proposed

Class Representatives—like the members of the class and subclass—uniformly face application of the Rule, which will prevent the Proposed Class Representatives and the class members alike from pursuing their asylum claims.  The Proposed Class Representatives seek injunctive and declaratory relief that would bar the application of the Rule.  If the Proposed Class Representatives succeed in obtaining this relief, it will ameliorate the harm that the Rule is causing to each class member.  Accordingly, there is no conflict of interest between the Proposed Class Representatives and the members of the class they seek to represent.

81.     The Proposed Class Representatives have retained counsel who are experienced in class action, civil rights, and immigrants' rights litigation.  Plaintiffs' counsel will fairly and adequately represent the interests of the class.

82.     The named Defendants have implemented a Rule that uniformly revokes asylum eligibility for all members of the proposed class and subclass.  They have acted on grounds that apply generally to the proposed class and subclass, such that final injunctive or declaratory relief invalidating the Rule would restore the rights of the proposed class and subclass as a whole.  *See* Fed. R. Civ. P. 23(b)(2).

## COUNTS

## CLASS ACTION COUNT ONE

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT: RULEMAKING CONTRARY TO LAW (8 U.S.C. § 1158)

83.     Plaintiffs incorporate by reference paragraphs 1 through 82.

84.     The Immigration and Nationality Act, 8 U.S.C. § 1158(a)(1), gives any noncitizen who is physically present in or who arrives in the United States a statutory right to seek asylum, regardless of that individual's immigration status and manner of entry.

85.     By barring the plaintiffs from obtaining asylum based solely on the manner in which they entered the United States, the Rule violates the INA, which prohibits penalizing refugees for entering the country illegally and other than at a port of entry.

86.     Under the Administrative Procedure Act, a court "shall hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law."  5 U.S.C. § 706.

87.     The Rule is not in accordance with 8 U.S.C. § 1158(a)(1).  The Rule is therefore contrary to law under the APA.

88.     Plaintiffs have been harmed as a result of Defendants' violations of the INA and the APA.  In particular, Plaintiffs have been denied a meaningful opportunity to seek asylum, exposing them to multiple other harms including the threat of removal to their home countries and the persecution from which they fled.  The Rule also deprives Plaintiffs of other benefits to which asylees are entitled.  The harm to Plaintiffs is irreparable.

89.     Plaintiffs do not have an adequate remedy at law to redress the violations alleged herein, and therefore seek injunctive relief restraining Defendants from continuing to engage in the unlawful policy and practices alleged herein.

## COUNT TWO

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT: RULEMAKING CONTRARY TO LAW (8 U.S.C. § 1225(b))

90.     Plaintiffs incorporate by reference paragraphs 1 through 89.

91.     The Immigration and Nationality Act, including 8 U.S.C. § 1225(b)(1) (expedited removal) and 8 U.S.C. § 1158 (asylum), affords noncitizens an opportunity to apply for asylum, by screening arriving noncitizens to determine whether their asylum claims are potentially viable.

92.     Expedited removal procedures apply to certain noncitizens, including noncitizens who lack proper travel documents and either arrive at a port of entry or are apprehended within 14 days of their arrival and within 100 miles of the U.S. international border.  *See* 69 Fed. Reg. 48,877 (Aug. 11, 2004).   Under expedited removal procedures, an inspecting officer may summarily remove certain noncitizens.  However, if the noncitizen expresses a fear of returning to her country of origin, the officer is required to refer her to an asylum officer for a "credible fear determination."  *See* 8 U.S.C. § 1225(b)(1).

93.     By statute, an applicant has a "credible fear of persecution" if she can demonstrate "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under section 1158 of this title."  *Id.* § 1225(b)(1)(B)(v).

94.     Under this Congressional design, a noncitizen in expedited removal proceedings—including a noncitizen who enters without inspection—should not fail a credible fear interview unless there is no significant possibility that that individual would ultimately prevail in her asylum claim.  *See* 8 C.F.R. § 208.30(e)(5) (citing to 8 C.F.R. § 208.13(c)(3)).  A credible fear interview is not an on-the-merits adjudication of the claim.  To the contrary, the credible fear standard of review is intended to be sufficiently low to ensure all bona fide asylum seekers receive a full hearing on their claims.

