**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| O.A., *et al.*, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br>v.<br><br>DONALD J. TRUMP, *et al.*,<br><br>*Defendants*. | Civil Action No. 1:18-cv-02718-RDM |

**PLAINTIFFS' SUPPLEMENTAL BRIEF IN
SUPPORT OF THEIR MOTION FOR
<u>SUMMARY JUDGMENT AND CLASS CERTIFICATION</u>**

At the hearing on May 29, 2019, this Court requested further briefing to address procedural developments relating to specific Plaintiffs and how those developments relate to this Court's jurisdiction. The O.A. Plaintiffs offer the following additional briefing and information.

**I.     The Court Has Jurisdiction Under 28 U.S.C. § 1331 To Hear a Challenge to a New Asylum Eligibility Bar.**

The Rule that is the subject of this litigation primarily includes two regulatory amendments: to 8 C.F.R. § 208.13 and, separately, § 208.30.[1] Most of Plaintiffs' claims challenge the new mandatory asylum bar appended to § 208.13, which does not involve removal proceedings at all.

The Rule's amendment to § 208.13, "A. Limitation on Eligibility for Asylum for Aliens Who Contravene a Presidential Proclamation Under Section 212(f) or 215(a)(1) of the INA Concerning the Southern Border," makes asylum unavailable to any person who enters the United States across the southern border outside a port of entry. As the postures of certain Plaintiffs in the O.A. group illustrate, this portion of the Rule applies generally to claims for asylum, and it defines who is eligible for asylum regardless of whether they seek it inside or outside of the removal process. And asylum, as a concept, is not inherently intertwined with removal proceedings. For example, more than a hundred thousand people file affirmative asylum applications every year, *see* Dep't of Homeland Security, *Annual Flow Report, Refugees and Asylees: 2017*, Table 6a (Mar. 2019),[2] and many are granted asylum without ever being placed in removal proceedings.[3]

---

[1] The Department of Justice corollaries to these Department of Homeland Security regulatory amendments are in 8 C.F.R. § 1208.13 and 8 C.F.R. § 1208.30.
[2] Available at https://www.dhs.gov/sites/default/files/publications/Refugees_Asylees_2017.pdf.
[3] Affirmative applicants who are denied asylum by the Asylum Office are not necessarily placed into removal proceedings either—they may have another basis for legal status, such as a student visa. If the Government's position that affirmative asylum seekers inherently have claims "arising from" removal proceedings under 8 U.S.C. § 1252(b)(9) were correct, such individuals would be left with no recourse at all, as there is no right of appeal from an affirmative asylum proceeding.

In contrast with § 208.13, which addresses asylum eligibility generally, § 208.30 applies to credible fear determinations for persons in expedited removal proceedings. The Rule's amendment to § 208.30, "B. Screening Procedures in Expedited Removal for Aliens Subject to Proclamations," addresses how the new mandatory bar on asylum eligibility will be effectuated in expedited removal proceedings. But the unlawful nature of the Rule's amendment to § 208.13 restricting who is eligible for asylum exists apart from the operation of § 208.30 in the expedited removal context. A challenge to § 208.13 cannot be classified as one "arising from any action taken or proceeding brought to remove an alien under this subchapter," 8 U.S.C. § 1252(b)(9). That section does not deprive this Court of subject matter jurisdiction under 28 U.S.C. § 1331 as to *any* of the Plaintiffs' claims that the new mandatory bar to asylum violates 8 U.S.C. § 1158(a).

This proposition follows logically from the language of the Rule, and is illustrated by how the Rule affects the Plaintiffs, and how the Government might try to apply the Rule if it is reinstated. One Plaintiff, G.Z., is seeking asylum affirmatively. As explained below, because G.Z. is an unaccompanied child, his claim will be heard in the first instance by an Asylum Officer, outside of removal proceedings. Another Plaintiff, G.R., illustrates the Rule's far-reaching consequences after removal proceedings are completed. G.R. has received asylum, but as explained below, if the Rule is not permanently enjoined, the Government may invoke § 208.13 to attempt to strip her of that status or prevent her from adjusting her immigration status.

Even as to § 208.30—which does implicate the expedited removal process—at a minimum, this Court would have jurisdiction under 8 U.S.C. § 1252(e)(3).[4] Plaintiffs A.V., D.R., P.R., and

---

[4] As this case challenges a global change to asylum eligibility rather than removal determinations, Plaintiffs do not agree that § 1252 applies. If, however, the Government were correct that the challenge to Part B of the Rule falls within the scope of § 1252, § 1252(e)(3) would clearly apply.

