**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| O.A., *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 18-2718 (RDM) |
| DONALD J. TRUMP, *et al.*, | |
| *Defendants*. | |
| S.M.S.R. *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 18-2838 (RDM) |
| DONALD J. TRUMP, *et al.*, | |
| *Defendants*. | |

<u>**MEMORANDUM OPINION**</u>

On November 9, 2018, the Attorney General and the Secretary of Homeland Security jointly issued an interim final rule adding "a new mandatory bar on eligibility for asylum for certain aliens who are subject to a presidential proclamation suspending or imposing limitations on their entry into the United States . . . and who enter the United States in contravention of such a proclamation."  Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55,934, 55,939 (Nov. 9, 2018) ("the Rule" or "the Interim Final Rule").  That same day, the President issued a proclamation suspending for a period of ninety days "[t]he entry of any alien into the United States across the international boundary between the United States and Mexico," except by aliens "who enter[] the United

States at a port of entry and properly present[] for inspection" and entries by "lawful permanent resident[s] of the United States."  Addressing Mass Migration Through the Southern Border of the United States, 83 Fed. Reg. 57,661, 57,663 (Nov. 15, 2018) ("the Proclamation").  Since that proclamation expired, the President has issued two subsequent proclamations suspending entries across the southern border, except at a port of entry, for additional ninety-day periods.  *See* Addressing Mass Migration Through the Southern Border of the United States, 84 Fed. Reg. 3,665 (Feb. 12, 2019); Addressing Mass Migration Through the Southern Border of the United States, 84 Fed. Reg. 21,229 (May 13, 2019).  It is uncontested that together, these actions make aliens (with the sole exception of lawful permanent residents) ineligible for asylum if they enter the United States from Mexico outside a designated port of entry.

Plaintiffs in these consolidated cases are nineteen individuals from Honduras, El Salvador, Nicaragua, and Guatemala who entered the United States from Mexico outside ports of entry after November 9, 2018, and two nonprofit organizations that provide legal services to refugees.  All but one of the individual plaintiffs seek asylum, and the remaining plaintiff was granted asylum during the pendency of this proceeding but fears revocation if the Rule is enforced, Dkt. 80 at 3.  Together, Plaintiffs challenge the lawfulness of the Rule on multiple grounds.  First and foremost, they contend that the Rule runs afoul of the Immigration and Nationality Act ("INA"), Pub. L. No. 82-414, 66 Stat. 163 (1952) (codified as amended at 8 U.S.C. § 1101 *et seq.*), which declares that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . .) irrespective of such alien's status, may apply for asylum."  8 U.S.C. § 1158.  In other words, aliens have a statutory right to seek asylum regardless of whether they enter the United States at

a designated port of entry, and Defendants may not extinguish that statutory right by regulation or proclamation.

Beyond that core challenge, Plaintiffs also argue that the Rule: (1) circumvents the statutorily-mandated process for promulgating "additional limitations and conditions" on eligibility for asylum, which authorizes the Attorney General and Secretary of Homeland Security to add limitations and conditions "by regulation," 8 U.S.C. § 1158(b)(2)(C), but does not authorize the President to do so by proclamation; (2) violates the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA"), Pub. L. No. 110-457, 122 Stat. 5044 (2008), by depriving unaccompanied children of the right to seek asylum in a non-adversarial setting, *see* 8 U.S.C. § 1158(b)(3)(C); (3) is "arbitrary and capricious" in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A); and (4) was promulgated without the required opportunity for notice and public comment, also in violation of the APA, 5 U.S.C. § 553.  Some of the plaintiffs also contend that the Rule violates the INA's expedited removal scheme, 8 U.S.C. § 1225(b), by mandating a negative credible fear determination for those aliens who cross between ports of entry.

Several motions are currently before the Court.  Plaintiffs in both consolidated cases— *O.A. v. Trump*, Civ. No. 18-2718 ("*O.A.*") and *S.M.S.R. v. Trump*, Civ. No. 18-2838 ("*S.M.S.R.*")—have moved for summary judgment and to certify a class of all asylum seekers who entered or will enter the United States after November 9, 2018 by crossing the southern border, except at a designated port of entry.  *See* Dkt. 51; Dkt. 52.  Defendants, in turn, oppose those motions and cross-move for summary judgment, arguing that the Court lacks subject-matter jurisdiction; that Plaintiffs lack standing to sue; that Plaintiffs' claims fail on the merits; and that the Court should not certify a class.  *See* Dkt. 66.  Also pending before the Court are the

*O.A.* and *S.M.S.R.* Plaintiffs' earlier-filed motions for temporary and preliminary injunctive relief, Dkt. 6; Mot. for Temp. Restraining Order, Dkt. 6, *S.M.S.R. et al. v. Trump et al.* (No. 18-2838), which the Court held in abeyance after the United States District Court for the Northern District of California issued a nationwide preliminary injunction eliminating any risk of imminent injury to any of the plaintiffs in these actions. *See* Minute Entry (Dec. 21, 2018); *see also E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094 (N.D. Cal. 2018).

As explained below, the Court first holds that it has subject-matter jurisdiction, and that Plaintiffs have Article III and zone of interests standing to challenge the Rule. The Court also holds that the Rule (in conjunction with the Proclamation) is inconsistent with 8 U.S.C. § 1158. Those three conclusions end the required inquiry: Because the Rule is contrary to law and must, as a result, be set aside, 5 U.S.C. § 706(2)(A), the Court need not consider Plaintiffs' alternative legal challenges. Nor need the Court resolve the parties' dispute about the propriety of nationwide injunctions. As the D.C. Circuit has explained, "'[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual [plaintiffs] is proscribed.'" *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)). As a result, vacatur—*i.e.*, nullification—of the Interim Final Rule obviates any need for the issuance of an injunction. Should future events dictate otherwise, Plaintiffs are free to return to the Court to seek appropriate relief at that time. Finally, although it is unclear that class certification will serve any significant purpose given vacatur of the Rule, the Court finds that Plaintiffs have met their burden under Rule 23(a) and Rule 23(b)(2) for certification of a class.

# I.  BACKGROUND

## A.    Statutory and Regulatory Background

Asylum is a form of discretionary relief that allows an otherwise removable alien who qualifies as a refugee to remain in the United States.[1]  Asylum also creates a path to lawful permanent resident status and citizenship and confers other benefits, including the right to work in the United States and to receive certain forms of financial assistance from the federal government.  *See* 83 Fed. Reg. at 55,936.  Prior to 1980, "the U.S. refugee program consisted of ad hoc responses to various crises."  Jaya Ramji, *Legislating Away International Law: The Refugee Provisions of the Illegal Immigration Reform and Immigrant Responsibility Act*, 37 Stan. J. Int'l L. 117, 132 (2001) (hereinafter "*Legislating Away*").  In addition to legislative responses to discrete concerns, *see*, *e.g.*, Refugee Relief Act of 1953, Pub. L. No. 83-203, 67 Stat. 400; Immigration and Nationality Act of 1965, Pub. L. No. 89-236, 79 Stat. 913, the Attorney General was authorized to use his general parole authority to provide protection for refugees within the United States, *see INS v. Cardoza-Fonseca*, 480 U.S. 421, 427 n.4 (1987).

The Refugee Act of 1980 ("1980 Act"), Pub. L. No. 96-212, 94 Stat. 102 (codified at 8 U.S.C. §§ 1157–59 (1980)), introduced the nation's first "uniform and systematic asylum procedure" and "created the framework for the current asylum process."  Ramji, *Legislating Away*, 37 Stan. J. Int'l L. at 132.  The 1980 Act charged the Attorney General with establishing "a procedure for an alien physically present in the United States or at a land border or port of

---

[1]  The INA defines a "refugee" as "any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  8 U.S.C. § 1101(a)(42).

entry, irrespective of such alien's status, to apply for asylum" and authorized the Attorney

General to grant asylum in his discretion, provided that that the applicant was a refugee within

the meaning of the INA.  8 U.S.C. § 1158(a) (1980).  At the same time the 1980 Act established

the asylum process, it amended the statutory scheme governing a related form of relief—

"withholding of deportation"—to remove the Attorney General's discretion to decide whether to

grant that form of relief.  *Cardoza-Fonseca*, 480 U.S. at 428–29.  As amended by the 1980 Act,

the INA "*requires* the Attorney General to withhold deportation of an alien who demonstrates

that his 'life or freedom would be threatened' on account of one of [a list of factors] if he is

deported."  *Id*. at 423 (emphasis added).

Accordingly, as of 1980, the INA included two related, but distinct, forms of relief

available to those subject to persecution in their country of origin: asylum and withholding of

deportation.  "[O]ne of the Congress' primary purposes" in enacting "the entire 1980 Act . . . was

to bring United States refugee law into conformance with the 1967 United Nations Protocol

Relating to the Status of Refugees ("1967 Protocol"), 19 U.S.T. 6223, T.I.A.S. No. 6577, to

which the United States acceded in 1968."  *Id.* at 436–37.  The Protocol, in turn, incorporated by

reference the substantive provisions of the 1951 United Nations Convention Relating to the

Status of Refugees ("1951 Convention").  *See id*. at 429; *Sale v. Haitian Ctrs. Council, Inc.*, 509

U.S. 155, 169 n.19 (1993).  Among other parallels, "the definition of 'refugee' that Congress

adopted" in the 1980 Act "is virtually identical to the one proscribed by . . . the [1951]

Convention."  *Cardoza-Fonseca*, 480 U.S. at 437.

The next relevant amendment to the INA did not come until 1996, when Congress

enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L.

No. 104-208, Div. C, 110 Stat. 3009-546 (1996).  Among other changes, IIRIRA established two

types of removal proceedings.  Regular, or "formal," removal proceedings allow aliens to challenge their removal in administrative proceedings with various procedural guarantees, including the rights to written notice of the charge of removability, to counsel, to appear at a hearing before an immigration judge and to present evidence, to appeal an adverse decision to the Board of Immigration Appeals ("BIA"), and to seek judicial review.  8 U.S.C. §§ 1229(a)(1), 1229a(b)(4); 8 C.F.R. §§ 1003.1(b), 1240.11(a)(2), 1240.15.  An alien placed in formal removal proceedings may avoid removal by establishing, through this adversarial process, that she is eligible for asylum, withholding of deportation, or some other form of relief.

   The second type of proceedings, called expedited removal, affords considerably less process to a subset of aliens—most notably, those arriving at the border and those who recently entered the United States without inspection.[2]  Under expedited removal procedures, the Department of Homeland Security may remove an alien from the United States "without further hearing or review[,] unless the alien indicates either an intention to apply for asylum under [8 U.S.C. § 1158] or a fear of persecution" supporting a claim to withholding of removal.  8 U.S.C. § 1225(b)(1)(A)(i).  If "the alien indicates either an intention to apply for asylum . . . or a fear of

---

[2]  Although IIRIRA permits the Department of Homeland Security to apply expedited removal procedures more broadly, 8 U.S.C. § 1225(b)(1)(A)(i), (iii), the Department has traditionally limited application of the expedited procedures to (1) arriving aliens; (2) aliens who arrived in the United States by sea within the last two years, who have not been admitted or paroled by immigration authorities; and (3) aliens found in the United States within 100 miles of the border within 14 days of entering the country, who have not been admitted or paroled by immigration authorities.  *See* Designating Aliens Subject to Expedited Removal Under Section 235(b)(1)(A)(iii) of the Immigration and Nationality Act, 67 Fed. Reg. 68,924 (Nov. 13, 2002); Designating Aliens for Expedited Removal, 69 Fed. Reg. 48,877 (Aug. 11, 2004).  On July 23, 2019, however, the Department issued a notice in the Federal Register outlining its intent to "exercise the full remaining scope of its statutory authority" to apply expedited removal procedures to all aliens determined inadmissible under 8 U.S.C. § 1182(a)(6)(C) or 8 U.S.C. § 1182(a)(7).  *See* Designating Aliens for Expedited Removal, 84 Fed. Reg. 35,409 (Jul. 23, 2019).

persecution, the [immigration] officer [is required to] refer the alien for an interview by an asylum officer," who must determine whether the alien has a credible "fear of persecution." *Id.* § 1225(b)(1)(A)(ii).  For purposes of the asylum officer's assessment, a credible fear of persecution means "that there is a significant possibility . . . that the alien could establish eligibility for asylum." *Id.* § 1225(b)(1)(B)(v).[3]  If the asylum officer determines that the alien has a credible fear, "the alien [is] detained for further consideration of the application for asylum," *id.* § 1225(b)(1)(B)(ii), and is typically placed in formal removal proceedings.  If, on the other hand, the asylum officer determines that the alien does not have a credible fear of persecution, "the officer shall order the alien removed from the United States without further hearing or review." *Id.* § 1225(b)(1)(B)(iii)(I).

An alien who is ineligible for asylum or is denied asylum may apply for other forms of relief, including withholding of removal in cases in which the alien can show "that it is more likely than not that he or she would be persecuted on account of" a protected ground if removed from the United States.[4]  8 C.F.R. § 1208.16(b)(2); *see also* 8 U.S.C. § 1231(b)(3).  Withholding of removal, accordingly, requires a more substantial showing than the "well-founded fear of

---

[3]  The standard necessary to establish a "credible fear" is lower than the standard for obtaining asylum itself.  The Supreme Court has indicated that ultimately to prevail on an asylum claim, applicants must establish that there is roughly a 10% chance that they will be persecuted on account of a protected ground if they are returned to their country of origin. *See Cardoza-Fonseca*, 480 U.S. at 431–32.  To prevail at the initial credible fear interview, however, applicants need only show "a significant possibility" that they could establish eligibility for asylum.  8 U.S.C. § 1225(b)(1)(B)(v).

[4]  An alien can pursue withholding of removal either under the INA, 8 U.S.C. § 1231(b)(3), or under regulations implementing U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), 8 C.F.R. § 1208.16(c).  83 Fed. Reg. at 55,936.  Protection from removal under CAT requires that the alien "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal."  8 C.F.R. § 1208.16(c)(2).

persecution" standard applicable in asylum cases, *see Kouljinski v. Keisler*, 505 F.3d 534, 544 (6th Cir. 2007).  Unlike asylum, moreover, withholding does not preclude the government from removing the alien to a third country where the alien would not face persecution, does not establish a pathway to lawful permanent resident status and citizenship, and does not afford derivative protection for the alien's family members.  *See* 83 Fed. Reg. at 55,939.

IIRIRA also amended the asylum provision of the INA, adding language relevant to Plaintiffs' challenge here.  Although the 1980 Act required the Attorney General to establish procedures for an alien "physically present in the United States . . . , *irrespective of such alien's status*, to apply for asylum," 8 U.S.C. § 1158(a) (1980) (emphasis added), IIRIRA clarified that:

> [a]ny alien who is physically present in the United States or who arrives in the United States (*whether or not at a designated port of arrival* and including an alien who is brought to the United States after having been interdicted in international waters or United States waters), *irrespective of such alien's status*, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title [which addresses expedited removal].

8 U.S.C. § 1158(a) (emphasis added).  In addition, IIRIRA added a number of restrictions and limitations on asylum.  It precludes aliens from applying for asylum, for example, (1) "if the Attorney General determines that the alien may be removed, pursuant to a bilateral or multilateral agreement, to a country (other than the country of the alien's nationality . . .) in which the alien's life or freedom would not be threatened," *id*. § 1158(a)(2)(A); (2) if the alien cannot "demonstrate[] by clear and convincing evidence" that she filed her asylum application within 1 year after their date of arrival in the United States, subject to certain exceptions, *id.* § 1158(a)(2)(B); or (3) if the alien, again subject to certain exceptions, "previously applied for asylum and had such application denied," *id.*§ 1158(a)(2)(C).

Although the Attorney General's authority to grant or to deny an asylum application had long been discretionary—subject only to the limitation, added in 1990, that "[a]n alien who ha[d]

been convicted of an aggravated felony" could "not apply for or be granted asylum,"
Immigration Act of 1990, Pub. L. No. 101–649, 104 Stat 4978 (codified at 8 U.S.C. § 1158(d))—
IIRIRA added a number of further statutory limitations on the Attorney General's discretion to
grant relief.  *See* 8 U.S.C. § 1158(b)(2).  The Attorney General, for example, may not grant
asylum to an alien who "participated in the persecution of any person," who has "been convicted
by a final judgment of a particularly serious crime," or who poses "a danger to the security of the
United States."  *Id*. § 1158(b)(2)(A)(i)–(ii), (iv).  Finally, of particular relevance here, Congress
granted the Attorney General authority to issue regulations "establish[ing] additional limitations
and conditions, consistent with [8 U.S.C. § 1158,] under which an alien shall be ineligible for
asylum."  *Id.* § 1158(b)(2)(C).

In general, an alien may apply for asylum in one of three ways: (1) if she is not in any
kind of removal proceeding, she may file an affirmative application for asylum, *see* 8 U.S.C.
§ 1158(a)(1); 8 C.F.R. § 208.1(a)(1); (2) if she is subject to regular removal proceedings under 8
U.S.C. § 1229a, she may file a defensive application for asylum as a defense to removal, *see* 8
U.S.C. § 1229a(c)(4); 8 C.F.R. § 208.2(b); or (3) if she is subject to expedited removal
proceedings under 8 U.S.C. § 1225, she may also file a defensive application for asylum as a
defense to expedited removal, *see* 8 U.S.C. § 1225(b)(1)(A)(i); 8 C.F.R. § 208.30(f).  Special
procedures, however, apply to unaccompanied minors.  Under the TVPRA, an "unaccompanied
alien child" that the Department of Homeland Security seeks to remove from the United States is
entitled to the procedural protections afforded by formal—as opposed to expedited—removal
proceedings, 8 U.S.C. § 1232(a)(5)(D), but is also entitled to present her claims in the first
instance in a non-adversarial setting, *see id.* § 1158(b)(3)(C).