95.     The Rule mandates a negative credible fear finding for anyone who enters without inspection, even in cases where there is a significant possibility that the noncitizen is eligible for asylum.  This requirement violates the plain meaning of Section 1225.

96.     Immigration judges are mandated to follow the same rules as those that are applicable to asylum officers in denying a credible fear finding for asylum seekers who are subject to the Rule.  8 C.F.R. § 1208.30(e).  This also violates the plain text of Section 1225.

97.     The Rule forbids a positive credible fear determination even if an asylum officer or an immigration judge determines that there is a "significant possibility" that federal courts will determine that the individual has a right to seek asylum under the statute notwithstanding the regulations, and that the individual otherwise has a significant possibility of winning such a claim.  *See id.* § 208.30(e)(5); *id.* § 1208.30(e)(5).

98.     Under the Administrative Procedure Act, a court "shall hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law."  5 U.S.C. § 706.

99.     Defendants' Rule is "not consistent with applicable provisions" of the asylum and expedited removal provisions and thus is "in violation of law."  8 U.S.C. § 1252(e)(3)(A)(ii).  The Rule is therefore contrary to law under the APA.

100.    Plaintiffs do not have an adequate remedy at law to redress the violations alleged herein, and therefore seek injunctive relief restraining Defendants from continuing to engage in the unlawful policy and practices alleged herein.

## CLASS ACTION COUNT THREE

**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT:
RULEMAKING CONTRARY TO THE TRAFFICKING VICTIMS PROTECTION
REAUTHORIZATION ACT OF 2008**

101.    Plaintiffs incorporate by reference paragraphs 1 through 100.

102.    The William Wilberforce Trafficking Victims Protection Act ("TVPRA") provides specific asylum protections to children.  *See* 8 U.S.C. § 1158 (b)(3)(C).

103.    Under the TVPRA, unaccompanied children who enter without inspection are generally not subject to expedited removal provisions.  *See id.* § 1232(a)(5)(D)(i).   Instead, unaccompanied children are placed into regular removal proceedings before an immigration judge without having to pass a credible fear interview.  *Id.*

104.    However, the immigration judge is not the first person to whom an unaccompanied minor presents his or her application for asylum.  Instead, the TVPRA provides that "[a]n asylum officer . . . shall have initial jurisdiction over any asylum application filed by an unaccompanied alien child."  *Id.*

105.    Under the TVPRA, if the asylum officer denies the application for asylum, the unaccompanied minor then has an opportunity to proceed before the immigration judge.

106.    This sequencing implements an important objective of the statute.  By allowing an unaccompanied child the opportunity to present an asylum claim to an asylum officer in the first instance, the TVPRA ensures that when a child recounts for the first time the traumatic and sensitive facts of the persecution underlying a claim for humanitarian protection, he or she may do so in a non-adversarial setting.

107.    The Rule is contrary to the system established by the TVPRA.  Under the Rule, unaccompanied children subject to the Proclamation are ineligible for asylum, and will be subject to a mandatory negative credible fear finding.  Because asylum officers do not have authority to order withholding of removal or protection under the Convention Against Torture, the asylum officer will, under the Rule, have no obvious basis to hear or assess the merits of the unaccompanied minor's claims of persecution.

108.    As a result, the first time an unaccompanied minor like G.Z. will be permitted to present and obtain any review of the traumatic and sensitive details of a claim for asylum is in the

adversarial proceeding that occurs before an immigration judge.  The Rule thus upends the non-adversarial process mandated by Congress in 8 U.S.C. § 1158 (b)(3)(C).

109.    Because Defendants' actions under the Rule are contrary to the TVPRA, they violate APA Section 706(2)(A) because they are "not in accordance with law" and APA Section 706(2)(C) because they exceed Defendants' statutory authority.