2

G.R. were in expedited removal proceedings at the time they filed their claims, and the Court retains jurisdiction now.

## II. Plaintiffs' Respective Procedural Postures Show the Inapplicability of § 1252.

### A. G.Z. Is an Unaccompanied Minor Seeking Asylum Affirmatively.

G.Z. entered the United States on or about November 10, 2018 as an unaccompanied child and was placed in removal proceedings. The William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) § 235(d)(7)(C), codified at 8 U.S.C. § 1158(b)(3)(C), provides special asylum protections to unaccompanied children like G.Z. Under the TVPRA, "[a]n asylum officer . . . shall have *initial jurisdiction* over any asylum application filed by an unaccompanied alien child . . . *regardless of whether filed in accordance with this section or section 1225(b) of this title*." 8 U.S.C. § 1158(b)(3)(C) (emphases added). Thus, unlike adults, asylum claims by unaccompanied children are heard in the first instance by an asylum officer, even if they have already been placed in removal proceedings.

That is how G.Z.'s case will proceed. G.Z. filed his application with the Asylum Office on February 6, 2019, and he is currently awaiting the scheduling of his asylum interview. Although G.Z. remains in removal proceedings, his asylum application is currently outside the jurisdiction of the immigration court because his application will be addressed in the first instance by the Asylum Office. If the Asylum Office grants G.Z. asylum, his removal proceedings will be terminated. If, and only if, the Asylum Office declines to grant asylum, will the adjudication of G.Z.'s asylum claim proceed in removal proceedings.[5]

---

[5] The fact that the Court has federal question jurisdiction over G.Z.'s challenge to the Rule as violating § 1158 does not create a slippery slope (as the Government posited at the hearing) leading to more litigation because there are barriers to bringing individual claims in this Court. Only final agency action can be reviewed under the Administrative Procedure Act, and rulings against individual litigants will by their nature not be final until a removal order is entered.

G.Z.'s claim illustrates why this Court has jurisdiction. The Government argues that § 1252(b)(9) requires Plaintiffs to challenge the Rule only in removal proceedings. But the TVPRA ensures that unaccompanied minors will have their asylum applications addressed outside of removal. G.Z.'s pending affirmative application for asylum demonstrates that his claim that the Rule's mandatory bar to asylum is unlawful does not "arise from" removal proceedings; it arises, in the first instance, in his proceeding before the Asylum Office. If permitted to go back into effect, the Rule will affect G.Z. in the affirmative proceeding he is entitled to under the TVPRA.

### B.     G.R. Has Been Granted Asylum and Is Not in Removal Proceedings.

Similarly, G.R., who was granted asylum on April 1, 2019 and released from custody, remains exposed to the Rule even though she is no longer in removal proceedings. At the May 29 hearing, the Government stated that once individuals are placed in "ordinary" removal proceedings, the Government will not revisit that decision, no matter the future of the Rule. But the Government declined to make any such representations as to other potential future applications of the Rule. As a result, should the Rule be upheld, there is nothing preventing the Government from attempting to terminate asylum from G.R. or others like her who receive asylum during the period that the Rule is enjoined. The existence of the Rule thus affects the O.A. Plaintiffs and others like them even if they are granted asylum, further demonstrating that their claims exist separate and apart from the removal process and do not constitute a challenge to the removal process.

Although G.R. has received asylum, there are at least three ways in which the Rule could be applied against her and others like her.

First, the government could attempt to terminate asylee status under 8 U.S.C. § 1158(c)(2). That provision states that "[a]sylum granted under subsection (b) does not convey a right to remain

permanently in the United States, and may be terminated." Section 1158(c)(2)(B) then provides that termination may occur if "the alien meets a condition described in [8 U.S.C. § 1158(b)(2)]." Section 1158(b)(2) contains a list of bars to asylum, and is the section that the Government has invoked to promulgate the bar to asylum at issue in this case. *See* Gov't Br. 26-27. Thus, if the Rule took effect, the Government could seek to terminate asylum as to G.R. and anyone else like her under 8 U.S.C. § 1158(c)(2)(B).