**B.**     **Challenged Actions**

On November 9, 2018, the Attorney General and the Secretary of Homeland Security promulgated the Interim Final Rule.  *See* 83 Fed. Reg. at 55,934.  The Rule explains, by way of background, that "the United States has seen a large increase in the number and proportion of inadmissible aliens subject to expedited removal who assert an intent to apply for asylum . . . and are subsequently placed into removal proceedings in immigration court."  83 Fed. Reg. at 55,935.  According to the Rule, "[m]ost of these aliens unlawfully enter the country between ports of entry along the southern border" and the need to "surveil, apprehend, . . . process," and detain these individuals has placed strains on the Justice Department and the Department of Homeland Security.  *Id.*  Moreover, by entering the United States between ports of entry along the southern border, these aliens "engage in conduct that seriously endangers themselves, any children traveling with them, and the U.S. Customs and Border Protection ('CBP') agents who seek to apprehend them."  *Id.*  The purpose of the Rule is to encourage aliens entering the United States along the southern border to do so at a designated port of entry, where they—and their applications for asylum—can be processed in an orderly and efficient fashion.  *Id.* at 55,936.  The solution to that problem, according to the Rule, is to treat aliens who enter at the southern border between ports of entry as categorically ineligible for asylum.  *Id.*

Rather than enact this regulatory change entirely through the Interim Final Rule, however, the Departments of Justice and Homeland Security and the President adopted the new policy in two steps.  As the first step, the Attorney General and the Secretary of Homeland Security amended two regulations relating to the eligibility for asylum.  As noted above, when Congress enacted IIRIRA, it granted the Attorney General—and, now, the Secretary of Homeland Security—authority to establish, by regulation, "additional limitations and conditions,

consistent with [8 U.S.C. § 1158], under which an alien shall be ineligible for asylum." 8 U.S.C.

§ 1158(b)(2)(C). The first regulation the Rule amended deals with eligibility for asylum as a

general matter, applicable irrespective of how an alien applies for asylum. *See* 8 C.F.R. § 208.13

("Establishing asylum eligibility"). Among other things, that regulation sets forth certain

"mandatory" grounds for denial of asylum applications. *Id.* § 208.13(c). The Rule adds the

following "[a]dditional limitation on eligibility for asylum" to the existing list of mandatory

grounds for denial:

> For applications filed after November 9, 2018, an alien shall be ineligible for
> asylum if the alien is subject to a presidential proclamation or other presidential
> order suspending or limiting entry of aliens along the southern border with
> Mexico that is issued pursuant to [8 U.S.C. § 1185(a)(1) or 8 U.S.C. § 1182(f)]
> on or after November 9, 2018 and the alien enters the United States after the
> effective date of the proclamation or order contrary to the terms of the
> proclamation or order.

83 Fed. Reg. at 55,952; 8 C.F.R. § 208.13(c)(3). This limitation on eligibility depends on the

promulgation of an applicable presidential proclamation.

In addition, and consistent with Defendants' "anticipat[ion] that a large number of aliens

who would be subject to a proclamation-based ineligibility bar would be subject to expedited-

removal proceedings," 83 Fed. Reg. at 55,936, the Rule also amended the regulation governing

credible fear determinations in expedited removal proceedings, 8 C.F.R. § 208.30. Under the

pre-existing regulation, an asylum officer is required to "conduct [an] interview [of the applicant]

in a nonadversarial manner . . . to elicit all relevant and useful information bearing on whether

the applicant has a credible fear of persecution or torture" and must find that the alien has a

credible fear of persecution "if there is a significant possibility . . . the alien can establish

eligibility for asylum . . . or for withholding of removal." *Id.* § 208.30(d), (e)(2). As amended

by the Rule, however, the regulation now directs an asylum officer to make a "negative credible

fear determination" if the alien is "described in [8 C.F.R.] § 208.13(c)(3)."  *Id.* § 208.30(e)(5)(ii).

As a result, an alien subject to the new Rule automatically receives a negative credible fear

determination.  Under those circumstances, the applicant is ineligible for asylum—although she

can still attempt to satisfy the more demanding threshold standard for withholding of removal.

*Id.*

As the second step in adopting the regulatory change, the President issued a proclamation

entitled "Addressing Mass Migration Through the Southern Border of the United States," 83

Fed. Reg. 57,661, on the same day the Rule was promulgated.[5]  Although entry into the United

States outside of a designated port of entry is already unlawful, 8 U.S.C. § 1325(a), the

Proclamation declares that "[t]he entry of any alien into the United States across the international

boundary between the United States and Mexico is hereby suspended and limited" for a period of

ninety days or until "an agreement permits the United States to remove aliens to Mexico"

pursuant to 8 U.S.C. § 1158(a)(2)(A).  83 Fed. Reg. at 57,663, Proclamation § 1.  The

Proclamation applies only prospectively, does not apply to aliens who enter at a designated port

of entry or who are lawful permanent residents of the United States, and does not limit the right

of any alien to be "considered for withholding of removal."  *Id.* § 2(b)–(c).  The President issued

subsequent proclamations extending this suspension on entry for additional ninety-day periods

on February 7, 2019, *see* 84 Fed. Reg. 3,665, and on May 13, 2019, *see* 84 Fed. Reg. 21,229.

Even if the President declines to renew the Proclamation at some point in the future, however,

the bar will remain in place for those who entered the United States during the designated period.

---

[5]  The Proclamation was issued after the Interim Final Rule and is therefore not a part of the
Administrative Record.  *See* Dkt. 64.  The Court takes judicial notice of the Proclamation as a
document or fact "not subject to reasonable dispute because it . . . can be accurately and readily
determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid.
201(b).

83 Fed. Reg. at 55,941 (stating that aliens will not overcome ineligibility "merely because a proclamation has subsequently ceased to have effect").

All agree that, taken together, the Rule and the Proclamation create a categorical bar to asylum for aliens who have entered the United States from Mexico outside a port of entry after November 9, 2018.

## C.  *East Bay Sanctuary Covenant* Litigation

The same day the Rule and the Proclamation were issued, a group of nonprofit organizations that provide legal and social services to immigrants filed suit in the Northern District of California, challenging the Rule and seeking a temporary restraining order.  *See* Complaint, *E. Bay Sanctuary Covenant v. Trump*, No. 18-6810 ("*East Bay*") (N.D. Cal. Nov. 9, 2018), Dkt. 1; Motion for Temporary Restraining Order, *E. Bay Sanctuary Covenant v. Trump*, No. 18-6810 (N.D. Cal. Nov. 13, 2018), Dkt. 8.  On November 19, 2018, following expedited briefing and a hearing, the district court granted a nationwide temporary restraining order barring implementation of the Rule until December 19, 2018, when that court was scheduled to hold a hearing on the plaintiffs' motion for a preliminary injunction.  *E. Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838 (N.D. Cal. 2018) ("*East Bay I*").  The government promptly filed an emergency motion to stay the district court's temporary restraining order pending appeal, and the Ninth Circuit denied that motion.  *See E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219 (9th Cir. 2018) ("*East Bay II*").  The Supreme Court, in turn, also declined to stay the temporary restraining order pending appeal.  *Trump v. E. Bay Sanctuary Covenant,* 139 S. Ct. 782 (U.S. Dec. 21, 2018).  On December 19, 2018, the district court granted the plaintiffs' request for a preliminary injunction, *E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1102 (N.D. Cal. 2018) ("*East Bay III*"), and that order is currently on appeal to the Ninth Circuit, *E. Bay*

*Sanctuary Covenant v. Trump*, appeal docketed, No. 18-17274 (9th Cir. Nov. 27, 2018) (initially

docketed with respect to district court's order granting temporary restraining order).

**D.     This Proceeding**

The day after the Northern District of California issued the temporary restraining order in

*East Bay I*, a group of asylum seekers who crossed the southern border outside ports of entry

after November 9, 2018, brought suit in this Court.  *See* Complaint for Declaratory and

Injunctive Relief, *O.A. v. Trump*, No. 18-2718 ("*O.A.*") (D.D.C. Nov. 20, 2018), Dkt. 1.  The

next day, November 21, 2018, those plaintiffs moved for a temporary restraining order and

preliminary injunction.  *See* Dkt. 6.  Before briefing was complete on those motions, a second

group of individual plaintiffs—this time joined by two organizations, the Capital Area

Immigrants' Rights Coalition ("CAIR Coalition") and Refugee and Immigrant Center for

Education and Legal Services, Inc. ("RAICES")—brought suit, *see* Complaint, *S.M.S.R. v.

Trump*, No. 18-2838 ("*S.M.S.R.*") (D.D.C. Dec. 3, 2018), Dkt. 3, and also moved for a temporary

restraining order and preliminary injunction, *see id.*, Dkt. 6.  Unlike the original *O.A.* complaint,

the *S.M.S.R.* complaint included class allegations.  *See id.*, Dkt. 3 at 43–44 (Compl. ¶¶ 175–77).

The Court held a hearing on the pending motions on December 17, 2018.  *See* Minute

Entry (Dec. 17, 2018).  At the conclusion of the hearing, the Court noted that a nationwide

temporary restraining order was then in effect; that the Ninth Circuit had declined to stay that

order pending appeal; that a stay application was pending before the Supreme Court; and that the

U.S. District Court for the Northern District of California was likely to decide in the next two

days whether to grant a nationwide preliminary injunction.  Dkt. 41 at 123–25 (Dec. 17, 2018

Hrg. Tr.).  In light of this state of affairs and the fact that Plaintiffs would not face any risk of

imminent injury while an injunction issued by another court remained in effect, the Court

directed that the parties meet and confer about whether to proceed by way of expedited briefing

on cross-motions for summary judgment rather than motions for preliminary relief. *Id.* (Dec. 17,

2018 Hrg. Tr.).  The Court also consolidated the *O.A.* and *S.M.S.R.* cases and set December 18,

2018, as the deadline for Plaintiffs to amend their complaints.  *See* Minute Order (Dec. 17,

2018); *S.M.S.R.*, Minute Order (Dec. 17, 2018).  Both sets of plaintiffs timely amended and

joined additional individual plaintiffs, and the *O.A.* Plaintiffs added class allegations to their

complaint.  *See* Dkt. 39 (*S.M.S.R.* Amend. Compl.); Dkt. 40 (*O.A.* Amend. Compl.).  Following a

telephonic status conference on December 21, 2018, the Court set a schedule for expedited

briefing on cross-motions for summary judgment and class certification.  *See* Minute Entry (Dec.

21, 2018).  Pending resolution of those motions, and barring any intervening need to act, the

Court has held the *O.A.* and *S.M.S.R.* motions for temporary restraining orders and preliminary

injunctions in abeyance. *Id.*

The parties' cross-motions for summary judgment and Plaintiffs' motions to certify a

class, Dkt. 51; Dkt. 52; Dkt. 66, along with Plaintiffs' previously-filed motions for preliminary

relief, Dkt. 6; Mot. for Temp. Restraining Order, Dkt. 6, *S.M.S.R. et al. v. Trump et al.* (No. 18-

2838), are currently before the Court.

## II.  LEGAL STANDARD

In the normal course, summary judgment may be granted "if the pleadings, the discovery

and disclosure materials on file, and any affidavits [or declarations] show that there is no genuine

issue as to any material fact and that the movant is entitled to a judgment as matter of law." *Air*

*Transp. Ass'n. of Am., Inc. v. Nat'l Mediation Bd.*, 719 F. Supp. 2d 26, 31–32 (D.D.C.

2010), *aff'd*, 663 F.3d 476 (D.C. Cir. 2011).  "In a case involving review of a final agency action

under the Administrative Procedure Act, 5 U.S.C. § 706, however, the Court's role is limited to

reviewing the administrative record, so the standard set forth in Rule 56(c) does not apply." *Id.*

In the APA context, "it is the role of the agency to resolve factual issues to arrive at a decision

that is supported by the administrative record, whereas 'the function of the district court is to

determine whether or not as a matter of law the evidence in the administrative record permitted

the agency to make the decision it did.'" *Catholic Health Initiatives v. Sebelius*, 658 F. Supp. 2d

113, 117 (D.D.C. 2009) (quoting *Cottage Health Sys. v. Sebelius,* 631 F. Supp. 2d 80, 89–90

(D.D.C. 2009)).   Summary judgment serves as "the mechanism for deciding, as a matter of law,

whether the agency action is supported by the administrative record and otherwise consistent

with the APA standard of review." *Id.* (internal quotations omitted).

## III.  ANALYSIS

Plaintiffs raise a host of challenges to the Rule, principally under the APA, and they seek

to proceed on behalf of a nationwide class of "[a]ll noncitizen asylum-seekers who have entered

or will enter the United States through the southern border but outside ports of entry after

November 9, 2018," Dkt. 52-13 at 1; Dkt. 51-16 at 1.  Among other things, they contend that the

Rule violates the INA's mandate that an alien present in the United States is entitled to seek

asylum "whether or not" the alien arrived in the United States "at a designated port of arrival,"

and "irrespective of [the] alien's status."  8 U.S.C. § 1158(a)(1).  They further contend that the

Rule violates a range of laws designed to protect the rights of aliens and unaccompanied alien

children to seek asylum and the right of the public to participate in the regulatory process.

Before reaching any of these questions, however, the Court must address a series of threshold

issues, including statutory jurisdiction, Article III standing, and zone of interests standing.  After

resolving those issues, the Court will turn to the merits.  Finally, the Court will consider the

appropriate remedy and Plaintiffs' motions for class certification.

A.      **Threshold Issues**

1.      *Statutory Jurisdiction*

Defendants devote the lion's share of their briefing to the question of this Court's statutory jurisdiction over the individual plaintiffs' claims.[6]  In Defendants' view, the individual plaintiffs will have an opportunity to challenge the Rule if they are eventually subject to final orders of removal; they cannot, however, short-circuit the process that Congress established for judicial review in the courts of appeals only after issuance of a final order of removal.  The individual plaintiffs are bound to follow that process, Defendants contend, because all but one of the individual plaintiffs are now in full removal proceedings, and the one plaintiff who is no longer in removal proceedings has received asylum and, thus, no longer has standing to challenge the Rule.  As a result, according to Defendants, each of the individual plaintiffs with a live claim is subject to two relevant statutory provisions:  8 U.S.C. § 1252(a)(5), which mandates that "a petition for review filed with an appropriate court of appeals [pursuant to the Hobbs Act] shall be the sole and exclusive means for judicial review of an order of removal," and 8 U.S.C. § 1252(b)(9), which consolidates "[j]udicial review of all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien from the United States" into "judicial review of a final order" of removal.  As Defendants read these provisions, this Court lacks statutory jurisdiction to consider any challenge to an agency action (1) that occurs in the course of removal proceedings, or (2) that the individual plaintiffs *could* challenge in those proceedings.  Dkt. 22 at 27; *see also* Dkt. 66 at 34–35.  On this telling, the individual plaintiffs

---

[6]  Defendants do not argue that this Court lacks statutory jurisdiction over the organizational plaintiffs' claims.

brought their challenge in the wrong place (in this Court, as opposed to a court of appeals) and at the wrong time (prior to receiving any final order of removal).

Plaintiffs, for their part, understand the nature of their lawsuit and the judicial review provisions of the INA in very different terms. As they explain it, this suit does not challenge any order of removal, nor does it "arise from" any removal proceeding. Rather, they challenge the validity of the Rule on its face, without regard to any particular application, based on a host of substantive and procedural flaws in the rulemaking. Nor, in Plaintiffs' view, is the Rule itself inextricably tied to removal proceedings, as Defendants contend. To the contrary, the Rule affects anyone seeking asylum, whether the asylum seeker applies affirmatively—that is, outside of any removal proceeding—or defensively—that is, within the confines of either a formal or expedited removal proceeding. Indeed, Plaintiffs argue, many of the individual plaintiffs "were in neither expedited nor ordinary removal proceedings when they filed this suit." *See, e.g.*, Dkt. 52-1 at 24–25 & n.8. As a result, as Plaintiffs see it, § 1252's channeling rules, which apply only to claims arising from actions taken and decisions rendered in removal proceedings, have nothing to do with this case.

But even if that view of § 1252's jurisdictional provisions is incorrect, Plaintiffs contend that this Court has jurisdiction to consider at least some of the individual plaintiffs' claims under 8 U.S.C. § 1252(e)(3), which authorizes judicial review in this Court to determine whether "any regulation issued to implement" the expedited removal provision of the INA is "consistent with the applicable provisions" of the statute. Defendants concede that at least one of the individual plaintiffs, A.V., was in expedited removal proceedings at the time the original complaint and amended complaint were filed. *See* Dkt. 22 at 29; Dkt. 90 at 11 (Defs' SUMF ¶ 46). It was only after suit was brought that the government inexplicably moved her from expedited removal to

full removal—without conducting an initial credible fear interview—on the eve of oral argument.  This matters, according to Plaintiffs, because jurisdiction must be assessed at the time an action is commenced.  And, finally, even putting that principle aside, Plaintiffs argue that two individual plaintiffs—an unaccompanied minor who is entitled to present his asylum request in the first instance to an asylum officer outside the context of full removal proceedings and a plaintiff who received asylum, but fears that the government will revoke that status if the Rule is allowed to stand—are not subject to full removal proceedings (and thus are not subject to the channeling rules Defendants invoke) even to this day.

"Within constitutional bounds, Congress decides what cases the federal courts have jurisdiction to consider."  *Bowles v. Russell*, 551 U.S. 205, 212 (2007).  As a general rule, federal district courts have jurisdiction under 28 U.S.C. § 1331 over "all civil actions arising under the Constitution, law, or treaties of the United States."  But Congress may curtail that grant of jurisdiction "by establishing an alternative statutory scheme for administrative and judicial review."  *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, No. 18-5289, 2019 WL 3122446 at *3 (D.C. Cir. July 16, 2019).  Here, Defendants invoke two provisions of the INA—§ 1252(a)(5) and § 1252(b)(9)—and argue that, taken together, these provisions divest this Court of jurisdiction to adjudicate the individual plaintiffs' claims.  For the reasons explained below, the Court concludes that the individual plaintiffs' claims fall "outside the text of [the] jurisdiction-channeling provision[s]" and, thus, "may proceed in the district court."  *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 127 (D.C. Cir. 2010).

  a.  <u>8 U.S.C. 1252(a)(5)</u>

Defendants do not contend that § 1252(a)(5), standing alone, divests this Court of jurisdiction but, rather, argue that it does so in conjunction with § 1252(b)(9).  A close reading of § 1252(a)(5), however, reveals that it adds little to Defendants' argument.