110.    Plaintiff G.Z. is irreparably harmed by losing his statutory right to participate in a non-adversarial process before an asylum officer.  Plaintiff G.Z. therefore asks that this Court grant declaratory and injunctive relief to him and all others who are similarly situated.

## CLASS ACTION COUNT FOUR

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT: RULEMAKING THAT IS ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION AND OTHERWISE CONTRARY TO LAW

111.    Plaintiffs incorporate by reference paragraphs 1 through 110.

112.    The promulgation of the Rule constitutes agency action by the Acting Attorney General and the Secretary that is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law for a number of reasons.  Among other things, the Rule is irrational and arbitrary.  It is therefore unlawful under 5 U.S.C. § 706(2)(A).

## CLASS ACTION COUNT FIVE

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT: CONTRARY TO 28 U.S.C. § 508 AND THE APPOINTMENTS CLAUSE

113.    Plaintiffs incorporate by reference paragraphs 1 through 112.

114.    President Trump fired former Attorney General Jefferson B. Sessions III on or about November 7, 2018.  Mr. Sessions therefore was no longer the Attorney General at the time the Rule issued and could not have promulgated the Rule.

115.    Defendant Whitaker's appointment to the position of Acting Attorney General is invalid because it violates the requirements of 28 U.S.C. § 508.  Section 508 requires that "in case of a vacancy in the office of Attorney General, or his absence or his disability, the Deputy Attorney General may exercise all the duties of the office."  28 U.S.C. § 508.  If the Deputy Attorney General is also unavailable, then the duties "shall" be assumed by the Associate Attorney General and the Attorney General may also designate the Solicitor General or the Assistant Attorneys General to assume the duties.  *Id.* § 508(b).

116.    Because Defendant Whitaker was not the Deputy Attorney General, Associate Attorney General, Solicitor General, or an Assistant Attorney General at the time of his appointment to the position of Acting Attorney General, his appointment is invalid under 28 U.S.C. § 508.

117.    Defendant Whitaker's appointment to the position of Acting Attorney General is also invalid because it violates the Appointments Clause of the United States Constitution, art. II, § 2, cl. 2.

118.    The Appointments Clause requires that the President obtain "the Advice and Consent of the Senate" before appointing principal "Officers of the United States."  U.S. Const. art. II, § 2, cl. 2.

119.    The Attorney General, as the chief law enforcement officer of the United States, the head of the Department of Justice, and a Cabinet level official who reports only to the President, is a principal officer under the Appointments Clause.  *See Morrison v. Olson*, 487 U.S. 654, 670–77 (1988).  An Acting Attorney General must therefore be appointed by the President and confirmed by the Senate.

120.    President Trump did not obtain the advice and consent of the Senate before appointing Defendant Whitaker to the position of Acting Attorney General.  Defendant Whitaker's appointment is thus in direct contravention of the Appointments Clause.

121.     Because Defendant Whitaker lacked authority to promulgate the Rule due to his illegal appointment, the Rule is unlawful under the APA, 5 U.S.C. § 706(2)(C).

## CLASS ACTION COUNT SIX

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT: CONTRARY TO REQUIREMENT THAT ASYLUM LIMITS BE MADE BY REGULATION

122.    Plaintiffs incorporate by reference paragraphs 1 through 121.

123.    Even if Defendant Whitaker's appointment as Acting Attorney General was lawful, the Rule constitutes agency action in excess of the statutory authority conferred upon him.

124.    In 8 U.S.C. § 1158(b)(2)(C), Congress provided that "[t]he Attorney General may by Regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum."

125.    The Rule violates the statutory requirement that additional limitations and conditions be established by regulation, because it automatically incorporates, without independent rulemaking process, the content of unspecified Presidential proclamations, so long as the proclamation includes terms that "suspend[] or limit[] the entry of aliens along the southern border with Mexico" and is issued pursuant to subsection 212(f) or 215(a)(1) of the INA on or after November 9, 2018.