Second, when an asylee applies for permanent status in the United States, another eligibility adjudication must occur. Under 8 U.S.C. § 1159, asylees may seek permanent residency (a green card) after having been present as an asylee for one year. In the ordinary course, G.R. would seek adjustment of immigration status by filing form I-485 with United States Citizenship & Immigration Services (USCIS); her request would then be adjudicated outside of the removal process. *See* 8 C.F.R. § 209.2(a)(1). In reviewing such applications, USCIS can, and routinely does, revisit the underlying asylum claims to make sure asylum was properly granted. *See id.* § 209.2(a)(1)(iii). If the Agency were to determine that the grant of asylum was contrary to an applicable bar, it again might take the position that asylee status should be terminated, or that adjustment should be denied.

Third, the Government could take the position that the Rule and the ineligibility for asylum that it would create affects eligibility for naturalization. The naturalization statute requires that a noncitizen have been "lawfully admitted for permanent residence" to be eligible to naturalize. 8 U.S.C. §§ 1427(a), 1429. Courts have interpreted this provision to involve a backwards-looking examination to ensure that each step toward citizenship was lawfully taken. *See, e.g.*, *Fedorenko v. United States*, 449 U.S. 490, 514-15 (1981). Thus, a noncitizen cannot naturalize if he or she

was admitted in error.[6] If the Rule were allowed to take effect, the Government could take the position that G.R. and others like her cannot be naturalized or ought to have naturalization voided as "illegally procured." *See id.* at 506 (failure to comply with any prerequisites of citizenship renders certificate of citizenship illegally procured); *United States v. Jean-Baptiste*, 395 F.3d 1190, 1191 (11th Cir. 2005); *United States v. Dang*, 488 F.3d 1135, 1139-41 (9th Cir. 2007); *United States v. Suarez*, 664 F.3d 655, 661-62 (7th Cir. 2011).

In sum, the Government's ability to attempt to revoke an administratively final asylum grant or prevent an adjustment of status means that all Plaintiffs will continue to have live claims even if, like G.R., they obtain asylum while the Rule is enjoined.

    **C.**    **If 8 U.S.C. § 1252 Applies, the Court Has Jurisdiction Under § 1252(e)(3) Over the Claims Commenced in Expedited Removal.**

Finally, even if this Court were to conclude that the O.A. Plaintiffs' claims "arise from" removal, the Court would nevertheless have jurisdiction to review Plaintiffs' claims to the extent that they challenge regulations implementing 8 U.S.C. § 1225, the expedited removal statute. All of the original O.A. Plaintiffs (except G.Z., an unaccompanied child) were eligible for expedited removal as soon as they were apprehended after crossing the border somewhere other than at a port of entry, even though the Government chose to initiate such proceedings only as to A.V. As of the time the original O.A. Plaintiffs filed their case, none of them were in ordinary removal proceedings. Prior to the filing of this case, Plaintiff G.Z. had been issued an NTA purporting to initiate ordinary removal proceedings, but the notice was defective as it lacked a date and time. *See Pereira v. Sessions*, 138 S. Ct. 2105, 2118 (2018). Plaintiffs O.A., K.S., D.S., and C.A. were

---

[6] Even innocent errors can pose a barrier. For instance, in *Turfah v. USCIS*, the government mistakenly admitted a child 24 days before his father entered the United States, in violation of a requirement that a derivative child not enter before his parent. *See* 845 F.3d 668, 671-75 (6th Cir. 2017). The Sixth Circuit held that this inadvertent error precluded the child from naturalizing unless and until he could obtain a lawful admission. *Id*. at 673-75.

6

not placed in ordinary removal proceedings until December 16, 2018—the day before the Court's hearing on Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction—when the Government filed NTAs with the immigration court.

Multiple Plaintiffs in the O.A. case were in expedited removal at the time they filed their claims. Plaintiff A.V. was placed in expedited removal proceedings as of November 12, 2018, where she stayed until late in the day on May 28, 2019, the day before the Court's hearing on the parties' Cross-Motions for Summary Judgment. May 28, 2019 was the first occasion on which the Government issued an effective NTA to A.V.[7] *See* Hr'g Tr. at 69:15-18. Plaintiffs D.R., P.R. and G.R., who joined the case on December 18, 2018, were each in expedited removal proceedings at the time they joined the case as plaintiffs.[8]

The Government's recent transfer of A.V.'s case from expedited removal to ordinary removal is highly unusual. As set forth in the attached declaration of A.V.'s immigration counsel, the Government's transfer of A.V. from expedited removal to ordinary removal differed from the usual procedure and came with no warning. Decl. ¶ 6. The ordinary path from expedited removal proceedings into ordinary removal proceedings is a credible fear interview. *See id.*; *see also* 8 U.S.C. § 1225(b)(1). In A.V.'s case, no credible fear interview was conducted, nor did she request to be transferred into ordinary removal without one. Decl. ¶ 14. Rather, she asked the Government to conduct such an interview. Decl. ¶¶ 9, 14. Instead, the Government moved A.V. without

---

[7] The Government first attempted to enter an NTA for A.V. on Friday, May 24, 2019. That NTA was facially invalid, however, because it included no hearing date or time. *See Pereira*, 138 S. Ct. at 2118. The Government apparently corrected that defect the day before this Court's hearing, a fact that Plaintiffs learned for the first time during argument.