The Court starts, as it must, with the statute's text.  *See BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006).  Section 1252 begins with § 1252(a)(1), which provides that "[j]udicial review of a final order of removal . . . is governed *only* by [the Hobbs Act, 28 U.S.C. §§ 2341– 51], except as provided in subsection (b) and except that the court [of appeals] may not order the taking of additional evidence under [28 U.S.C. § 2374(c)]."  8 U.S.C. § 1252(a)(1) (emphasis added).  Under the Hobbs Act, in turn, the federal courts of appeals—and not the district courts—are vested with exclusive jurisdiction to determine "the validity of" and to enjoin or to set aside, "in whole or in part, the order of the agency" at issue.  28 U.S.C. § 2349.  As a result, one need read no further than the first sentence of § 1252 to find that the "only" way to obtain judicial review of a final order of removal is by filing a petition in the appropriate court of appeals.  8 U.S.C. § 1252(a)(1).

Section 1252(a)(5) clarifies that the § 1252(a)(1) process is the "exclusive means of review" of an order of removal.  8 U.S.C. § 1252(a)(5).  That provision provides:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and [the Mandamus and All Writs Acts], a petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review of an order of removal [with the exception of expedited removal orders]. For purposes of this chapter, in every provision that limits or eliminates judicial review or jurisdiction to review, the terms 'judicial review' and 'jurisdiction to review' include habeas corpus review pursuant to section 2241 of Title 28, or any other habeas corpus provision, [the Mandamus and All Writs Act], and review pursuant to any other provision of law (statutory or nonstatutory).

8 U.S.C. § 1252(a)(5).  Taken together, § 1252(a)(1) and § 1252(a)(5) establish a comprehensive rule:  Section 1252(a)(1) defines the only means for obtaining "[j]udicial review of a final order of removal," 8 U.S.C. § 1252(a)(1), and § 1252(a)(5) provides that "a petition for review filed with an appropriate court of appeals" is "the sole and exclusive means for judicial review of an order of removal," 8 U.S.C. § 1252(a)(5).  An aggrieved party cannot circumvent the Hobbs Act

21

procedure by filing a petition for a writ of habeas corpus, a mandamus petition, an All Writs Act action, or any other statutory or nonstatutory claim in federal district court.  The exclusive means of obtaining judicial review of an order of removal is the Hobbs Act.  That much is clear.

The work that § 1252(a)(5) does in clarifying that the Hobbs Act remedy is exclusive and not subject to circumvention, however, does nothing to advance the inquiry here.  Congress did not declare that any legal challenge relating to the immigration laws and regulations must be brought under the Hobbs Act.  Instead, at least as far as § 1252(a)(1) and § 1252(a)(5) go, Congress provided an "exclusive means for judicial review of an *order of removal*."  8 U.S.C. § 1252(a)(5) (emphasis added); *see also* 8 U.S.C. § 1252(a)(1) (providing procedure for "[j]udicial review of a final order or removal").  Here, however, Plaintiffs do not seek review of an "order or removal," nor do they challenge anything that has occurred in the course of a removal proceeding.  Rather, they bring a facial challenge to the validity of a regulation of general applicability based on the administrative record generated in the rulemaking.  The plain language of § 1252(a) and § 1252(a)(5) makes clear that those provisions do not, standing alone, apply to Plaintiffs' challenge.

This reading of § 1252(a)(5) invites an obvious retort:  If § 1252(a)(1) provides that judicial review of a final order of removal is subject to review "only" under the Hobbs Act, what function does § 1252(a)(5) perform?  The answer to that question is found in the statutory history of the INA.  At one time, a petition for a writ of habeas corpus provided the sole means of challenging the lawfulness of an deportation order.[7]  *See Heikkila v. Barber*, 345 U.S. 229, 230,

---

[7]  Prior to 1996, aliens who entered the country without inspection were deemed deportable and placed into deportation proceedings.  In contrast, aliens arriving at the border were deemed excludable and placed into exclusion proceedings.  *See Judulang v. Holder*, 132 S. Ct. 476, 479 (2011).  With the passage of IIRIRA in 1996, Congress changed that nomenclature and created

234–36 (1953).  Then, for a period of time, the Supreme Court held that although the detailed

hearing procedures specified by the APA did not apply to deportation hearings under the INA,

*see Marcello v. Bonds,* 349 U.S. 302 (1955); *Ardestani v. INS*, 502 U.S. 129, 133 (1991), the

APA's judicial review provisions did, *see Shaughnessy v. Pedreiro,* 349 U.S. 48, 50–52 (1955).

In 1961, Congress introduced the Hobbs Act remedy for deportation orders, but explicitly

retained habeas review of these orders.  *INS v. St. Cyr*, 533 U.S. 289, 309–10 (2001).  When

Congress enacted the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No.

104-132, 110 Stat. 1214 (1996), however, it repealed the provision permitting aliens to challenge

deportation orders in habeas, and when Congress enacted IIRIRA later that year, it replaced the

remaining jurisdictional rules that Congress enacted in 1961 with a version of the rules currently

set forth in § 1252.  Thus, as of 1996, the Hobbs Act provided the "only" process for obtaining

judicial review of a final order of removal following full removal proceedings.

Congress did not enact § 1252(a)(5) until 2005, following the Supreme Court's decision

in *INS v. St. Cyr*, 533 U.S. 289 (2001).  *St. Cyr* held that, notwithstanding § 1252(a)(1)'s

declaration that "[j]udicial review of a final order of removal . . . is governed *only* by" the Hobbs

Act, 8 U.S.C. § 1252(a)(1) (emphasis added), criminal aliens who were otherwise barred from

obtaining judicial review could invoke the district court's habeas jurisdiction.  533 U.S. at 314.

In response, Congress enacted § 1252(a)(5), along with other changes to § 1252, to offer a "clear,

unambiguous, and express statement of congressional intent to preclude judicial consideration on

habeas of" certain claims, *id.* at 314.  *See* H.R. Conf. Rep. 109-72 at 80–81.  Understood in this

light, § 1252(a)(5) does not expand the scope of § 1252(a)(1) or reach agency action unrelated to

---

"removal" proceedings for all aliens, regardless of whether they had already entered the country
or were apprehended at the border.  *Id.*

a removal proceeding.  Rather, it merely reaffirms that Congress has provided a single means for obtaining judicial review of removal orders.

Because Plaintiffs do not seek review of a removal order—or, indeed, of any decision or action taken in the course of a removal proceeding—§ 1252(a)(5) has no bearing on the Court's statutory jurisdiction.

> b.  8 U.S.C. § 1252(b)(9)

Defendants rely primarily on § 1252(b)(9), which channels "[j]udicial review of all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien" into "judicial review of [the] final order" of removal.  Courts have, at times, described § 1252(b)(9) as "'vise-like' in grip[,] . . . swallow[ing] up virtually all claims that are tied to removal proceedings." *J.E.F.M. v. Lynch*, 837 F.3d 1026, 1031 (9th Cir. 2016) (quoting *Aguilar v. ICE*, 510 F.3d 1, 9 (1st Cir. 2007)).  But courts have also recognized that § 1252(b)(9) "has built-in limits," *id*. at 1032.  By its own terms, § 1252(b)(9) applies only to claims that arise from removal proceedings.  *See Nielsen v. Preap*, 139 S. Ct. 954, 962 (2019) (plurality opinion); *Jennings v. Rodriguez*, 138 S. Ct. 830, 840–41 (2018) (plurality opinion); *id*. at 876 (Breyer, J., dissenting).  That limitation is determinative here.

The Court begins, once again, with the statutory text, *see BP Am. Prod. Co.*, 549 U.S. at 91, which provides in relevant part:

> (b)  **Requirements for review of orders of removal**
>
> With respect to review of an order of removal under subsection (a)(1), the following requirements apply:
> . . . .
>
> (9)  **Consolidation of questions for judicial review**
>
> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under

> this subchapter shall be available only in judicial review of a final order under
> this section.  Except as otherwise provided in this section, no court shall have
> jurisdiction, by habeas corpus under [28 U.S.C. § 2241] or any other habeas
> provision, by [28 U.S.C. § 1361 (mandamus) or § 1651 (All Writs Act)], or by
> any other provision of law (statutory or nonstatutory), to review such an order
> or such questions of law or fact.

8 U.S.C. § 1252(b)(9).  The Supreme Court has characterized § 1252(a)(9) "as a 'zipper clause,'"

which "consolidate[s] 'judicial review' of immigration proceedings into one action in the court

of appeals."  *St. Cyr*, 533 U.S. at 313 (quoting *Reno v. Am.-Arab Discrimination Comm.*, 525

U.S. 471, 483 (1999) ("*AADC*")).  For present purposes, the statutory text presents two

significant interpretative questions.

The first question focuses on the import of § 1252(b)'s introductory clause.  As the

Supreme Court observed in *St. Cyr*, this clause limits the reach of § 1252(b)(9); it applies "only

'[w]ith respect to review of an order of removal under subsection (a)(1).'"  *Id.* (quoting

§ 1252(b)(9)).  Read literally, that language might dispose of Defendants' § 1252(b)(9) defense

for precisely the same reason that § 1252(a)(5) does not apply:  Plaintiffs do not seek review of

"an order of removal."  But, as the *St. Cyr* dissent explains, that reading of the statute proves too

much and would, among other things, render § 1252(b)(9) meaningless.  *Id.* at 332 (Scalia, J.,

dissenting).  That is, if § 1252(b)(9) applies only to the review of final orders of removal, what

work is done by its channeling of "all questions of law and fact . . . arising from any action taken

or proceeding brought to remove an alien" into review of the "final order" of removal?  8 U.S.C.

§ 1252(b)(9).

The answer to that question is relatively straightforward:  If an alien subject to a removal

proceeding wants to challenge "any action taken" to "remove" her from the United States, she

may do so only by seeking "judicial review of [the] final order" of removal.  *See St. Cyr*, 533

U.S. at 332 (Scalia, J., dissenting).  The zipper clause applies "[w]ith respect to review of an

order of removal," *id.* at 313 (majority opinion), because it folds all precedent challenges "arising from" the removal "proceeding" or "action taken . . . to remove [the] alien" into review of the final "order of removal," 8 U.S.C. § 1252(b)(9).  Although offered by the *St. Cyr* dissent, that reading of the statute is not inconsistent with the majority's conclusion that actions that are not *ever* subject to judicial review under § 1252(a)(1) are also not subject to § 1252(b)(9)'s channeling rule, *St. Cyr*, 533 U.S. at 313; that is, if there is no final order of removal, there is nothing into which to fold the precedent challenges.  Understood in this light, § 1292(b)(9) functions to consolidate all challenges arising from a removal proceeding or action taken to remove an alien into "review of [the final] order of removal," 8 U.S.C. § 1252(b); *see also St. Cyr*, 533 U.S. at 313 ("Subsection (b)(9) simply provides for the consolidation of issues to brought in petitions for '[j]udicial review.'"), much in the way that a party to an administrative adjudication must typically wait for a final decision before challenging any action taken or proceeding brought leading up to the final agency action, *see Bennett v. Spear*, 520 U.S. 154, 177–78 (1997); *Scenic Am. v. U.S. Dep't of Transp.*, 836 F.3d 42, 55–56 (D.C. Cir. 2016).

The second question focuses on the meaning of the phrase "arising from any action taken or proceeding brought to remove an alien from the United States."  8 U.S.C. § 1252(b)(9).  The Supreme Court recently considered the meaning of that phrase in *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018), and *Nielsen v. Preap*, 139 S. Ct. 954 (2019).  Both *Jennings* and *Preap* involved habeas petitions and class actions challenging the government's authority to detain aliens, either: (1) subject to ongoing removal proceedings, without providing periodic bond hearings (*Jennings*); or (2) pursuant to mandatory detention rules, without regard to how long after their release from prison on criminal changes they are taken into immigration custody (*Preap*).  In both cases, the Supreme Court held that § 1252(b)(9) did not strip the district courts of

jurisdiction.  *See Preap*, 139 S. Ct. at 962 (plurality opinion); *see generally id*. at 976–85

(Breyer, J., dissenting); *Jennings*, 138 S. Ct. at 839–41 (plurality opinion); *id.* at 876 (Breyer, J.,

dissenting).

As Justice Alito explained for the *Jennings* plurality, "when confronted with capacious

phrases like 'arising from,'" the Court has "eschewed 'uncritical literalism' leading to results that

'no sensible person could have intended.'"  138 S. Ct. at 840 (plurality opinion) (quoting

*Gobeille v. Liberty Mut. Ins. Co*., 136 S. Ct. 936, 943 (2016) (internal quotation marks omitted)).

The Supreme Court, notably, took just that approach when interpreting the "very phrase" at issue

here as used in a subsequent provision of § 1252.  *Id.* at 840–41 (plurality opinion).  That

provision, § 1252(g), specifies that § 1252 constitutes the exclusive grant of jurisdiction "to hear

any cause or claim by or on behalf of any alien *arising from* the decision or action by the

Attorney General to commence proceedings, adjudicate cases, or execute removal orders against

any alien."  8 U.S.C. § 1252(g) (emphasis added).  In *AADC*, the Supreme Court did not

"interpret this language to sweep in any claim that can technically be said to 'arise from' the

three listed actions of the Attorney General" but, instead, "read the language to refer to just those

three specific actions themselves."  *Jennings*, 138 S. Ct. at 841 (plurality opinion); *see id*. at 876

(Breyer, J., dissenting).

Having recognized that the phrase "arising from" does not sweep in every action or

decision connected in any way with the removal process, neither *Jennings* nor *Preap* endeavored

to announce a test that would govern in all cases.  The Court did, however, hold in both cases

that § 1252(b)(9) did not "present a jurisdictional bar" because the respondents in those cases (1)

were "not asking for review of an order of removal;" (2) were "not challenging the decision to

detain them in the first place or to seek removal;" and (3) were "not even challenging any part of

the process by which their removability will be determined." *Jennings*, 138 S. Ct. at 841 (plurality opinion); *see also Preap*, 139 S. Ct. at 962 (plurality opinion) (quoting same).

Against the backdrop of *St. Cyr*, *AADC*, *Preap*, and *Jennings*, the Court concludes that § 1252(b)(9) does not divest this Court of jurisdiction to adjudicate individual plaintiffs' claims for several reasons:

First, the plain language of § 1252(b)(9) applies only to claims arising from "any *action taken* or *proceeding brought* to remove an alien from the United States." 8 U.S.C. § 1252(b)(9) (emphasis added). In *Jennings*, the concurrence concluded (and the plurality assumed) that detention typically "is an 'action taken . . . to remove' an alien." 138 S. Ct. at 855 (Thomas, J., concurring in part and concurring in the judgment) (emphasis omitted); *see also id.*, 138 S. Ct. at 841 n.3 (plurality opinion). The plurality, however, expressed doubt—albeit without deciding the question, which was not before the Court—that the detention of an alien "under 8 U.S.C. § 1225(b)(1)(B)(ii) for consideration of [his or her] *asylum application*[]" constitutes an "action taken . . . to remove" the alien "from the United States." 138 S. Ct. at 840 & n.2 (plurality opinion) (emphasis added). The concurrence's view that the detentions at issue in *Jennings* were "action[s] taken . . . to remove" aliens, moreover, was premised on the fact that "detention during removal proceedings" is "an 'aspect of the [removal] process.'" *Id.* at 854 (Thomas, J., concurring in part and concurring in the judgment).

Here, in contrast, Plaintiffs do not challenge any aspect of the removal process. They do not challenge or seek to set aside an order of removal, a decision to initiate removal proceedings, the rejection of any defensive asylum claim, or a detention order. Rather, they bring a series of facial challenges to a regulation that applies equally to affirmative and defensive applications for

asylum, seeking to set aside the regulation itself.[8]  The challenged Rule is not an "action

taken . . . to remove an alien from the United States," and was not promulgated as part of a

removal "proceeding."  8 U.S.C. § 1252(b)(9).  Just as it was "implausible" in *AADC* to construe

"the mention of three discrete events along the way the road to deportation" in § 1252(g) as "a

shorthand way of referring to all claims arising from deportation proceedings," 525 U.S. at 482,

it is implausible to construe § 1252(b)(9)'s mention of an "action taken" or a "proceeding

brought to remove an alien" as shorthand for any agency action that might ultimately facilitate

the removal of a *class* of aliens.  To borrow from *AADC*, this reading is not implausible "because

Congress is too unpoetic to use synecdoche, but because that literary device is incompatible with

the need for precision in legislative drafting."  *Id.* at 482.

---

[8]  Because Plaintiffs challenge the lawfulness of the Rule—and not any individual asylum
application or order of removal—there is no merit to Defendants' contention, *see* Dkt. 22 at 30,
that Plaintiffs fail to satisfy the final-agency-action requirement of the APA, *see* 5 U.S.C. § 704.
Although the Attorney General and the Secretary of Homeland Security have invited public
comment on the Interim Final Rule, there is no doubt that the Rule "mark[s] the 'consummation
of the agenc[ies'] decisionmaking process" and that "legal consequences will flow" from it.
*Bennett*, 520 U.S. at 178.  Nor is the Court convinced by Defendants' late-asserted contention
that Plaintiffs' claims are barred for failure to exhaust under 8 U.S.C. § 1252(d).  Dkt. 81 at 5.
That provision merely requires an alien to "exhaust[] all administrative remedies" before "[a]
court may review a final order of removal."  8 U.S.C. § 1252(d).  Here, however, Plaintiffs have
not asked the Court to review a final order of removal.  Finally, the Court concludes that
Defendants have waived their contention that Plaintiffs have an "adequate other remedy"
precluding review under the APA.  Dkt. 81 at 6 n.4.  That requirement, found at 5 U.S.C. § 704,
is not jurisdictional, *Trudeau v. FTC*, 456 F.3d 178, 183–84 (D.C. Cir. 2006), and Defendants'
effort to raise it in a footnote—included in a supplemental brief that the Court authorized only to
address unrelated issues—is insufficient to preserve the argument.  *See, e.g.*, *CTS Corp. v. EPA*,
759 F.3d 52, 64 (D.C. Cir. 2014) ("A footnote is no place to make a substantive legal argument .
. . hiding an argument there and then articulating it in only a conclusory fashion results in
forfeiture."); *Elec. Privacy Info. Ctr. v. IRS*, 261 F. Supp. 3d 1, 13 (D.D.C. 2017) (holding that
claims raised only in footnotes of party's brief were deemed forfeited), *aff'd*, 910 F.3d 1232
(D.C. Cir. 2018); *Davis v. Bud & Papa, Inc.*, 885 F. Supp. 2d 85, 90 (D.D.C. 2012) ("[I]t is a
well-settled prudential doctrine that courts generally will not entertain new arguments first raised
in a reply brief.").