126.    The Rule is contrary to the statutory requirement that conditions and limitations on the availability of asylum be established by regulation.  Instead, the Rule constitutes an abdication

of that responsibility by allowing the President, by proclamation and without a rulemaking process, to add or change the conditions and limitations for asylum.

127.    The Rule therefore exceeds the Acting Attorney General's statutory authority under 8 U.S.C. § 1158(b)(2)(C) and is invalid under the APA.

## CLASS ACTION COUNT SEVEN

### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACTION: NOTICE AND PUBLIC COMMENT PROVISIONS

128.    Plaintiffs incorporate by reference paragraphs 1 through 127.

129.    The Rule is illegal because the Administration promulgated the Rule without providing the notice and opportunity for public comment set forth in 5 U.S.C. §§ 553(a)–(d).

## CLASS ACTION COUNT EIGHT

### VIOLATION OF THE IMMIGRATION AND NATIONALITY ACT: *ULTRA VIRES* RULEMAKING

130.    Plaintiffs incorporate by reference paragraphs 1 through 129.

131.    The Rule is illegal and so is *ultra vires* for the reasons provided in Counts One through Six.  *See, e.g.*, *Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006); *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1172, 1175 (D.C. Cir. 2003).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in its favor and against Defendants, and to grant the following relief:

a.    A declaratory judgment (1) that the Rule is arbitrary, capricious, and contrary to law within the meaning of 5 U.S.C. § 706; (2) that Defendant Whitaker's appointment to the position of Acting Attorney General is unlawful, and the promulgation of the Rule therefore constitutes agency action in excess of the statutory authority conferred upon the office of the

Attorney General; (3) in the event that the Court determines Defendant Whitaker's appointment

was lawful, that the promulgation of the Rule violates the requirement that additional limitations

on the availability of asylum be established by regulation; (4) that the Rule was promulgated in

violation of 5 U.S.C. § 553; and (5) the Rule is *ultra vires* because it is illegal.

b. Such preliminary injunctive and ancillary relief as may be necessary to avert the

likelihood of irreparable harm to Plaintiffs during the pendency of this action, including, but not

limited to, temporary and preliminary injunctions;

c. A permanent injunction forbidding Defendants from implementing or enforcing the

Rule;

d. An order awarding Plaintiffs' costs of suit, and reasonable attorneys' fees and

expenses pursuant to any applicable law; and

e. Such additional and other relief as the Court deems just and proper.

Dated:  December 18, 2018 Respectfully submitted,

/s/Thomas G. Hentoff
Thomas G. Hentoff (D.C. Bar No. 438394)
Ana C. Reyes (D.C. Bar No. 477354)
Ellen E. Oberwetter (D.C. Bar No. 480431)
Mary Beth Hickcox-Howard (D.C. Bar No. 1001313)
Charles L. McCloud[*]
Matthew D. Heins[*]
Vanessa O. Omoroghomwan[*†]
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel: (202) 434-5000
Fax: (202) 434-5029

Hardy Vieux (D.C. Bar No. 474762)
HUMAN RIGHTS FIRST
805 15th Street, N.W., Suite 900

---

[*] Practicing pursuant to LCvR 83.2(g).
[†] Practice supervised by D.C. Bar members pursuant to D.C. Court of Appeals Rule 49(c)(8).

Washington, D.C. 20005
Tel: (202) 547-5692
Fax: (202) 553-5999

Eleni Rebecca Bakst[*]
Anwen Hughes[*]
HUMAN RIGHTS FIRST
75 Broad Street, 31st Floor
New York, New York 10004
Tel: (212) 845-5200
Fax: (212) 845-5299

Charles George Roth[*]
Keren Hart Zwick[*] (D.D.C. Bar Number IL0055)
Gianna Borroto[*]
Ruben Loyo[*]
NATIONAL IMMIGRANT JUSTICE CENTER
208 S. LaSalle Street, Suite 1300
Chicago, Illinois 60604
Tel: (312) 660-1370
Fax: (312) 660-1505

*Attorneys for Plaintiffs*