[8] Defendants' Statement of Material Facts illustrates that each of D.R., P.R., and G.R. were in expedited removal, as illustrated by their receipt of credible fear interviews. Plaintiffs D.R. and P.R. did not receive NTAs initiating ordinary removal proceedings until after December 18, 2018. Before joining this suit, G.R. had received an invalid NTA that did not set a date and time, but did not receive a facially valid NTA until December 28, 2018, after she became a plaintiff in this case.

conducting an interview. *Id.* Indeed, when argument commenced on May 29, neither A.V.'s counsel in this case nor her counsel in her immigration proceedings had been made aware that a hearing date had been set in immigration court. Decl. ¶ 15.

Whether a court has jurisdiction cannot so easily be manipulated after the filing of a lawsuit: subject matter jurisdiction is determined at the time of filing. The "time-of-filing rule is hornbook law (quite literally) taught to first-year law students in any basic course on federal civil procedure." *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 570–71 (2004); *see also Connolly v. Taylor*, 27 U.S. 556, 565 (1829) ("[W]here there is no change of party, a jurisdiction depending on the condition of the party is governed by that condition, as it was at the commencement of the suit."). There is no good reason why this rule would not apply in a case brought under § 1252(e)(3).

In arguing to the contrary, the Government, at the hearing, offered no outer limit on its ability to engage in jurisdictional gamesmanship. According to the Government, shifting a plaintiff from expedited removal to ordinary removal instantly divests this Court of jurisdiction, even if it occurs months or years into a case, a full record has been developed and the parties are awaiting a court's final disposition, or if the case is on appeal to the United States Court of Appeals for the District of Columbia Circuit or the Supreme Court of the United States.[9]

This cannot be what Congress intended when it vested this Court with jurisdiction to hear challenges to regulations implementing the expedited removal statute, as the prospects for

---

[9] In light of the change in A.V.'s posture, the Court asked the Government during the May 29, 2019 hearing whether, if the Government were to transfer a plaintiff to ordinary removal the day the Judge was signing his opinion on summary judgment, would the Court be required to "rip it up and throw it in the trash?" Hr'g Tr. at 59:3. The Government responded in the affirmative, asserting that it can avoid any and all challenges to regulations implementing the expedited removal statute simply by exercising discretion to move an individual into ordinary removal proceedings. *See id.* at 75:4-17.

gamesmanship to evade legal review would be too great. Section 1252(e)(3) has the express purpose of permitting challenges to the "validity of the system" of expedited removal; claims under § 1252(e)(3) may only be brought within sixty days of the enactment of a new rule, and they may not be brought as class actions. 8 U.S.C. § 1252(e)(3). Were the Government capable of divesting this Court of jurisdiction at any time during the pendency of an action brought under § 1252(e)(3), it could do in all cases what it is attempting to do here: transfer any plaintiff who brings suit within sixty days of a new rule's implementation from expedited removal to ordinary removal, and then never under any circumstances face judicial review of rules implementing the expedited removal statute. Congress's directive that this Court have jurisdiction to hear challenges to the validity of the expedited removal system would effectively be a dead letter.

For the same reasons, the Government's argument that a plaintiff may not invoke § 1252(e)(3) until she receives an expedited removal order fails. This argument, like the Government's claim that the Court must cease to entertain a § 1252(e)(3) action if a plaintiff is moved from expedited removal to ordinary removal at some point after filing suit, neglects both the language and the purpose of § 1252(e)(3). The statute neither expressly nor impliedly limits itself to persons who have already received expedited removal orders or persons who remain in expedited removal throughout the pendency of the litigation. To the contrary, the statute authorizes "[j]udicial review of determinations under section 1225(b) of [Title 8] and [that section's] implementation" when "an action" is "instituted" in this Court—entirely irrespective of what the posture of that individual plaintiff's immigration case might be after her complaint is filed. 8 U.S.C. § 1252(e)(3)(A). To the extent A.V.'s claims arise from removal, they are challenges to the validity of the expedited removal system as "implemented" by the Rule, and