Second, for similar reasons, this is not a case in which Plaintiffs seek judicial review of a question of law or fact "arising from" an action taken or proceeding brought to remove an alien. 8 U.S.C. § 1252(b)(9).  Even assuming that the individual plaintiffs' removal proceedings, and not the challenged Rule, are the "action[s] taken . . . to remove" them for purposes of § 1252(b)(9), the relevant question is "whether the legal questions in this case *arise from* such an action," *Jennings*, 138 S. Ct. at 841 n.3 (plurality opinion) (emphasis omitted and added).  They do not.  To the contrary, Plaintiffs ask that the Court consider a series of questions of law "arising from" a rulemaking of general applicability.  Among other things, they ask that the Court consider whether the Attorney General and the Secretary of Homeland Security acted lawfully when they (1) promulgated the Rule without providing a timely opportunity for public notice and comment and without publishing the rule thirty days in advance of its effective date, (2) adopted a regulation limiting the eligibility of a class of aliens to seek asylum based on their entry into the United States outside a designated port of entry; and (3) sought to adopt additional "conditions or limitations on the consideration of an application for asylum" *by regulation*, while ceding to the President the authority to define the scope and timing of those conditions or limitations *by proclamation*.  None of these questions arise "'from [removal] proceedings'" or from the "'many . . . decisions or actions that may be part of the [removal] process.'"  *Jennings*, 138 U.S. at 854 (Thomas, J., concurring in part and concurring in the judgment) (quoting *AADC*, 525 U.S. at 482–83).  Rather, they "arise from" the challenged rulemaking.

Defendants' attempts to sidestep this clear textual limitation are unavailing.  In Defendants' view, § 1252(b)(9) divests the district courts of jurisdiction to adjudicate "all issues arising from removal proceedings *or that can be raised in those proceedings*."  Dkt. 22 at 27 (emphasis added); *see also* Dkt. 66 at 31.  Because the individual plaintiffs are now in removal

proceedings and *could* seek to bring their procedural and substantive challenges to the Rule in those individual proceedings, Defendants contend that they are obligated to do so.  But, even aside from the fact that an immigration judge lacks the authority to set aside a regulation promulgated by the Attorney General and the Secretary of Homeland Security, *see Jafarzadeh*, 270 F. Supp. 3d 296, 310 (D.D.C. 2017), Defendants' reading cannot be reconciled with the plain language of the statute.  The question is not whether an issue *could* be raised in removal proceedings, but rather whether it "arise[s] from" those proceedings.  8 U.S.C. § 1252(b)(9); *see also Jennings*, 138 S. Ct. at 841 & n.3 (plurality opinion).  Nor is Defendants' position supported by the cases they cite, which concern claims directly implicating the plaintiffs' ability to defend themselves in removal proceedings.  *See J.E.F.M.*, 837 F.3d at 1029 (challenging deprivation of the right to counsel in removal proceedings); *Aguilar*, 510 F.3d at 13–14 (same); *Vetcher v. Sessions*, 316 F. Supp. 3d 70, 75 (D.D.C. 2018) (challenging access to law library to defend against removal).  The claims in those cases challenged procedures intrinsic to individual removal proceedings, which "arise from" those proceedings as contemplated by § 1252(b)(9) in a way that a facial challenge to a regulation of general applicability does not.

*AADC*, *Jennings*, and *Preap* all make clear that the phrase "arising from" cannot be divorced from the terms it modifies, thereby transforming a defined restriction on § 1331 jurisdiction into an amorphous limitation on most, if not all, APA review of immigration rules. As the *Jennings* plurality explained, the phrase "arising from" appears in both § 1252(b)(9) and § 1252(g)—and if courts must "read th[at] language" in § 1252(g) "to refer to just th[e] three specific actions" listed in § 1252(g), courts must read § 1252(b)(9) in a similar manner.  138 S. Ct. at 840–41 (plurality opinion).  True, the specific actions listed in § 1252(b)(9)—"any action taken or proceeding brought to remove an alien from the United States"—are more expansive

than those listed in § 1252(g)—a "decision or action . . . to commence proceedings, adjudicate

cases, or execute removal orders against any alien."  But the operative phrase—"arising from"—

must mean the same thing in both subsections, *see Gustafson v. Alloyd Co.,* 513 U.S. 561, 570

(1995) (adhering to the "normal rule of statutory construction that identical words used in

different parts of the same act are intended to have the same meaning" (internal quotation

omitted)), and cannot be used in either subsection to extend the reach of the channeling rule

beyond the actions or proceedings identified.

Third, consideration of other portions of § 1252 confirms that Congress did not intend

§ 1252(b)(9) to sweep in the sort of APA challenges to a rulemaking that Plaintiffs bring here.

Most notably, § 1252(b)(4)(A) specifies that the record in cases governed by §1252(a) and

§ 1252(b)(9) "shall" consist of "only . . . the administrative record *on which the order of removal*

*is based*."  8 U.S.C. § 1252(b)(4)(A) (emphasis added).  Although that record might have some

bearing on an individual plaintiff's standing to sue in any particular case, it has nothing to do

with the challenges Plaintiffs have brought in this case.  Instead, the relevant record here consists

of the materials the Attorney General and the Secretary of Homeland Security considered in

deciding whether to issue the Rule and in considering whether to invoke the APA's exceptions to

the usual notice-and-comment and advanced-publication requirements.  Without *that* record,

which § 1252(b)(4)(A) precludes the courts of appeals from considering, it is difficult to fathom

how meaningful judicial review of individual plaintiffs' claims could occur.  Similarly,

§ 1252(b)(4) sets forth the governing standards of review, which treat "administrative findings of

fact" as "conclusive unless any reasonable adjudicator would be compelled to conclude to the

contrary," 8 U.S.C. § 1252(b)(4)(B); treat "a decision that an alien is not eligible for admission"

as "conclusive unless manifestly contrary to law," *id.* § 1252(b)(4)(C); and accord "conclusive"

weight to "the Attorney General's discretionary judgment whether to grant" asylum to an applicant "unless manifestly contrary to the law and an abuse of discretion," *id.* § 1252(b)(4)(D). These standards, unique to the removal process, would leave no room for the courts of appeals to evaluate the lawfulness of the Rule under APA standards.

Fourth, the Supreme Court has recognized—in similar circumstances and interpreting a similar statutory provision—that district courts have jurisdiction over "general collateral challenges to [unlawful] practices and policies used by [immigration authorities]." *McNary v. Haitian Refugee Ctr.*, 498 U.S. 479, 492 (1991). In 1986, Congress enacted the Immigration Reform and Control Act ("IRCA"), Pub. L. No. 99-603, 100 Stat. 3359, which, among other things, allowed alien farmworkers who had resided in the United States and performed at least ninety days of qualifying agricultural work during a specified period to apply for adjustment of status to "special agricultural workers" ("SAWs"). 8 U.S.C. § 1160(a). IRCA, however, allowed only limited "administrative or judicial review of a determination respecting an application for adjustment of status" and, in particular, provided that "[t]here shall be judicial review of such a denial only in the judicial review of an order of exclusion or deportation." *Id.* § 1160(e). In *McNary*, the plaintiffs challenged certain "practices and policies" adopted by the Immigration and Naturalization Service ("INS")—the predecessor agency to the United States Citizenship and Immigration Service—"in [the] administration of the SAW program." 498 U.S. at 487. In response to the government's contention that the district court lacked jurisdiction to consider that challenge, the Supreme Court held that § 1160(e) did not divest the district court of jurisdiction over the plaintiffs' pattern or practice claims. *Id.* at 491–95.

*McNary* premised its holding on two relevant considerations, both of which apply in the present context with equal or greater force. First, and most significantly, the Supreme Court

focused on the words of the jurisdiction-limiting provision, which applied only to judicial review

"'of *a determination* respecting *an application*' for SAW status," and which channeled only

"'judicial review of *such a denial*'" into the Hobbs Act procedures for reviewing final exclusion

or deportation orders.  *Id.* at 492 (quoting 8 U.S.C. § 1160(e)(1) and (e)(3)).  Like the provision

at issue in *McNary*, § 1252(b)(9) applies to challenges to specific actions—that is, "any *action*

*taken* or *proceeding brought* to remove an alien from the United States," 8 U.S.C. § 1252(b)(9)

(emphasis added)—and not to challenges of the type Plaintiffs press here.[9]  *Jafarzadeh*, 270 F.

---

[9]  The Court of Appeals for the Ninth Circuit observed that, in enacting IIRIRA, "Congress was legislating against the backdrop of recent Supreme Court law," and that *McNary* "offered a blueprint for how Congress could draft a jurisdiction-channeling statute that would cover not only individual challenges to agency decisions, but also broader challenges to agency policies and practices."  *J.E.F.M.*, 837 F.3d at 1034.  According to the Ninth Circuit, that "blueprint" appeared in the following passage:

> [H]ad Congress intended the limited review provisions of [§ 1160(e)] . . . to encompass challenges to INS procedures and practices, it could easily have used broader statutory language.  Congress could, for example, have . . . channel[ed] into the Reform Act's special review procedures "all causes . . . arising under any of the provisions" of the legalization program.  It moreover could have modeled [§ 1160(e)] on 38 U.S.C. § 211(a), which governs review of veterans' benefit claims, by referring to review "on all questions of law and fact" under the SAW legalization program.

*McNary*, 498 U.S. at 494.  Congress's use of the phrase "all questions of law and fact" in § 1252(b)(9) led the Ninth Circuit to conclude that Congress must have intended to "include[e] policies-and-practices challenges" in § 1252(b)(9)'s channeling provisions.  *J.E.F.M.*, 837 F.3d at 1029.  That might be right with respect to certain types of policy and practice claims but, if anything, the "blueprint" that the Supreme Court offered in *McNary* counsels against the conclusion that § 1252(b)(9) reaches Plaintiffs' challenge here.  To be sure, the model that the *McNary* Court referenced—38 U.S.C. § 211(a)—used the phrase "any question of law or fact." 38 U.S.C. § 211 (1982).  But what matters is what comes next:  Section 211(a) did not identify a particular type of proceeding in which such questions might arise but, rather, applied the any-question-of-law-or-fact standard to *all* "[t]he decisions of the Administrator [of Veterans Affairs] . . . under any law administered by the Veterans' Affairs Administration providing benefits for veterans."  *Id.*  Had Congress followed that sweeping blueprint here, it would have provided for Hobbs Act review of "all questions of law and fact" arising from decisions of the Department of Justice or the Department of Homeland Security "under any law administered by" either agency relating to immigration.

Supp. 3d at 309. Second, the Supreme Court stressed that the statutory scheme at issue in *McNary* limited review to the "administrative record," and specified that "'the findings of fact and determinations contained in such record shall be conclusive unless the applicant can establish abuse of discretion or that the findings are directly contrary to clear and convincing facts contained in the record considered as a whole.'" *McNary*, 498 U.S. at 493 (quoting 8 U.S.C. § 1160(e)(3)(B)). Because that administrative record did not speak to the type of challenge that the *McNary* plaintiffs brought, and because the "'abuse-of discretion' standard" made "no sense" if the judicial review provisions were read to encompass pattern or practice claims, the Court further concluded that "the language of" § 1160(e)(3)(B) added "substantial credence to the conclusion that [IRCA's] review provision [did] not apply to challenges to the INS'[s] practices and procedures in administering the SAW program." *Id.* at 493–94. For the reasons explained above, the same conclusion applies here. In short, "as in *McNary*, [P]laintiffs raise claims that are outside the scope of the administrative process." *Jafarzadeh*, 270 F. Supp. 3d at 309.

The D.C. Circuit's "cases interpreting *McNary* hew to [the] distinction between collateral and particularized claims" and hold that similar jurisdiction-limiting provisions "only bar claimants from circumventing statutory provisions that give appellate courts jurisdiction to hear their . . . challenges." *Gen. Elec. Co.*, 610 F.3d at 126–27. That distinction also coheres with other Supreme Court precedent holding that "[p]rovisions for agency review do not restrict judicial review unless the 'statutory scheme' displays a 'fairly discernible' intent to limit jurisdiction, and the claims at issue 'are of the type Congress intended to be reviewed within th[e] statutory structure.'" *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 489 (2010) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207, 212 (1994)).

Under that line of authority, courts must "presume that Congress does not intend to limit jurisdiction if 'a finding of preclusion *could* foreclose all meaningful judicial review'; if the suit is 'wholly collateral to a statute's review provisions'; and if the claims are 'outside the agency's expertise.'" *Id*. at 489–90 (quoting *Thunder Basin Coal Co*., 510 U.S. at 212–13 (emphasis added)); *see also Am. Fed'n of Gov't Emps., AFL-CIO*, 2019 WL 3122446, at *3.

Adopting Defendants' position here "could" deprive some or all of the individual plaintiffs of "meaningful judicial review." *Thunder Basin Coal Co*., 510 U.S. at 212–13. Consider just one example. Those who seek asylum often also seek withholding of removal, which holds applicants to a higher standard of proof and affords fewer benefits if granted—most notably, it does not provide a path to lawful permanent resident status or citizenship. *See* 83 Fed. Reg. at 55,939. As a result, if an individual plaintiff is denied asylum but granted withholding of removal, she will not be subject to a final order of removal and will not, in all likelihood, have the opportunity to obtain judicial review of the asylum denial under § 1252(a).[10] *See, e.g.*, *Karshe v. Gonzales*, 161 F. App'x 726, 2006 WL 64426 at *1 (9th Cir. 2006); *Zeng v. INS*, 83 F. App'x 264, 2003 WL 22977463 at * 1 (9th Cir. 2003). Requiring an individual plaintiff to forego a claim for withholding of removal—and thus subject themselves to the risk of removal— in order to obtain judicial review of an asylum denial would arguably violate U.S. treaty obligations. *See* Article 33(1), United Nations Convention Relating to the Status of Refugees, 189 U.N.T.S. 150, 176 (1954), reprinted in 19 U.S.T. 6259, 6276, T.I.A.S. No. 6577 (1968); *Cardoza–Fonseca*, 480 U.S. at 428–29; *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch)

---

[10] Although the Court need not decide for present purposes whether any post-*McNary* Supreme Court precedent is to the contrary, the Court notes the D.C. Circuit has held: "Properly read, . . . *McNary*'s conclusion that the immigration statute's jurisdiction-stripping provision presented no bar to a pattern and practice suit did not depend on the unavailability of alternative means of judicial review." *Gen. Elec. Co.*, 610 F.3d at 126.

64, 118 (1804) (holding that a statute "ought never to be construed to violate the law of nations if any other possible construction remains"). But, even putting that question of international law aside, it would constitute "an odd procedure for Congress to choose" to provide for judicial review of the Rule, *Free Enter. Fund*, 561 U.S. at 490, and distinguishes this case from precedents holding that a plaintiff's inability "to obtain pre-implementation' review" of a challenged practice does not deprive the plaintiff of all meaningful judicial review, *Am. Fed'n of Gov't Emps., AFL-CIO*, 2019 WL 3122446, at *4.

Plaintiffs' challenges are also "wholly collateral," *Free Enter. Fund*, 561 U.S. at 489, to "any action taken or proceeding brought to remove an alien from the United States," 8 U.S.C. § 1252(b)(9). As explained above, the action challenged is the Attorney General and Secretary of Homeland Security's promulgation of the Interim Final Rule; Plaintiffs do not seek to overturn any asylum decision and do not challenge anything occurring in any removal proceeding. "[N]either the immigration judge nor the Board of Immigration Appeals can review" whether the Attorney General and Secretary of Homeland Security complied with the substantive and procedural requirements of the APA when they promulgated the Interim Final Rule. *Jafarzadeh*, 270 F. Supp. 3d at 310.

Finally, for similar reasons, Plaintiffs' challenges "are also outside the . . . competence and expertise" of asylum officers, immigration judges, and the BIA. *Free Enter. Fund*, 561 U.S. at 478. Nothing within the expertise of these decisionmakers will have any bearing on the claims Plaintiffs assert. To the contrary, because Plaintiffs challenge the Rule—and not its implementation—the relevant facts, expert judgments, and theory of statutory interpretation that the Court must review reside in the Administrative Record and in the Rule itself. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947); *Citizens to Preserve Overton Park, Inc., v. Volpe*, 401

U.S. 402, 419–20 (1971); *Comm. for Creative Non-Violence v. Lujan*, 908 F.2d 992, 997 (D.C. Cir. 1990).  It is, in other words, "black-letter administrative law that in an [APA] case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision."  *CTS Corp. v. EPA*, 759 F.3d 52, 64 (D.C. Cir. 2014).  Nor is there any reason to believe, in the circumstances of this case, that an immigration judge or the BIA would have any relevant expertise to bring to bear on the administrative law questions the case poses or that they would be better situated than the Court to determine whether phrases like "may apply" and "is eligible" mean the same thing.  This is not a case that requires detailed knowledge of a complex regulatory scheme.  In short, nothing an asylum officer, an immigration judge, or the BIA might offer "could 'obviate the need to address' . . . [Plaintiffs'] statutory claims," could "moot" one or more of those claims, or is likely meaningfully to inform the judiciary's consideration of Plaintiffs' facial challenge to the Interim Final Rule.  *Am. Fed'n of Gov't Emps., AFL-CIO*, No. 18-5289, 2019 WL 3122446, at *8 (quoting *Jarkesy v. SEC*, 803 F.3d 9, 29 (D.C. Cir. 2015)).