Section 1252(e)(3) allows for such claims to be brought by a plaintiff who sued when she was placed in the expedited removal system.[10]

Nor has the Government's eleventh-hour maneuvering to thwart judicial review mooted A.V.'s claim under § 1252(e)(3). Under long-standing principles, a Plaintiff's claims persist if she "[has] suffered, or [is] threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990). That is the case here: the Rule's effect on A.V., and on all Plaintiffs, is neither speculative nor unlikely. The Government placed A.V. in expedited removal and evinced its intent to apply the Rule against her. Its litigation-oriented decisions do not change this fact, and do not retroactively bar A.V. from pursuing a claim that Congress expressly authorized persons in her position to bring.

## CONCLUSION

For the foregoing reasons, the Court has jurisdiction over the O.A. Plaintiffs' claims under 28 U.S.C. § 1331 or, at a minimum, over the claims of the Plaintiffs who commenced this case while in expedited removal under 8 U.S.C. § 1252(e)(3).

---

[10] The broad language of § 1252(e)(3) suggests that *all* of the plaintiffs were at one point authorized to bring suit in this Court to challenge the Rule, because § 1225, the associated regulations, and the Rule purport to grant immigration officers the authority to place each and every one of the plaintiffs, except G.Z., in expedited removal. *See* 8 U.S.C. § 1225; 8 C.F.R. § 235.3.

Dated:  June 5, 2019                    Respectfully submitted,

/s/Thomas G. Hentoff
Thomas G. Hentoff (D.C. Bar No. 438394)
Ana C. Reyes (D.C. Bar No. 477354)
Ellen E. Oberwetter (D.C. Bar No. 480431)
Mary Beth Hickcox-Howard (D.C. Bar No. 1001313)
Charles L. McCloud*
Matthew D. Heins (D.C. Bar No. 241063)
Vanessa O. Omoroghomwan*
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005
Tel: (202) 434-5000
Fax: (202) 434-5029

Hardy Vieux (D.C. Bar No. 474762)
HUMAN RIGHTS FIRST
805 15th Street, N.W., Suite 900
Washington, D.C. 20005
Tel: (202) 547-5692
Fax: (202) 553-5999

Eleni Rebecca Bakst*
Anwen Hughes*
HUMAN RIGHTS FIRST
75 Broad Street, 31st Floor
New York, New York 10004
Tel: (212) 845-5200
Fax: (212) 845-5299

Charles George Roth*
Keren Hart Zwick (D.D.C. Bar No. IL0055)
Gianna Borroto*
Ruben Loyo*
NATIONAL IMMIGRANT JUSTICE CENTER
208 S. LaSalle Street, Suite 1300
Chicago, Illinois 60604
Tel: (312) 660-1370
Fax: (312) 660-1505

*Attorneys for Plaintiffs*

---

* Pursuant to LCvR 83.2(g).

**CERTIFICATE OF SERVICE**

I hereby certify that on June 5, 2019, I caused to be electronically filed the foregoing document with the Clerk of the Court for the United States District Court for the District of Columbia using the CM/ECF system.  Counsel in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/Thomas G. Hentoff
Thomas G. Hentoff (D.C. Bar No. 438394)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

O.A., *et al.*, on behalf of themselves and all others similarly situated,

                *Plaintiffs*,

v.

DONALD J. TRUMP, *et al.*,

                *Defendants*.

Civil Action No. 1:18-cv-02718-RDM

## DECLARATION OF ALYSHA WELSH

I, Alysha Welsh, make this declaration from my personal knowledge and, if called to testify to these facts, could and would do so competently.

1. I am a licensed attorney. I graduated from Suffolk University Law School in 2012. I am a member in good standing of the Bar of the Commonwealth of Massachusetts.

2. I have been working exclusively in immigration law since 2014. During this time, I have focused primarily on removal defense and many of my clients have been asylum seekers.

3. I am currently the managing attorney of Human Rights First's Refugee Representation team in Washington, D.C. In this position, I supervise a team of attorneys and legal services coordinators in their representation of individuals seeking asylum, represent asylum seekers in affirmative and defensive applications, and mentor pro bono attorneys in their representation of asylum applicants.

4. I currently represent A.V., a plaintiff in *O.A. v. Trump*.

5. A.V. entered the United States on November 11, 2018. The next day, a Determination of Inadmissibility was issued against her, pursuant to INA § 235(b)(1). She was then detained

pending criminal charges for illegal entry. She was released from federal custody upon payment of a surety, and was permitted to relocate to Washington, D.C., to live with her surety.