For all of these reasons, the Court concludes that it has federal question jurisdiction over the individual plaintiffs' claims under 28 U.S.C. § 1331, and that nothing in § 1252(a)(5) or § 1252(b)(9) divests this Court of that jurisdiction.

c.  8 U.S.C. § 1252(e)(3)

The parties have also devoted considerable attention to whether the Court has jurisdiction over at least some of the individual plaintiffs' claims, in any event, under 8 U.S.C. § 1252(e)(3). That provision confers original jurisdiction on the United States District Court for the District of Columbia to review "determinations" made in the implementation of the expedited removal provisions of the INA, including jurisdiction to decide "whether . . . any regulation issued to implement [the expedited removal provision] is . . . in violation of law."  8 U.S.C.

§ 1252(e)(3)(A).  Any such challenge must be brought "no later than 60 days after the date the

challenged . . . regulation is first implemented," *id.* § 1252(e)(3)(b), and the court may not

"certify a class under Rule 23," *id.* § 1252(e)(1)(B).  Section 1252(e)(3) is potentially relevant

here because the Rule amends both the general regulation applicable to asylum eligibility and the

regulation specifically applicable in expedited removal proceedings.  *See* 83 Fed. Reg. at 55,952

(amending both 8 C.F.R. § 208.13 and 8 C.F.R. § 208.30).

According to Defendants, § 1252(e)(3) does not provide this Court with jurisdiction

because none of the individual plaintiffs are currently in expedited removal proceedings.  Dkt. 81

at 2–3.  That contention, however, disregards the maxim that, at least for cases originally filed in

federal court, subject matter jurisdiction "depends upon the state of things at the time the action

is brought," *Mollan v. Torrance*, 22 U.S. (9 Wheat.) 537, 539 (1824); *see also Grupo Dataflux v.*

*Atlas Glob. Grp. L.P.*, 541 U.S. 567, 570–71 (2004) ("[T]ime-of-filing rule is hornbook law

(quite literally) taught to first-year law students in any basic course on federal civil procedure."),

or, if a complaint is amended in a manner that affects the jurisdictional allegations, subject

matter jurisdiction is determined at the time the amended complaint is filed, *see Rockwell Int'l*

*Corp. v. United States*, 549 U.S. 457, 473 (2007) (noting, for example, that "withdrawal of

[relevant] allegations" may divest the court of jurisdiction, "unless they are replaced by others

that establish jurisdiction").  Where multiple plaintiffs assert claims seeking precisely the same

declaratory or injunctive relief, moreover, and where the court has subject matter jurisdiction to

consider the claims of at least one of those plaintiffs, the court need not address its jurisdiction to

consider the claims of the remaining plaintiffs.  *See, e.g.*, *Clinton v. City of New York*, 524 U.S.

417, 434–35 (1998) (Article III jurisdiction); *Bowsher v. Synar*, 478 U.S. 714, 721 (1986)

(same); *Sec'y of the Interior v. California*, 464 U.S. 312, 319 n.3 (1984) (same).  As a result,

Plaintiffs need only demonstrate that the Court has jurisdiction under § 1252(e)(3) over the claims of at least one of the individual plaintiffs.

Although the parties dispute whether a number of the individual plaintiffs (D.R., P.R., G.R., L.C.V.R., C.S.C.C., R.G.G., N.A.G.A., K.P.P.V., R.D.P.V., and Y.A.L.P.) remained in expedited removal proceedings on December 18, 2018—the day the *O.A.* and *S.M.S.R.* Plaintiffs filed their amended complaints—Defendants concede that at least one plaintiff, A.V., was in expedited removal proceedings until at least May 24, 2019.[11]  *See* Dkt. 90 at 11 (Defs' SUMF ¶ 46) ("After entering the United States on November 11, 2018, Plaintiff A.V. was issued a Notice and Order of Expedited Removal under 8 U.S.C. § 1225(b)(1) on November 12, 2018."); Dkt. 22 at 29; Dkt. 66 at 19.  Indeed, as of May 29, 2019—the day the Court held oral argument—"the government had not notified either A.V. or [her counsel] that she had been issued a Notice to Appear and placed into ordinary removal proceedings."  Dkt. 80-1 at 4 (Walsh Decl. ¶ 15).  Thus, on the day A.V. filed suit and on the day she filed her amended complaint, she was in expedited removal proceedings under § 1225.

Defendants do not take issue with the rule that statutory jurisdiction is, in the usual course, decided based on the facts as they existed at the time the complaint or amended complaint was filed.  That rule, moreover, is entirely sensible.  It would hardly promote "the just, speedy, and inexpensive determination of every action and proceeding," Fed. R. Civ. P. 1, for

---

[11]  The parties disagree, for example, about when, as a factual matter, the Department of Homeland Security made final credible fear determinations as to plaintiffs D.R. and P.R., *compare* Dkt. 81 at 2 n.1, *with* Dkt. 85 at 1–2; and whether, as a legal matter, aliens remain in expedited removal proceedings until they receive a credible fear interview, until they receive a Notice to Appear without a time and date, until they receive a Notice to Appear *with* a time and date, or until their Notice to Appear is filed with the immigration court, *compare* Dkt. 85 at 2; Dkt. 80 at 7–8, *with* Dkt. 81 at 4.  The Court notes, however, that the Department's own regulations specify that full removal proceedings are not commenced until the Notice to Appear is filed with the immigration court.  *See* 8 C.F.R. § 1239.1.

example, for one court—properly vested with statutory jurisdiction—to spend weeks, months, or years adjudicating a case, only to yield jurisdiction to an entirely different court based on intervening events, and for the second court to need to start from square one. Departing from the established rule would also invite forum shopping and other mischief, at least to the extent that one or more of the parties to the litigation is able to affect the court's statutory jurisdiction based on their post-complaint actions. The usual rule, moreover, dates back to the early days of the republic, *see Mollan*, 22 U.S. (9 Wheat.) at 539, and Congress has legislated against this settled principle since then, *Miles v. Apex Marine Corp*., 498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes legislation.").

Defendants argue that A.V.'s claims do not implicate that usual rule because she is no longer in expedited removal proceedings and, thus, will never receive a "'determination' under section 1225(b)." Dkt. 81 at 10. That fact, in Defendants' view, does more than alter the initial jurisdictional terrain—it means that A.V. will never be subject to a "determination" under the expedited removal provision, and it means that the Court cannot afford her any relief with respect to a "determination" ordering her expedited removal. *Id*. (quoting 8 U.S.C. § 1252(e)(3)). In other words, according to Defendants, the government's decision to move A.V. from expedited to full removal proceedings has "mooted" her right to invoke this Court's jurisdiction under § 1252(e)(3). That contention is flawed in a number of respects.

First, Defendants' argument misunderstands the mootness doctrine. It is a claim, and not jurisdiction, that can become moot based on changed circumstances, and, here, A.V.'s *claim* is premised on the APA, not on § 1252(e)(3). To the extent Defendants implicitly disagree, they fail to identify any feature of § 1252(e)(3) suggesting that it provides a cause of action, much less

an exclusive cause of action for claims brought challenging implementation of the expedited removal statute.

Second, to the extent Defendants contend that § 1252(e)(3) vests this Court with jurisdiction only after the Department of Homeland Security makes a "determination" respecting expedited removal and that, because A.V. is no longer in expedited removal proceedings, this predicate will never be satisfied, they misread the statute.  The language of § 1252(e)(3) is plain: it applies to both "judicial review of determinations" made under the expedited removal provision *and* to judicial review of the "implementation" of that provision.[12]  Any suggestion that review is nonetheless unavailable unless and until the Department makes a final determination of expedited removal is both unsupported by the text and at odds with the fact that a challenge must be brought within sixty days of the "first implement[ation]" of a challenged regulation, *see Am. Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1354 (D.C. Cir. 2000).  Under Defendants' reading of § 1252(e)(3), the sixty-day deadline would mean that an alien's ability to press her claim concerning the implementation of the expedited removal scheme is based wholly on happenstance:  If the government happens to make a final determination as to her expedited removal within the sixty-day window, she can bring a claim challenging the system.  If the government does not enter such a determination within sixty days, that same alien is out of luck. The Court doubts that Congress intended such an arbitrary result.

---

[12]  Section 1252(e)(3) refers to "[j]udicial review of determinations under [§ 1225(b)] and its implementation."  8 U.S.C. § 1252(e)(3).  One might argue that "its implementation" refers to implementation of the removal order, and not to implementation of § 1225(b).  That, however, is not the best reading of the provision.  Among other things, the reference to "implementation" is in the singular, as is the reference to "section 1225(b)," while the reference to "determinations" is in the plural.

Third, Defendants' argument proves too much.  At oral argument, counsel conceded that, under Defendants' reading of the statute, this Court would lose jurisdiction under § 1252(e)(3) if the government moves the plaintiff from expedited to full removal proceedings—up to the moment the Court enters final judgment.  Dkt. 79 at 58–59 (May 29, 2019 Hrg. Tr.).  That reading of the statute would attribute to Congress an intent to empower the government to avoid an unfavorable decision at any time, so long as the government acts before the Court enters final judgment.  Considered against the backdrop of the usual rule, which fixes statutory jurisdiction at the time the complaint is filed, that contention is a step too far.  There is no reason to believe that Congress intended to cede to the government the unique capacity to shift fora at its whim.

Notwithstanding these problems with Defendants' argument, the Court is unpersuaded that § 1252(e)(3) applies here, for essentially the same reasons that it is unpersuaded that § 1252(a)(5) and § 1252(b)(9) apply.  Most importantly, § 1252(e)(3) is about challenges to expedited removal orders and the implementation of the expedited removal provisions that Congress enacted in IIRIRA.  This case, in contrast, presents neither a challenge to a removal order nor a challenge to the statutory or regulatory system for expedited removal.  Rather, as explained in greater detail above, Plaintiffs assert a facial challenge to a rule governing eligibility for asylum, whether sought in a defensive or affirmative application.  That is why § 1252—as a whole—does not apply to Plaintiffs' challenges, and it is why the Court has statutory jurisdiction.  But, even if Defendants were correct that § 1252 had some bearing on this case, the bottom line would be the same.  That is because § 1252(e)(3) sweeps, if anything, more broadly than § 1252(a)(5) and § 1252(b)(9)—it does not apply merely to removal proceedings and actions taken to remove an alien, but to the implementation of the expedited removal provisions of IIRIRA—and the government's post-complaint decision to move A.V. from expedited to full

removal proceedings would not divest the Court of whatever jurisdiction it had at the time the complaints were filed.

*   *   *

The Court, accordingly, concludes that it has statutory jurisdiction under 28 U.S.C. § 1331 to consider the Plaintiffs' claims, because § 1252 does not divest the Court of jurisdiction over the individual plaintiffs' claims and because Defendants raise no statutory, jurisdictional defense to the organizational plaintiffs' claims.

2.      *Article III Standing and Zone of Interests Standing*

Defendants next argue that the organizational plaintiffs lack Article III and prudential (or "zone of interests") standing and that the individual plaintiffs lack Article III standing.[13] "Because Article III limits federal judicial jurisdiction to cases and controversies, *see* U.S. Const. art. III, § 2, federal courts are without authority" to decide disputes unless the plaintiff has standing—that is, "'a personal stake in the outcome of the controversy [sufficient] to warrant *his* invocation of federal-court jurisdiction.'" *Chamber of Commerce v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)). This fundamental limitation "is founded in concern about the proper—and properly limited— role of the courts in a democratic society." *Summers*, 555 U.S. at 492–93 (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). To demonstrate Article III standing, a plaintiff must demonstrate a "concrete and particularized" injury that is "fairly traceable" to the defendant's conduct and "that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547–48 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560

---

[13] Even though "zone of interests" standing is not jurisdictional, *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126, 128 n.4 (2014), the Court addresses it here as a threshold issue.

(1992)).  "At least one plaintiff must have standing to seek each form of relief requested," *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017), and that party "bears the burden of establishing" the elements of standing "with the manner and degree of evidence required at the successive stages of the litigation," *Lujan*, 504 U.S. at 561.

　　a.  Organizational Plaintiffs

　　The Court begins with the organizational plaintiffs.  An organization "can assert standing on its own behalf, on behalf of its members or both."  *Equal Rights Ctr. v. Post Props., Inc.,* 633 F.3d 1136, 1138 (D.C. Cir. 2011).  Here, the organizational plaintiffs rely on the first approach, "which requires [them], like an individual plaintiff, to show 'actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision.'"  *Id.* (quoting *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990)).  For support, Plaintiffs rely on *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982).  In that case, a fair housing organization claimed that the defendant's discriminatory housing practices "frustrated" the organization's ability to "provide counseling and referral services for low- and moderate-income homeseekers," forcing it "to devote significant resources to identify and counteract" the alleged discriminatory practices.  *Id.*  The Supreme Court held that "there [could] be no question that the organization . . . suffered injury in fact" because it established a "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—[that] constitute[d] far more than simply a setback to the organization's abstract social interests."  *Id.*

　　The D.C. Circuit "has applied *Havens Realty* to justify organizational standing in a wide range of circumstances."  *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006) (collecting cases); *see also* 13A Charles Alan Wright *et al.*, *Federal Practice & Procedure* § 3531.9.5 (3d ed. Sept. 2018) (same).  That said, *Havens* is

not without limits:  A plaintiff must show more than a mere "setback to the organization's abstract social interests," *Havens*, 455 U.S. at 379, a "self-inflicted budgetary choice,'" *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc., 659 F.3d 13, 25 (D.C. Cir. 2011) ("ASPCA"*), or an effect on the "organization['s] lobbying activities," *Ams. for Safe Access v. DEA,* 706 F.3d 438, 457 (D.C. Cir. 2013).  An organization seeking to establish *Havens* standing must clear two hurdles.  First, it "must show a 'direct conflict between the defendant's conduct and the organization's mission.'" *ASPCA*, 659 F.3d at 25 (quoting *Nat'l Treasury Emps. Union v. United States,* 101 F.3d 1423, 1430 (D.C. Cir. 1996)).  If it can do so, the Court must then "ask whether the plaintiff used its resources to counteract that injury."  *Id*.  "[A]n organization may not," however, "'manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit.'"  *Id.* (quoting *Spann*, 899 F.2d at 27).

Plaintiffs have met this burden.  Both CAIR Coalition and RAICES have identified various ways that the Rule would frustrate their missions of providing direct legal services to asylum seekers.  Dkt. 39 at 46–56 (*S.M.S.R.* Amend. Compl. ¶¶ 213–255).  The declaration of CAIR Coalition's litigation director, for example, describes the organization's mission in detail and explains how the Rule will interfere with that mission and will, if allowed to take effect, impose substantial, tangible costs on the organization.  *See* Dkt. 6-5 at 2–11 (Cubas Decl. ¶¶ 3– 39), *S.M.S.R. et al. v. Trump et al.* (No. 18-2838).  In particular, according to the declaration, the Rule will either dramatically reduce the number of clients that CAIR Coalition can serve or will require it to "raise more funds to serve the same number of clients."  *Id*. at 5 (Cubas Decl. ¶ 14).  To take just one example, if CAIR Coalition's clients are ineligible for asylum, the organization will need to assist them in seeking withholding of removal, which requires that applicants meet a substantially more demanding test ("reasonable fear" as compared to "credible fear"), and will,

as a result, require "double th[e] time [to] prepar[e]" them for interviews. *Id.* at 7 (Cubas Decl.

¶ 22). More cases, moreover, will "move directly to trial at immigration court," which will

further tax CAIR Coalition's resources. *Id.* at 10 (Cubas Decl. ¶¶ 33–34). And at the same time

that the Rule will impose these additional demands on the organization, it will diminish a portion

of CAIR Coalition's funding, which "is tied [in part] to the number of adult clients that the

organization serves each year." *Id.* at 11 (Cubas Decl. ¶ 38).

Similarly, RAICES attests that the Rule will frustrate its mission and will impose

substantial, tangible burdens on the organization. Dkt. 39 at 52 (*S.M.S.R.* Amend. Compl.

¶ 238). The declaration of RAICES's chief legal programs officer describes the mission of the

organization and explains how the Rule will undermine that mission and will impose additional

costs on the organization. *See* Dkt. 6-6 at 2–11 (Garza Pareja Decl. ¶¶ 3–36), *S.M.S.R. et al. v.*

*Trump et al.* (No. 18-2838). According to the declaration, the Rule will require RAICES "to

divert scarce resources—including staff time—to: (1) creating new intake procedures for

detained families; (2) preparing [affected] asylum seekers for more onerous reasonable fear

interviews; (3) preparing children of [affected] asylum seekers for reasonable fear

interviews . . . ; (4) appealing more negative determinations to immigration court and beyond; (5)

preparing unaccompanied minors to testify and be cross-examined in immigration court, rather

than at the non-adversarial Asylum Office; (6) assisting families to prepare multiple applications

for relief, instead of one application with derivative family members; (7) creating new resources

and policies to implement these changes; (8) training staff on these new policies; and (9)

retraining staff from certain programs to move into new roles to implement these policies." *Id.* at

9–10 (Garza Pareja Decl. ¶ 32). The organization, as a result, will "be unable to represent the

same number of clients that it does currently," will need to "spend more resources on each

individual case," and will be "force[d] . . . to divert scarce resources away from other important programs." *Id.* at 3 (Garza Pareja Decl. ¶ 6).

These uncontested declarations demonstrate that the Rule directly conflicts with the missions of the organizational plaintiffs and that it will require them to use substantial "resources to counteract that injury." *ASPCA*, 659 F.3d at 25. No more is required to establish standing under *Havens*. Defendants disagree, arguing that "nothing in the [R]ule prevents CAIR [Coalition] or RAICES from continuing to represent asylum-seeking clients." Dkt. 31 at 32. That is correct, but immaterial. Courts have never required an organization to prove that is it entirely hamstrung by challenged actions; a direct conflict is one in which a defendant's actions cause a "perceptibl[e] impair[ment]" of the organization's mission that makes its "overall task more difficult." *Nat'l Treasury Emps. Union*, 101 F.3d at 1429 (quoting *Fair Emp't Council of Greater Washington, Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994)). CAIR Coalition and RAICES have made such a showing here.