6.      Following the Determination of Inadmissibility, A.V. was placed in expedited removal. Ordinarily, when I work with clients who have been in expedited removal, the way they are placed into ordinary removal proceedings is by passing a credible fear interview. That is not what happened with A.V.

7.      After A.V.'s arrival in Washington, D.C., I spoke with the federal public defender assigned to her criminal case in California. At that time, her defense attorney informed me that ICE in San Diego would not conduct a credible fear interview while A.V.'s criminal case was pending. Once A.V. relocated to Washington, D.C., however, she was within the jurisdiction of the Washington ICE Field Office in Fairfax, Virginia. I told A.V.'s criminal defense attorney that I would request a credible fear interview with the Arlington Asylum Office. A.V.'s defense attorney stated that based on her experience, she believed that A.V.'s criminal charges would be dismissed if she passed a credible fear interview. A.V.'s criminal case was continued pending the outcome of her credible fear interview request.

8.      On March 19, 2019, I completed a request for a credible fear interview that I later sent to the Washington ICE Field Office. Based on previous interactions with ICE and USCIS, I know that non-detained credible fear interviews are of the lowest scheduling priority for the asylum office. To expedite A.V.'s credible fear process, I reached out to ICE headquarters to obtain the name of a direct contact at the ICE Washington Field Office to discuss expediting the interview process. My contact at ICE headquarters instructed me to send the credible fear interview request to the legal access team, who would, in turn, send it to the appropriate staff member at the ICE Washington Field Office.

9. On March 27, 2019, I sent the credible fear interview request to the legal access team at ICE headquarters. Because A.V. was no longer detained, I requested that she be referred to the Arlington Asylum Office for a credible fear interview, in accordance with the normal procedures for non-detained credible fear interviews.

10. On May 15, 2019, I contacted the legal access team to follow up on the status of A.V.'s credible fear interview.

11. On May 20, 2019, I spoke with a member of the legal access team via telephone. I was told that A.V. should not have been released while in expedited removal proceedings and that the ICE Washington Field Office had requested the file and would move forward with the credible fear request. They informed me, however, that there was a risk that A.V. would be detained. I confirmed that the interview needed to take place to move forward with the asylum process. While we preferred to move forward with a non-detained interview, A.V. was willing to come in to ICE to move the process forward, even if it meant she risked being detained.

12. On May 22, 2019, I spoke with the legal access team a second time via telephone and explained that A.V. was a named plaintiff in *O.A. v. Trump*. I also explained that I was attempting to schedule a credible fear interview because of the likelihood that the Department of Justice's Office of Immigration Litigation or this Court might request an update on the status of her credible fear interview request before or at the May 29 summary judgment hearing. I asked if processing the request with the Washington ICE Field Office was the most efficient way forward. My contact on the legal access team asked me for my contact at the Office of Immigration Litigation so that she could confirm A.V.'s status as a plaintiff in *O.A. v. Trump*.

13. That afternoon, my office forwarded the contact information for Erez Reuveni, assistant director of the District Court Division at the Office of Immigration Litigation. The legal access

team confirmed that they had received the contact information and indicated they would reach out to the Office of the Principal Legal Advisor for instructions on how to move forward.

14. At no time did I ask that A.V. be transferred into ordinary removal without a credible fear interview. Rather, I asked that my client receive an interview as a means of moving her into ordinary removal and to end her criminal proceedings, because I understood that passing such an interview could result in the dismissal of her criminal charges.

15. As of May 29, 2019, the government had not notified either A.V. or me that she had been issued a Notice to Appear and placed into ordinary removal proceedings. We were not aware that a hearing date had been set in her case.

16. As of the date of this declaration, A.V. and I have yet to receive the mailed copy of the Notice to Appear and Hearing Notice that the government ostensibly mailed shortly before the May 29 summary judgment hearing.

17. After that hearing, I did receive the Notice to Appear and the Hearing Notice, however, from A.V.'s lawyers in *O.A. v. Trump* at Williams & Connolly LLP after they received it, subsequent to the hearing, from government counsel in this matter.

18. I reserve the right to amend or supplement this declaration as appropriate upon receipt of additional information or documents.

I declare under penalty of perjury of the laws of the District of Columbia and the United States that the foregoing is true and correct.

*/s/ Alysha Welsh*
Alysha Welsh
Executed this 5th day of June 2019 in Washington, D.C.