Defendants also argue that the organizational plaintiffs fail the zone of interests test. Dkt. 31 at 33–34. The Court, once again, disagrees. Zone of interests standing is not a jurisdictional doctrine but, rather, requires that the "plaintiff's complaint falls within the zone of interests protected by the law invoked." *Lexmark Int'l*, 572 U.S. at 126. The zone of interests test is, in other words, a "tool for determining who may invoke the cause of action" created in the statute at issue. *Id.* at 130. "[I]n keeping with Congress's 'evident intent' when enacting the APA 'to make agency action presumptively reviewable,'" the test, at least in the APA context, "'is not meant to be especially demanding.'" *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (quoting *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 399–400 (1987)). "The interest [the plaintiff] asserts must be 'arguably within the zone of

48

interests to be protected or regulated by the [underlying] statute' that [the plaintiff] says was
violated." *Id.* at 224 (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150,
153 (1970)).  Courts "do not require any 'indication of congressional purpose to benefit the
would-be plaintiff,'" and the Supreme Court has "always conspicuously included the word
'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff." *Id.* (quoting
*Clarke*, 479 U.S. at 399–400).  "The test forecloses suit only when a plaintiff's 'interests are so
marginally related to or inconsistent with the purposes implicit in the statute that it cannot
reasonably be assumed that Congress intended to permit the suit.'" *Id.* (quoting *Clarke*, 479 U.S.
at 399).

The organizational plaintiffs easily meet this permissive test.  To start, the organizational
plaintiffs' interest in providing legal assistance to as many asylum seekers as they can is
consistent with the INA's purpose to "establish[ ] . . . [the] statutory procedure for granting
asylum to refugees." *Cardoza-Fonseca*, 480 U.S. at 427.  Even more to the point, the
organizational plaintiffs' interest in representing asylum seekers furthers the purposes of the
INA.  As the Ninth Circuit observed in *East Bay II*, the INA includes provisions designed "to
ensure that pro bono legal services of the type that the [organizational plaintiffs] provide are
available to asylum seekers." *East Bay II*, 909 F.3d at 1245.  Most notably, Congress required
that, "[a]t the time of filing an application for asylum, the Attorney General shall . . . advise the
alien of the privilege of being represented by counsel and of the consequences . . . of knowingly
filing a frivolous application for asylum" and shall "provide the alien a list of persons (updated
not less often than quarterly) who have indicated their availability to represent aliens in asylum
proceedings on a pro bono basis." 8 U.S.C. § 1158(d)(4).  In expedited removal proceedings
involving aliens convicted of certain crimes, moreover, Congress directed that the Attorney

General take steps "to ensure that the alien's access to counsel and right to counsel . . . are not impaired" due to the alien's place of detention, 8 U.S.C. § 1228(a)(2), and to provide that "the alien shall have the privilege of being represented (at no expense to the government) by counsel" in removal proceedings, 8 U.S.C. § 1228(b)(4)(B).  In addition, the INA guarantees that aliens in "removal proceedings before an immigration judge and in any appeal proceedings before the Attorney General from any such removal proceedings . . . shall have the privilege of being represented (at no expense to the [g]overnment) by . . . counsel[] authorized to practice in such proceedings."  8 U.S.C. § 1362; see also id. § 1101(i)(1) (requiring that potential T visa applicants be referred to nongovernmental organizations for legal advice); id. § 1184(p)(3)(A) (same for U visas).

The Court, accordingly, concludes that the interests that the organizational plaintiffs seek to protect are at least "arguably" within the zone of interests protected by the INA and that, as a result, the organizational plaintiffs' claims satisfy the zone of interests test.[14]

   b.  Individual Plaintiffs

There is no doubt that asylum is a valuable form of relief from removal and that it affords the asylee benefits above and beyond avoiding removal, including, most notably, a path to lawful

---

[14]  Neither *INS v. Legalization Assistance Project of the L.A. Cty. Fed'n of Labor* ("*LAP*"), 510 U.S. 1301, 1305 (1993) (O'Connor, J., in chambers) nor *Fed'n for Am. Immigration Reform, Inc. v. Reno* ("*FAIR*"), 93 F.3d 897, 900–04 (D.C. Cir. 1996), Dkt. 31 at 34, supports a contrary conclusion.  Justice O'Connor's in chambers opinion in *LAP* reflects the views of a single Justice relating to a different statute, IRCA.  *FAIR*, too, is inapposite.  The organization at issue in that case was "dedicated to ensuring that levels of legal immigration are consistent with the absorptive capacity of the local areas where immigrants are likely to settle," and it brought suit challenging the INA's scheme for "parole and adjustment of status of Cuban nationals" into the United States.  *FAIR*, 93 F.3d at 899 (internal quotation omitted).  The D.C. Circuit held that the organization's mission bore no more than a "marginal[] rela[tionship]" to the statutory purposes of the INA, because it pointed to no language of congressional intent that "even hint[ed] at a concern about regional impact" of immigration.  *Id.* at 900–01.

permanent resident status and citizenship.  Nor is there any doubt that the Rule, by definition,

applies to each of the individual plaintiffs and that it, by definition, would render each of the

plaintiffs categorically ineligible for asylum.  *See Lujan*, 504 U.S. at 561–62 (holding that "there

is ordinarily little question" that a plaintiff has standing if she herself is "an object of the

action . . . at issue").  And while it is not the Court's role to adjudicate the individual plaintiffs'

claims to asylum—and the Court will not do so—each has submitted a declaration setting forth

facts sufficient to state a plausible claim to asylum.  *See, e.g.*, Dkt. 51-2 (O.A. Decl.); Dkt. 51-4

(A.V. Decl.); Dkt. 51-6 (G.Z. Decl.); Dkt. 51-8 (D.S. Decl.); Dkt. 51-10 (D.R. Decl.); Dkt. 51-11

(P.R. Decl.); Dkt. 51-12 (G.R. Decl.); Dkt. 6-3 (S.M.S.R. Decl.), *S.M.S.R. et al. v. Trump et al.*

(No. 18-2838); Dkt. 6-4 (R.S.P.S. Decl.), *S.M.S.R. et al. v. Trump et al.* (No. 18-2838); Dkt. 52-3

(L.C.V.R. Decl.); Dkt. 52-4 (R.G.G. Decl.); Dkt. 52-5 (A.J.A.C. Decl.); Dkt. 52-6 (K.P.P.V.

Decl.); Dkt. 52-7 (Y.A.L.P. Decl.).  That is enough to establish an injury in fact that is fairly

traceable to the challenged Rule and that would be redressed by the invalidation of the Rule.  *See*

*Lujan*, 504 U.S. at 560–61.

Defendants disagree, arguing that because of the *East Bay* preliminary injunction, "the

challenged rule has not been applied to" any of the individual plaintiffs and that, at least as long

as the preliminary injunction remains in place, the individual plaintiffs "cannot show any

possibility of imminent injury."  Dkt. 66 at 25.  Although the government's appeal of the

preliminary injunction is pending, Defendants contend that the "hypothetical future vacation of

the [*East Bay*] injunction is inadequate" to establish the possibility of imminent injury.  Dkt. 76

at 16.  That is incorrect.  As the Supreme Court has held, preliminary injunctive relief does not

defeat Article III standing; the relief is by definition temporary, leaving the threat of future injury

in place. *See Preap*, 139 S. Ct. at 963 (plurality opinion) ("Unless that preliminary injunction was made permanent and was not disturbed on appeal, [plaintiffs] faced the threat of [injury].").

That threat of future injury, moreover, is apparent here:  the President himself has confirmed by proclamation that "[t]he United States is appealing th[e] [preliminary] injunction," and, "[s]hould the injunction be lifted, aliens who enter the United States unlawfully through the southern border in contravention of this proclamation will be ineligible to be granted asylum under th[e] interim final rule."  84 Fed. Reg. at 3,665; 84 Fed. Reg. at 21,230.  At oral argument, moreover, the Court asked counsel for Defendants whether the government would revisit the positive credible fear determinations made for some, but not all, of the individual plaintiffs if the Rule is allowed to take effect, and counsel declined to provide the Court or Plaintiffs with any assurances.  Dkt. 79 at 59–60 (May 29, 2019 Hrg. Tr.) ("I don't have a firm answer on that, I'm going to leave the government's options open.").  Indeed, counsel went a step further and left the government's options open to *revoke* the grant of asylum obtained by one of the individual plaintiffs.  *Id.* at 60 (May 29, 2019 Hrg. Tr.) ("Again, same response, your Honor, I have to wait and see.").  More importantly, the Rule itself declares in categorical terms that "an alien shall be ineligible for asylum if the alien is subject to" the Proclamation.  83 Fed. Reg. at 55,952; 8 C.F.R. § 208.13.  As a result, if the Rule is allowed to take effect, each of the individual plaintiffs will be "ineligible" for asylum, regardless of whether they have been subject to a credible fear interview, have obtained an initial credible fear determination, or (perhaps) have even been granted asylum.  *See, e.g.*, 8 U.S.C. § 1158(c)(2)(A) ("Asylum granted under subsection (b) does not convey a right to remain permanently in the United States and may be terminated if the Attorney General determines that . . . the alien no longer meets the conditions described in subsection (b)(1) owing to a fundamental change in circumstances.").

Defendants also press this same point in a different way, arguing that the *East Bay* injunction "has, in effect, provided Plaintiffs with the full relief they seek from this Court." Dkt. 66 at 40.  But, regardless of whether this issue is best considered as one of standing or mootness, the Court is unconvinced.  Although the *East Bay* court had entered a temporary restraining order at the time the *O.A.* and *S.M.S.R* suits were commenced, that court did not enter the existing preliminary injunction until December 19, 2018, *see East Bay III,* 354 F. Supp. 3d at 1102—after the original and amended complaints were filed in this case.  *See* Dkt. 1 (*O.A.* Compl.); Complaint, *S.M.S.R.*, No. 18-2838 (D.D.C. Dec. 3, 2018), Dkt. 3; Dkt. 39 (*S.M.S.R.* Amend. Compl.); Dkt. 40 (*O.A.* Amend. Compl.).  To carry their "heavy" burden of establishing that Plaintiffs' claims have been mooted by the *East Bay* preliminary injunction, *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953), Defendants must show that "there is no reasonable expectation . . . that the alleged violation will recur" and that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *ABA v. FTC*, 636 F.3d 641, 648 (D.C. Cir. 2011) (internal quotation omitted).  Far from doing so, Defendants have appealed the *East Bay* preliminary injunction and have preserved the "option" to apply the Rule to all of the individual plaintiffs.

## B.    Merits

That all amounts to a very long backstroke for a relatively short putt.  Plaintiffs challenge the Rule on a variety grounds, several of which have considerable force.  The Court need only consider the first of Plaintiffs' challenges, however, because it is sufficient to resolve the case.  That challenge boils down to one question:  Is the Rule, which renders all aliens who enter the United States across the southern border after November 9, 2018, *except at a designated port of entry*, ineligible for asylum, consistent with 8 U.S.C. § 1158(a)(1), which provides that "[a]ny alien who is physically present in the United States or who arrives in the United States (*whether*

*or not at a designated port of arrival . . .* ), irrespective of such alien's status, may apply for

asylum"?  According to Plaintiffs, the inconsistency between the Rule and statute is self-evident.

According to Defendants, the Rule is consistent with the statute because a bar on "eligibility" for

asylum (as specified in the Rule) is different than a bar on "applying" asylum (as precluded by

the statute).  For the reasons explained below, the Court agrees with Plaintiffs and concludes that

Defendants' reading of the statute is untenable.

Neither party explicitly invokes the familiar *Chevron* framework and, for present

purposes, the Court need not decide whether *Chevron* applies to an interim final rule which lacks

the benefit of public comment, *see United States v. Mead Corp.*, 533 U.S. 218, 230–31 (2001)

(while notice and comment is "significant . . . in pointing to *Chevron* authority, the want of that

procedure . . . does not decide the case," as courts "have sometimes found reasons for *Chevron*

deference even when no such administrative formality was required and none was afforded"), or

whether *Chevron* deference was forfeited here, *see Neustar, Inc. v. Fed. Commc'ns Comm'n*, 857

F.3d 886, 893–94 (D.C. Cir. 2017) ("The [government's] brief nominally references *Chevron*'s

deferential standard in its standard of review but did not invoke this standard with respect to

rulemaking.  Consequently, it has forfeited any claims to *Chevron* deference.").  Rather, "[t]he

judiciary is the final authority on issues of statutory construction and must reject administrative

constructions," like that at issue here, "which are contrary to clear congressional intent."

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984).

The Court, moreover, need not pause over the fact that presidential actions are not

themselves subject to APA review, *see Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992),

because it is the Rule, and not the Proclamation, that has operative effect, *see Chamber of

Commerce v. Reich*, 74 F.3d 1322, 1326 (D.C. Cir. 1996) (finding regulations that implement an

executive order are reviewable under the APA).  The fact that the Rule defines those who are ineligible for asylum by reference "to a presidential proclamation or other presidential order" may raise separate problems with the Rule, *see* Dkt. 39 at 57–58 (*S.M.S.R.* Amend. Compl. ¶ 263); Dkt. 40 at 34–35 (*O.A.* Amend. Compl. ¶¶ 124–127), but it does not insulate the Rule from APA review or even purport to transfer the statutory authority to establish—"by regulation"—additional limitations on asylum from the Attorney General and the Secretary of Homeland Security to the President.

The Court starts, once again, with the statutory text, *see Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016), and "must enforce plain and unambiguous statutory language according to its terms," *Hardt v. Reliance Standard Life Ins. Co*., 560 U.S. 242, 251 (2010).  As the Supreme Court "ha[s] stated time and again[,] . . . courts must presume that a legislature says in a statute what it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'"  *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)) (citations omitted).  The words of the statute, moreover, must be "placed in context," *FDA v. Brown & Williamson Tobacco Corp*., 529 U.S. 120, 132 (2000), and must be read "with a view to their place in the overall statutory scheme," *id.* at 133 (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)).

The language at issue here was enacted as part of IIRIRA in 1996.  Prior to that time, the relevant provision of the INA merely required the Attorney General to establish "a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum."  8 U.S.C. § 1158(a) (1980).  In its current form, § 1158(a)(1) now provides:

> Any alien who is physically present in the United States or who arrives in the United States (*whether or not at a designated port of arrival* and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title.

8 U.S.C. § 1158(a)(1) (emphasis added).  The other paragraph relevant to the present dispute was also introduced in IIRIRA, and it provides:

> The Attorney General [and now the Secretary of Homeland Security] may by regulation establish additional limitations and conditions, *consistent with this section*, under which an alien shall be ineligible for asylum under paragraph (1).

8 U.S.C. § 1158(b)(2)(C) (emphasis added).  All agree that a regulation barring all aliens who enter the United States from Mexico outside a designated port of entry from *applying* for asylum would be "inconsistent with" § 1158(a)(1) and, thus, *ultra vires*.  But, according to the government, that is not what the Rule does.  Instead, it treats those aliens as *ineligible* for asylum.  And, in its view, "the instruction that aliens '*may apply*' for asylum regardless of whether they entered at a port of entry does not require that an alien *must be eligible* for or be able to 'receive' asylum."  Dkt. 66 at 42 (emphasis added).

As a matter of plain language, the government's distinction is, to say the least, a fine one.  The word "ineligible" means "legally or officially unable to be considered for a benefit." *Ineligible*, Oxford English Dictionary, https://www.lexico.com/en/definition/ineligible (last visited Aug. 2, 2019).  Defendants never explain, nor could they, how that differs from "legally or officially unable to apply for a benefit."  Whether framed as a restriction on who may apply or on who is eligible, the government must consider whether the restriction at issue is applicable; provide the alien with some opportunity to be heard; and render a decision, which is then subject to review by an immigration judge.  8 U.S.C. 1225(b)(1)(B)(iii)(III); 8 C.F.R. §§ 208.13, 208.14.  As a matter of common usage, no one would draw a meaningful distinction, for example,

between a rule providing that children may not apply for a driver's license and one providing that children are not eligible to receive a driver's license. Both locutions mean the same thing.

Moreover, even if one might hypothesize *some* circumstance in which the phrases "may not apply" and "are ineligible" do not mean the same thing, this is not such a case. Under the government's theory, § 1158 is divided into two discrete realms. Section 1158(a), which includes the right to apply for asylum "whether or not" the applicant arrived in the United States "at a designated port of arrival," defines who may—and who may not—"apply" for asylum, while § 1158(b), which includes the Attorney General and Secretary of Homeland Security's authority to promulgate regulations "consistent with" § 1158, defines who is—and who is not— "eligible" for asylum. But that purported distinction is at odds with the Rule itself, as well as the Department of Homeland Security's implementing regulations. As the Rule explains, in the context of expedited removal proceedings, an asylum officer must "ask *threshold* questions to elicit whether an alien is ineligible for a grant of asylum pursuant to [the] proclamation bar," and if "an alien lacks a significant possibility of eligibility" under the bar, the asylum officer must make a negative credible fear determination. 83 Fed. Reg. at 55,944 (emphasis added). The asylum officer is charged with going on to determine whether the alien is "subject to one or more of the mandatory bars to applying for, or being granted, asylum contained" in § 1158(a) (who may apply) or § 1158(b) (who is eligible) only "if [the] alien" clears the credible fear hurdle. 8 C.F.R. § 208.30(e)(5)(i)–(ii). In other words, under Defendants' theory, asylum officers must decide whether an alien is "eligible" for asylum before deciding whether he may "apply." That result is unproblematic if the terms are even roughly synonymous; it makes no sense if the right to apply is viewed as a step precedent to consideration of the alien's eligibility.

Other regulatory provisions confirm that the government itself treats the "bars *to applying for,* or *being granted,* asylum" as interchangeable.  8 C.F.R. § 208.30(e)(5)(i) (emphasis added).  Thus, in addition to § 208.30(e)(5), § 208.13(c), which the Rule also amends, provides that "an applicant shall not qualify for asylum if" § 1158(a)(2) (who may apply) or § 1158(b)(2) (who is eligible) "applies to the applicant."  8 C.F.R. § 208.13(c)(1).  Notably, in the government's own words, if the applicant fails to "qualify" under *either* paragraph of § 1158, he shall be "found to be *ineligible* for asylum."  *Id*. (emphasis added) ("If the applicant is found to be ineligible for asylum under either" § 1158(a)(2) or § 1158(b)(2)).  Against this regulatory backdrop, the distinction Defendants would have the Court draw between limitations on who may apply and who is eligible for asylum not only "strains credulity," *East Bay I*, 349 F.3d at 857, but snaps it.

But the Court need not go that far to conclude that the Rule is contrary to law.  Even assuming that the phrases "may not apply" and "are ineligible" reflect some subtle distinction in meaning, the relevant question is not whether the Rule uses the exact same words as in the statutory prohibition.  The question, instead, is whether the Rule is "consistent with," 8 U.S.C. § 1158(b)(2)(C), the statutory mandate that any alien present in the United States "may apply for asylum," regardless of "whether or not" the alien entered the United States "at a designated port of arrival," 8 U.S.C. § 1158(a)(1).  Defendants do not even attempt to satisfy that test, nor could they.  As the Ninth Circuit put it, "[t]he technical differences between applying for and eligibility for asylum are of no consequence to a refugee when the bottom line—no possibility of asylum— is the same."  *East Bay II*, 909 F.3d at  1247–48.  Or to continue the analogy started above, a regulation making all sixteen-year-olds "ineligible" to obtain a driver's license is not, by any logic, *consistent with* a statute providing that any sixteen-year-old may "apply" for a driver's license.  The statute might not mean that all sixteen-year-olds should receive a license.  It might

not mean that the motor vehicle administration is precluded from considering the age or maturity

of an applicant, along with other factors.  But a categorical bar on "eligibility" for all sixteen-

year-olds is not "consistent with" a statutory right to "apply" for a driver's license at sixteen.

Turning, again, to the dictionary, "consistent" means "compatible or in agreement with."

*Consistent*, Oxford English Dictionary, https://www.lexico.com/en/definition/consistent (last

visited Aug. 2, 2019).  The Rule's direction that "an alien shall be ineligible for asylum" if the

alien entered the United States outside a designated port of entry is not "compatible" with the

congressional mandate that all aliens present in the United States may "apply" for asylum,

regardless of whether they entered the United States at a designated port of entry.[15]

　　　None of Defendants' counterarguments are persuasive.  Defendants first invoke the final

clause of § 1158(a)(1), which qualifies an alien's right to apply for asylum with the condition

that the alien must do so "in accordance with this section or, where applicable, section 1225(b)

of" the INA.  Dkt. 76 at 18.  In Defendants' view, this qualification "makes clear that an

individual's ability to apply for asylum is always subject to the discretion afforded to the

Attorney General and the Secretary of Homeland Security to determine asylum eligibility."  *Id.*

---

[15]  Because the statutory text is plain, the Court need not consider whether Defendants'
interpretation is at odds with the established purpose of § 1158 and the *Charming Betsy* canon of
statutory interpretation, *see Schooner Charming Betsy*, 6 U.S. (2 Cranch) at 118.  Nor is the
Court persuaded by Defendants' effort to reconcile their position with the relevant treaty
background.  In particular, Defendants contend that Article 31 of the 1951 Convention applies
only to penalties imposed on account of illegal entry by a refugee "coming directly from a
territory where their life or freedom was threatened."  Dkt. 22 at 37 (quoting Article 31(1), 19
U.S.T. at 6275).  In Defendants' view, that prohibition does not apply here because the
individual plaintiffs in this action—who seek asylum from Honduras, El Salvador, Nicaragua,
and Guatemala—came to the United States through Mexico.  *Id.*  But, even if Defendants were
correct that Article 31 is so limited—and that proposition is subject to dispute—the path to the
United States followed by the individual plaintiffs *in this case* says nothing about *what that
statute means*.  Rather, the phrase "may apply" must have the same meaning regardless of
whether the alien is seeking asylum from Mexico or from Honduras.

But that construction of the statute turns the relevant allocation of authority on its head. Congress has defined who may apply for asylum, specifying that "[a]ny alien who is physically present in the United States" may do so, regardless of "whether or not" the alien arrived "at a designated port of arrival."  8 U.S.C. § 1158(a)(1).  Congress also granted the Attorney General and the Secretary of Homeland Security authority to promulgate regulations establishing "additional limitations and conditions" on eligibility for asylum, but only to the extent "*consistent with*" § 1158.  *Id.* § 1158(b)(2)(C) (emphasis added).  As a result, if any incongruity exists between the terms of the statute and a regulation, the statutory text prevails—not vice versa.

Next, Defendants dispute that the Rule is "predicated upon the manner of an alien's entry pe se" and argue, instead, that it turns on "whether an alien has contravened a Presidential proclamation concerning a particular crisis at the southern border at a particular time."  Dkt. 31 at 38.  This matters, according to Defendants, because "[a]liens who contravene such a measure have not merely violated the immigration laws, but have also undercut the efficacy of a measure adopted by the President based on his determination of the national interest in matters that could have significant implications for the foreign affairs of the United States."  83 Fed. Reg. at 55,940.  The Court does not doubt that the Proclamation reflects a determination by the President that the influx of aliens entering the United States across the southern border outside the designated ports of entry poses a "particular problem for the national interest."  Dkt. 41 at 93 (Dec. 17, 2018 Hrg. Tr.).  But that assessment is neither sufficient to override a statutory mandate permitting all aliens present in the United States to apply for asylum, regardless of whether they arrived in the United States "at a designated port of arrival," 8 U.S.C. § 1158(a)(1); *see Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), nor does it suffice to shift the

congressional assignment of authority to adopt additional limitations on asylum "by regulation" from the Attorney General and the Secretary of Homeland Security to the President.  The authority that the Attorney General and the Secretary of Homeland Security have invoked in support of the Rule is their authority to promulgate regulations "consistent with" § 1158, 8 U.S.C. § 1158(b)(2)(C), and they cannot sidestep the statutory restriction on *their* authority by invoking a presidential proclamation that is not premised on any authority to alter or supplant the rules that Congress specified in § 1158.

Finally, Defendants argue that the government has, "for decades, considered whether an alien unlawfully entered the country in issuing discretionary asylum denials." Dkt. 31 at 36. The principal BIA decision upon which they rely, however, *Matter of Pula*, 19 I. & N. Dec. 467 (BIA 1987), was decided almost a decade before Congress amended § 1158(a)(1) in IIRIRA to include the critical language ("whether or not at a designated port of arrival") upon which Plaintiffs rely.  Nor does that decision sweep as broadly as Defendants suggest.  True, *Pula* recites that "an alien's manner of entry or attempted entry is a proper and relevant discretionary factor to consider in adjudicating asylum applications."  *Id.* at 473.  In *Pula*, however, the "manner of entry" was through the use of "a fraudulent document," raising concerns unlike those at issue here.  *Id*. at 474.  But even putting that distinction aside, there is a vast difference between considering how the alien entered the United States as one, among many, factors in the exercise of a discretionary authority, and a categorial rule that disqualifies any alien who enters across the southern border outside a designated port of entry.  Returning, once again, to our teenaged drivers, one might plausibly argue that it is permissible to consider a sixteen-year-old's age, among other factors, in deciding whether she should receive a driver's license.  But it is

something altogether different to maintain that no sixteen-year-old may receive a driver's license, notwithstanding a statutory entitlement to apply for a license at age sixteen.

Because the Interim Final Rule exceeds the authority that Congress conferred on the Attorney General and the Secretary of Homeland Security to "establish additional limitations and conditions" on asylum that are "consistent with" § 1158, 8 U.S.C. § 1158(b)(2)(C), the Rule is "not in accordance with law" and "in excess of statutory . . . authority," 5 U.S.C. § 706(2)(A), (C). Having concluded that the Rule is, therefore, "unlawful" within the meaning of the APA, *id.* § 706(2), the Court need not reach Plaintiffs' remaining substantive and procedural challenges to the lawfulness of the Rule.

## C.  Remedy

This brings the Court to the question of remedy. The *S.M.S.R.* Plaintiffs urge the Court to issue "a declaration that the Rule is unlawful and an injunction prohibiting its enforcement against each member of the proposed class." Dkt. 72 at 34. The *O.A.* Plaintiffs, likewise, argue that Plaintiffs are entitled to "[n]ationwide [r]elief," contending that "there is nothing unusual about a court issuing an injunction that provides Plaintiffs complete relief and also prevents the [g]overnment from harming other similarly situated individuals." Dkt. 73 at 29–31. Defendants disagree, arguing that "Article III and equitable principles require that relief be no broader than necessary to redress the Plaintiffs' injuries" and that "a plaintiff's remedy must be tailored to redress the plaintiff's particular injury." Dkt. 66 at 65 (quotation omitted). Relying on Justice Thomas's concurrence in *Trump v. Hawaii*, Defendants contend that "[n]ationwide injunctions . . . 'take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch.'" Dkt. 66 at 66 (quoting 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring)). Thus, according to Defendants, "this Court has

the authority to grant only declaratory relief[] and must limit the relief to remedying only the

particular harms alleged by the specific plaintiffs properly before it—that is, a challenge to

implementation of Section 1225(b)(1) by the sole Plaintiff subject to an expedited removal order,

A.V." *Id.* at 67.

Neither Plaintiffs' nor Defendants' view of the appropriate remedy is persuasive.

In several recent cases, the propriety of nationwide injunctive relief has been front and

center. *See*, *e.g.*, *Trump v. Hawaii*, 138 S. Ct. at 2423; *City of Chicago v. Sessions*, 888 F.3d

272, 293 (7th Cir. 2018); *NAACP v. Trump*, 315 F. Supp. 3d 457, 474 n.13 (D.D.C. 2018); *see*

*also* Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L.

Rev. 417 (2017); Zayn Siddique, *Nationwide Injunctions*, 117 Colum. L. Rev. 2095 (2017).

This, however, is not such a case, because the APA and controlling D.C. Circuit precedent

dictate the proper remedy. For the reasons explained above, the Court has concluded that the

Interim Final Rule is both "contrary to law" and was adopted "in excess of statutory . . .

authority," 5 U.S.C. § 706(2)(A), (C). Under these circumstances, the APA mandates that the

Court "shall" "set aside" the challenged "agency action." *Id*. § 706. That is, under the plain

language of the APA, the Court must "annul or vacate" the agency's action. *See Set Aside*,

Black's Law Dictionary (10th ed. 2014).

That reading of the APA is consistent with longstanding and consistent practice in this

circuit. *See*, *e.g.*, *Humane Soc'y of United States v. Zinke*, 865 F.3d 585, 614 (D.C. Cir. 2017)

("A common remedy when we find a rule is invalid is to vacate."); *Blue Water Navy Viet.*

*Veterans Ass'n, Inc. v. McDonald*, 830 F.3d 570, 578 (D.C. Cir. 2016) ("vacatur is the 'normal

remedy'") (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014));

*Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002) ("Normally

when an agency . . . clearly violates the APA we would vacate its action.").  To be sure,

decisions in this circuit have, on occasion, remanded a rule without vacatur, *see Allied–Signal,*

*Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993), but

Defendants cite no authority suggesting that any remedy short of vacatur is appropriate here, nor

have they even requested remand without vacatur.  *Cf. Milk Train, Inc. v. Veneman*, 310 F.3d

747, 757 (D.C. Cir. 2002) (Sentelle, J., dissenting) (positing that vacatur is always required);

*Checkosky v. SEC*, 23 F.3d 452, 491 (D.C. Cir. 1994) (Randolph, J., concurring) (same).

 To the extent Defendants argue that the vacatur remedy should be limited to the plaintiffs

in this case, that contention is both at odds with settled precedent and difficult to comprehend.

The D.C. Circuit has "made clear that '[w]hen a reviewing court determines that agency

regulations are unlawful, the ordinary result is that the rules are vacated—*not that their*

*application to the individual petitioners is proscribed.*'" *Nat'l Mining Ass'n*, 145 F.3d at 1409

(quoting *Thornburgh*, 878 F.2d at 495 n.21) (emphasis added).  As the D.C. Circuit explained in

that decision, "Justice Blackmun made a similar observation in *Lujan v. National Wildlife*

*Federation*, 497 U.S. 871 (1990), writing in dissent but apparently expressing the view of all

nine Justices on th[e] question."  *Nat'l Mining Ass'n*, 145 F.3d at 1409.  Justice Blackmun wrote:

> The Administrative Procedure Act permits suit to be brought by any person
> "adversely affected or aggrieved by agency action."  In some cases the "agency
> action" will consist of a rule of broad applicability; and if the plaintiff prevails,
> the result is that the rule is invalidated, not simply that the court forbids its
> application to a particular individual.  Under these circumstances a single
> plaintiff, so long as he is injured by the rule, may obtain "programmatic" relief
> that affects the rights of parties not before the court.  On the other hand, if a
> generally lawful policy is applied in an illegal manner on a particular occasion,
> one who is injured is not thereby entitled to challenge other applications of the
> rule.

*Lujan*, 497 U.S. at 913 (Blackmun, J., dissenting).  As understood by the D.C. Circuit in

*National Mining Association*, this view was shared by the three Justices who joined Justice

Blackmun's dissent, and by the majority, which observed that a final agency action may "be challenged under the APA by a person adversely affected—and the entire [agency program], insofar as the content of that particular action is concerned, would thereby be affected." *Id.* at 890 n.2; *see also Nat'l Mining Ass'n*, 145 F.3d at 1409 (citing same).

Even without this controlling precedent, moreover, the Court would be at a loss to understand what it would mean to vacate a regulation, but only as applied to the parties before the Court. As a practical matter, for example, how could this Court vacate the Rule with respect to the organizational plaintiffs in this case without vacating the Rule writ large? What would it mean to "vacate" a rule as to some but not other members of the public? What would appear in the Code of Federal Regulations? Fortunately, the Court need not engage in such logical gymnastics because the language of the APA and the controlling D.C. Circuit precedent are unambiguous. The Court, accordingly, concludes that the proper remedy is to set the Rule aside, and the legal consequences of that result are not limited "to the individual" plaintiffs. *Nat't Mining Ass'n*, 145 F.3d at 1409.

That leaves the question whether issuance of an injunction is also warranted. The Supreme Court has cautioned that a district court vacating an agency action under the APA should not issue an injunction unless doing so would "have [a] meaningful practical effect independent of its vacatur." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). This is because "[a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course" or where "a less drastic remedy . . . [is] sufficient to redress" the plaintiffs' injury. *Id.* At least on the present record, this is such a case. Defendants have represented that they will abide by the Court's order, Dkt. 79 at 78 (May 29, 2019 Hrg. Tr.), and Department of Justice guidance regarding vacatur under the APA provides that the "Department

litigators should" comply "with circuit precedent," including the D.C. Circuit's decision in

*National Mining Association*, 145 F.3d 1399 (D.C. Cir. 1998), *see* Memorandum from the

Attorney General to Heads of Civil Litigating Components (Sept. 13, 2018),

https://www.justice.gov/opa/press-release/file/1093881/download (last visited Aug. 2, 2019).

Those assurance are sufficient under the present circumstances.  Plaintiffs are free, however, to

return to the Court for further relief if warranted.

*   *   *

The Court, accordingly, will vacate the Rule but will decline Plaintiffs' request that the

Court enter an injunction.

**D.      Class Certification**

Finally, the Court must consider whether to grant Plaintiffs' motions for class

certification.[16]  The question of class certification arises in an unusual posture in this case

because the Court directed that the parties brief the merits on an expedited basis (to obviate the

need for further litigation on Plaintiffs' motions for preliminary relief) and because the parties

consolidated their briefing on class certification with the merits.  It is also unclear that class

certification will serve any significant purpose, given the Court's decision on the merits and the

relief that the Court has already ordered.  But, because the law is unsettled on whether the Court

may, in its discretion, decline to certify a class (or may decline to decide whether to certify a

---

[16]  Although mindful of the fact that Rule 23(c)(1) directs courts to resolve class certification
motions "[a]t an early practicable time," Fed. R. Civ. P. 23(c)(1)(A), the Court notes that the rule
grants district courts "great discretion in determining the appropriate timing for such a ruling."
*Hyman v. First Union Corp.*, 982 F. Supp. 8, 11 (D.D.C. 1997); *see also* 7A Charles Alan Wright
*et al.*, *Federal Practice & Procedure* § 1785.3 (3d ed. Sept. 2018) ("The time at which the court
finds it appropriate to make its class-action determination may vary with the circumstances of the
particular case.").  Thus, district courts are not required to decide class certification issues before
ruling on the merits.

class) based on these prudential considerations, and because class certification could have some

bearing on future proceedings in this matter, the Court will resolve the pending motions.

*Compare Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co*., 559 U.S. 393, 398–400

(2010) (Rule 23 "says that if the prescribed preconditions are satisfied '[a] class action *may be*

*maintained*' (emphasis added)—not "a class action *may be permitted*."  Courts do not maintain

actions; litigants do.") *with* Tobias Barrington Wolff, *Discretion in Class Certification*, 162 U.

Pa. L. Rev. 1897, 1900 (2014) ("The Court did not indicate that it was effecting any radical

change [in *Shady Grove*], nor did it acknowledge any need to harmonize its assertion with the

decades of federal judicial holdings recognizing the discretion of district courts in matters

relating to class certification."); *see also Mills v. District of Columbia*, 266 F.R.D. 20, 22

(D.D.C. 2010) (declining to certify class because declaration that statute was facially

unconstitutional already provided complete relief to putative class members).

To proceed on behalf of a class, a plaintiff or group of plaintiffs must clear two hurdles.

First, the putative class representatives must show that "(1) the class is so numerous that joinder

of all members is impractical; (2) there are questions of law or fact common to the class; (3) the

claims or defenses of the representative parties are typical of the claims or defenses of the class;

and (4) the representative parties will fairly and adequately protect the interests of the class."

Fed. R. Civ. P. (23)(a).  These four "prerequisites," *DL v. District of Columbia*, 860 F.3d 713,

723 (D.C. Cir. 2017), are referred to as numerosity, commonality, typicality, and adequacy of

representation, *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* 133 S. Ct. 1184, 1191 (2013).

Second, the "plaintiffs must then demonstrate that their proposed class falls into one of the

categories of class actions listed in Rule 23(b)." *DL*, 860 F.3d at 723.  As relevant here, Rule

23(b)(2) applies if "the party opposing the class has acted or refused to act on grounds that apply

generally to the class, so that final injunctive relief or corresponding declaratory relief is

appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).  Because "[t]he class

action is 'an exception to the usual rule that litigation is conducted by and on behalf of the

individual named parties only,'" *Comcast Corp. v. Behrend*, 589 U.S. 27, 33 (2013)

(quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)), the party seeking class treatment

"must affirmatively demonstrate . . . compliance" with Rule 23, *Wal-Mart Stores, Inc. v. Dukes*,

564 U.S. 338, 351 (2011).

    1.    *Rule 23(a) and (b)*

    Here, the four "prerequisites" contained in Rule 23(a) are readily satisfied.  First,

Defendants do not dispute—nor could they—that the proposed class, which consists of "[a]ll

noncitizen asylum-seekers who have entered or will enter the United States through the southern

border but outside ports of entry after November 9, 2018," Dkt. 51 at 21–22; Dkt. 52 at 1–2,

satisfies the numerosity requirement.  To meet this requirement, Plaintiffs need not clear any

"specific threshold," although "courts in this jurisdiction have observed that a class of at least

forty members is sufficiently large to meet this requirement." *Taylor v. D.C. Water & Sewer*

*Auth.*, 241 F.R.D. 33, 37 (D.D.C. 2007).  Plaintiffs may satisfy the requirement, moreover, by

supplying estimates, rather than a precise number, of putative class members*, see Pigford v.*

*Glickman*, 182 F.R.D. 341, 347–48 (D.D.C. 1998), "so long as there is a reasonable basis for the

estimate provided," *Kifafi v. Hilton Hotels Ret. Plan*, 189 F.R.D. 174, 176 (D.D.C. 1999).

Relying on statistics available in the Administrative Record, Plaintiffs reasonably estimate that

the class consists of "thousands of migrants who have crossed and will cross the United States'

southern border outside ports of entry." Dkt. 52-1 at 16.  That is sufficient to satisfy the

numerosity requirement.

The second and third requirements, commonality and typicality, often overlap.  The second requirement is satisfied if "there are questions of law or fact common to the class," Fed. R. Civ. P. 23(a)(2), and the third is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of class," Fed. R. Civ. P. 23(a)(3).  The commonality requirement is satisfied if class members' claims "depend upon a common contention" that "is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350.  The typicality requirement, in turn, demands that the proposed, representative plaintiffs "possess the same interest and suffer the same injury" as the other class members. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982) (internal quotation marks and citations omitted).  "While commonality requires a showing that the members of the class suffered an injury resulting from the defendant's conduct, the typicality requirement focuses on whether the representatives of the class suffered a similar injury from the same course of conduct." *Bynum v. D.C.*, 214 F.R.D. 27, 34 (D.D.C. 2003).  Both requirements are satisfied here.  All members of the proposed class, and all of the proposed class representatives, face the same threat of injury: loss of the right to seek asylum because they entered the United States across the southern border after November 9, 2018, outside a designated port of entry.  All challenge the same Rule on the same grounds, and all seek the same remedy—invalidation of the Rule.  Finally, all have the same interest in this Court's judgment and will likely share an interest in any further relief they might subsequently decide to seek.

Defendants disagree, arguing that "the proposed class includes disparate groups of persons whose statutory and constitutional rights are distinct . . . and thus would be affected by the Rule differently."  Dkt. 66 at 60–61.  The Court is unpersuaded.  Unlike in *Dukes*, where the

Supreme Court reasoned that no "glue" held together each of the purported acts of discrimination alleged by a class of women, 564 U.S. at 352, Plaintiffs and the putative class members share an identical interest in the invalidation of the Rule and in enforcing this Court's decision. Commonality is satisfied where there is "a uniform policy or practice that affects all class members," *DL*, 713 F.3d at 128, and that principle applies with equal force to the typicality requirement. Because the Rule exposes all putative class members and all named Plaintiffs to the same deprivation of their statutory right to seek asylum, the Court finds that the proposed class satisfies Rule 23(a)'s requirements of commonality and typicality.

Finally, Plaintiffs also satisfy Rule 23(a)'s adequacy of representation requirement. This requirement imposes two conditions on plaintiffs seeking to represent a class: first, "the named representative must not have antagonistic or conflicting interests with the unnamed members of the class," and second, "the representative must appear able to vigorously prosecute the interests of the class through qualified counsel." *Twelve John Does v. Disttrict of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997). Here, Defendants challenge only the first of these conditions, arguing that the named representatives "cannot vigorously prosecute the interests of the entire class, which [includes members in] diverse and disparate situations." Dkt. 66 at 63–64. But that argument merely rehashes Defendants' attack on the commonality and typicality of Plaintiffs' claims. To be sure, each individual plaintiff and member of the putative class will have a unique interest in pursuing his or her own claim to asylum. That, however, is not what this case is about. It relates solely to whether the individual plaintiffs and putative class members will have an opportunity to pursue those claims, unencumbered by the Rule's categorical ban.

Although Defendants do not dispute that Plaintiffs' counsel are qualified to represent the class, the Court has considered that question *sua sponte* and concludes that current counsel is

well-qualified to do so.  As shown by the declarations submitted in support of class certification,

current counsel are willing and have the ability vigorously to litigate this case and to protect the

interests of absent class members.  *See* Dkt. 51-13 (Reyes Decl.); Dkt. 51-14 (Vieux Decl.); Dkt.

51-15 (Roth Decl.); Dkt. 52-10 (Govindaiah Decl.); Dkt. 52-11 (Appelbaum Decl.).  The Court,

accordingly, concludes that the adequacy of representation requirement is satisfied.

 The Court also concludes that Plaintiffs have shown that Rule 23(b)(2) is satisfied in this

case.  Rule 23(b)(2) applies if "the party opposing the class has acted or refused to act on

grounds that apply generally to the class, so that final injunctive relief or corresponding

declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  "The

key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy

warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only

as to all of the class members or as to none of them."  *Dukes*, 564 U.S. at 360 (internal quotation

marks and citations omitted).  Rule 23(b)(2) imposes "two requirements: (1) that defendant's

actions or refusal to act are 'generally applicable to the class' and (2) that plaintiffs seek final

injunctive relief or corresponding declaratory relief on behalf of the class."  *Bynum*, 214 F.R.D.

at 37.  Both requirements are satisfied here.  The Rule imposes a categorical ban on asylum

eligibility that is applicable to the named Plaintiffs and to the entire class they seek to represent.

The relief Plaintiffs seek, moreover—a declaration that the Rule is unlawful and an injunction

setting the Rule aside, Dkt. 39 at 68 (*S.M.S.R.* Amend. Compl. Prayer for Relief); Dkt. 40 at 35–

36 (*O.A.* Amend. Compl. Prayer for Relief)—would prevent Defendants from applying the

categorical bar to every member of the proposed class "in one stroke."  *Dukes*, 564 U.S. at 350.

 Echoing their contentions that Plaintiffs have failed to satisfy the commonality,

typicality, and adequacy of representation requirements, Defendants contend that Rule 23(b)(2)

is not satisfied because a single remedy would not serve all members of the putative class.  That

contention, once again, conflates Plaintiffs' challenge to the categorical bar on eligibility for

asylum—which applies equally to all members of the putative class—with each putative member

of the class's unique interest in seeking asylum, which is not at issue in this case.  The relief

Plaintiffs seek is "generally applicable to the class" and is indivisible.  *See Garcia Ramirez v.*

*U.S. Immigration & Customs Enf't*, 338 F. Supp. 3d 1, 48 (D.D.C. 2018) (Rule 23(b) satisfied

where plaintiffs "d[id] not seek a court order mandating any particular outcome with respect to

any particular [individual plaintiff]"); *see also Damus v. Nielsen*, 313 F. Supp. 3d 317, 334–35

(D.D.C. 2018) (Rule 23(b)(2) satisfied where plaintiffs were not asking the court "to remedy

discrete errors in their parole determinations," but rather "only . . . address an alleged systematic

harm"); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 182 (D.D.C. 2015) (Rule 23(b)(2) satisfied

where plaintiffs sought to enjoin ICE from consideration of particular factor in making detention

determination).

The Court, accordingly, concludes that Plaintiffs have satisfied the requirements of Rule

23(a) and (b).  Defendants argue that class certification is nonetheless inappropriate for two

further reasons: (1) the Court allegedly lacks jurisdiction to certify a class, Dkt. 66 at 53–56; and

(2) Plaintiffs' proposed class is purportedly "overbroad and not ascertainable," *id*. at 57–59.

2.    *Jurisdiction to Certify a Class*

Defendants argue that the Court lacks jurisdiction to certify a class for two reasons.  First,

they argue that because "challenges to the Rule must be made either in a petition for review

under 8 U.S.C. § 1252(b)(9) or under the requirements for expedited-removal challenges

provided by 8 U.S.C. § 1252(e)(3)," Dkt. 66 at 53, the Court lacks jurisdiction to certify a class.

That contention, however, merely repeats the jurisdictional arguments that the Court considered,

and rejected, above.  Because § 1252(b)(9) does not govern Plaintiffs' claims, it has no bearing

on class certification.  Defendants are correct, though, that § 1252(e)(1) precludes certification of a class "in any action for which judicial review is authorized" by § 1252(e)(3).  Although the Court has recognized that an argument can be made that § 1252(e)(3) applies to the claims of some of the individual plaintiffs, *see supra* 38–43, the Court has declined to embrace that contention.  But, even if § 1252(e)(1) might apply to the claims of some of the individual plaintiffs, that would at most preclude those plaintiffs from serving as class representatives.  Those plaintiffs who were never placed in expedited removal proceedings would be able to pursue their claims on behalf of the class.

Second, Defendants rely on 8 U.S.C. § 1252(f)(1), which states:

> Regardless of the nature of the action or claim of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter [8 U.S.C. §§ 1221–1232], other than with respect to the application of such provisions to an individual alien against whom proceedings . . . have been initiated.

8 U.S.C. § 1252(f)(1).  Because the Plaintiffs seek injunctive relief in addition to a declaration that the Rule is invalid, and because the Supreme Court has made clear that § 1252(f)(1) bars "classwide injunctive relief against the operation of §§ 1221–123[2]," Dkt. 66 at 54 (quoting *AADC*, 525 U.S. at 481–82), Defendants argue that this provision "dooms" the bid for class certification.  Dkt. 66 at 54.  The Court disagrees.  As initial matter, § 1252(f) applies only to efforts to enjoin the operation of "part IV" of the INA, §§ 1221–1232.  The asylum provision Defendants invoked as authorization to issue the challenged Rule, however, is contained in part II of the INA.  Defendants make no attempt to explain why the Attorney General and the Secretary pf Homeland Security's exercise of authority under 8 U.S.C. § 1158(b)(2)(C) to establish conditions "under which an alien shall be ineligible for asylum under [§ 1158(b)(1)]" would fall under § 1252(f)(1)'s limitation on injunctive relief regarding "the operation of

§§ 1221–123[2]," *AADC*, 525 U.S. at 481–82; *see also Gonzales v. Dep't of Homeland Sec.*, 508 F.3d 1227, 1233 (9th Cir. 2007) ("Section 1252(f)(1) does not prohibit the current injunction because . . . it directly implicates the adjustment of status provision which falls under part V of subchapter II, notwithstanding that a reinstatement proceeding [under part IV] may be a collateral consequence of an unsuccessful adjustment application."); *Catholic Soc. Servs., Inc. v. INS,* 232 F.3d 1139, 1150 (9th Cir. 2000) (en banc) (upholding injunction issued under statutory provision governing adjustment of status, located in part V of the INA).  Although asylum officers are charged with implementing the Rule in expedited removal proceedings, which are authorized in part IV, the relief Plaintiffs seek would not enjoin the operation of removal proceedings.

But, even if Plaintiffs did seek to enjoin the operation of removal proceedings, Defendants' reliance on § 1252(f) would fail.  As the Ninth Circuit held in *Jennings*, and the Supreme Court did not question, § 1252(f) does not affect a lower court's "'jurisdiction over . . . statutory claims because those claims d[o] not 'seek to enjoin the operation of the immigration detention statutes, but to enjoin conduct . . . not authorized by the statutes.'"  138 S. Ct. at 851 (emphasis omitted) (quoting *Rodriguez v. Hayes*, 591 F.3d 1105, 1120 (9th Cir. 2010)).  In other words, "[w]here . . . a petitioner seeks to enjoin conduct that allegedly is not even authorized by the statute, the court is not enjoining the operation of [the statute], and § 1252(f)(1) therefore is not implicated." *Rodriguez,* 591 F.3d at 1120 (internal quotations and citations omitted); *see also Grace v. Whitaker*, 344 F. Supp. 3d 96, 143 (D.D.C. 2018); *Garcia Ramirez*, 338 F. Supp. 3d at 49; *Damus v. Nielsen*, 313 F. Supp. 3d at 328; *R.I.L-R*, 80 F. Supp. 3d at 184.  Where, as here, an injunction would not obstruct the "operation of" a covered provision but merely enjoin conduct that allegedly violates that provision, § 1252(f)(1) poses no bar to relief.

Finally, even if § 1252(f) applied here, and even if it applied to claims that the government has acted in excess of its statutory authority under the INA, it still would not foreclose class treatment because it "only bars injunctive relief," not declaratory relief. *Hamama v. Adducci*, 912 F.3d 869, 878 (6th Cir. 2018) ("[T]here is a big difference between barring the certification of a class under Rule 23 and barring all injunctive relief.  The former bars a *class action* regarding *anything*; the latter only bars *injunctive relief* for anyone other than *individuals*." (emphases in original)); *see also Alli v. Decker*, 650 F.3d 1007, 1013 (3d Cir. 2011) ("[V]iewing the provision in context and then taking into consideration the heading of the provision ['limits on injunctive relief'], it is apparent that the jurisdictional limitations in § 1252(f)(1) do not encompass declaratory relief."); *Rodriguez*, 591 F.3d at 1119 ("It is simply not the case that Section 1252(f) bars Petitioner from receiving declaratory relief on behalf of the class."); *Reid v. Donelan*, No. 13-30125-PBS, 2018 WL 5269992, at *6 (D. Mass. Oct. 23, 2018) (declining to address whether § 1252(f)(1) bars a class-wide injunction because the statute "does not bar classwide declaratory relief, which suffices to satisfy Rule 23(b)(2)").

### 3.     *Ascertainability*

Finally, Defendants argue that because the class "potentially includes all aliens outside the United States and extraterritorial aliens have no right to challenge laws that apply only to those on U.S. soil," Plaintiffs have failed to define an ascertainable class.  Dkt. 66 at 58.  Defendants premise this contention on the theory that "[c]ourts in this Circuit have 'grafted' onto Rule 23 an 'implied' requirement that a court should first determine whether a proposed class is adequately defined such that its members are clearly ascertainable, before reaching the four 'explicit' prerequisites of Rule 23(a)."  *Id*. at 57 (quoting *Brewer v. Lynch*, No. CV 08-1747-BJR, 2015 WL 13604257, at *5 (D.D.C. Sept. 30, 2015)).  It is "far from clear," however, "that there exists in this district a requirement that a class certified under Rule 23(b)(2) must

demonstrate ascertainability to merit certification." *Garcia Ramirez*, 338 F. Supp. 3d at 48. The requirement, moreover, "has been recently disavowed by four federal appellate courts," and "the D.C. Circuit has not opined on the requirement." *Hoyte v. District of Columbia*, 325 F.R.D. 485, 489 n.3 (D.D.C. 2017).

Out of an abundance of caution, the Court will assume for present purposes that such a requirement exists. *See id.* But even with that assumption, Defendants' argument fails. Where the ascertainability requirement exists for Rule 23(b)(2) classes, the proponents of class certification must demonstrate that "the general outlines of the members of the class are determinable at the outset of the litigation" without engaging in burdensome individualized determinations. *Brewer*, 2015 WL 13604257, at *5 (internal quotation omitted). The requirement, however, "is not designed to be . . . particularly stringent." *Id.*

The class members here are easily determined. The proposed class includes all asylum seekers who are subject to the Rule's categorical prohibition on asylum eligibility. It does not, as Defendants claim, include unknown and unidentifiable aliens who are outside the United States. Rather, aliens will only become members of the class *if and when* they enter the United States through the southern border without inspection. Nor is it at all unusual or improper for a Rule 23(b)(2) class to include future members. *See*, *e.g.*, *Garcia Ramirez*, 338 F. Supp. 3d at 49–50; *Abdi v. Duke*, 323 F.R.D. 131, 137–38 (W.D.N.Y. 2017); *R.I.L-R*, 80 F. Supp. 3d at 180; *Duprey v. Conn. Dep't of Motor Vehicles*, 191 F.R.D. 329, 338 (D. Conn. 2000). The proposed class in this case is defined by clear and objective criteria: If an asylum seeker crosses the southern border outside of a port of entry after November 9, 2018, he or she is a member of the class. That determination does not require complicated or individualized determinations—indeed, these

criteria are precisely the same ones Defendants would apply in enforcing the Rule.  That is sufficient.

*   *   *

The Court, accordingly, concludes that Plaintiffs have carried their burden of demonstrating that class treatment is warranted under Rule 23(b)(2).  The Court will enter a separate order certifying the proposed class, designating the individual plaintiffs as class representatives, and appointing Plaintiffs' counsel to serve as counsel for the class.

**CONCLUSION**

For the reasons set forth above, the Court will **GRANT** in part and **DENY** in part Plaintiffs' motions for summary judgment and class certification, Dkt. 51; Dkt. 52, and will **DENY** Defendants' cross-motion, Dkt. 66.  The Court will **DENY** as moot Plaintiffs' earlier-filed motions for temporary and preliminary injunctive relief, Dkt. 6; Mot. for Temp. Restraining Order, Dkt. 6, *S.M.S.R. et al. v. Trump et al.* (No. 18-2838).  A separate order consistent with this Memorandum Opinion will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  August 2, 2019